IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| In the Matter of the Arbitration of Certain Controversies between<br><br>SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,<br><br>Petitioner,<br><br>and<br><br>THE HELLENIC REPUBLIC,<br><br>Respondent. | Civil Action No. 1:13-cv-01070-GK |
| --- | --- |

**MOTION TO CONFIRM ARBITRATION AWARD AND TO ENTER JUDGMENT**

Petitioner, Leidos, Inc. (formerly Science Applications International Corporation) ("Leidos") hereby requests that this Court recognize the international arbitration award against the Hellenic Republic and enter judgment in Leidos' favor despite the set aside in Greece. The authority in support is set forth in the incorporated memorandum in support.

Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756

*Attorneys for Petitioner*
*Leidos, Inc.* (*formerly Science Applications International Corporation*)

Dated: September 8, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Arbitration of Certain Controversies between

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,

Petitioner,

and

THE HELLENIC REPUBLIC,

Respondent.

Civil Action No. 1:13-cv-01070-GK

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD AND TO ENTER JUDGMENT**

Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756

*Attorneys for Petitioner*
*Leidos, Inc.* (*formerly Science Applications International Corporation*)

Dated: September 8, 2014

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....... 1

PROCEDURAL BACKGROUND ....... 2

I. FOREIGN COURT JUDGMENTS THAT VIOLATE U.S. PUBLIC POLICY ARE NOT ENTITLED TO DEFERENCE ....... 3

A. The Courts Recognize Their Authority to Enforce Annulled Awards When The Annulling Judgment Violates U.S. Public Policy ....... 4

1. Federal circuit courts recognize a public policy ground to enforce foreign awards that are set aside by courts at the situs of the foreign arbitration ....... 4

2. Federal district courts utilize the public-policy doctrine to enforce annulled foreign arbitral awards ....... 5

B. The Judicial Standards Developed by United States Federal Courts to Ascertain whether an Annulled Foreign Award should Nevertheless be Enforced are Consistent with Both the Pro-Enforcement Policy of the New York Convention and the Doctrine of Comity ....... 8

II. THE GREEK COURT DECISION ANNULLING THE AWARD IS REPUGNANT TO U.S. PUBLIC POLICY ....... 11

A. The Athens Court's "Retrying" of the Hellenic Republic's Allegations of Corruption After Reevaluating the Same Evidence Presented in the Arbitration and Reaching Opposite Conclusions from the Final Award Violates U.S. Public Policy ....... 11

1. The Hellenic Republic lost after it had a full and fair opportunity to litigate its corruption allegations in the arbitration ....... 11

2. The Hellenic Republic's corruption allegations are a pretext to avoid paying Leidos because at the same time it has been condemning the C4I Contract as null and void it has also been relying on the Contract ....... 15

3. The Athens Court made no findings questioning or impugning the conduct of the arbitration ....... 16

4. The Athens Court made multiple conclusory findings of fact in direct contradiction to the well-reasoned findings of the Arbitral Award ....... 16

5. The Athens Court cannot stand in the shoes of the Tribunal—even assuming arguendo that the Arbitral Tribunal Made Mistakes in its findings of fact, that is not a valid basis to set aside the award ....... 23

6. The Athens Court of Appeals' set aside is the exact scenario that the public policy doctrine permitting enforcement is designed to

combat—one where a foreign state gains annulment from its own courts for its own pecuniary benefit........................................................23

B. Further, the Greek Court Decision Annulling the Award Violated U.S. Public Policy because in "Retrying" the Hellenic Republic's Allegations of Corruption, It Violated Greek Law that Limits the Scope of Review to the Findings of the Arbitral Tribunal....................................................................27

III. THE COURT SHOULD ENFORCE THE AWARD.......................................................29

A. The Greek Court Judgment of Annulment Is Invalid Under the *TermoRio-Baker Marine* Standard Because it Violated U.S. Public Policy...........................29

B. Enforcement of the Underlying Arbitral Award Is in Accordance with the Pro-Enforcement Policy of the New York Convention and the Principles of International Comity..........................................................................30

CONCLUSION..........................................................................................................31

REQUEST FOR ORAL HEARING.............................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ackermann v. Levine*,
288 F.2d 830 (2d Cir. 1986) ........ 4, 9, 26

**Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*,
191 F. 3d 194 (2d Cir. 1999) ........ passim

*Chromalloy Aeroservices, Inc v. The Arab Republic of Egypt*,
Court of Appeal, January 14, 1997, XXII Y.B. Com. Arb. 692 (1997) ........ 6

**Chromalloy Aeroservices, a Division of Chromalloy Gas Turbine Corp,, v. The Arab Republic of Egypt*,
939 F. Supp. 907 (D.D.C. 1996) ........ passim

**Corporación Mexicana de Mantenimiento Integral, S. De R.L de C.V (“COMMISA”) v. Pemex-Exploración y Producción (“Pemex”)*,
962 F. Supp. 2d 642 (S.D.N.Y. Aug. 27, 2013), *appeal docketed*, No. 13-4022 (2d Cir. Oct. 16, 2013) ........ passim

*Europcar Italia S.p.A. v. Maiellano Tours, Inc.*,
156 F.3d 310 (2d Cir. 1998) ........ 11, 30, 31

*Karaha Bodas Co v. Perusahaan*,
364 F.3d 274 (5th Cir. 2004) ........ 9, 30, 31

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) ........ 9, 30

*Société Hilmarton Ltd. v. Société OTV*,
Decision of 23 March 1994, XIX Y. B. Com. Arb. 665 (1994) ........ 8

*Société Polish Ocean Line v. Société Jolasry*,
Cour de Cassation, 10 March 1993 in XIX Y.B. Com. Arb. 662 (1994) ........ 8

*Spier v. Calzaturificio Tecnica, S.p.A.*,
71 F. Supp. 2d 279 (S.D.N.Y. 1999) ........ 8

*Tahan v. Hodgson*,
662 F.2d 862 (D.C. Cir. 1981) ........ 9

**TermoRio S.A. E.S.P. v. Electranta S.P.*,
487 F.3d 928 (D.C. Cir. 2007) ........ passim

*Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, No. 10-cv-5256, 2014 WL 476239, at *11 (S.D.N.Y. Feb. 6, 2014) ....................................24

**STATUTES**

9 U.S.C. § 207 ....................8

1958 New York Convention,
Article III ....................8
Article V ....................11, 31
Article V(1)(e) .................... passim
Article VI ....................8, 11

D.C. Code
§ 15-361 ....................10
§ 15-364(c) ....................10
§ 15-371 ....................10

**RULES AND REGULATIONS**

Restatement (Third) of the U.S. Law of Int'l Comm. Arb. § 4-16 (Tentative Draft No. 2, 2012) ....................10

**OTHER AUTHORITIES**

Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* ("Chamber of Commerce *Amicus* Brief"), No. 13-4022, *Corporación Mexicana de Mantenimiento Integral, S. De R.L de C.V v. Pemex-Exploración y Producción* (2d Cir. Apr. 18, 2014). ....................11, 25, 31

Christopher R. Drahozal, *Enforcing Vacated International Arbitration Awards: An Economic Approach*, 11 Am. Rev. Int'l Arb. 451, 469-70 (2000)) ....................26

Radu Lelutiu, *Managing Requests for Enforcement of Vacated Awards under the New York Convention*, 14 Am. Rev. Int'l Arb. 345 (2003)) ....................25

## **Introduction**

Leidos, Inc.'s Petition to Confirm its International Chamber of Commerce Arbitral Award against Respondent Hellenic Republic should be granted because the Athens Court decision to ignore the findings of the Arbitral Tribunal and set aside the award is repugnant to U.S. public policy and is Respondent's only defense to enforcement of the Award in the United States.

The sole basis upon which the Athens Court set aside the Arbitral Award is that the C4I Contract was tainted by the alleged corruption of Leidos' subcontractor Siemens. Throughout the various stages of the arbitration, the Hellenic Republic repeated this same argument. The Arbitral Tribunal, composed of three Greek nationals, thoroughly examined the corruption allegations by questioning witnesses, reviewing documentary evidence, and briefs under Greek law and in the Greek language. The Arbitral Tribunal analyzed and rejected the allegations in a reasoned Final Award. The Athens Court, without any analysis, simply adopted verbatim the arguments the Hellenic Republic had made and lost in the arbitration.

A few points demonstrate how the set-aside decision is particularly repugnant to U.S. public policy and how the Hellenic Republic's corruption allegations on which the decision is based are merely a pretext for the Hellenic Republic to avoid paying what it owes Leidos:

- The Hellenic Republic had not alleged, and the Athens Court did not find, abuse of discretion by the Arbitral Tribunal during the arbitration. Nevertheless, the Athens Court ignored and contradicted the Final Award's well-reasoned and express findings that there was no evidence that the execution of the C4I Contract or its Amendments were products of bribery or corruption.

- The Hellenic Republic raised corruption allegations to argue that the C4I Contract was void throughout the arbitration and enforcement action in order to avoid paying for large parts of the C4I System. At the same time, the Hellenic Republic relied on the validity of the very same C4I Contract and paid for C4I Services that it did want until the contract was concluded in mid-summer of this year.

- The Athens Court decision concludes without any support that Leidos chose Siemens as its subcontractor because it supposedly knew that Siemens would exert its alleged corrupt influence, but ignores the Arbitral Tribunal's finding and the Hellenic Republic's own admissions: (1) that Siemens was the subcontractor with the technical know-how to handle certain systems in the C4I Contract; and (2) thus it was necessary for Leidos to hire Siemens.

- As the Award found and as is undisputed, the Hellenic Republic knew of and was making corruption allegations against Siemens before it freely signed Modification No. 5 of the C4I Contract, on which the arbitration was based.

The deference to its Sovereign shown by the Athens Court must not prevent this Court from enforcing the Award at issue in this case. The standards adopted by United States courts establish this principle.

**Procedural Background**

Leidos, Inc. (formerly Science Applications International Corporation) ("Leidos") filed a Petition to Confirm Arbitration Award and Enter Judgment on July 12, 2013.[1] Respondent

[1] To avoid repetition, Leidos incorporates by reference the factual background in its Petition at ¶¶ 13-32 and Memorandum in Support at 4-9.

Hellenic Republic filed an action to set aside the international arbitral award in the Athens Court of Appeals on September 5, 2013 and then filed its opposition to the petition to confirm in this action on December 31, 2013 arguing for dismissal or stay of proceedings. After Petitioner's reply was filed on January 31, 2014, the parties filed a joint consent motion for stay, that this Court granted by order of March 28, 2014, staying proceedings pending the decision by the Athens Court of Appeals on the Hellenic Republic's set-aside request. With the Athens Court's set-aside decision or annulment judgment of June 18, 2014 (attached hereto as Exhibit 1), the stay in proceedings in this action expired and the parties filed a joint consent motion for briefing schedule that this Court granted dated July 14, 2014.

## I. FOREIGN COURT JUDGMENTS THAT VIOLATE U.S. PUBLIC POLICY ARE NOT ENTITLED TO DEFERENCE

U.S. courts are permitted to recognize and enforce an annulled foreign arbitral award when the foreign court decision setting it aside is repugnant to U.S. public policy. This imperative is recognized in judicial precedent and in approaches advanced by legal experts attempting to balance the New York Convention's pro-enforcement policy and the principles of international comity, and is well-supported among reputable experts in the international arbitration arena.[2]

---

[2] Professor George A. Bermann is a leading authority in the field of international arbitration and submitted a declaration in support of this motion. *See* Declaration of George A. Bermann ("Bermann Decl."), attached hereto as Exhibit 2. Professor Bermann is in his thirty-ninth year as a professor at Columbia Law School, President of the Board of Advisers of the New York International Arbitration Center (NYIAC), Director of the American Arbitration Association (AAA), a member of the Academic Council of the Institute for Transnational Arbitration (ITA), and the Chief Reporter of The American Law Institute's ongoing Restatement (Third) of the U.S. Law of International Commercial Arbitration, and has held other prominent roles in the field of international arbitration and international comparative law. *See id*. ¶¶ 4-10 and Exhibit A (curriculum *vitae*). Professor Bermann's Declaration is submitted in support of Leidos' motion and contains an analysis of the legal and scholarly authority governing the issue of whether courts should enforce a set aside arbitral award, and reaches the conclusion that this case

*{footnote continued}*

### A. The Courts Recognize Their Authority to Enforce Annulled Awards When The Annulling Judgment Violates U.S. Public Policy

The circuit courts dealing with this issue have unanimously recognized a public policy doctrine that permits the enforcement of set aside arbitral awards. *See* Bermann Decl. ¶¶ 19, 23, 25-28, 30-37 (noting the cases dealing with the enforceability of a foreign arbitral award despite its annulment by a competent court of the place of arbitration, and their recognition and application of the public policy doctrine to determine whether to enforce such an award). The district courts, which have original jurisdiction in these cases, have utilized this exception to enforce awards, in situations like this one, where the annulment decision violates U.S. public policy.

#### 1. *Federal circuit courts recognize a public policy ground to enforce foreign awards that are set aside by courts at the situs of the foreign arbitration*

In the D.C. Circuit, an annulment decision is "unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (quoting *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986)). Thus, deferral to a judgment of annulment is not warranted if doing so would violate "basic notions of justice to which we subscribe." *Id.* at 939; *see also* Bermann Decl. ¶¶ 31-35 (setting forth the D.C. Circuit's rationale for failure to utilize the public policy doctrine to enforce an annulled award and agreeing with the conclusion). This limitation was also recognized by the Second Circuit. *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 & n.3 (2d Cir. 1999) (affirming district court's refusal to enforce a vacated award because "[r]ecognition of the

---

*{continued from previous page}*
represents the exact instance where public policy grounds mandate a court to exercise its discretion to enforce despite the Greek court's set aside. *See generally id.*

Nigerian judgment in this case does not conflict with United States public policy."); *see also* Berman Decl. ¶¶ 27-29 (setting forth the Second Circuit's rationale in declining to enforce an annulled award based on the public policy doctrine and agreeing with the conclusion).

2. *Federal district courts utilize the public-policy doctrine to enforce annulled foreign arbitral awards*

District courts, including this Court, have enforced annulled arbitral awards when the annulment decision violates fundamental U.S. public policy.

In the first district court case to address the issue, *Chromalloy Aeroservices, a Division of Chromalloy Gas Turbine Corp*, *v. Arab Republic of Egypt*, 939 F. Supp. 907 (D.D.C. 1996), this Court recognized and enforced a foreign arbitral award that had been set aside by the Egyptian Court of Appeal at Cairo. The ground for set aside was that the tribunal's decision was based on a mistake of substantive Egyptian law. *Id.* at 911. In recognizing and enforcing the arbitral award in *Chromalloy*, this Court noted that the "requirements for enforcement of a foreign judgment . . . are that . . . the original claim not violate U.S. public policy." *Id*. at 913 (internal quotation and citation omitted). Utilizing the public policy doctrine to refuse to recognize a foreign judgment (in *Chromalloy*, a judgment of set aside), cautioned the Court, is to be undertaken "advisedly [and] with a full understanding that, '[J]udges have no license to impose their own brand of justice in determining applicable public policy.'" *Id*. (citation omitted).

The *Chromalloy* Court determined that "[t]he U.S. public policy in favor of final and binding arbitration of commercial disputes is unmistakable, and supported by treaty, by statute, and by case law" and that "an 'emphatic federal policy [exists] in favor of arbitral dispute resolution[s], particularly in the field of international commerce.'" *Id*. (quoting *Mitsubishi v. Soler Chrysler-Plymouth*, 473 U.S. 614, 631 (1985)). Balancing that "emphatic" public policy

against the interests of international comity, the *Chromalloy* court found that the Egyptian court's judgment setting aside the award adverse to the Egyptian government violated the "U.S. public policy in favor of final and binding arbitration" and enforced the valid, underlying arbitral award. *See id*. at 913-15.[3]

The public policy rationale in support of enforcement under *Chromalloy* remains good law. *See TermoRio,* 487 F.3d at 938; *see also Baker Marine*, 191 F. 3d at 197 & n.3; *Corporación Mexicana de Mantenimiento Integral, S. De R.L de C.V ("COMMISA") v. Pemex-Exploración y Producción ("Pemex"),* 962 F. Supp. 2d 642, 656-57 (S.D.N.Y. 2013), *appeal docketed*, No. 13-4022 (2d Cir. Oct. 16, 2013) (recognizing that *Chromalloy* remains good law for both "*Baker Marine* and *TermoRio* recognized that a district court should hesitate to defer to a judgment of nullification that conflicts with fundamental notions of fairness.") Professor Bermann encapsulates the vitality of the *Chromalloy* public policy rationale as follows: "if a judgment of annulment by a foreign court is truly lacking in integrity or is otherwise illegitimate, it would offend U.S. public policy to deny enforcement of the award on the basis of that annulment." *See* Bermann Decl. ¶¶ 24-25.

The U.S. District Court for the Southern District of New York recently confirmed an annulled foreign arbitral award under the public policy doctrine. *See Pemex*, 962 F. Supp. 2d at 644, 657, 661. Applying the D.C. Circuit's standard in *TermoRio*, the *Pemex* court found that the nullification of the award violated "basic notions of justice." *See id*. On December 1, 2004, COMMISA demanded arbitration to resolve a dispute with the Mexican state-owned oil company, Pemex, that arose under contracts for COMMISA to build and install offshore natural

[3] The French Court of Appeals also recognized the same award that this Court recognized in *Chromalloy*. *See Chromalloy Aeroservices, Inc. v. The Arab Republic of Egypt*, Court of Appeal, January 14, 1997, XXII Y.B. Com. Arb. 691, 692-693 (1997).

gas platforms in the Gulf of Mexico. *Id*. at 644-46. The arbitral panel issued a preliminary award against Pemex in November 2006. *Id*. at 647. Before rendering its final decision, the panel presided over an evidentiary hearing from November 27, 2007 to December 5, 2007. *Id*. at 648. After the adverse preliminary award, and after that final hearing, the Mexican government passed a statute that mandated that "issues of compliance with the requirements of public contracts" be subject to litigation in a special court and *not* arbitration. *Id*. at 647.

The panel issued its final award, against Pemex, on December 16, 2009. *Pemex*, 962 F. Supp. 2d at 648. Pemex then filed a suit in the Mexican courts to set aside, or annul, the award. *Id*. at 649-51. The Mexican courts relied on the new statutory prohibition against arbitration of disputes related to public contracts to annul the award against Pemex. *Id*. at 650-51. The U.S. District Court held that the Mexican court's "retroactive application of laws and the unfairness associated with such application" violated U.S. public policy, and was particularly concerned because the retroactive application "favor[ed] a state enterprise over a private party." *Id*. at 659-61. The *Pemex* court therefore confirmed the underlying arbitral award because its annulment offended "basic notions of justice." *Id*. at 661; *see also* Bermann Decl. ¶¶ 25-26 (finding the *Pemex* court's concern that the foreign court's "retroactive application of [the law] was undertaken to favor a state enterprise over a private party" to be "especially pertinent to the present case.")

As *TermoRio*, *Baker Marine*, *Chromalloy*, and *Pemex* make clear, a public policy doctrine exists that affords district courts discretion to enforce an annulled award when justice and U.S. public policy so demand. This recognized exception is consistent with the pro-enforcement policy of the New York Convention and the doctrine of international comity.

### B. The Judicial Standards Developed by United States Federal Courts to Ascertain whether an Annulled Foreign Award should Nevertheless be Enforced are Consistent with Both the Pro-Enforcement Policy of the New York Convention and the Doctrine of Comity[4]

The New York Convention as implemented by the Federal Arbitration Act authorizes the courts to confirm foreign arbitral awards, and heavily favors enforcement. *See* 9 U.S.C. § 207. Under the Convention, courts "*shall*" confirm the award except in certain circumstances. New York Convention, Art. III, V(1)(e), VI (emphasis added). One exception to the mandatory enforcement of international arbitral awards is that "[r]ecognition and enforcement of the award *may* be refused" if it was "set aside . . . by a competent authority of the country in which, or under the law of which, that award was made." New York Convention, Art. III, V(1)(e) (emphasis added). This exception is permissive, and affords the enforcing court discretion to enforce an annulled award. *See TermoRio*, 487 F.3d at 933 ("enforcement of awards '*may be refused*' if, *inter alia*, they were set aside by a competent authority in the country in which the award was made."); *Chromalloy*, 939 F. Supp. at 909; *Baker Marine*, 191 F.3d at 197; *see also Spier v. Calzaturificio Tecnica, S.p.A.*, 71 F. Supp. 2d 279, 286-87 (S.D.N.Y. 1999); Bermann Decl. ¶¶ 17-19, 77.

---

[4] These standards also are consistent with foreign courts' decisions to enforce annulled awards when the annulment decisions violate those countries' public policy. *See, e.g.*, *Société Hilmarton Ltd. v. Société OTV*, Decision of 23 March 1994, XX Y. B. Com. Arb. 663, 664 (1994) (Recognizing an annulled award because "the award rendered in Switzerland is an international award which is not integrated in the legal system of that State, so that it remains in existence even if set aside and its recognition in France is not contrary to international public policy."); *Société Polish Ocean Line v. Société Jolasry*, Cour de Cassation, 10 March 1993 in XIX Y.B. Com. Arb. 662, 662 (1994) ("[A] French court may not deny an application for leave to enforce an arbitral award which was set aside or suspended by a competent authority in the country in which the award was rendered, if the grounds for opposing enforcement, although mentioned in Art. V(1)(e) of the 1958 New York Convention, are not among the grounds specified in [French law].").

"Defenses to enforcement under the New York Convention [including on the grounds of set aside] are construed narrowly, 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts . . . .'" *Karaha Bodas Co. v. Perusahaan*, 364 F.3d 274, 288 (5th Cir. 2004) (citations omitted).  As such, courts should not utilize their discretion to refuse enforcement of an annulled award when the set-aside judgment violates U.S. public policy.  *See TermoRio*, 487 F.3d at 939 (deferral to a set-aside judgment is not warranted if its recognition would violate the "basic notions of justice"); *see also Baker Marine*, 191 F.3d at 197 & n.3 (distinguishing *Chromalloy* because the "recognition of the Nigerian judgment in this case does not conflict with United States public policy"); Bermann Decl. ¶¶ 27-29, 43-51 (reciting instances in case law and in learned treaties where courts should hesitate to recognized judgments of set aside when they violate U.S. public policy).

The principles of international comity do not change this analysis.  "No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."  *Chromalloy*, 939 F. Supp. at 913 (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984)).  In fact, "comity never obligates a national forum to ignore 'the rights of its own citizens or of other persons who are under the protection of its laws.'"  *Laker Airways*, 731 F.2d at 943 (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).  Thus, a district court may refuse to recognize a foreign judgment that is "repugnant to fundamental notions of what is decent and just" in the United States.  *Ackerman*, 788 F.2d at 841; *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (citing Restatement (Second) of Conflict of Laws § 117, comment c (1971)); *see also TermoRio*, 487 F.3d at 939 (citation omitted).

The Restatement (Third) of the U.S. Law of International Commercial Arbitration[5] also acknowledges that principles of international comity do not require the blanket acceptance of foreign judgments by U.S. courts. Bermann Decl. ¶¶ 44-46. The Restatement (Third) applies the Uniform Foreign-Country Money Judgment Recognition Act ("UFCMJRA") to reach the same conclusion as the aforementioned jurisprudence on international comity—that courts can refuse to recognize set-aside judgments on U.S. public policy grounds, and adds to the general standards for denying recognition of foreign judgments the circumstance in which "the set-aside court knowingly and egregiously departed from the rules governing set-aside in that jurisdiction [or] when other facts give rise to substantial and justifiable doubts about the integrity or independence of the foreign court with respect to the judgment in question."[6] Bermann Decl. ¶¶ 44-45. Under the Restatement's theory, "a judgment of set-aside is, after all, a judgment " subject to the application of the principles codified in the UFCMJRA. Restatement (Third) of the U.S. Law of Int'l Comm. Arb. § 4-16 (Tentative Draft No. 2, 2012) at Reporters' Notes; *see also* Bermann Decl. at Exhibit B (the Restatement). The D.C. Recognition Act provides that "[a] court of the District of Columbia need not recognize a foreign-country judgment, if the . . . [j]udgment . . . is repugnant to the public policy of the District of Columbia or of the United States." D.C. Code § 15-364(c). Thus, this Court can consider and refuse to recognize the Greek court's annulment decision if it is repugnant to U.S. public policy under the principles codified in the D.C. Recognition Act . *See Restatement* § 4-16 ; *see also* Bermann Decl. ¶¶ 19-20, 44-45.[7]

---

[5] This section of the Restatement (Third), for which Professor Bermann is the chief reporter, has been approved and is awaiting publication. *See* Bermann Decl. ¶ 44 & n.45.

[6] The District of Columbia codified the UFCMJRA at D.C. Code §§ 15-361 to 15-371 (the "D.C. Recognition Act").

[7] The U.S. Chamber of Commerce provides another approach to aid courts in balancing the tension between the pro-enforcement policy of the New York Convention and the doctrine of

*{footnote continued}*

As discussed below—whether this Court applies the recognized judicial exception or the approach of the Restatement—the outcome is the same.  The arbitral award against the Hellenic Republic should be recognized and enforced because the Greek Court's annulment decision is repugnant to U.S. public policy.

## II.    THE GREEK COURT DECISION ANNULLING THE AWARD IS REPUGNANT TO U.S. PUBLIC POLICY

### A.    The Athens Court's "Retrying" of the Hellenic Republic's Allegations of Corruption After Reevaluating the Same Evidence Presented in the Arbitration and Reaching Opposite Conclusions from the Final Award Violates U.S. Public Policy

#### 1.    *The Hellenic Republic lost after it had a full and fair opportunity to litigate its corruption allegations in the arbitration*

The Hellenic Republic raised ***three times*** corruption allegations in the arbitration and argued that the C4I Contract was null and void or that the arbitration should be stayed, and each time the Tribunal—composed of three Greek arbitrators—fully explored and analyzed in detail

---

*{continued from previous page}*
international comity.  It advocates that a court should utilize the factors set forth in *Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316 (2d Cir. 1998) to determine whether it should exercise discretion under Article V of the New York Convention.  *See* Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* ("Chamber of Commerce *Amicus* Brief"), No. 13-4022, *Corporación Mexicana de Mantenimiento Integral, S. De R.L de C.V v. Pemex-Exploración y Producción* (2d Cir. Apr. 18, 2014).  Although *Europcar* analyzes when a court should exercise its discretion under Article VI of the New York Convention, its factors to balance competing interests can help guide courts in determining whether to exercise discretion under Article V(1)(e) because both Article VI and Article V: (1) prescribe criteria for when a court can exercise its discretion and refuse enforcement of a foreign arbitral award and (2) relate to circumstances surrounding set-aside proceedings in a foreign jurisdiction.  *Compare* New York Convention Art. V(1)(e) *with* New York Convention Article VI.  Thus, the guidance provided in *Europcar* analyzing Article VI cases is also persuasive in Article V(1)(e) cases.  *See* Chamber of Commerce *Amicus* Brief at 11-14.  A balancing of the *Europcar* factors supports recognition and enforcement of an annulled award when the set-aside judgment violates U.S. public policy, *see id.* at 22-26, and harmonizes existing case law on the scope of the public policy doctrine, *id*. at 18-22.  For a listing and discussion of how applying the *Europcar* factors to this case supports the Court exercising its discretion to enforce the annulled award, see *infra* footnote 11.

the Hellenic Republic's arguments and rejected them. The Hellenic Republic raised these allegations a ***fourth time*** before its own state court and finally received the result denied it by the impartial tribunal—the Athens Court of Appeals set aside the award.

The Hellenic Republic had a full and fair opportunity to present its corruption allegations during proceedings that spanned over four years — from June 2009 to July 2013. These allegations were heard and considered by a tribunal composed of distinguished Greek jurists—two reputable attorneys and a distinguished retired justice. Grigorios J. Timagenis, the founding and senior partner of the Timagenis Law Firm, served as Chairman of the Tribunal. The Timagenis Law Firm is a well-respected maritime and commercial law firm located in Piraeus, Greece. Mr. Timagenis was appointed by the International Chamber of Commerce's (ICC) International Court of Arbitration, based in Paris, which administered the arbitration. The Hellenic Republic selected a Hellenic Republic attorney, Styliani Charitaki, to serve as its party arbitrator. Ms. Charitaki is a member of the Legal Council of State of the Hellenic Republic, the same institution as the Hellenic Republic's counsel in the arbitration. The Honorable Dionysios G. Kondylis, a retired justice and honorary member of the Supreme Court of the Hellenic Republic, served as the Leidos party arbitrator. The Hellenic Republic took full advantage of every opportunity to present its claims of corruption to this highly experienced Tribunal and the Tribunal considered them fully.

The Hellenic Republic *first* presented its corruption allegations to the Tribunal by way of a procedural motion. The Hellenic Republic sought to dismiss Leidos' demand for arbitration, or in the alternative to stay, and to void the arbitration clause in the C4I Contract, because the Hellenic Republic alleged the contract was invalidly procured through corrupt means. The Tribunal permitted both parties to brief the issues and conducted a hearing on December 17,

2010. On July 21, 2011, the Tribunal issued an Interim Award, *inter alia*, denying the Hellenic Republic's motion. With respect to the corruption allegations, the Tribunal stated that there was no evidence that Petitioner had any involvement in alleged bribes by Siemens:

> Given the above, the Arbitral Tribunal cannot justify acceptance of the request for suspension of the arbitration until the closing of the criminal proceedings (which, as it can be deduced from the evidence, is at the outset), specifically in the context of the arbitration which requires speedy proceedings, and furthermore since ***there is no evidence that the party in these proceedings, i.e. SAIC, had any participation in the alleged payments of bribes on behalf of Siemens***. Therefore, the relevant request of the Respondent must be dismissed. However if, during the process of the case, new evidence arises which may justify any suspension for a specific, reasonable period of time, a new relevant request may be re-submitted.

Declaration of Ivan Bilaniuk ("Bilaniuk Decl.") (attached hereto as Exhibit 3, Ex. A, Interim Award at 33 (emphasis added).

The Hellenic Republic presented its corruption allegations to the Tribunal a *second time* when it renewed its procedural motion to dismiss for corruption in its Statement of Defense, filed in response to Petitioner's claim for arbitration in the case on the merits. Notably, the corruption allegations in the Hellenic Republic's Statement of Defense were recited *verbatim* in its set-aside petition to the Athens Court of Appeals. *See* Declaration of Epameinondas Lambadarios in support of Leidos' Reply to Opposition to Petition to Enforce, ¶ 8 (noting that the Hellenic Republic's September 2013 annulment petition from pages 14-30 contained verbatim the corruption allegations on pages 27-42 of the Hellenic Republic's Statement of Defense from the arbitration).

The Hellenic Republic raised its allegations of corruption before the Tribunal a *third time* during an eight-day hearing on the merits in May 2012. During the hearing, the Tribunal received the testimony of witnesses and the arguments of counsel. Then, after considering the

Hellenic Republic's motions to dismiss for corruption, and the extensive evidence introduced during the merits hearing, the Tribunal denied the motions to dismiss for corruption in a well-reasoned and extensive section of the Final Award. Specifically, the Tribunal found that the Hellenic Republic had not satisfied its burden of proving that there was any bribery or corruption to the signing of the C4I Contract and particularly Modification No. 5 over which the parties arbitrated, or that Leidos knew or had constructive knowledge of any bribery or corruption:

> ***The final conclusion is*** […] there existed bribery or other act of corruption which caused (in other words has a causal link to) the signing of the Contract or its modifications and particularly the important 5th Amendment and that nonetheless that the Claimant knew or was obligated to know something regarding this matter ***not proven*** and indeed not to the degree of full proof.

Final Award ¶ 112 (emphasis added). In other words, the Tribunal rejected the Hellenic Republic's claims both that Leidos engaged in or knew of <u>any</u> corrupt behavior and that the C4I Contract was tainted by any Siemens corruption.

Because the Hellenic Republic failed in proving corruption after being given a full and fair opportunity to present its claims to the Tribunal, over the course of four years, the Hellenic Republic needed to litigate those same allegations a *fourth time* in a more favorable forum—the State's own Athens Court of Appeals. The Hellenic Republic's petition for annulment constitutes a regurgitation of the exact same allegations of corruption thrice raised before and rejected by the Tribunal. This time the claims fell on favorable ears. However, in setting aside the arbitral award against the Hellenic Republic, the Athens Court of Appeals blatantly disregarded the Tribunal's findings and issued its own opinion, devoid of <u>any</u> support in the arbitral award, that the C4I Contract was tainted by corruption. In particular, the court concluded, without support, that: (1) SAIC (now Leidos) selected Siemens as a subcontractor because Siemens "was in a position to influence …Greek politicians and public officials for the

assignment of the C4I project to [SAIC];" and (2) that Siemens actually did so.  *See* Annulment

Judgment at 21.  Both conclusions by the Athens Court were not only unsupported, but also

directly opposite to the well-reasoned conclusions of the Tribunal in the Final Award as

explained *infra* at Section II.A.3.  The Athens Court nevertheless ruled that the "disputed

domestic international arbitral award is in manifest, actual and specific contrast to the notion of

public order [and] . . . must be annulled," *id*. at 25.  It is with this conclusion that the Hellenic

Republic's fourth bite at the apple finally satisfied its hunger to avoid payment of the amount it

owed to Leidos for work performed and benefits received under the C4I Contract.

The Hellenic Republic's refusal to honor its contractual commitment for final and

binding resolution of its disputes with Leidos paid off, but the Court of Appeals' decision

violates United States public policy because it twists and overturns the findings of facts and

conclusions of law of the Tribunal to serve the pecuniary interests of its sovereign.

2. *The Hellenic Republic's corruption allegations are a pretext to avoid paying Leidos because at the same time it has been condemning the C4I Contract as null and void it has also been relying on the Contract*

The Hellenic Republic's contradictory treatment of the C4I Contract demonstrates that its

corruption allegations are a mere pretext and litigation tactic to avoid paying Leidos what it owes

under the Contract.  The Hellenic Republic raised the corruption allegations arguing that the C4I

Contract was null and void because it was tainted by corruption throughout the arbitration and to

oppose enforcement of the Award.  At the same, however, while the arbitration had been

underway and while post-award proceedings have been pending, the Hellenic Republic has taken

the contradictory position in which it has been relying on the validity and enforceability of the

very same C4I Contract.  The ten-year term of the part of the C4I Contract concerning

communications services for the Hellenic Republic's Fire Brigade, Coast Guard, and Ambulance

Service ended this summer on July 31, 2014.  The Hellenic Republic needed these services and

so it has had no issue relying on the C4I Contract for these services and paying for these services that Leidos and its subcontractor Siemens provided—the subcontractor that the Hellenic Republic alleged and the Athens Court found was responsible for the supposed corruption on which the set aside is based.

3.  *The Athens Court made no findings questioning or impugning the conduct of the arbitration*

The Athens Court of Appeals in its set-aside decision did not conclude that the Arbitral Tribunal had abused its discretion.  It made no findings or mention of any irregularities or other infringement of fundamental procedural rights by the Tribunal.  Nevertheless, the Athens Court ignored the Tribunal's extensive findings of fact from paragraphs 95-112 set forth on pages 71 to 85 of the Final Award in its set-aside decision.

4.  *The Athens Court made multiple conclusory findings of fact in direct contradiction to the well-reasoned findings of the Arbitral Award*

The Athens Court ignored the Tribunal's express findings that:  (a) Siemens was not a party to the C4I Contract and did not act as Leidos' intermediary; (b) there is no evidence that the execution of the C4I Contract  or its Amendments were products of bribery by Siemens or products of corruption; and (c) the Settlement Agreement between Siemens and the Hellenic Republic does not contain an admission regarding bribery on behalf of Siemens employees for the execution of the C4I Agreement nor for the Amendments.  Final Award ¶ 113.

The Athens Court also ignored the Tribunal's express conclusion that the Hellenic Republic failed to make out its case:

> Additionally not only was there no proof regarding that the Claimant (as the contracting party with the Respondent) committed acts of bribery or other corruption or was aware of such actions by Siemens or that it was obligated to be aware of them at the time of assumption of the Contract but to the contrary the Arbitral Tribunal had at its disposal evidence, which was provided by the Respondent and which strongly suggests, if not fully proves, that

> the Claimant was neither involved with or had knowledge of the illegal activities of Siemens. Whereas knowledge or the obligation of knowledge of the Claimant of acts of corruption by its subcontractor Siemens is a basic requirement for the invalidity or otherwise voidability of the Contract between the Claimant and the Respondent. It should be noted that both for corruption on the part of the Claimant as well as for knowledge of possible corruption on the part of Siemens, the burden of proof lies with the Respondent.

*Id.* ¶ 134.

The Athens Court of Appeals ***ignored*** these express Tribunal findings of fact; considered the ***very same*** allegations and evidence; and came to the ***opposite*** conclusion—finding that the C4I Contract was the result of bribery of Greek officials. The Athens Court did so without any analysis or explanation. The Court's predicate for it was a regurgitation of the Hellenic Republic's pleadings, which in turn were identical to the Hellenic Republic's briefings to the Tribunal. For example, the Athens Court found, contrary to the Tribunal, that "SIEMENS SA actively participated not only in the execution of the contract but also in the negotiations for the assignment of the project to the cla[i]mant." Annulment Judgment at 15.

The Athens Court of Appeals also found, without support and contrary to the Tribunal, that Leidos chose Siemens as a subcontractor so that Siemens could corruptly influence Greek politicians and public officials to award the C4I Project to Leidos. The Athens Court finding was based merely on its assertion that Leidos knew Siemens had a dominant position within the Greek public procurement sector. *Id.* at 21. This finding concerning why Leidos hired Siemens is particularly offensive not only because it is wholly unsupported but because it ignores the findings of the Tribunal and admissions by the Hellenic Republic's Parliament that Leidos needed to hire Siemens as a subcontractor because of Siemens' technical know how to handle certain systems in the C4I Contract:

> Here and in connection with the defenses of invalidity or otherwise voidability it must be emphasized that crucial to the signing of the Contract are: (i) the ministerial meeting which convened on July 16, 2002 presided over by the then Prime Minister (with the participation of six competent ministers and deputy ministers and the Secretary General of the Olympic Games) ***where it was decided*** that the awarding of the project for the security of the Olympic Games be made via the process of negotiations with "a limited list of companies" and ***for the platform for the four-channel wireless communication system (TETRA) to be also included in the same tender, something which according to the findings of Parliament necessitated the participation of Siemens as a subcontractor (See Parliamentary Findings p. 124)*** and (ii) the KYSEA Decision dated February 27, 2003 for the selection of SAIC as preferred contractor (Parliamentary Findings p. 127).

Final Award ¶ 97 (emphasis added).

The Athens Court set-aside decision recounted, throughout the opinion, the acts of Siemens and proceedings in Germany regarding Siemens and Siemens officers. Notably, the Athens Court made no reference to acts by Leidos or Leidos officers, and ignored the detailed analysis and findings of the Tribunal that the Hellenic Republic had failed to establish a nexus between Siemens' activities and either Leidos or the C4I Contract. For example, the Athens Court decision borrowed from the Hellenic Republic's brief in citing to testimony in Munich Court proceedings by a Siemens employee, R. Siekaczek, about certain payments recorded by Siemens as related to the C4I Contract.

The Athens Court completely ignored the Final Award's extensive quoting of this Siekaczek Siemens employee testimony, and the Tribunal's final analysis and conclusion that this testimony did **not** constitute evidence that any illicit payments were connected to the C4I Contract. Siekaczek testified in the Munich proceedings, in response to a direct question by the Judge, that the payments were only recorded as relating to consulting for the C4I Project because the C4I was a large project and it would look plausible and that these were "simply fabrications."

*Id.* ¶ 101.  Clearly, the Tribunal "did its homework."  To the contrary, the Athens Court was simply result-oriented.

The Athens Court also ignored the Tribunal's compelling analysis of how the timeline of events did not support the allegations of bribery in connection to the C4I Contract.  Notably, the Tribunal found that the Hellenic Republic was well aware of the Siemens corruption allegations before it signed Modification No. 5 of the C4I Contract with Petitioner in March 2007, and so the Hellenic Republic could not meet its burden to demonstrate that Modification No. 5, over which the parties litigated in the arbitration, was tainted by any bribery or corruption:

> while at the time of assumption of the important 5th Amendment (March 2007) not only is an act of corruption (namely bribery) not proven but it appears as certain that no such act existed as it appears that Siemens had stopped this practice as of October of 2005 (See Debevoise Memorandum p. 25) ***and in any event in 2006 and 2007 the scandal had already been uncovered***, an internal investigation at Siemens was already underway, Siekaczek had left Siemens and ***Prosecution summons had already been issued in Greece.***

*Id.* ¶ 111 (emphasis added).

This finding of the Arbitral Tribunal about timing of events is significant because it demonstrates how repugnant to U.S. public policy the annulment decision is.  The Hellenic Republic knew at the time that it spent months negotiating and then signed Modification No. 5 about Siemens corruption allegations, but it still signed the major modification anyway.  Modification No. 5 altered the parties' obligations, set forth new requirements for updates to parts of the C4I System and agreed-upon acceptance of other parts of the System, and provided for a nineteen-month period of performance.  *Id.* ¶ 138.  It is these provisions from Modification No. 5 that were at issue in the arbitration.  Thus, despite the knowledge of the Siemens corruption allegations, and despite possessing some of the evidence it submitted in the arbitration

and in the annulment action, the Hellenic Republic executed the modification, accepted its revised obligations, and received the newly contracted-for services from Leidos.  The Hellenic Republic only raised the corruption allegations when it refused to honor its acceptance and payment obligations, after Leidos delivered its contractual obligations under Modification No. 5, after the Government's own acceptance committee unanimously accepted the System in accordance with the Contract (*see id.* ¶ 177), and after Petitioner filed for arbitration.  The Hellenic Republic cannot now rely on the allegations of corruption—with no nexus proven either to Petitioner or the C4I Contract—to excuse its non-performance.  To do so is repugnant to U.S. public policy because it would permit an informed contracting party to renege on its contractual obligations, because that party essentially changed its mind about a known circumstance.  Such a result violates the "fundamental notions of what is decent and just."  *See TermoRio*, 487 F.3d at 938.

The Athens Court ignored the Tribunal's ruling rejecting the Hellenic Republic's allegations that the contract price of the project had been inflated by 10% to provide funds for Siemens to purportedly bribe and found the opposite.  *See* Annulment Judgment at 20-21.  The Award found the Hellenic Republic's allegations of augmenting the contract price by 10% to cover the cost of bribery baseless because, *inter alia*, Leidos had actually reduced its price from its first offer to €376 M to €255 M:

> Characteristically, according to the specifics presented above, due to the onset of the Olympic Games under urgent conditions three companies were invited to express interest.  ***Two submitted offers of a similar amount (SAIC 376,037,958 Euro*** and TRS 398,510,675 Euro).  ***Neither was accepted, negotiations followed, the Claimant was selected as the preferred contractor and following negotiations it reduced its offer to 254,999,000 Euro, which was agreed upon***.  All of this occurred subsequent to decisions made by all of the qualified and multistaffed bodies at the highest level under the then Prime Minister.  ***This series of***

> ***events does not justify bribery and indeed augmenting of the price to cover the cost of bribery as the Respondent claims.***

Final Award ¶ 138 (emphasis added).

The Athens Court also ignored the Award's ruling rejecting the Hellenic Republic's argument that the C4I Contract was void due to fraud because the Petitioner had signed the contract to deliver the C4I System in twelve months yet it took five years and found the opposite. *See* Annulment Judgment at 15, 22-23. The Tribunal made detailed and comprehensive findings the Athens Court contradicted with its conclusory finding. The Tribunal concluded the fraud allegations were baseless, *inter alia*, because the Hellenic Republic had not proven that officials from Petitioner had knowledge that it "did not have the capability to deliver the project on time." It also concluded that the fraud allegations were baseless because the Hellenic Republic had not proven that officials from the Hellenic Republic thought the entire project would be delivered within twelve months and provided a detailed rationale including the fact that the Hellenic Republic had already admitted that completion of the project was due to "objective inability" and that it itself shared in the blame:

> the timeframes were "incredibly tight," as the witness Polymenopoulos testified to the Parliamentary Investigative Committee (See p. 127 of the Minutes). They were however interested in at least the partial completion of the project within the contractual deadline, so that the Olympic Games could be safely conducted. Since only three companies were invited to submit offers and only two did, the provision would be awarded (necessarily) to one of these two, because there no longer was any time for the Respondent to approach another company. It is not evident that the other co candidate company, TRS, had greater capabilities than SAIC to deliver the project in "turnkey" condition within 12 months. The possibility for the project not to be completed within 12 months, regardless to which of the two companies who submitted bids it was awarded, must, according to the principle of common sense, have been obvious to the competent officers of the Respondent. ***It must further be noted that, as presented by the 7.7.2004 'Memorandum of Agreement'***

> ***the Respondent stated, that the non timely completion of the Contract is due to objective inability and to joint responsibility of themselves and of the Claimant***, that it subsequently temporarily accepted for use during the Olympic Games, certain security systems, and that upon the conclusion of the games (when there was no longer any pressure) it accepted that the Claimant continue the execution of the project and finally it assumed on March 29, 2007 (i.e. at a time when the criminal proceeding in Germany had been instituted and indeed Siekaczek had already testified) the 5th Amendment, with which the Contract was revised and a new deadline of 65 months from the activation of the Contract was provided for the completion and delivery of the project. ***In light of the above, it cannot be accepted that there is evidence capable of creating judicial certainty that fraud was committed by the Claimant (or by Siemens, which moreover does not appear to have ever negotiated with the Respondent, so as to defraud its competent bodies responsible for the signing of the Contract).***

Final Award ¶ 115 (emphasis added).

Another example of the Athens Court's ruling contrary to the Award concerns the evidentiary value of the Settlement Agreement between Siemens and the Hellenic Republic. The Tribunal analyzed the scope of the Settlement Agreement and concluded about Siemens' apology in the Settlement Agreement, "[t]his statement however, though it clearly refers to improper behavior, does not constitute . . . a confession of bribery and in any event cannot be used as a fact which proves bribery or other corruption ***in the specific case of the assumption of the Contract for the C4I or its fulfillment.***" Final Award ¶ 87 (emphasis added); *see also id.* ¶ 113. The Athens Court, however, focused on the Tribunal's finding that it referred to "improper behavior" by Siemens and found this evidence supported setting aside the Award for the C4I Contract even though the Tribunal, in the same sentence, found no connection between the "improper behavior" which Siemens referenced and Leidos or the C4I Contract. *See* Annulment Judgment at 23-24.

The Athens Court's findings, in direct contradiction to the well-reasoned findings of the Arbitral Award, would be repugnant to U.S. public policy even if the Court would have provided a rationale.  But, it is notable that the Athens Court did not even bother to support its findings directly with any analysis or explanation and used as its predicate the regurgitation of the Hellenic Republic pleadings, which in turn were identical to the Hellenic Republic's briefings to the Tribunal.

     5.    *The Athens Court cannot stand in the shoes of the Tribunal—even assuming* arguendo *that the Arbitral Tribunal Made Mistakes in its findings of fact, that is not a valid basis to set aside the award*

The Athens Court tries to cloak its decision as one falling within the enumerated grounds for annulment in the New York Convention—that the decision was against international public policy.  But, the Arbitral Tribunal had already adjudicated the Hellenic Republic's allegations of corruption and evaluated its evidence and made findings of fact rejecting the Hellenic Republic's allegations of corruption.  Thus, the Court of Appeals is essentially annulling the arbitral award for making purported mistaken findings of fact, which is not a permitted ground under the New York Convention and which also is repugnant to U.S. public policy.  *See* Bermann Decl. ¶¶ 71-74.

     6.    *The Athens Court of Appeals' set aside is the exact scenario that the public policy doctrine permitting enforcement is designed to combat—one where a foreign state gains annulment from its own courts for its own pecuniary benefit*

The Hellenic Republic's appeal, and the preordained set aside by the Greek court, constitutes a pernicious use of a foreign sovereign's own court to set aside the forty-million Euro arbitral award against it.  The appeal itself reflects the final stand in the Hellenic Republic's scorched earth approach to avoid paying the legitimate balance owed to Leidos.  *See* Sections II.A.1 and A.2, *supra*.  It comes as no surprise that the Hellenic Republic's own court

set aside an award for the exact reasons continuously and thoroughly considered and rejected by the Tribunal (*see* Section II.A.1, *supra*)—alleged corruption—without a shred of evidentiary support linking Leidos to the conduct the Tribunal attributed solely to Siemens or any evidence of corruption on the C4I Contract (*see* Section II.A.4, *supra*; *see also* Bermann Decl. ¶¶ 58-66) . Such a set aside effectively nullified the parties' contractual agreement to be bound by the Tribunal's decision. The set aside, by an instrumentality of the Hellenic Republic (the Athens Court of Appeals), served exclusively to protect the economic interests of the Hellenic Republic without regard to Leidos' right to enforce the valid arbitral award or receive payment for services rendered. It is precisely this blind partiality and interventionism by a foreign court to protect its sovereign that "violates the basic notions of justice" and mandates enforcement of the underlying arbitral award.

A set aside based on unwarranted interventionism by foreign courts trying to protect their sovereign is recognized by courts as grounds for enforcement of the underlying arbitral award. "Parties engaged in cross-border transactions often agree to arbitrate their disputes to promote . . . fairness . . . and to avoid foreign judicial systems and perceived favoritism to local parties, *particularly if the local party is a government-owned, or politically powerful,* entity," or in this case, *the government itself*. *Pemex*, 962 F. Supp. 2d at 657. However, in such instances where a private party enters into arbitration agreements with a foreign state or government-owned entity, "national sovereignty runs strong, and sometimes results in judicial interventions, and even nullifications, of arbitration proceedings and awards." *Id.*[8] Recognizing this inherent

---

[8] The *Thai-Lao Lignite* court also recognized the "suspicion of the . . . courts' partiality" in instances where an arbitral award was set aside by the courts of the foreign sovereign that lost in arbitration. *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic,* No. 10-cv-5256, 2014 WL 476239, at *11 (S.D.N.Y. Feb. 6, 2014) (distinguishing the case

*{footnote continued}*

bias exists when one party is a state-owned entity, the *Pemex* court applied the *TermoRio* standard to enforce the underlying award because "the decision vacating the Award violated 'basic notions of justice,'" and therefore did not require deference. *Id.* at 656-57 (citing *TermoRio*, 487 F.2d at 935 (refusing to enforce an underlying award because "there is nothing in the record here indicating that the proceedings before the [court] were tainted or that the judgment of that court is other than authentic.")). This bias recognized by the *Pemex* court is especially prevalent when a court holds the power to save its own state from a major economic loss—in this case, the Hellenic Republic itself that has been struggling financially since the worldwide economic collapse.

"This case awakens the very fears expressed by [reputed scholars]—as well as by the Restatement of the U.S. Law of International Commercial Arbitration—that some courts . . . [would] annul an award that plainly does not deserve annulment" simply because doing so protects "the State's economic or other interests." Bermann Decl. ¶ 75; *see also id*. ¶¶ 47-51 (reciting the opinions of scholars). Foreign courts choose to vacate arbitral awards because "the breaching party is not infrequently a governmental entity in whose rescue national courts are eager to graciously aid." Bermann Decl. ¶ 49 (citing Radu Lelutiu, *Managing Requests for Enforcement of Vacated Awards under the New York Convention*, 14 Am. Rev. Int'l Arb. 345, 347, 351 (2003)); *see also Pemex*, 962 F. Supp. 2d at 657 n.21 (citing same). The nationalistic protectionism of such a set-aside decision undermines the fundamental principles of the New York Convention to promote uniform enforcement of foreign arbitral awards. Thus, when a

---

*{continued from previous page}*
before it and refusing enforcement because it "is not a case in which the Respondent is an entity of Malaysia's government" but "rather, Malaysia is a neutral, third country that the parties mutually chose as the seat of the arbitration.").

state or state-owned entity "successfully obtained annulment of [a foreign arbitral] award in its own courts . . . that is precisely the circumstance where a court in the enforcement forum should approach annulment with some skepticism." Chamber of Commerce *Amicus* Brief at 23-24. It is Article V(1)(e)'s permissive enforcement mechanism that operates as a check on biased foreign courts' power to "reduce the risk of aberrational decisions by a court in the arbitral situs." Berman Decl. ¶ 48 (citing Christopher R. Drahozal, *Enforcing Vacated International Arbitration Awards: An Economic Approach*, 11 Am. Rev. Int'l Arb. 451, 469-70 (2000)). An evaluation of the Greek Court's set-aside decision makes manifestly clear that it was without factual or legal justification, and undertaken in violation of the well-established pro-enforcement policy of the New York Convention. It therefore is not entitled to deference. *See Pemex*, 962 F. Supp. 2d at 656-57; *see also TermoRio*, 487 F.2d at 938; *Baker Marine*, 191 F.3d at 197 & n.3; *Chromalloy*, 939 F. Supp. at 913-15; *Ackerman*, 788 F.2d 841. Indeed, as Professor Bermann concluded, "In my judgment, the decision of the Athens Court of Appeals exemplifies the antithesis of 'basic notions of justice.'" Bermann Decl. ¶ 77. For Professor Bermann, the Greek court's set-aside decision is the most egregious set-aside decision he has encountered, "***I have over the years read a great many judgments of annulment, but I know of none that surpasses this one in its disregard of fundamental principles of fairness and justice*** inscribed in the annulling court's own law of arbitration and universally recognized as indispensable ingredients of international commercial arbitration." *Id.* ¶ 74 (emphasis added).

"It would be particularly perverse to deny enforcement of an award, despite the strong U.S. public policy in favor of award enforcement, when [, as here,] the sole reason for doing so is a foreign judgment whose invocation of foreign public policy to justify the annulment rings so manifestly hollow." *Id.* ¶ 73. That the Hellenic Republic sought and received an annulment in

its own courts that inured to its own fiscal benefit, without valid justification in the appellate decision, represents the exact scenario in which U.S. courts should exercise discretion under Article V(1)(e) to enforce the underlying arbitral award. *See id.* ¶ 77.

### B. Further, the Greek Court Decision Annulling the Award Violated U.S. Public Policy because in "Retrying" the Hellenic Republic's Allegations of Corruption, It Violated Greek Law that Limits the Scope of Review to the Findings of the Arbitral Tribunal

As the Athens Court of Appeals itself stated at the beginning of its judgment, Greek law provides for only a limited scope of review of an arbitral award—under Greek law, a court cannot "retry" the case on the merits by reevaluating the arguments and evidence and make findings directly opposite to findings of the tribunal. The Judgment states:

> [T]he cassation judge only deals with the issue of integration (admission) or not, of the decision into public order and ***does not try the case*** for which the parties agreed the arbitration clause, and therefore the legal action for annulment is dismissed to the extent that it would lead to a new examination of the merits of the case. This examination requires special attention so that is does not affect the arbitration as an autonomous, equivalent judicial order. . . . The ***erroneous interpretation or application of the law or the inadequate reasoning or the incorrect judgment*** on the merits by the arbitral tribunal, ***cannot in and of themselves justify the review of the arbitral award by an action for annulment . . .*** .

Annulment Judgment at 7-8 (emphasis added). It is well-settled Greek law that an award's findings of fact are binding on the Court of Appeals and Supreme Court in an action for annulment of an award. *See* Ex. 3, Bilaniuk Decl., Ex. B, Legal Opinion of Professor Nikolaos Nikas ("Nikas Opinion") ¶ 8.[9]

---

[9] Professor Nikas explained how under Greek law a court reviewing an annulment petition is bound by the award's findings of fact:

> The judge of the action for annulment of an arbitral award, on grounds of conflict with public policy or *bonos mores*, is obliged to have as a starting point and as a guide the factual basis, the

*{footnote continued}*

The Athens Court of Appeals, however, then proceeded to make finding after finding directly contradicting the Tribunal's express findings of facts on the Hellenic Republic's corruption allegations as detailed in Section II.A. *supra*. The Greek Court's "retrying" the case and making opposite findings of fact from the Tribunal is particularly egregious given the extensive litigation of the Hellenic Republic's allegations of corruption and the Hellenic Republic's copying verbatim its allegations from the arbitration as described more fully in Section II.A. *supra*.

---

*{continued from previous page}*

> findings and only the findings which were used by the arbitrators to form their award. Reevaluation by the state court of the factual material (arguments of fact, pleas, etc.) and reevaluation of the evidential procedure which took place before the arbitral tribunal must definitely be excluded from the scope of this review. New allegations which refer to the merits of the case cannot be the subject-matter of the state court's search (see Supreme Court 1066/2007, EPoID 2008.68). The state court is not allowed to replace the arbitral tribunal's evaluation of the evidence with that of its own. It is correctly pointed out in Supreme Court decision 1377/2011, ChrID 2012. 286, NoB 2012.672 (Judge Rapporteur G.Fourlanos), that the breach of public policy rules «must be the direct outcome of the findings of the ratio and of the ruling of the arbitral award under review, based on the facts which the arbitrator accepted and <u>which the court has no authority to review</u> (underlined by the author), whereas the Court of Appeal, in reviewing a ground for annulment of the arbitral award from the same provision, due to conflict with a public policy rule, and in order to pronounce his/her (the Judge's) conclusive assessment, only investigates and evaluates the same findings in conjunction with the ratio of the arbitral award (Supreme Court [Plenary Session] 13/1995)».

Nikas Opinion ¶ 8 (emphasis in original).

## III. THE COURT SHOULD ENFORCE THE AWARD

That the Hellenic Republic sought and received an annulment in its own courts, to its own fiscal benefit, and in violation of Greek law, is the exact scenario in which U.S. courts should exercise discretion under Article V(1)(e) to enforce the underlying arbitral award. A U.S. court's exercise of such discretion is consistent with the "fundamental notions of justice" and the public policy doctrines set forth in *TermoRio* and *Baker Marine*, and is supported by balancing the pro-enforcement policy of the New York Convention and the principles of international comity.

### A. The Greek Court Judgment of Annulment Is Invalid Under the *TermoRio-Baker Marine* Standard Because it Violated U.S. Public Policy

The Greek Court's annulment decision is invalid because it violates both U.S. public policy and Greek law. *See TermoRio*, 487 F.3d at 938. Specifically, the decision of the Greek court to ignore the extensive findings of fact of the esteemed arbitral panel, when such findings of fact were conclusive, "conflicts with United States public policy," *see* Section II(A), *supra*, and deference is therefore not required. *See Baker Marine*, 191 F.3d at 197 & n.3. Moreover, the Greek court's decision to rewrite the findings of fact of the arbitral panel, and undertake an extensive review of the application of the newly-written facts to the law, violates Greek law that provides for only limited review of arbitral awards in which the Court must accept the final award's findings of fact as true. *See* Section II(B), *supra*. The Greek court's absolute disregard for the esteemed arbitral panel's findings of fact, and its violation of the Greek standard of review, is "repugnant to fundamental notions of what is decent and just." *TermoRio*, 487 F.3d at 938. The judgment of annulment is therefore unenforceable. *See id*.

### B. Enforcement of the Underlying Arbitral Award Is in Accordance with the Pro-Enforcement Policy of the New York Convention and the Principles of International Comity

The principles of international comity do not save the Greek court's judgment from scrutiny. As the D.C. Circuit emphatically states, "[n]o nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum." *Laker Airways*, 731 F.2d at 937, *accord Chromalloy*, 939 F. Supp. at 913. The annulment decision is antithetical to U.S. public policy, as discussed in Section II, *supra*, and is thus prejudicial to the interests of the United States, which is a signatory to the New York Convention.[10] The New York Convention heavily favors enforcement, and defenses to enforcement "are construed narrowly, 'to encourage the recognition and enforcement of commercial arbitration agreements in international contract . . . .'" *Karaha Bodas Co.*, 364 F.3d at 288 (citations omitted). The proceedings in the Hellenic Republic greatly exceed the scope of permissible review in violation of U.S. public policy and Greek law. The Sovereign's court simply determined to protect the sovereign. The resulting annulment decision is therefore not entitled to deference under the principles of international comity. *See id.*; *see also* Restatement (Third) of the U.S. Law of International Commercial Arbitration.[11]

---

[10] The annulment decision also is clearly prejudicial to Leidos, a company that worked to provide reliable TETRA communications and C4I systems and services to the Hellenic Republic in accordance with a valid contract. The dispute between Leidos and the Hellenic Republic over the security contract for the 2004 Athens Olympics has lasted a decade. Following failed negotiations, Leidos filed its demand for arbitration in June 2009—over four and a half years ago—the remedy afforded to Leidos in its contract with the Hellenic Republic. It obtained a valid arbitral award. The Hellenic Republic challenged that award in court, and the court undertook a review that greatly exceeded its authority under Greek law. This protracted dispute over a valid contract and well-reasoned arbitral award is harmful to Leidos' interests and repugnant to U.S. law.

[11] The analysis advocated by the U.S. Chamber of Commerce in its amicus brief in the Second Circuit of applying the factors in *Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310

*{footnote continued}*

## Conclusion

Because the set-aside judgment violates U.S. public policy, the Court should recognize the foreign arbitral award against the Hellenic Republic and enter judgment in favor of Leidos.

## Request for Oral Hearing

Leidos respectfully requests an oral hearing on its Motion to Confirm Arbitration Award and to Enter Judgment.

---

*{continued from previous page}*
(2d Cir. 1998) discussed, *supra* at note 7, also strongly supports this Court exercising its discretion under Article V to enforce the set aside award in this case. *See* Chamber of Commerce *Amicus* Brief at 22-26. These factors enable the Court to strike a balance between the pro-enforcement policy of the New York Convention and the principle of international comity. *The general objectives of arbitration to expeditiously resolve disputes* favors a 'narrow construction' of defenses to enforcement under the Convention, including Article V(1)(e). The objective of arbitration—to obtain "the expeditious resolution of disputes and the avoidance of protracted and expensive litigation"—mitigates in favor of enforcement. *See Europcar*, 156 F.3d at 317. This factor "favors a 'narrow construction' of defenses to enforcement under the Convention, including Article V(1)(e)." Chamber of Commerce *Amicus* Brief at 14 (citations omitted); *see also Karaha Bodas Co.*, 364 F.3d at 288.

*The level of scrutiny afforded to the award*. When foreign courts closely scrutinize arbitral awards and consider annulment grounds other than those enumerated in the New York Convention, this factor favors enforcement of annulled awards. Here, while Greek law provides for deferential review because the award's findings of fact are binding on the court reviewing the award, the Court, while claiming to annul on public policy grounds, actually annulled the award based on purported mistaken findings of fact, which is not a permitted ground under the New York Convention.

*The characteristics of the foreign proceeding*. The Hellenic State party's own courts annulling an adverse arbitral award should be closely scrutinized because of the potential for partiality.

*Whether the judgment annulling the award would be entitled to recognition or enforcement standards applicable in a United States court*. One of the grounds for a D.C. Court to refuse to recognize a foreign judgment is that it is repugnant to the public policy of the United States.

*Any other circumstances that could tend to shift the balance in favor of or against enforcement*. The actions of the Hellenic Republic over the last decade to resist compensating Leidos for the C4I System.

Dated: September 8, 2014

Respectfully submitted,

/s/ Allen B. Green
Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756

*Attorneys for Petitioner*
*Leidos, Inc. (formerly Science Applications International Corporation)*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September, 2014, a true and correct copy of the foregoing MOTION TO CONFIRM ARBITRATION AWARD AND TO ENTER JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT, proposed order, and supporting declarations and exhibits were electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following:

Neal Goldfarb
Max Maccoby
Butzel Long, PC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
goldfarb@butzel.com
(202) 454-2800
*Attorneys for Respondent The Hellenic Republic*

/s/ Allen B. Green
Allen B. Green (D.C. Bar No. 222158)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756
agreen@mckennalong.com

*Attorneys for Petitioner*
*Leidos, Inc. (formerly Science Applications International Corporation)*