# EXHIBIT A

LAMBADARIOS LAW FIRM
3, STADIOU STR.-ATHENS 105 62 GREECE
TEL. +30 210 3224047, +30 210 3224517
e-mail: info@lambalaw.gr
website: www.lambadarioslaw.gr

PROKOPIOS G. DIMITRIADIS
ATTORNEY AT LAW (Reg. No. 26051)
LAMBADARIOS LAW FIRM
3, STADIOY STREET - ATHENS 105 62
TEL.: 0030 210 3231135 - 0030 210 3224419
FAX: 0030 210 3226368
VAT.: 070678280

# INTERNATIONAL CHAMBER OF COMMERCE

# INTERNATIONAL COURT OF ARBITRATION

**Case 16394/GZ**

Between:

The company **SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**, as legally represented and with registered office in the United States of America (1710 SAIC DRIVE, McLean, VA, 22102)

**CLAIMANT**

- and -

The **GREEK STATE**, seated in Athens
as legally represented
by the Minister of Finance and the
Minister of Civil Protection
(68, Akadimias Str., 106 78 Athens, Greece)

**RESPONDENT**

---

## AWARD REGARDING THE PRELIMINARY ISSUES

(referred to in paragraph 14 of the Terms of Reference dated 21 July 2010)

**(INTERIM AWARD)**

---

## A. INTRODUCTION AND SUBJECT-MATTER OF THE AWARD

The Arbitral Tribunal, composed by the following Arbitrators: Grigorios Timagenis, Chairman of the Arbitral Tribunal, Dionysios Kondylis, Arbitrator and Styliani Charitaki, Arbitrator:

**1.** conducted a hearing in the presence of the parties' authorised lawyers on 17 December 2010 in a specific room in the Athenaeum Intercontinental Hotel in Athens

and subsequently deliberated in Athens on 11 February 2011 and 6 April 2011 in order to decide upon the preliminary issues referred to in paragraph 14 of the Terms of Reference dated 21 July 2010, which are connected to the dispute of this arbitration between the parties arising from Agreement 020A/03 dated 19 May 2003 pertaining to the supply of the C4I System for Olympic Security and related Products and Services, and for which the parties agreed to conduct a separate hearing and render a separate decision.

**2.** (a) The object of the Agreement for the C4I System is described briefly in para 7(b) of the ToR as follows:

> " The dispute which must be resolved by the Arbitral Tribunal arises from Agreement 020A/03 concluded between the parties on 19 May 2003, the objective of which, under its clause 3.1, includes the study, design, construction, installation, testing, certification, completion, development, sale, provision of services, according to the requirements of each case, and delivery of the C4I Olympic Security systems as a "turn-key" solution, compatible and interoperable between each other, as an integral unit, as specified in Annex A of this agreement, which constitute a security and operations support information system under the name "Command Control Communications Coordination & Integration – C4I" concerning initially the security of Olympic Games 2004 and subsequently for permanent use (hereinafter "**C4I System**"). The C4I System, according to the Agreement, consists of three systems: a) the Command & Decision Support System (CDSS) which comprises 7 sub-systems in total, b) the Communication and Information System (CIS) which comprises 13 sub-systems, and c) the Command Support Systems (CSS) which comprises 10 sub-systems.
>
> The original agreement was further modified under the following amendments:
> (i) The 1st Amendment dated 23 December 2003
> (ii) The 2nd Amendment dated 7 April 2004
> (iii) The 3rd Amendment dated 25 June 2004
> (iv) The 4th Amendment dated 05 August 2004
> (v) The 5th Amendment dated 29 March 2007
> (vi) The 6th Amendment dated 11 September 2007
> (vii) The 7th Amendment dated 27 October 2008
>
> The original agreement and the amendments shall be referred to hereinafter for the purposes of this arbitration as "**the Agreement**". "

(b) The allegations of the Claimant are summarized in para 7c of the ToR as follows:

> " Based on the Claimant's request for arbitration dated 16 June 2009 (hereinafter "**Request for Arbitration**"), the Claimant contends that the Respondent acted in bad faith and in a non-contractual manner and has repeatedly breached the Agreement. More specifically, the Claimant considers that, in spite of the fact that the C4I System was completed and delivered to the Respondent and that it is

already used on a daily basis and now constitutes an integral component of the public safety infrastructure of the Greek State, the Respondent refuses to repay the Claimant and to release the letters of guarantee submitted by the Claimant. The Claimant contends that the Respondent failed to fulfil its obligations for no good reason and, in particular, it breached its duty to act in good faith and observe its contractual obligations. "

(c) The requests for relief of the Claimant are summarized in para 7d of the ToR.

(d) The allegations of the Respondent are summarized in para 7e of the ToR as follows:

" The Respondent, in its answer to the Request for Arbitration dated 25 September 2009 (hereinafter "**Answer**") contends that the Claimant was not in a position to supply the Respondent with a complex and interoperable security system for the 2004 Athens Olympic Games, as a turn-key solution, as required under the circumstances and in accordance with the specifications set by the Respondent. The Respondent contends that the Claimant failed to fulfil its obligations and, in particular, failed to supply, apart from the other systems and subsystems, the CDSS System. Consequently, it exposed the country to the risk of suffering international humiliation due to the potential transfer of the Games to another country. In view of the Olympic Games, it became necessary to provisionally accept, by usage and not in accordance with the terms of the agreement, some of the C4I Systems and Subsystems, without carrying out the agreed testing.
The right to carry out all the agreed contractual procedures of delivery and acceptance of the System was reserved.

The Respondent argues that the Claimant acted in bad faith, abusively and that the Request for Arbitration was brought prematurely. The Claimant was obliged to deliver the C4I System as an integral unit, as a "turn-key" solution and ready for operational use. The performance of the Claimant's obligations under a strict time-limit was a material condition of the Agreement. The Claimant was in delay and seemed incapable of carrying out the material requirements of the Agreement, primarily in respect of the inter-operability of the system, but also in respect of the development of the applications of the CDSS system.

Following the 5th amendment of the Agreement, while the Respondent fulfilled its obligations, the Claimant failed to fulfil its side of the obligations and delayed in delivering some of the remaining subsystems, such as subsystem 16 AVL, while it failed to deploy a broadband network in subsystem 17, as it had promised. Additionally, the claimant failed to pay the difference in the telecommunication charges which were incurred from the change of the architecture of the network in subsystem 17, while it was obliged to do so under the agreement. Furthermore, it failed to fulfil its contractual obligation to construct a second switching centre of subsystem 20 - TETRA - in GADA, before the completion of the general C4I system test (October 2008). Moreover,

the Claimant delayed in fulfilling its contractual (under the 5th amendment) obligation to deliver the overall implementation design of subsystems 1-7. Additionally, the Respondent alleges that SIEMENS HELLAS S.A. replaced the Claimant, following the 5th amendment of the agreement. "

(e) The requests for relief of the Respondent are summarized in para 7f of the ToR.

**3**. Paragraph 14 of the Terms of Reference concerning of the preliminary issues is cited *verbatim* as follows:

" **14. Preliminary Issues**

A separate hearing shall be conducted and a separate decision shall be rendered for preliminary issues. For the purposes of this paragraph No. 14 (i.e. for the separate hearing and decision), preliminary issues are considered to be those which are connected to:

a) the following requests by the Claimant:

(1) Inadmissibility of the Respondent's Supplementary Answers

(2) Inadmissibility of the Plea for set-off, because on the one hand this plea hides a belated counter-claim and on the other hand the costs of the ICC Arbitration have not yet been paid

(3) Separation of the examination of the merits of the case into two (2) stages the first of which will determine whether the acceptance of the C4I System by the Respondent shall be upheld or rejected

b) the following requests by the Respondent:

(1) Request for the suspension of the proceedings due to criminal charges.

(2) Lack of standing to bring the Request.

(3) Inadmissibility of the Request for Arbitration due to lack of written preliminary steps.

(4) Invalidity of the arbitration clause and thus lack of jurisdiction of the Arbitral Tribunal.

It is however evident that the determination of these issues and this paragraph in general do not constitute nor can be construed as limiting any party from raising, according to the procedural rules which govern this arbitration and at any subsequent stage, any claims or pleas on the merits or on the arbitral proceedings, preliminary or not, while they do not limit nor can be construed as limiting the Arbitral Tribunal from holding at any stage of the proceedings that there are any other preliminary issues concerning the proceedings or the merits of the dispute, or any part of them, nor whether an issue is preliminary or not, nor whether a preliminary issue is closely connected to the merits of the dispute or whether it requires taking of evidence, so that this issue may be considered along with the merits of the dispute. "

**4**. Having regard to the Rules of Arbitration (***Rules***) of the International Court of Arbitration of the International Chamber of Commerce (***ICC***) as in force from 1

January 1998 and consequently applicable both at the time when the arbitration agreement entered and at the time when this arbitration was initiated.

**5.** Having regard to the following documents, other than those instituting the proceedings, which were submitted by the parties, and more specifically, **by the Respondent** (a) its Supplementary Answer dated 20/4/2010, (b) its Second Supplementary Answer dated 14 May 2010, (c) the Respondent's comments dated 28 May 2010, and (d) its letter dated 19 July 2010, and **by the Claimant** (a) its letter dated 30 April 2010 regarding the inadmissibility of the Respondent's Supplementary Answer, (b) its reply dated 14 May 2010 with its Extrajudicial Declaration-Answer dated 4 May 2010 annexed thereto, (c) the "Claimant's Reply to the Respondent's Supplementary Answers" dated 19 May 2010, (d) its letter dated 27 May 2010, (e) its letter dated 6 July 2010, and (f) its letter dated 20 July 2010. The Arbitral Tribunal also considered any other documents addressed to the Tribunal by the parties or exchanged between them and served to the Tribunal, as well as to any claims included in these documents.

**6.** Having regard to the submissions, memoranda, pleadings and cross pleadings, as well as to the supplementary pleadings submitted on 24 September 2010, 15 October 2010 and 21 January 2011, and to other documents submitted together with the latter pleadings or during any other stage of the proceedings as well as to the claims and arguments developed by the parties orally during the hearing of 17 December 2010.

**7.** It deliberated, according to the law, the ICC Rules and the agreements of the parties.

**8**. A Table of Abbreviations in attached as Annex A and is an integral part of this Award.

## B. PRELIMINARY STAGE

**1.** This Award refers to the parties set out on the first page and is made by the Arbitral Tribunal composed by the arbitrators referred to in the above paragraph A.

**2.** The full address of the arbitrators and the parties, as well as the details and the addresses of their authorised lawyers, the documents instituting the proceedings, the composition of the Arbitral Tribunal, and the brief summary of the background of the dispute are set out in the Terms of Reference signed by the parties on 21 July 2010 ("Terms of Reference") and specifically in paragraphs 1, 2, 3, 4 and 7(a). Paragraphs 1-4 are as follows:

> " **1. The Arbitral Tribunal**
>
> The arbitral tribunal is composed of:
>
> (a) **Grigorios I. Timagenis** Lawyer LL.M, Ph.D.
> (Chairman of the Arbitral Tribunal)

57 Notara Str., 8th floor
185 35 Piraeus
Greece
Tel.: +30-210-4220001
Fax.: +30-210-4221388
E-mail: gjt@timagenislaw.com

(b) **Dionysios Kondylis** Emeritus Judge of the Supreme Court (Areios Pagos)
(Co-arbitrator nominated by the Claimant)
23 Amaryllidos Str.,
153 41 Aghia Paraskevi
Greece
Tel.: +30-210-6399621
Fax: +30-210-6399621
E-mail: d-kondil@otenet.gr

(c) **Styliani Charitaki** Legal Counsel of the State
(Co-arbitrator nominated by the Respondent)
10 Karageorgi Servias Str.,
101 84 Athens
Greece
Tel.: +30-210-3375190, 3375039 (secretariat 210-3375221)
Fax: +30-210-3375040
E-mail: ns.symv3@yo.syzefxis.gov.gr

**2. Documents Instituting the Proceedings**

This arbitration was instituted by the Claimant's submission of the Request for Arbitration dated 16 June 2009, to which the Respondent answered with its Answer to the Request dated 25 September 2009 following an extension granted by the Secretariat of the International Court of Arbitration of the ICC in its letter dated 27 August 2009 addressed to the parties.

**3. Composition of the Arbitral Tribunal**

The Arbitral Tribunal is constituted as follows:

(a) On 3 September 2009, pursuant to Article 9(2) of the ICC Rules of Arbitration, the Secretary General of the International Court of Arbitration of the ICC confirmed as co-arbitrator Mr. Dionysios Kondylis, who was nominated by the Claimant in its Request for Arbitration dated 16 June 2009.

(b) On 3 September 2009, pursuant to Article 9(2) of the ICC Rules of Arbitration, the Secretary General of the International Court of Arbitration of the ICC confirmed as co-arbitrator Mrs Styliani Charitaki, who was nominated by the Respondent in its document dated 6 August 2009 (Protocol No. 87774/457380).

(c) The two arbitrators who were nominated by the parties failed to nominate the Chairman of the Arbitral Tribunal, and consequently the International Court of Arbitration of the ICC appointed Mr. Grigorios I. Timagenis, holder of a PhD, Lawyer,

as Chairman of the Arbitral Tribunal, following a recommendation by the Greek Committee of the ICC (Articles 8(4) and 9(3) of the Rules of Arbitration of the ICC).

## 4. The parties to this Arbitration and their authorised lawyers

The parties to this arbitration are as follows:

(a) Claimant
**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,**
1710 SAIC DRIVE, McLean, VA, 22102,
United States of America

Its authorised lawyers are as follows:

1. Messrs. **Allen B. Green** and **William T. O' Brien**
   McKenna Long & Aldridge LLP
   1900 K Street NW
   Washington, DC 20006-1108
   United States of America
   Tel.: +1 202.496.7107
   Fax: +1 202.496.7756
   E-mail: wobrien@mckennalong.com and agreen@mckennalong.com

2. Mr. **Grigorios Pelekanos**
   Ballas, Pelekanos & Associates
   10 Solonos Str., Kolonaki
   106 73 Athens
   Greece
   Tel.: 210 3625943
   Fax: 210 3647925
   E-mail: gregory.pelecanos@balpel.gr

3. Mr. **Epameinondas Lampadarios**
   Lampadarios and Associates
   3 Stadiou Str.
   105 62, Athens
   Greece
   Tel.: 210 3224047
   Fax: 210 3226368
   E-mail: lambalaw@lambalaw.gr

and

(b) Respondent
**Greek State**, as legally represented by the Minister of Finance and the Minister of Civil Protection
68 Akadimias Str.
106 78 Athens
Greece
Tel.: 210 3804971
Fax: 210 3328180
E-mail: n.poulakos@nsk.gr

Its authorised lawyers are as follows:
1. Mr. **Dimitrios Chanis** (Legal Counsel of the State)
   2 Paparrigopoulou Str., 105 61 Athens, Greece
   Tel.: +30 210 3252977 and  +30 210 3368747 / Fax: +30210 3231964
   Mr. **Dimitrios Katopodis**
   (Associate Judge of the Legal Council of the State)
   Mrs **Georgia Papadaki**
   (Associate Judge of the Legal Council of the State)
   3 Akadimias Str.
   106 71 Athens
   Greece
   Tel.: 210 3682541
   Fax: 210 3682221
   E-mail: georgiapapadaki@mfa.gr

2. Potamitis, Vekris, Bersis, Papadiamantis Law Firm
   Paparrigopoulos Ioannou,
   Attn: **Stathis Potamitis, Xenophon Paparrigopoulos, Vicky Psalti**
   9 Neophytou Vamva
   106 74 Athens
   Greece
   Tel.: 210 3380000
   Fax: 210 3380020
   E-mail: stathis.potamitis@potamitisvekris.com,
   xenophon.paparrigopoulos@potamitisvekris.com,
   vicky.psaltis@potamitisvekris.com

(The Claimant and the Respondent shall be referred to hereinafter as the "**parties**"). "

**3.** For the legalisation of their authorised lawyers, the following documents were submitted to the Arbitral Tribunal by the parties:
   (a) By the Claimant, the power of attorney dated 24 May 2010 (in English, together with its lawful translation in Greek with an Apostille dated 26 May 2010) which was signed by Lawrence E. Ruggiero, Vice-Chairman and Assistant General Legal Advisor, as legal representative of the Claimant, in the presence of the Notary Public of the State of Virginia in the USA, Kaye Elliot Endahl, and (b) by the Respondent, the documents of the Chairman of the Legal Council of the State dated 6 August 2009 (protocol no. 87775/457380), 11 December 2009 (protocol no. 136444/457380) and 17 June 2010 (protocol no. 69270/457380), as well as the decision of the Minister of Finance dated 14 July 2010 (protocol no. 10107).

**4.** Except for the abovementioned persons, Ioannis-Dionysios Filiotis, Lawrence Ruggiero, Prokopios Dimitriadis, Charikleia Daouti and Konstantinos Lampadarios also attended the hearing of the case on behalf of the Claimant, appointed under the e-mail dated 9/12/2010 which was sent to the Chairman of the Arbitral Tribunal by Mr. Epameinondas Lampadarios, as authorised under the abovementioned power of attorney.

**5.** Finally, the Administrative Secretary of the Arbitral Tribunal Mr. Ioannis Timagenis, who was appointed under the Decision of the Arbitral Tribunal dated 18 November 2010, also attended the meeting.

**6.** During the hearing, recorded and stenographic minutes were kept.

**7.** After the end of the hearing, the there was fixed the 21st January 2011 as the date for the submission of supplementary pleadings by the parties and for the closing of the proceedings. By the submission of such pleadings the proceedings for the preliminary issues were closed and the Arbitral Tribunal proceeded to the consideration of the case and the issue of an interim award for the preliminary issues.

**8.** After the Arbitral Tribunal was constituted, the file of the case was forwarded to the arbitrators who received it on 15/12/2010. At the same time, the International Court of Arbitration of the ICC, by its decision which was taken at the meeting of 7/1/2010 (which was notified to the Arbitral Tribunal on 8/1/2010), set a time limit for the drafting of the Terms of Reference until the 31/3/2010. This time limit was later extended sequentially until the 30th of April 2010, the 31st of May 2010, the 30th of June 2010 and the 31st of July 2010, by decisions of the International Court of Arbitration of the ICC which were taken at its meetings of 4/3/2010, 1/4/2010, 6/5/2010 and 3/6/2010 respectively (which were notified to the Arbitral Tribunal on 22/3/2010, 21/4/2010, 28/5/2010 and 24/6/2010 respectively).
The Terms of Reference were signed on 21st of July 2010 and the time limit which is provided for by the Rules for the issuance of the award was extended sequentially until the 30th of April 2011 and the 31st of July 2011 by decisions of the International Court of Arbitration of the ICC at its meetings which were held on 13/1/2011 and 7/4/2011 respectively (which were notified to the Arbitral Tribunal and to the litigant parties by email on 13/1/2011 and by letters on 28/1/2011 and 19th April 2011 respectively).

## C. JURISDICTION

### 1. Summary

(a) During the deliberation, the Arbitral Tribunal decided by a majority that it has the jurisdiction to determine the disputes arising between the parties from the contested agreement under the arbitration clause included in article 28.3, which is valid, and thus rejected any objections to the contrary submitted by the Respondent in accordance with the following paragraphs of Chapter D and in the operative part of this Award.

(b) The majority opinion regarding the reasoning is included in the following paragraphs, while the dissenting opinion and any different opinions or supplementary reasoning are set out in Chapter F below.

### 2. Jurisdiction clause (and applicable law)

The jurisdiction of the Arbitral Tribunal is *prima facie* based on the arbitration clause ("Arbitration Clause") of article 28 para. 3 of Agreement No. 020A/03 dated 19 May 2003 which was signed between the parties for the Supply of the C41 System for Olympic Security and the Related Products and Services, and which stipulates that:

> *"All claims or disputes arising out of or in connection with the present AGREEMENT or its interpretation, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce (ICC) and shall be decided under the Greek Law. The arbitration shall be conducted by three Greek arbitrators, appointed pursuant to the Rules of the International Chamber of Commerce, where one arbitrator shall be nominated by the PURCHASER, one arbitrator shall be nominated by the CONTRACTOR and the third Arbitrator, acting as Chairman, shall be nominated by the two nominated arbitrators or, in case of disagreement, in accordance with the aforesaid Rules."*

**3. Contest of jurisdiction / The power of the Arbitral Tribunal to decide upon its jurisdiction**

(a) The Respondent, in its Supplementary Answer dated 20 April 2010 and for the reasons stated therein, requested that the arbitration clause be declared invalid and thus that the Arbitral Tribunal lacks jurisdiction, notwithstanding that, in addition, according to paragraph 14 of the Terms of Reference dated 21 July 2010, it was agreed that a separate hearing would be conducted and a separate decision rendered for some Preliminary Issues, including the invalidity of the arbitration clause. The Claimant, according to its documents and written submissions referred to above under A4 and 5, requested that the aforesaid request of the Respondent be rejected.

(b) Pursuant to article 6, para. 2 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, the Arbitral Tribunal is empowered to decide on its own jurisdiction. Notwithstanding any relevant request by the Respondent, the Arbitral Tribunal must examine and decide of its own motion regarding its jurisdiction before the examination of any other preliminary issue or of the merits of the dispute.

**4. Applicable law**

Given that, pursuant to both the arbitration clause and the Terms of Reference (paragraph 10), the place of this arbitration is in Athens, the Greek law shall apply to this dispute, regarding both the validity of the arbitration clause and the jurisdiction of the Arbitral Tribunal.

**5. Constitution of Greece**

Pursuant to paragraphs 1 and 2 of article 94 of the Constitution of Greece (hereinafter the "Constitution"):

" *1. The hearing of administrative disputes belongs to the jurisdiction of the Council of State and the ordinary administrative courts, as provided by law, subject to the powers of the Court of Audit.*

*2. Civil courts shall have jurisdiction on all private disputes, as well as on cases of voluntary jurisdiction, as provided by law.* "

**6. <u>The legislative basis for the submission of private disputes to arbitration according to the Civil Procedure Code</u>**

Based on the aforesaid provisions, it is clear that a dispute, administrative or private, is exempt from the jurisdiction of the courts as provided by the Constitution, and an agreement between the parties to this effect (arbitration clause) is valid, only if this is provided by law ("*as provided by law*"). Regarding private disputes which may be referred to arbitration, according to the Civil Procedure Code (CPC), it is always accepted (without any contrary opinion) that the parties may agree to refer them to arbitration in accordance with article 867 CPC and its requirements. More specifically, if one of the parties is the Greek State, then the dispute may be referred to the arbitration based on the CPC under article 49 of the Introductory Law to the Civil Procedure Code and its requirements.

**7. <u>Decision of Special Supreme Court No. 24/1993 regarding the submission of the administrative disputes to arbitration</u>**

(a) It was, however, argued that administrative disputes cannot be referred to arbitration (and therefore that the related arbitration clause is invalid) even if this is provided or permitted by law, and in particular it was argued that such law may be forbidden by the constitution.

(b) Decision No. 24/1993 of the Special Supreme Court resolved this issue, stating that according to the true meaning of article 94 para. 1 of the Constitution, the legislator may permit administrative disputes to be referred to arbitration upon an agreement of the parties and that the related law is not forbidden by the constitution.

(c) Given the above, it is accepted that administrative disputes may also be referred to arbitration, if the law permits. However, there is no general provision permitting administrative disputes to be referred to arbitration, such as articles 867 CPC and 49 of the Introductory Law to the Civil Procedure Code, and therefore there must be a case by case examination of whether there is any law permitting the specific category of administrative disputes to be referred to arbitration given that, without a legislative basis, the arbitration clause shall be invalid as it directly contradicts the aforesaid provision of the Constitution.

**8. <u>The parties' claims</u>**

The Respondent has already raised the objection regarding the invalidity of the arbitration clause in its Supplementary Answer dated 20/4/2010, and not only was this objection specifically developed in its written submissions and pleadings referred to

above (under A5), but also orally during the hearing of 17 December 2010, while the Claimant developed its arguments regarding both the belated submission and inadmissibility of the aforesaid objection as well as the merits of this objection in its letter dated 30/4/2010 and in its other letters, written submissions and pleadings referred to above (under A4 and 5 respectively), and also orally during the hearing of 17 December 2010 and pleaded the validity of the arbitration agreement.

The current section specifically refers to the Arbitral Tribunal's own-initiative examination regarding its jurisdiction, while in the context of this examination, answers regarding the related claims of the parties are also provided.

**9. <u>The Arbitral Tribunal's own-initiative examination</u>**

Given the above, the Arbitral Tribunal must investigate, on its own initiative, during the examination of its jurisdiction, whether this dispute is private or administrative and in the latter case whether there is any law permitting the dispute to be referred to arbitration or, irrespective of the fact that the dispute may be private or administrative, whether there is any legislative basis permitting the dispute to be referred to arbitration. Specifically regarding the latter issue, it must investigate whether Law 2735/1999 on international commercial arbitration constitutes a legislative basis for the validity of the arbitration clause included in the contested agreement, an issue which has already been raised by the Claimant in its Submissions dated 21 January 2011.

**10. <u>Distinction between the interpretation of article 1 of Law 2735/1999, and submission to this article, and the interpretation and submission to other provisions</u>**

It is apparent that the Arbitral Tribunal must firstly decide if the requirements for the application of article 1 of Law 2735/1999 are met, and more specifically whether this arbitration is international and commercial according to the meaning of this provision. It must be noted that in order to decide upon this matter, it is not necessary that the Tribunal examine whether the contested dispute is administrative or not, since a dispute only needs to be categorised as administrative, or as international or commercial, in the context (interpretation) of specific provisions in order to establish whether their requirements have been met, and thus the corresponding legal consequences may be imposed. Therefore, a court may examine essentially whether a dispute is administrative when interpreting article 1 of Law 1406/1983 or article 94 para. 1 of the Constitution, or any other provisions which contain the term 'administrative dispute'. However, in this specific case, article 1 of Law 2735/1999 is the subject-matter of the interpretation, which contains the terms "international" and "commercial" and not the term "administrative dispute". Consequently, a dispute, which according to other provisions may be administrative, may be "international" or "commercial" in the context of the interpretation of article 1 of Law 2735/1999 without this contradicting the different categorisation of this dispute in the context of the interpretation of other provisions. The independent interpretation of article 1 of Law 2735/1999 is also supported by the fact that this law essentially transposes into the Greek law an

international model, specifically the UNCITRAL Model Law for international commercial arbitration.

**11. Regarding the international character of the arbitration**

**(1)** Pursuant to article 1 of Law 2735/1999 on the commercial arbitration "*the provisions of this law apply .... to an international commercial arbitration, if its place is in the territory of the Greek State*" (paragraph 1), "*An arbitration is international if: a) the parties to an arbitration agreement have, at the time of the conclusion of that agreement, their places of business in different States ...*" (paragraph 2) and for the application of paragraph 2 "*a) if a party has more than one place of business, the place of business is that which has the closest relationship to the arbitration agreement, b) if a party does not have a place of business, reference is to be made to his habitual residence and if this party is a legal person, to the place where it has its office*" (paragraph 3).

**(2)** Despite the wording of the law (using the definite article "the place of business" in article 1, para. 2a), which refers to the real registered office of a company, from where it exercises its administration as can be deduced from paragraph 3a of article 1, the law provides that a corporation may have more than one places of business, thus referring to branches (special commercial places) and not only to the place of its central administration where the important decisions for the corporation (registered office) are made, and which can only be one place.

**(3)** This can also be deduced from the English original text where the term used is "place of business". Furthermore, the same is evident from the preparatory works of UNCITRAL for the Model Law on International Commercial Arbitration (see Analytical Commentary on draft text of the Model Law on International Commercial Arbitration in the Report of the General Secretariat on the 18th Conference of UNCITRAL in Vienna, 3-21 June 1985 UN doc A/CN.9/264/25 March 1985, hereinafter Model Law Commentary), which states that the Model Law does not refer to the <u>principal</u> place of business or to the head office of its administration but to the branch with which a specific agreement was concluded (see Model Law Commentary, under article 1, para. 26 and 27). The same applies according to the United Nations Convention on Contracts for the International Sale of Goods (Vienna 1980, Law 2532/1997, articles 1 and 10), the wording of which was also used by the Model Law on International Commercial Arbitration (see Model Law Commentary, under article 1 para. 24), and consequently the Convention on International Sale of Goods can be used for the interpretation of the latter, as can be the corresponding commentary of the United Nations Secretariat (see UN document A/CONF.97/5, hereinafter International Sales Commentary, under articles 1 and 9 of the Draft, already articles 1 and 10 of the Convention).

**(4)** At the same time, the law provides that reference is made to the place of business at the time of the conclusion of the arbitration agreement (article 1, para. 2(a), Law 2735/1999) and if a party has more of one places of business, then reference is made to the business which has the closest relationship to the arbitration agreement (article 1,

para. 3(a), Law 2735/1999); such a case of closest relationship arises when the negotiations for the agreement were made entirely with a specific place of business, without taking into account the place where the contract was finally signed (Model Law Commentary, under article 1, para. 32, also see article 1, para. 2 of International Sale of Goods Convention, which notes that if it is not possible to establish the place of business in a given state based on the agreement or on any dealings between the parties, or information disclosed by the parties at any time before or upon conclusion of the agreement, such place is disregarded (see also article 10 of Convention on Contracts for the International Sale of Goods and International Sales Commentary, under article 9 of the draft, para. 7 which states that the place of closest relationship to the arbitration agreement would not be altered by any subsequent decision to perform the agreement at another place of business). Finally, the law (article 1 para. 3(b), Law 2735/1999) also refers to a place where a legal person has its office, but it does not consider this as a place of business. It must be noted that the UNCITRAL Model Law does not contain any similar provision, and that it only refers to the habitual residence.

**(5)** In this case, the contested agreement No. 020A/03, dated 19 May 2003, as can be deduced from its text, was concluded between the Greek State and the SAIC Company, which, as noted in the agreement, has its head offices at the city McLean in the State of Virginia in the USA. This agreement was signed on behalf of SAIC by its Senior Vice President Mr. Steven H. Weiss (under a power of attorney), who does not appear to have any place of business in Greece. Furthermore, no reference is made to any place of business of SAIC in Greece which might have been involved in the negotiations and the conclusion of the agreement. The address of 90 Kifisias Avenue, Amarousio, Attiki, referred to in article 30 of the agreement for the purposes of correspondence, even if it was the address of the place of business of the Claimant in Greece at that time, is referred to in relation to correspondence between the parties taking place after the conclusion of the Agreement (i.e. for the interpretation of the Agreement, para. 30(2)(1), for the implementation of the Agreement para. 30(2)(2) and for financial issues arising from the Agreement, para. 30(2)(2)) and it does not appear that any place of business of the Claimant in Greece may have been involved in the negotiations and the conclusion of the Agreement, while the place of business which is taken into consideration is the place of business at the time of the conclusion of the agreement and the place with the closest relationship to the agreement is the one which negotiated and concluded the arbitration agreement.

**(6)** Therefore, the place of business of the Claimant where according to the Agreement, this Agreement was negotiated and concluded, which fact is also supported by other evidence, is in the USA i.e. in another state from the state of the place of business of the Respondent, and therefore the arbitration is international, pursuant to the meaning of article 1 of Law 2735/1999.

**12. Regarding the commercial character of the arbitration**

**(1)** Article 1 para.1 of Law 2735/1999 expressly stipulates that the provisions of this law apply to the international commercial arbitration.

**(2)** The law does not provide any definition for the term "commercial". However, the Explanatory Notes of the Law state, *inter alia*, that:

> *"The same text of the original law, as drafted by UNCITRAL, refers to the following footnote in regard to the term "commercial", which widens its interpretation to be considered as "financial".*
>
> *"The term "commercial" should be given a wide interpretation so as to cover matters arising from all relationships of a commercial nature, whether contractual or not. Relationships of a commercial nature include, but are not limited to, the following transactions:*
>
> *Any trade transaction for the supply or exchange of goods or services, distribution agreement, commercial representation or agency, factoring, leasing, construction of works, licensing, investment, financing, banking, operating agreement or concession, joint venture and other forms of industrial or business cooperation, carriage of goods or passengers by air, sea, rail or road."*
>
> *For legislative technique reasons this footnote was not included in the text of the proposed law, as predetermined by various countries when adopting the model law as national law. However, it is still used for the interpretation of the term "commercial".*

**(3)** Furthermore, the Model Law Commentary, commenting on article 1, mentions that the footnote concerning the term "commercial" was added as an interpretation tool for this term (paragraph 16) and expresses the legislative intent to construe the term "commercial" in a wide manner (paragraph 18). It is also noted that this footnote points to an independent interpretation of the term "commercial" and does not refer to the national laws for the characterisation of a relationship as commercial, as does the New York Convention 1958 "on the Recognition and Enforcement of Foreign Arbitral Awards" (law 4220/1961) in its article 1, paragraph 3, and that it would be erroneous to apply national notions regarding the characterisation of a relationship as commercial (paragraph 19). Finally, it is clarified that although the Model Law does not refer to the matter of the state immunity, the Model Law also covers relationships in which a state body or a state entity may be a party in an agreement under the condition that the relationship is of a commercial nature (paragraph 21).

**(4)** In addition, it is noted that historically the term of "international arbitration", without any other determining factor, refers to arbitrations of the (public) international law specifically between States and therefore by adding the term "commercial", this arbitration can be distinguished from the arbitration of the international law between States[1] and notwithstanding that the implication of traders is an indicative element, this is not crucial since the States can also participate in a commercial arbitration in the context of a commercial activity[2].

---

[1] J.M. Lew, L.A. Mistelis, S.M. Kröll, Essential Characteristics of International Commercial Arbitration, Chapter 4 in J.M. Lew, L.A. Mistelis et al, Comparative International Commercial Arbitration (Kluwer Law International 2003) page 49-69, paras 4-3, in page 49.

[2] Ibid, para. 4-5 page 50.

**(5)** Furthermore, it has been noted that the notion of commerciality is so wide that it covers in essence any financial dispute[3] and, under this concept of commerciality, any disputes in which public entities participate which arise from their national commercial transactions must be included in the concept of the international commercial arbitration, since the public character of these entities does not usually affect the rules which govern an agreement or an international arbitration in which they participate[4].

**(6)** In this case, the contested agreement is a contract of sale of goods and provision of services and the arbitration for any disputes arising therefrom clearly falls within the concept of the commercial arbitration, as defined in article 1 of Law 2735/1999 on international commercial arbitration, and as this concept is clarified by the explanatory note of this law, the corresponding footnote of the UNCITRAL Model Law and the Model Law Commentary as referred to above. [In addition, this independent interpretation of the term "international commercial arbitration" in Law 2735/1999 is not influenced by, nor does it influence, any interpretation or characterisation of this relationship in the context of any interpretation of any other law.]

**(7)** Furthermore, and irrespective of the characterisation and the submission of this arbitration to article 1 of Law 2735/1999, the Respondent itself, both during the conclusion of the arbitration agreement (and irrespective of its permissibility or its validity) and also during the stage of the negotiations and the conclusion of the contested supply agreement, was considering any disputes arising from this agreement to be international commercial disputes, and for this reason it agreed to an arbitration of the International Chamber of Commerce (ICC) in relation to which article 1, paragraph 1, of the Rules of Arbitration stipulates that the function of the International Court of Arbitration of the ICC is "to provide for the settlement by arbitration of business disputes of an international character".

**(8)** It must be noted that the referral of any disputes to arbitration according to the Rules of Arbitration of the ICC is included not only in the contested contact for the supply of the C4I systems but also in the decision of the Minister of National Defence which ratified the supply of the C4I Olympic Security Systems (Φ600/ΑΠ 9092 Σ.16 13 May 2003, paragraph 24). Furthermore, it is certain that this term was also the subject-matter of negotiations since, even though the call for tender regarding the provision of the C4I Olympic Security Systems (Decision of the Ministry of National Defence –YPETHA - Φ600/44139 Σ.23 6 September 2002) provides for the settlement of disputes by arbitration (paragraph 16), it does not refer to the arbitration of the ICC, although this was finally included in the award decision. Therefore, these elements must also be taken into consideration when examining the true intent of the parties both under the subjective criterion (article 173 of Civil Code) and the objective criterion (article 200 of Civil Code), which leads to the conclusion that (and irrespective of the direct application of article 1 of Law 2735/1999) according to the understanding and the intent

---

[3] E.Gaillrd, J.Savage, Definition of International Commercial Arbitration, in Emmanuel Gaillard and John Savage (eds), Fouchard Gaillard Golman on International Commercial Arbitration, (Kluwer Law International 1999) page 9-62 in para. 59 page 34, see also Explanatory Notes of Law 2735/1999.

[4] Ibid, para. 70-71 page 40.

of the parties, any disputes arising from the contested agreement would be commercial and subject to this arbitration.

**13. <u>Law 2735/1999 as legislative basis for the conclusion of valid arbitration agreements</u>**

**(1)** Given the above (under C11 and C12), this arbitration constitutes an international commercial arbitration according to the meaning of article 1 of Law 2735/1999 and is governed by the provisions of this law.

**(2)** However, there is an ambiguity in whether Law 2735/1999 constitutes a legislative basis for the conclusion of valid arbitration agreements, i.e. whether this falls within the meaning of the "law", as this term is used in paragraphs 1 and 2 of article 94 of the Constitution ("*as provided by law*").

**(3)** Accordingly, it must be noted that there is no issue and there has never been any different opinion or doubt expressed, neither in the theory nor in the case law, that Law 2735/1999 constitutes the legislative basis for private disputes as required by the Constitution (article 94, para. 2) in order to exclude private disputes from the jurisdiction of the civil courts and, upon agreement, submit them to arbitration. It must also be noted that it is generally accepted, without any expressed opinion or doubt to the contrary, that international commercial disputes, which according to other provisions (of the national law) are characterised as private, following the application of Law 2735/1999 (which is more recent than the Civil Procedure Law and more specific, since it only refers to particular private disputes, i.e. the international commercial disputes, while article 867 of Civil Procedure Law refers to all private disputes), are subject to Law 2735/1999 and not to the provisions of the Civil Procedure Code. Therefore, this law constitutes the legislative basis for the validity of the relevant arbitration agreements.

**(4)** Furthermore, to this day neither the case law nor the theory have examined the question whether Law 2735/1999 constitutes the basis for the submission to arbitration, upon agreement of the parties, of disputes which, under other provisions (such as article 94, paragraph 1 of the Constitution or article 1 of Law 1406/1983), are characterised as administrative disputes, but at the same time and irrespective of this, they fall, according to the above (under C 10-12), in the scope of article 1 as international commercial disputes and therefore in the scope of Law 2735/1999. However, similarly, the same conclusion as above must be reached regarding private disputes. Indeed, the wording of the first paragraph of article 94 of the Constitution regarding administrative disputes ("*as provided by law*") is similar to the wording of the second paragraph which concerns private disputes ("*as provided by law*") and law 2735/1999 is considered, without any doubt and without any opinion to the contrary, to be the legislative basis which is required by article 94 para. 2 of the Constitution for the conclusion of valid arbitration agreements. Consequently, it must also be accepted, without any doubt to the contrary, that the same law is the legislative basis which is required by the similar article 94 para. 2 of the Constitution for the conclusion of a valid arbitration agreement for this category of administrative disputes, i.e. for those which also fall in the meaning

of international commercial disputes of article 1 of Law 2735/1999 (except for those which – as provided by article 1, paragraph 4 of Law 2735/1999 – are excluded by provisions of laws from arbitration proceedings, which does not appear to apply to this dispute, and no party has submitted any such request).

**(5)** From all the provisions of Law 2735/1999, it can be deduced that this law recognises the arbitration agreement as a reason for the exclusion of disputes which fall within the scope of article 1 of this law from the state courts and their submission to arbitration; according to these provisions, a pre-requisite is the submission of a dispute to arbitration based on not only the agreement provided in article 7 of the law, but also expressly stated in article 8 of this law (the "negative" effect of the arbitration agreement, see also Model Law Commentary, under article 8, para. 1), which stipulates that in cases where an arbitration agreement is valid, the court before which an action is brought shall refer the parties to arbitration (provided that the relevant request shall be submitted in a timely fashion), while article 9 stipulates that it is not incompatible with an arbitration agreement for the court to order interim measures, and therefore from this provision it appears *a contrario* that the arbitration agreement excludes the hearing of the substance of the dispute from the courts. Finally, article 7 of law 2735/1999 does not simply refer to the definition of the arbitration agreement, but also recognises it as "*the most important legal document which constitutes the basis and the reason for an arbitration*" (see also Model Law Commentary, under article 7, para. 1 and 2-4).

**(6)** However, the submission to arbitration of international commercial transactions (i.e. the international supplies) with the Greek State, according to article 1 of Law 2735/1999, also serves the interests of the Greek State, since in cases where such submission to arbitration, and specifically to an internationally accepted arbitration, was not permitted, many suppliers or service providers from abroad would hesitate to participate in tenders or negotiations with the Greek State, which would thus be deprived of the option to negotiate with a broader range of candidates and to select between better products and achieve better terms in its agreements.

**(7)** For this reason, many provisions of the Greek laws facilitate the conclusion of an arbitration agreement (and also other terms of agreements in contrast with any restrictions which apply to transactions of a purely national character) in the international transactions of the Greek State. Indicatively, we refer to the exclusion from the restrictions of article 49 of the Introductory Law to the Civil Procedure Code (i.e. the existence of an opinion by the Plenary of the Legal Council of the State) in the case of an international transaction (see article 8 para. 1 of law 736/1970 and judgment of Hellenic Supreme Court in Plenary (Areios Pagos) 8/1996 Elliniki Dikaiosyni 1996, page 1052, EEN 1996, page 32, END 1996, page 448, see also other similar provisions below under C14(13) (e) and C14(14) (e)).

**(8)** The fact that Law 2735/1999 does not expressly refer to administrative disputes cannot support the interpretation that this law does not cover such disputes (under the argument that if the law intended to cover these disputes it would have included a relevant provision), since Law 2735/1999 incorporates in the Greek legislation the UNCITRAL Model Law, i.e. an international text which could not refer to the

differences of the Hellenic national laws and which furthermore consciously intended to disconnect the characterisation of the international commercial disputes from any characterisation under the internal national laws of any state (see also Model Law Commentary, under article 1, para. 19). Nevertheless, it intended to also include disputes with state entities (see also Model Law Commentary, under article 1, para. 21). Additionally, although Law 2735/1999 does not refer to private disputes, it is incontestable that private disputes are indeed covered by the provisions of this law. Finally, Law 2735/1999 – and the UNCITRAL Model Law as incorporated in the Greek law thereby – cannot be interpreted (i.e. the intent of the legislator cannot be understood) based on arguments derived from other laws such as Law 2717/1999 (Administrative Procedure Code), which does not contain any provisions regarding the submission of administrative disputes to arbitration (such as the Civil Procedure Code); compared to the latter, Law 2735/1999 is a more recent and specific law since, according to what was set out above, it refers to only a single category of administrative disputes, i.e. to those which also constitute international commercial disputes, according to article 1 of this law.

**(9)** Considering the above and that this arbitration (irrespective of its characterisation based on other provisions) is an international commercial arbitration and the dispute in question is an international commercial dispute, according to article 1 of Law 2735/1999, it is not deemed necessary to examine whether this dispute is a private or an administrative dispute according to paragraphs 1 and 2 of article 94 of the Constitution since, in both cases, this dispute may be lawfully submitted to arbitration by an agreement, while this arbitration agreement is valid and the legal basis for this is Law 2735/1999.

## 14. The validity of the arbitration agreement pursuant to Presidential Decree 284/1989

**(1)** Additionally, the arbitration agreement (clause) included in article 28 of the contested agreement is valid pursuant to article 69 paragraph 7 of presidential decree 284/1989[5] regarding the supplies of the Armed Forces, which was in force at the time of the conclusion of this agreement (presidential decree 284/1989 was abolished by article 71 of Law 3433/2006) and according to the terms of which the contested agreement was lawfully signed.

**(2)** In particular, article 1 of presidential decree 284/1989 stipulates that: "*This Presidential Decree exclusively governs the procedures regarding the supplies, contracts, works and service provision, carried out internally or abroad under the care of the Ministry of National Defence in order to fulfil its needs of any kind*".

**(3)** In addition, article 1, para. 1 of Law 2292/1995, regarding the organisation and operation of the Ministry of National Defence, stipulates that: "*The National Defence*

[5] Presidential decree 284/1989 was issued under statutory power conferred by article 50, para. 5 of Law 721/1970 "*Regarding Financial Care and Accounting of the Armed Forces*", which was re-established in force by Law 370/1976 "*regarding abolishment of paragraph 2(a) of article 1 of Presidential Decree 142/1974*").

*includes all operations and activities developed by the State in order to protect its integrity, national independence and sovereignty, as well as the security of the citizens against any external attack or threat, and the support of the national interests*", while paragraph 3 of this article provides that "*the Governmental Committee for National Defence (KYSEA) is the main body to decide upon issues concerning the exercise of the defence policy*" and article 3 of the same law (powers of KYSEA) provides that KYSEA has the power to approve "*the major programmes for the supply and production of equipment and materials of defence*" (case c) and to decide "*upon issues for which the co-operation of more than one ministry is required*" (case r).

**(4)** Additionally, article 5, para. 1 of Law 2833/2000 stipulates that: "*The security of the Olympic Games belongs to the Hellenic Police, at the Headquarters of which a specific service is constituted under the title "Olympic Games Security Directorate" to supervise the executive planning and to coordinate the bodies which are responsible for the order and security and which participate in the preparation and operation of the 2004 Olympic Games*", while paragraph 2 of the same article stipulates that: "*2. In order to execute its mission, the abovementioned Directorate shall cooperate with all the bodies involved in the preparation and operation of the 2004 Olympic Games. The subject-matter and the method of this cooperation as well as any related issue thereto shall be regulated by common decisions issued by the Minister of Public Order and the Minister of Culture and the applicable competent Ministers.*"

**(5)** Finally, article 1 of Law 2800/2000 regarding the Ministry of Public Order (now Ministry of Civil Protection) provides that: "*The Ministry of Public Order, in the context of the Constitution and the laws, is commissioned with: a) The establishment and preservation of the public order, b) the protection of the public and state security.*"

**(6)** From the abovementioned provisions, it can be deduced that the security of the Olympic Games was conferred under article 5 of Law 2833/2000 to the Hellenic Police and therefore it was essentially within the powers of the Ministry of Public Order, according to its constitutional law. However, this assignment was not exclusive, since from article 5 of Law 2833/2000 (paragraphs 1 and 2) it appears that the established Olympic Games Security Directorate had the power "*to coordinate the bodies which are responsible for the order and the security*" (para. 1) and "*In order to execute its mission, the abovementioned Directorate shall cooperate with all the bodies involved...*" (para. 2), whereas YPETHA was incontestably amongst these bodies, since the protection "*of the security of the citizens against any external attack or threat*" (article 1 para. 1 of Law 2292/1995) was one of its powers, while the Olympic Games Security measures were clearly aiming to also protect the citizens from external attacks during the Olympic Games.

**(7)** Therefore, KYSEA, as the competent governmental body for regulating issues which fall within the powers of YPETHA and for which the cooperation of more than one ministry is required (article 3 para. 3, case r of Law 2292/1995), lawfully and within its powers (a) authorised YPETHA, under its decision 1/23.1.2003, to proceed to directly negotiate with each participant in a previous unsuccessful procedure for the

award of the implementation of the C4I Olympic Security programme, pursuant to presidential decree 284/1989, in accordance with articles 6(2i), 71(1b) and 73 (1b) (13) (1g), which are expressly referred to in this decision and also in accordance with the provisions of articles 71 (1a) (1e), 73(1h) and 76(1) (3), not referred to in the decision, based on which decision Φ.600/9024/Σ3 dated 29/1/2003 of the Ministry of National Defence was issued, approving the implementation of the program (para. 1b) and characterising the programme as "confidential" and "urgent", (b) selected, under its decisions No. 2 dated 27/2/2003, SAIC Team as the contractor to proceed with the negotiations, and (c) decided, under its decision No. 1/13.3.2003 to award the implementation of the C4I programme to the SAIC Team against the amount of 254,999,000 Euros.

**(8)** Furthermore, the Minister of National Defence (based on the aforesaid decisions and the aforesaid laws) lawfully awarded the supply of the C4I Olympic Security Systems to the Science Applications International Corporation (i.e. to the Claimant) under its decision Φ.600/ΑΠ.9092/Σ.16 dated 13 May 2003, to which 26 documents are annexed (a-z) which are referred to in the previous proceedings, while paragraph 1 of the decision lists a number of applicable provisions (a-j) amongst which is presidential decree 284/1989 "*regarding supplies, contracts and works of the Greek State*" (under i) and its enabling law, i.e. Law 721/1970 "*Regarding the Financial Care and Accounting of the Armed Forces*" (under a).

**(9)** Given the above, it is indisputable that the contested agreement was the subject-matter of negotiations and was concluded according to the provisions of presidential decree 284/1989, and that this was made lawfully following the lawful procedures according to the abovementioned analysis.

**(10)** In addition, article 69 (dispute resolution) of presidential decree 284/1989, in its paragraphs 1-6, stipulates an administrative procedure for the resolution of some specific disputes particularly in relation to the delivery of supplies. Given that paragraph 7 provides as follows: "*Specifically for supplies of major importance, the procedure for the dispute resolution is defined in the relevant agreement. In this case, an equivalent provision shall be stated in the specific terms of the call of the corresponding tender*", a question arises as to whether this provision constitutes a legislative basis for the validity of the arbitration agreement (clause) which is included in article 28 of the contested agreement.

**(11)** Regarding this issue, it must firstly be noted that the wording of the provision of paragraph 7, article 69 of presidential decree 284/1989 is clear (*"for supplies of major importance, **the procedure for the dispute resolution is defined in the relevant agreement**")* and it is undeniable that the supply of the C4I Olympic Security System is "*a supply of major importance*", while the resolution of disputes by arbitration is provided both in article 16 of the call for tender dated 6 September 2002 (YPETHA decision Φ.600/44139/Σ.23 of 6 Sept. 2002 issued following the decision dated 12/6/2002 of the Inter-Ministerial Committee for the Coordination of the Preparations for the Olympic Games – DESOP –; however it also has a legislative basis on the abovementioned provisions regarding the partial authority of YPETHA), and in article

24 of the award decision for the Supply (YPETHA decision Φ.600/ΑΠ 9092/Σ.16 dated 13 May 2003).

**(12)** The Respondent, however, claims that paragraph 7 of article 69 of presidential decree 284/1989 does not constitute a legislative basis for the valid conclusion of an arbitration agreement (and therefore the arbitration clause included in article 28 of the contested agreement is invalid) because this paragraph must be interpreted in a restrictive manner, due to its position in article 69 which (in its entirety) only refers to the administrative resolution of some specific disputes (specifically in relation to the delivery of supplies) and therefore, although a different procedure for the resolution of disputes may be provided for supplies of major importance, this procedure always refers to disputes which are similar to those disputes referred to in the previous paragraphs, and which concern the delivery of supplies, while this is always an administrative procedure similar to that which is provided by the previous paragraphs of the same article 69.

**(13)** **(a)** This systemic interpretation, however, i.e. an interpretation on the basis of the position of a provision, as attempted by the Respondent which, notwithstanding that in some cases it can constitute an interpretation tool when seeking the meaning of a provision, is insufficient to justify a restrictive interpretation (in particular of a provision which is so clear) unless it is used in conjunction with other interpretation approaches, and specifically with a teleological interpretation.

**(b)** In addition, even based on a systemic approach, it must be noted that paragraph 7 (in an article entitled "dispute resolution") is at the end of the article with the obvious intention to distinguish (and differentiate as to the legal consequences, i.e. to apply different procedures for the resolution of the disputes) between supplies of major importance, and therefore the legislator intended an *a contrario* interpretation of paragraph 7 in relation to the previous paragraphs. It does not appear to provide convincing arguments to support that this different procedure for the resolution of the disputes (which paragraph 7 certainly intends), and which shall be agreed upon in the agreement, must be subject to some restrictions (as to the type of dispute, i.e. in regard to the delivery, and as to the type of resolution, i.e. an administrative one) based on the previous paragraphs.

**(c)** The fact that an eighth paragraph was subsequently added (under article 31 of presidential decree 189/1997), which refers once more to the Dispute Resolution Committees (expenditures), cannot support that paragraph 7 refers to similar dispute resolution proceedings, firstly because it is still certain that paragraph 7 purposefully intended to establish a different method of dispute resolution for supplies of major importance, and furthermore in a manner which is agreed upon in the agreement, and secondly the systemic interpretation is important for some laws with dogmatic cohesion, while the addition of a paragraph subsequent to paragraph 7, which paragraph should potentially have been present from the outset, may very well be deemed as a legislative error.

**(d)** Furthermore, the historical interpretation (i.e. what the previous presidential decree 785/1978 provided for) may assist in the interpretation, given that presidential decree 284/1989 indeed intended to amend and supplement (and rephrase) presidential decree 785/1978. Indeed, presidential decree 785/1978, in its article 69, paragraph 6

(the last sentence of which was similar to paragraph 7 of article 69 of presidential decree 284/1989) provided that: "*More specifically, in case of supplies of major importance from abroad, the abovementioned Committee shall be constituted as provided by the relevant* agreement, *which may also examine any dispute regarding the interpretation and implementation of the agreement*".

**(e)** This provision defines (teleological interpretation) its purpose (which once again proves that the legislator prefers to follow arbitration proceedings for international disputes of the public sector) and the purpose of the amended provision (i.e. of paragraph 7 of article 69 of presidential decree 284/1989) as well as the purpose of the amendments. It is indeed clear that the purpose of the last sentence of paragraph 6 of presidential decree 785/78 was to ensure that, for the resolution of disputes regarding the supplies "*of major importance*" "*from abroad*", the committee would not be constituted in accordance with the provisions of the presidential decree for other supplies, but "*as provided by the relevant agreement*" (and therefore, for instance, in accordance with the agreement, it could be constituted as provided by the ICC Rules of Arbitration), and that it may "*examine any dispute regarding the interpretation and implementation of the agreement*" (i.e. to have the full powers of an arbitration such as this arbitration provided by article 28 of the agreement).

**(f)** The reason for this regulation is evident and is referred to in paragraphs C13(6) and (7) above, i.e. for supplies of major importance many firms from abroad were unwilling to accept the resolution of disputes by the committees of the presidential decree or by the courts (which was ultimately detrimental to the interests of the Greek State, since the number of its candidates-suppliers was limited, and thus it would not have the opportunity to achieve better supplies at better terms) and for this reason presidential decree 785/78 allowed the parties to agree upon the constitution of committees which could resolve all disputes arising from the agreement. The fact that this provision of presidential decree 785/1978 (i.e. an arbitration by committees with agreed composition and with subject-matter the resolution of all disputes arising from the interpretation and implementation of the agreement) is included in the last sentence of paragraph 6 of article 69 (which, as to the remaining, refers to the administrative resolution of disputes regarding the delivery), proves that the position of a provision (restrictive interpretation) is less relevant that its wording (grammatical interpretation) in combination with its purpose (teleological interpretation).

**(g)** By amending presidential decree 284/1989, paragraph 7 of article 69, the legislator in fact widened (clearly in favour of the Greek State) the previous regulation so that firstly, this regulation may apply to all supplies of major importance (i.e. even if these supplies are made by firms abroad) and secondly, the agreement of the parties may regulate not only the composition of the committees but also in general the method for the resolution of the disputes (i.e. either by the ordinary courts or by arbitration proceedings) and in case of arbitration, the type of the arbitral tribunal and the entire proceedings without imposing by (new) paragraph 7 any restrictions as to the subject-matter of the arbitration.

**(h)** Therefore, interpreting presidential decree 284/1989 (article 69, para. 7) *a contrario* to presidential decree 785/1978 (article 69 para. 6) and concluding that the legislator, with the amendment of presidential decree 284/1989 and despite the clear wording of the provision, intended not to widen the previous provision but to restrict it, so that supplies of major importance may not be submitted to arbitration for every

dispute with agreed upon bodies for the resolution of the disputes, does not pursue any objective, and such *a contrario* interpretation without any connection to any teleological interpretation, must not be accepted, since it leads to erroneous conclusions.

**(i)** Given the above, it is obvious that a restriction of the clear wording and spirit of paragraph 7 of article 69 of presidential decree 284/1989 is not justified.

**(14)** **(a)** However, given that law 284/1989 is a presidential decree, and as long as a valid agreement upon which a dispute is transferred from the jurisdiction of courts to arbitration may only be concluded by law (according to article 94 para. 1 and 2), it remains for us to examine the legislative delegation for presidential decree 284/1989, and specifically with reference to whether it permits the conclusion of an arbitration agreement for disputes arising from agreements concluded in accordance with the proceedings of presidential decree 284/1989.

**(b)** It must also be noted that presidential decree 284/1989 was issued by the authority of paragraph 5 of article 50 of presidential decree 721/1970. More specifically, paragraph 5 provides *inter alia* as follows:

> " *5. By Royal Decrees, issued following proposals by the Ministers of National Defence and Economics, the following is provided regarding supplies, contracts and works, carried out nationally or abroad by the Directorates of the Armed Forces:* "
>
> ..................
>
> " *k. The procedure for the tenders, the award of the contracts, the submission and hearing of objections.* "
>
> ..................
>
> " *n. The method of checking and delivering, rejecting supplies, arbitration, as well as the constitution, the purpose and operation of the central or peripheral committees for the acceptance, checking and arbitration.* "
>
> ..................
>
> " *u. The specific terms and the proceedings for some supplies from abroad, by exception from the provisions regarding the supplies of the Armed Forces.* "
>
> ..................
>
> " *v. The remuneration paid to the military officers in general, civil officers and persons employed by other services which participate in committees for conducting tender proceedings, expert opinions, delivery acceptance procedures and arbitration proceedings.* "
>
> ..................
>
> "*x. Any other relevant provision and details.* "

**(c)** Based on these provisions, an authorisation is granted to define by royal, and now presidential, decrees the "*method ... of arbitration*" (case n) and reference is made to "*persons employed by other services*" which may participate "*in committees for conducting ... arbitration proceedings*" (case v).

**(d)** In this case, once again, the restrictive interpretation of the term "arbitration" cannot be supported under the argument that the original, and furthermore absent-minded, legislator of presidential decree 721/1970 (and specifically the enabling legislative provision of paragraph 5 of article 50) did not confer a wider authorisation

for arbitration, but it exclusively referred (and thus restricted its authorisation) to the restricted and advisory arbitration of article 16 of law 654/1937 (A162), which was a text adopted 33 years earlier and in an era when the binding arbitration agreement was not widely accepted in private disputes, i.e. only in commercial disputes (see Civil Procedure i.e. Law 2/14 Apr. 1834 article 106-110)[6], and furthermore since the same enabling legislative provision (i.e. paragraph 5 of article 50 of law 721/1970) was used as a legislative basis for the arbitration of the last sentence of paragraph 6 of article 69 of presidential decree 758/1978, which concerned supplies from abroad and established a binding arbitration for all disputes arising from the agreement, with a composition of arbitration committees based on the agreement between the parties which, as referred to above, widened the meaning of presidential decree 284/1989.

**(e)** Furthermore, and irrespective of what is referred to above, case u of paragraph 5 of article 50 of law 721/1970 enables the regulation of specific terms and proceedings *"for some supplies from abroad, by exception from the provisions regarding the supplies of the Armed Forces"* (and this is one more provision which grants more discretion for the conclusion of international agreements, including arbitration in contrast with other provisions) whereas case x stipulates that the decrees which shall be issued may provide for "*any other relevant provision*" including the agreement for arbitration as a relevant provision.

**(f)** Given the above, the legislative authority for paragraph 7 of article 69 of presidential decree 284/1989 (but also the legislative basis for arbitration clauses) is set out in not only in cases n and v of paragraph 5 of article 50 of law 721/1970 but also in cases u and x of the same paragraph, which is further reinforced by the fact that the contested agreement was concluded on the basis of the exceptional provisions of articles 71, 73 and 76 of presidential decree 284/1989, which permit "*the delivery of supplies by exception from ordinary proceedings*" (article 71 para. 1) and under "*direct contracting of a supply without call for tender*" (article 73 para. 1) and without any restriction as to the content of the relevant agreements, thus permitting the arbitration agreement.

**(g)** Therefore, paragraph 7 of article 69 of presidential decree 284/1989 constitutes the legislative basis for the conclusion of a valid agreement for the submission to arbitration of disputes arising from agreements of major importance which were concluded pursuant to presidential decree 284/1989, and accordingly of the arbitration clause which is included in article 28 of the contested agreement. Furthermore, articles 71 para. 1 and 73 para. 1 constitute the legislative basis for permitting such arbitration agreement; these articles in some cases (such as in this case) permit, in the interest of the Greek State, the direct contracting of a supply by exception from the ordinary proceedings and without any restrictions as to the content of the relevant agreements. Consequently, the arbitration clause of article 28 of the contested agreement is valid.

**(h)** In addition, since the Respondent itself included the arbitration agreement both in the original call for tender and in the decision for the awarding of the supply agreement, and then finally in the contested agreement, it is clear that the Respondent accepted that article 69 para. 7 and the provisions of presidential decree 284/1989 in general (under which the agreement was concluded) permitted the conclusion of a valid

---

[6] See Evolutionary interpretation.

arbitration agreement, and therefore, in the context of good administration, it is unacceptable to attempt *a posteriori* a different interpretation and to defeat the reasonable expectations of its contracting parties, which relied upon the validity of the arbitration clause of article 28 of the contested agreement which, as referred to above, was a subject-matter of their negotiations.

**15. The decision**

Given the above, it must be accepted that the arbitration agreement which is included in article 28 of the contested agreement is valid and its legislative basis lies both in law 2735/1999 and in presidential decree 284/1989, article 69, paragraph 7, and also in articles 71 para. 1 and 73 para. 1. Therefore, the Arbitral Tribunal has the jurisdiction to determine any disputes arising from the contested agreement, dismissing any objections to the contrary by the Respondent. It must be noted that based on the abovementioned analysis, it is unnecessary for the Arbitral Tribunal to decide whether the contested agreement and any disputes arising therefrom are private or administrative, since, in any case, based on the abovementioned provisions of the law, an arbitration agreement may be validly concluded for these disputes.

**16. Other issues**

Finally, given that the Arbitral Tribunal, in the context of its investigation, by its own initiative (see also article 16 para. 1 of law 2735/1999), upheld that it has jurisdiction, it is unnecessary to examine the Claimant's claim that the Respondent submitted its objection regarding the invalidity of the arbitration clause belatedly and, in the alternative, in an unfair manner, and thus should be dismissed.

## D. PRELIMINARY REQUESTS RAISED BY THE CLAIMANT

### 1. Regarding the admissibility of the supplementary answers of the Respondent

(a) The Claimant, based on a number of documents, starting with its letter dated 30 April 2010 addressed to the Arbitral Tribunal, with its written submissions, memoranda and additional pleadings, and also orally during the hearing of the case on 17 December 2010, argued that the claims and requests of the Respondent, which were submitted with its supplementary answers, should be dismissed, mainly because the ICC Rules of Arbitration do not make such provision. The Respondent replied that these allegations and requests were admissible.

(b) In relation to this issue, article 5 of the ICC Rules of Arbitration, which specifies that the Respondent must file its Answer within 30 days, requires that the Respondent submit its answer to the relief sought by the Request (and to submit its claims in relation to the real facts); the Respondent, however, had already submitted such claims with its answer dated 25 September 2009 (following an extension of the time for filing its Answer granted by the Secretariat of the International Court of Arbitration of the ICC).

(c) However, notwithstanding that article 5 of the Rules seeks an answer to the request (and the Respondent with its answer sought the dismissal), it does not require the Respondent to submit all its claims, arguments, rebuttals or requests with its answer.

(d) Furthermore, article 18(1) of the Rules, presupposes that the parties shall have submitted further arguments before the drafting of the Terms of Reference, since it provides that the Arbitral Tribunal shall draft the Terms of Reference in consideration of the most recent submissions of the parties.

(e) Furthermore, article 19 of the Rules stipulates that after the Terms of Reference have been signed, no party shall make new claims or counterclaims ("*produce claims or counterclaims*" according to the Greek rendering of the Rules) which fall outside the limits of the Terms of Reference, unless it has been authorised to do so by the Arbitral Tribunal. From this provision, it appears that new claims or counterclaims may be submitted before the Terms of Reference have been signed, without the permission of the Arbitral Tribunal.

(f) Given the above, any answer and request submitted by the Respondent (and also by the Claimant) before the Terms of Reference were signed were filed in a timely fashion whereas any claims to the contrary by the Claimant must be dismissed.

**2. Regarding the inadmissibility of the Respondent's plea for set-off because (a) this plea hides a belated counterclaim and (b) the costs of the Arbitration have not yet been paid**

(a) The Respondent, with its Supplementary Answer dated 20/4/2010, submitted an alternative request that the amount of 70,246,683.30€ must be set-off against its counterclaims amounting to 122,027,043€ and other counterclaims which were not specified, but it reserved its right to specify them with its written submissions [specifically see Terms of Reference under 7(f)11(3)].

(b) The Claimant filed a procedural objection requesting that the Respondent's plea for set-off be dismissed because the related plea hides a belated counterclaim and also the costs of the Arbitrations have not yet been paid.

(c) In relation to this matter, it must be noted that the Respondent, by submitting its counterclaims, does not request that the Claimant pay these amounts of the counterclaims but it requests to dismiss the claims of the Claimants because of these counterclaims.

(d) However with such request, the submission of the Respondent's counterclaims constitutes a real plea for set-off and any claims to the contrary by the Claimant must be dismissed.

(e) Furthermore, the Arbitral Tribunal has no jurisdiction to fix the advance on costs. More specifically, according to article 30(2) of the Rules, the amount for the advance on costs is fixed by the International Court of Arbitration of the ICC. This rule

also applies in the case of a plea for set-off which, according to article 30(5) of the Rules, is taken into account when determining or adjusting the advance to cover the costs of arbitration by the International Court of Arbitration of the ICC, pursuant to article 30(2) of the Rules.

(f) In any event the decision of the Arbitral Tribunal on the admissibility of the set-off objection is not linked with the decision of the International Court of Arbitration of ICC about the amount of the advance.

(g) For these reasons the Arbitral Tribunal holds that the set-off objection of the Respondent is admissible and the Arbitral Tribunal reserves its decision on the merits for a future Award.

**3. Regarding the separation of the examination of the merits of the case in two stages, the first of which will determine whether the acceptance of the C4I System by the Respondent shall be upheld or rejected**

(a) The Claimant, with its abovementioned documents, both during the drafting of the Terms of Reference and with its aforesaid written submission and memoranda, and also during the hearing of the case on 17 December 2010, submitted and claimed that the merits of the case must be examined in two (2) stages, the first of which will determine whether the acceptance of the C4I System by the Respondent shall be upheld or rejected. The Respondent denied such separation. By the Terms of Reference (paragraph 14) this request was agreed to be examined as a preliminary issue in a separate hearing conducted for the preliminary issues.

(b) Given this request, it must be noted that in order to facilitate the proceedings, the Arbitral Tribunal has the power to separate the examination of the merits of the case in two stages.

(c) Nevertheless, the documents which were submitted to the Arbitral Tribunal up to this date are insufficient for the Arbitral Tribunal to decide whether the requested separation shall facilitate or obstruct the investigation of the merits (as argued by both parties) and despite the fact that both parties indicatively referred to some examples, these were insufficient to provide a full picture to the Arbitral Tribunal.

(d) The main issue, which remains unclear, is the legal consequences (and the basis of the provisions) of the recognition by the Arbitral Tribunal that the Respondent accepted the delivery of the C4I, and which of the defence arguments of the Respondent (e.g. claims regarding defects or omissions, pleas for set-off, etc.) would be rejected if such acceptance were to took place, while it is clear that any development of such claims from both parties at this stage of the examination of the preliminary issues would require extensive analysis of substantial issues. Therefore, and given the above, this request is so closely connected to the merits of the case that the Arbitral Tribunal cannot examine it before becoming aware of all the claims and evidence on the merits

of the case, and specifically as to the influence of the acceptance of the C4I System on the other issues of the merits. In addition, the proposed separation does not correspond to a separation between the liability and the quantum of the claim, but also affects the claims of the parties in regard to the liability.

(e) It is certain that this does not assist the parties, which shall be obliged to prepare and submit all their arguments, both main and alternate; however, for the correct administration of justice, the Arbitral Tribunal must be able to examine the entire case file in order to decide whether some issues could or might be separated and examined in a different hearing.

(f) Following this, the Claimant's request regarding the separation of the examination of the merits is rejected.

## E. <u>PRELIMINARY ISSUES RAISED BY THE RESPONDENT</u>

### 1. <u>Request for the suspension of the proceedings due to criminal charges</u>

The Respondent (as detailed below) requests the suspension of the arbitration on the basis of article 250 of the Greek Code of Civil Procedure due to pending criminal proceedings.

More specifically, article 250 of the Code of Civil Procedure reads as follows:

> " *If a criminal action is pending and affects the determination of the (civil) dispute, the Court may on its own initiative or following the request of any party, to order the postponement of the hearing until the criminal proceedings are terminated irrevocably.*"

Regarding this request of the Respondent, it must be noted that the Arbitral Tribunal, as more specifically explained below, has the discretion (but not the obligation) to suspend the arbitration proceedings in view of any other pending proceedings, the results of which might affect the issues determined by this arbitration. This discretion, however, must be exercised very cautiously in order to avoid long delays which by their nature are incompatible with the arbitration proceedings, *a fortriori* since the Arbitral Tribunal has the power to decide in preliminary proceedings upon any issues which constitute pre-requisites for the acceptance or rejection of requests or claims submitted before the tribunal; in this case, however, although 2 ½ years have passed since the criminal

prosecution, neither the investigating authorities nor the Respondent have ascribed any charges to any specific public officers.

Regarding any influence (and the legal consequences) of corruption (in the conclusion of the agreement or in the acceptance of the project), the evidence submitted to this day is insufficient to justify the suspension of the arbitration until the end of any criminal proceedings. For this reason, this request for suspension cannot be accepted at this stage, but it can be re-examined with the merits of the case if it is re-submitted and the corruption, its method and its consequences are specified (i.e. if they affected the agreement or the acceptance of the delivery).

The criminal charges which were pressed only *in rem*– a long time ago – and not against any specific person who handled this matter on behalf of the Respondent, cannot justify any suspension.

More specifically:

(a) The request for suspension of the arbitration proceedings due to criminal charges was submitted by the Respondent with its original answer to the request (pages 9-10), it was developed in detail in its Pleading dated 24/9/2010 submitted prior to the hearing of 17/12/2009 (specifically pages 1-38) and in its Supplementary Cross-Pleadings submitted after this hearing (specifically pages 23-40). It was also developed orally during the hearing of the case by the authorised lawyers of the Respondent.

According to the arguments of the Respondent, the legal basis of this request is article 250 of the Civil Procedure Code, while the factual basis is the fact that criminal charges have been pressed and an investigation has been launched for the case of Siemens, "an aspect of which is the conclusion and implementation of the agreement for the supply of the C4I Olympic Games Security Systems". The criminal charges have been pressed for the following offences against the Public State: passive and active corruption, money laundering, fraud, constitution of criminal organisation for committing these offences at a felony level (see pages 12-13 of pleadings dated 24/9/2009). The Respondent also states that this agreement is the subject matter of investigation by the Investigative Committee of the Greek Parliament.

In order to establish the connection of Siemens with the Claimant, the Respondent notes that the first company was the main subcontractor (at a percentage over 80%) of the contested agreement for the supply of the C4I system, that following the 5th amendment of the agreement it undertook to execute almost the entire project, and that it undertook, by substituting the Claimant, the crucial sector of the interoperable system.

(b) The Claimant argues that article 250 of the Civil Procedure Code does not apply in these arbitration proceedings, which must be conducted according to the ICC Arbitration Rules, law 2735/1999 and in the alternative articles 682-703 of the Civil Procedure Code, as defined by paragraph 11 of the Terms of Reference. These rules do not contain – according to the Claimant – any provision similar to article 250 of the Civil Procedure Code. Therefore, according to the Claimant, this request is unlawful. In addition, the Claimant argues, clearly in the alternative, that in any case the requirements of article 250 of the Civil Procedure Code do not apply and that "the decision for the suspension is at the discretion of the Arbitral Tribunal". Furthermore, relying upon article 24(1) of the ICC Rules of Arbitration, as well as on the delay in the criminal proceedings in Greece, the Claimant argues that any acceptance of suspension "would result in the final abolishment of the arbitration proceedings" and thus the principle of fair trial would be infringed upon.

(c) Article 15(1) of the ICC Rules of Arbitration stipulates as follows (in free translation from English): "The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is

thereby made to the rules of procedure of a national law to be applied to the arbitration."

Based on this provision, paragraph 11 of the Terms of Reference provided that the Arbitral Tribunal shall apply the ICC Rules of Arbitration, and that "*if the proceedings are not governed by other rules, in the alternative, the provisions of articles 683-703 of the Greek Civil Procedure Rules shall apply, subject to the exceptions which are mentioned herein below in paragraph 13*". Given that this arbitration (as upheld above) is an international commercial arbitration and falls within Law 2735/1999, article 19 of this law shall also apply (and furthermore by priority against the interim measures provisions of the articles of the Civil Procedure Rules, as the last alternative resort), which stipulates that failing any agreement between the parties upon some procedural issues, the Arbitral Tribunal may conduct the arbitration in such manner as it considers appropriate. Finally, number 9 of paragraph 13 of the Terms of Reference states, *inter alia*, that the Arbitral Tribunal shall be able to enact any other provisions or exceptions for all the procedural issues while it shall inform the parties in a timely fashion.

(d) The provisions referred to in the previous paragraph, which govern the proceedings of this arbitration, do not expressly refer to article 250 of the Civil Procedure Code and do not contain any provision similar to this article, while article 250 of the Civil Procedure Code does not apply in the interim measures proceedings and it is incompatible with their urgent nature. However, when these proceedings have been agreed upon in arbitration for the hearing of the main case, as in this case, article 250 of the Civil Procedure Code is compatible, and based on article 19 of Law 2735/1999, the Arbitral Tribunal may, at its discretion, apply this article directly or by analogy. Furthermore, the Respondent submitted its request for suspension of the arbitration proceedings, based on article 250 of the Civil Procedure Code with its original Answer to the Request for Arbitration, i.e. before the determination of the abovementioned rules, while it reinstated this during the hearing for drafting the Terms of Reference and it was referred to in the latter as its "first preliminary" request. The Terms of Reference were drafted upon a unanimous agreement of the parties and the Arbitral Tribunal, and provide for a separate hearing and decision upon the preliminary issues. Therefore, it would be contradictory to accept that the procedural rules which are provided in the Terms of Reference *a priori* exclude upholding as well-founded in law the abovementioned request, and that at the same time they impose its examination as a priority. Thus, according to the correct interpretation approach of the aforesaid definitions of the Terms of Reference, the application of article 250 of the Civil Procedure Code, as well as the investigation of the merits of the Respondent's relevant request based on this article, are also included in the "provisions or exceptions", which may be enacted by the Arbitral Tribunal during the arbitration, since the related exception is taken for granted by the same Terms of Reference of which the parties were aware, and which they had unanimously accepted. Given the above, the Arbitral Tribunal upheld that the application of article 250 of the Civil Procedure Code must not be excluded in this arbitration, but on the contrary it must be accepted, under the main condition that its requirements are met, that the suspension is at the discretion of the Arbitral Tribunal and that the suspension shall not result in a *de facto* abolishment or in a long delay of the arbitration proceedings. Consequently, the Respondent's request is acceptable and *prima facie* (under the meaning of the existence of an establishing

provision) well-founded in law and as to the remaining, it must be decided whether it is founded in law (i.e. whether the Respondent relies on facts which fulfil the remaining requirements of article 250 of the Civil Procedure Code) and in fact (i.e. whether the facts upon which the Respondent relies are real).

(e) In order to establish, legally and substantially, the abovementioned request, the Respondent relies on and submits mainly the following evidence, the material content of which is in summary as follows: a) The ω-05, ω-7/50 and ω/2008/47 orders of the Public Prosecutor of the Athens Court of First Instance, initiating ordinary investigations. Based on these orders, criminal prosecution was pressed regarding the offences referred to above (under no. 1) in relation to Siemens. On 26/6/2009, an arrest warrant was issued against Mich. Christoforakos, employee and managing director of Siemens in Greece, for fraud against the Greek Public State, concerning over 150,000 Euros, in regard to the supply of the C4I Olympic Games Security System to the Public State. According to the warrant, the false representations that constituted the offence of the fraud were mainly that the Claimant and Siemens as the subcontractor represented that they had the technical infrastructure, know-how, etc. to implement and deliver the project within its contractual time limit, while in fact they were not qualified to do so. The time of committing the fraud appears to be the period between the year 2002 and 19/5/2003. b) On 14/9/2009, a new arrest warrant was issued against Christoforakos for repeated fraud against the Public State. It refers to the period between 23/8/2004 and 5/12/2007, it concerns the same false representations and the total amount of damages is in the amount of 79,279,261.35 Euros, i.e. the released amount for the supply during this period. c) Order imposing an imprisonment penalty of one year in total by the Magistrates' Court of Munich on M. Christoforakos since, as director of Siemens in Greece, he proceeded to pay bribes to the two largest political parties, and specifically to the treasurers of these parties at the time. More specifically, he was sentenced on the basis that he paid an amount in the order of tens of millions Euros to the aforesaid treasurers of the two parties in order to accelerate the acceptance of the partial works for the supply of the C4I and to persuade the competent officials to decide in favour of Siemens, possibly in breach of their duties. d) Decision by the Court of First Instance of Munich dated 28/7/2008, based on which the officer of Siemens, Rheinhard Siekaczec, was sentenced to a two-year imprisonment for paying bribes to various countries, including Greece, in relation to the C4I supply. This decision notes that for these bribes, Siemens (in Germany) was ordered to pay a fine of 201,000,000 Euros). e) The memorandum dated 6/6/2008 by the American law firm Debevoise and Plimpton LLP addressed to the Public Prosecutor of the Athens Court of First Instance which states that M. Christoforakos told Siekaczek "since the delivery of the project was well under way" (Siekaczec, that is the C4I project), he would need 10-15 million Euros "in order to pay commissions to four ministries – Internal Affairs, National Defence, Culture, Communications – based on the promises he made at the time of the awarding of the contract". This document also states that: "Siekaczec added that he had never discussed about the payment of commissions with anyone in SAIC and that he had never got the impression that SAIC had any involvement in these payments" (page 24, case 3-6). Furthermore, this document also refers to M. Christoforakos' attempts to obtain money for bribes regarding the C4I project through the employees of Siemens Kutschenreuther and Meyer. f) The testimony of Siekaczec dated 17/11/2006 before the Magistrates'

Court of Munich, in which he stated that Christoforakos told him that the receivers of the monies, which were transferred by the Placid Blue Corporation, through its account in ABN AmroBank in Munich (which account is estimated to amount annually from 1 to 4 million Euros), "were the political parties in Greece". In the same testimony, Siekaczek stated that M. Christoforakos told him that in order for the C4I programme to be awarded to Siemens and to the joint venture, he (i.e. Christoforakos) had to pay "the Ministry of National Defence, the Ministry of Internal Affairs, the Ministry of Sports and one more Ministry", and that the amount was approximately 10 million Euros. g) The statement of defence dated 6/2/2007 of Siekaczek to the Bavarian State Criminal Police, in which he refers to the monies paid for bribes to various countries, including 10 million Euros for Greece. h) The report dated 8/10/2008 for the examination of Siekaczek as a witness by the 4th special investigator, made in Munich. The most material facts testified by the witness (and which are similar to the previous ones) refer to the monies which were sent through Munich "for the improvement of the relationships with the political parties, i.e. with PASOK and Nea Dimokratia", and that he paid Christoforakos and Mavridis approximately 10-15 million Euros per year. He also states that he does not know whether Greek officials or ministers or politicians received payments as bribes from Siemens or SAIC and that: "As far as I know, SAIC did not have any involvement in eventual promises for payment of monies (bribes)".

(f) As stated by the Respondent, and also as noted from the abovementioned documents cited by the Respondent, criminal charges were pressed for the first time regarding the aforesaid offences in July 2008 (on 2/7/2008). The prosecution was launched *in rem*, whereas the relevant charges have not been personalised, by the hearing of the case on 17/12/2010 or by the closing of the proceedings (21/1/2011), against specific public officers or employees of the Greek State. Only employees of Siemens have been prosecuted. However, a pre-requisite for bribery is a bribed public employee or officer. Such a specific person is not referred to by the Respondent and is not proven by the submitted evidence. Such persons and the manner by which the contested agreement was affected or the Claimant's claims are affected have not been

specified by the Respondent or by the conducted investigation, even though a substantial period of time has elapsed since the beginning of the prosecution.

(g) Given the above, the Arbitral Tribunal cannot justify acceptance of the request for suspension of the arbitration until the closing of the criminal proceedings (which, as it can be deduced from the evidence, is at the outset), specifically in the context of the arbitration which requires speedy proceedings, and furthermore since there is no evidence that the party in these proceedings, i.e. SAIC, had any participation in the alleged payments of bribes on behalf of Siemens. Therefore, the relevant request of the Respondent must be dismissed. However if, during the process of the case, new evidence arises which may justify any suspension for a specific, reasonable period of time, a new relevant request may be re-submitted.

**2. Dispute of the legal representation and of the standing to bring the Request or in the alternative, of the legal interest on behalf of the Claimant**

(a) The Respondent in its original answer (pages 10-11) contested the authority of the legal representation of the Claimant to bring this Request in its name and argued that the Claimant lacks standing to bring this Request because, following the 5th Amendment of the contested agreement, "SIEMENS HELLAS S.A." undertook to implement such a large part of the project that in fact SAIC (the Claimant) was substituted in full by Siemens, i.e. the latter undertook all the rights and obligations of the agreement and therefore the Claimant lacks *locus standi*, or, in the alternative (pursuant to the Respondent's Pleadings dated 24/9/2010), "SIEMENS HELLAS S.A." has a legal interest in this arbitration, not the Claimant.

(b) Regarding the legal representation of the Claimant in this arbitration, the latter submitted the power of attorney referred to above under **B 3(a),** which the Arbitral Tribunal, for the present time and under the condition that it shall not further be contested on specific and convincing reasons, considers it sufficient for the lawful representation of the Claimant in this arbitration while, regarding the *locus standi* of the Claimant, it must be noted that as deduced from the 5th amendment dated 29/3/2007 of the contested agreement, this amendment (as was the original agreement and the previous amendments) was concluded and signed between on the one hand the Greek State (Respondent) and on the other hand the Science Applications International Corporation – SAIC (Claimant) and irrespective of the size of the works which "SIEMENS HELLAS S.A." undertook to implement, this company was acting and continues to act as a subcontractor of the Claimant, while the Respondent and the Claimant remained the parties of the contested agreement. Therefore, the Claimant has standing to bring this arbitration and it also has legal interest to raise the claims it submits, and any arguments to the contrary of the Respondent must be dismissed.

**3. Inadmissibility of the Request for Arbitration due to lack of written preliminary steps**

(a) The Respondent, in its original Answer dated 25 September 2009 (pages 11-12), submitted an objection regarding the inadmissibility of the Request for Arbitration due to failure to complete the written preliminary steps provided by article 28, paragraph 2 of the contested agreement; this request was re-submitted with its pleading dated 24 September 2010 (pages 40-42) with the additional argument that any failure to observe the preliminary steps of article 28, paragraph 1 "*questions the jurisdiction of the arbitral tribunal or, in any case, the inadmissibility of this request for arbitration*" (page 42 of the pleadings *in finem*).

(b) Article 28, paragraph 2 of the contested agreement provides that:
" ***28.2.*** *The contracting parties undertake to act in good faith and through negotiations, to settle within a short period of time any dispute or claim arising out of the AGREEMENT, or in connection with it or with any of its clauses. In cases where the parties fail to settle their dispute under the abovementioned means, following written notice communicated between parties, which shall confirm the dispute, each party may have recourse to arbitration, as set out herein below. In light of the foregoing, each party shall communicate to the other a written report of its position on the matter which remains unsettled.* "

(c) The Claimant (specifically in its Pleadings dated 15 October 2010, page 42 et seq.) relies on article 8 of the contested agreement, as amended by the 5th Amendment of the agreement, and specifically by its paragraph 8, and argues that based on this amendment (which as noted is more recent than article 28.2), a specific step for the acceptance of the system and the recourse to arbitration is provided, while the Claimant, allegedly, according to its correspondence with the Respondent, observed the preliminary step of article 8.8 on the one hand and on the other hand it simultaneously observed the steps of article 28.2. More specifically, article 8.8 of the contested agreement, as amended by the 5th Amendment of the contested agreement, states *verbatim* as follows:

> " ***8.8.*** *Following the completion of all test procedures for the C4I SYSTEM, either with success or with deficiencies / variations which do not render it inappropriate for the intended use, THE PURCHASER shall issue and sign a Protocol of Qualitative and Quantitative Acceptance within 15 days from the completion, and therefore the C4I SYSTEM shall be deemed as FINALLY ACCEPTED by the PURCHASER at that specific day of the signing of the aforesaid Protocol. In the case where, according to a justified opinion of the PURCHASER, there are deficiencies / variations according to what is referred to above, these shall be recorded in the Protocol of Qualitative and Quantitative Acceptance. The parties are obliged, within 50 days from the date of issuance of the Protocol of Qualitative and Quantitative Acceptance, to proceed to solve any dispute on the value of the deficiencies / variations of the C4I SYSTEM and its SUBSYSTEMS. Failing to conclude such agreement within the aforesaid time limit, any of the Parties may have recourse to the arbitration provided in article 28 in order to finally resolve the Dispute.* "

(d) In this regard, it must be noted that the observance of the steps provided in article 28.2 of the Agreement does not affect in any way the validity of the arbitration clause (which is included in article 28 para. 3 of the contested agreement) and therefore there is no issue regarding the jurisdiction of the Arbitral Tribunal. On the contrary, the Arbitral Tribunal is competent to decide whether this step was observed or not, since any contest of this issue is also a dispute arising from the agreement or its interpretation and falls within the arbitration agreement of article 28.3 of the agreement. Failing to observe the step of article 28.2 could simply act as an exception which would postpone the arbitration proceedings.

(e) First and foremost, however, the purpose of article 28.2 is to empower the parties with an amicable resolution of their dispute through negotiations. Furthermore, the written notice communicated between parties which is provided in this article aims to make the other party aware that the notifying party considers that the negotiation stage has ended and thus the other party, if it so wishes, may commence the arbitration proceedings (without waiting for any response from the notifying party or without expecting any further negotiations).

(f) However, when a party refers to arbitration, at that point the document for the initiation of the arbitration proceedings in fact incorporates the confirmation of the

dispute, the notice that further negotiations are insignificant and the development of its case, whereas the development of the case of the other party is set out in its answer.

(g) It must be noted that the relevant written notice of article 28.2 does not serve any other purpose than that which is referred to in para. (e) above and therefore it cannot be interpreted as preventing the initiation of the arbitration.

(h) In addition, contrary to the claims of the Respondent, the provision of article 28.2 of the contested agreement for the resolution of any dispute through negotiations, within a short period of time and upon written notice and written report of the position of the parties, does not serve, nor does it appear that it serves the detailed specification of the subject-matter of the dispute before the commencement of the arbitration. This view is reinforced by the fact that according to what was accepted above and pursuant to the ICC Rules of Arbitration (but also pursuant to the request of the Respondent which was accepted by the Tribunal), additional requests and answers and arguments (which define the subject-matter of the arbitration) may be submitted even after the initial requests and answers, an argument which was vigorously supported by the Respondent in relation to its supplementary answers. Furthermore, article 28.2 does not aim to address the "tight" time limits provided by the ICC Rules of Arbitration regarding the answer and the other proceedings, since these time limits of the ICC Rules of Arbitration, in complicated cases, can be addressed with extensions (such as in this case, firstly for the submission of the Respondent's answer and during the subsequent stages of the proceedings) and with the submission of supplementary requests (as it was also accepted in this case, according to what is referred to above).

(i) In any case, both from the communication of the parties before the commencement of the arbitration (as detailed in the Claimant's Pleadings of 15 October 2010, pages 44-49 and proven by the cited documents) and from the positions of the parties as set out in the Terms of Reference and its pleadings, the existence of a dispute and the positions of the parties are fully confirmed, and therefore the suspension of the arbitration proceedings in order to communicate the written notice confirming the dispute is pointless.

(j) Therefore, it must be accepted that the Claimant's Request for Arbitration dated 16 June 2009 is not inadmissible due to failure to complete written preliminary steps, according to article 28.2 of the contested agreement, and thus the Respondent's claims to the contrary must be rejected.

**4. Invalidity of the arbitration clause and thus lack of jurisdiction of the arbitral tribunal**

The Respondent, in its Supplementary Answer dated 20 April 2010 and with it subsequent pleadings and cross-pleadings and for the reasons stated therein, raised an objection regarding the lack of the Arbitral Tribunal's jurisdiction due to the invalidity of the arbitration clause included in article 28.3 of the contested agreement. This request of the Respondent was examined above under C together with the *ex officio*

Arbitral Tribunal's examination of its own jurisdiction which, as stated therein, was accepted thus rejecting the Respondent's objection to the contrary.

## F. DISSENTING OPINION AND DIFFERENT OR SUPPLEMENTARY REASONING

### (1) Different and supplementary reasoning by the arbitrator Mr. Dionysios Kondylis

One of the arbitrators, Mr. Dionysios Kondylis, expressed the following different and supplementary reasoning, specifically in regard to the jurisdiction of the Arbitral Tribunal and the validity of the arbitration agreement:

1. The objection regarding the invalidity of the arbitration clause and therefore the lack of jurisdiction of the Arbitral Tribunal was raised in the first "Supplementary Answer" of the Respondent dated 20/4/2009, and developed in detail in the pleadings submitted both before the hearing of 17/12/2009 and after this hearing. It was also developed in detail orally during the hearing. Furthermore, the Arbitral Tribunal must examine *ex officio* its own jurisdiction based on not only the general rules of law, but also on the specific provision of article 6(2) of the ICC Rules of Arbitration and article 16 para. 1 of Law 2735/1999.

2. In order to establish the invalidity of the arbitration clause, the Respondent claims that the contested Agreement is administrative, that it was governed by the provisions of presidential decree 284/1989 and that these provisions does not permit the resolution of the disputes by arbitration.
The opinion of this arbitrator regarding this objection is as follows:

(1) According to the prevailing opinion in case law and in theory, an agreement is administrative if one of the contracting parties is the State or a public entity, and this agreement aims to satisfy a purpose of public interest according to the law, and in addition the State or the public entity, in order to satisfy the abovementioned purpose, is in a dominant position over the counter-party, either based on the regulatory regime which governs the agreement, or based on clauses provided by regulations and included in the agreement, but in exception from the common law (Supreme Special Court 19, 20, 21/2009, with references to the case law of the Supreme Special Court, Spiliotopoulos, Administrative Law, issue 13th, para. 186, 187). The administrative agreement falls within the field of the administrative law, while the element of the dominant position of the State or the public entity, which is a notional element of this law, must follow either from the regulatory regime which governs the agreement, or from its clauses, which not only deviate from the common law, but which must also be included in this agreement by law ("... which are provided by regulation and have been included in the agreement", according to the wording of the abovementioned decisions of the Supreme Special Court).

(2) Article 1 of presidential decree 284/1989, which was in force at the time of the conclusion of the contested Agreement, stipulates that: "This Presidential Decree exclusively governs the procedures regarding the supplies, contracts, works and service

provision, carried out nationally or abroad under the care of the Ministry of National Defence in order to fulfil its needs of any kind". (The same, with more a detailed wording, is provided by article 1 of Law 3433/2006, article 71 of which abolished presidential decree 284/1989). Furthermore, article 5 para. 1(a) of Law 2833/2000 stipulates that: "The security of the Olympic Games is assigned to the Hellenic Police, at the Headquarters of which a specific service is constituted under the title "Olympic Games Security Directorate" to supervise the executive planning and to coordinate the bodies which are responsible for the order and security and which participate in the preparation and operation of the 2004 Olympic Games". Furthermore, article 1 para. 1 of Law 2292/1995 and article 1(a)(b) of Law 2800/2000, the former referring to the Ministry of National Defence and the latter to the Ministry of Public Order, stipulate as follows: Article 1 para. 1 of Law 2292/1995: "The National Defence includes all operations and activities developed by the State in order to protect its integrity, national independence and sovereignty, as well as the security of the citizens against any external attack or threat, and the support of the national interests". Article 1(a)(b) of Law 2800/2000: "The mission of the Ministry of Public Order, within the limits of the Constitution and the laws, is as follows: a) To safeguard and preserve the public order; b) to protect the public and state security".

3.1. It is apparent from the abovementioned provisions that the security of the 2004 Olympic Games was under the authority of the Ministry of Public Order, to which the Hellenic Police belongs. This can be deduced from the mission of this Ministry under the law, while it is also expressly stated in article 5 para. 1 of Law 2833/2000, as set out above, and in the introductory notes of this law, which state as follows:

> "The abovementioned requirements at a security level impose the establishment of a Specific Service in the context of the Hellenic Police, as furthermore also provided in the candidacy file, which shall be competent to supervise the executive planning and to coordinate the bodies which are responsible for the order and security, and which participate in the preparation and operation of the 2004 Olympic Games. In order to execute its mission, this service shall cooperate with all the competent bodies and shall be staffed by personnel on secondment from these bodies..."

From the abovementioned extract, it is also apparent that even in the candidacy file which was submitted by our Country for the award of the organisation and execution of the Olympic Games, the Police was specified as the competent body for order and security issues. Consequently, the supplies and services regarding the security of these games concern the satisfaction of the needs of the Hellenic Police, i.e. of a service which belonged to the Ministry of Public Order, and not to the satisfaction of the needs of the Ministry of National Defence. Therefore, presidential decree 284/1989 cannot apply to these supplies, since this decree refers to supplies, etc for the satisfaction of the needs of this Ministry.

3.2. The contested Agreement refers to supplies of goods and to provision of services related to the security of the Olympic Games. This is indisputable, and it also apparent from its entire content and specifically from its article 3, which defines as its subject-matter the obligation of the Claimant against a contractual price to "study, design, build, install, test, certify, complete, develop, sell and provide, according to the

requirements of each case, to the purchaser (i.e. the Greek State) the C4I Systems for the Olympic Security as a "Turn-Key" solution... The C4I Olympic Security SYSTEMS constitute an information technology security system... concerning the security of the Olympic Games 2004". Therefore, due to its subject-matter, this Agreement serves, mainly at a minimum, the needs of the Ministry of Public Order. In addition, this is clearly stated in the inter-ministerial decision of the Ministers of National Defence and Public Order No 249101/22/8/2006, which was issued based on article 19 of Law 3489/2006; paragraph 1 of its single article stipulates that the abovementioned Ministers decide "to transfer the execution and implementation of Agreement 020A/03 for the C4I Olympic Security Systems and Agreement 16/03 for the Offset Benefits arising from the supply of these systems from the Ministry of National Defence to the Ministry of Public Order, **to which these supplies mainly refer**".

3.3. Given the above, the Respondent's argument that the contested Agreement is administrative, because it is governed by presidential decree 284/1989 and therefore it is subject to a regulatory regime that secures the dominant position of the State, is erroneous according to the opinion of this Arbitrator.

3.4. Furthermore, the Respondent argues that: "the same provisions of the Agreement deviate from the common law and constitute an exceptional law which confers a dominant position to the State". It also refers to such provisions of the contested Agreement: a) article 23.1, according to which in cases where the supplier delays in fulfilling its obligations, penalties may be imposed, which shall be paid with deduction from its payment or by forfeiting its guarantees, etc., b) article 24, which provides that the supplier may be declared in default if it breaches its contractual obligations, c) para. 8.1 and 8.2 of article 8. The Respondent argues that based on these paragraphs, it can reduce the contractual price unilaterally in cases where any of the subsystems have deficiencies or variations. It must firstly be noted that the original agreement did not contain provisions regarding the reduction of the contractual price in paragraph 8.1 and 8.2 of article 8. Such reduction was added in the abovementioned paragraph following the 5th amendment, based on which these provisions were modified. However, and according to their current wording, these provisions do not stipulate a unilateral reduction of the price, but a reduction which "corresponds" or is "equivalent" to the deficiencies or variations, for the level of which the parties must clearly agree, as it also can be deduced from their comparison with paragraph 8 of the same article, which was also added with the 5th amendment. In any case, the matter remains the same even if these provisions are interpreted according to the arguments of the Respondent, d) the provisions of articles 34.1, 34.3 and 34.3.4.4, which confer to the State the right to terminate unilaterally the Agreement and to forfeit the letters of guarantee in case where the supplier is in default of its own fault to fulfil his obligations or if it is declared to be in bankruptcy, etc.

3.5. All the abovementioned terms of the contested agreement, according to the opinion of the Arbitrator, do not deviate from the common law. On the contrary: the default clause, in case of one party failing to fulfil its obligations, the incidental agreement for the penalty clause in case of delay or improper fulfilment of the main obligation, as well as the right of the purchaser to terminate the agreement or to reduce the price in

cases of deficiencies or variations, are common terms in private law agreements, which are binding according to article 361 CC, and are provided specifically in articles 399, 404 and 540 CC. Clearly, if the contested Agreement was subject to a regulatory regime which imposed these terms to be included in its texts, then it could be argued that these terms constitute a dominant position of the Respondent over the Claimant.
However since, as it was already explained, presidential decree 284/1989 does not apply in this case and there is no other law imposing the abovementioned terms in the Agreement, these terms derive from the intention of the parties, and are in agreement with the rules of private law. In addition, even if they deviate from the rules of private law, this does not suffice to characterise the agreement as "administrative". These terms, according to the case law of the Special Supreme Court, must also be "**provided by regulatory laws**", which is not the case.

3.6. Furthermore, the Respondent argues that, if the contested agreement is not governed by presidential decree 284/1989, then it is absolutely null and void, based on articles 79 and 85 of Law 2362/1995, which declare the absolute invalidity of agreements, in cases where they impose obligations on the State, and these obligations do not contribute to fulfilling its purposes. However, in this case, since "the security of the Olympic Games belongs to the Hellenic Policy" (article 5 para. 1 of Law 2833/2000), the purpose of the State is to observe it. Furthermore, this agreement contributes to the fulfilment of this purpose. It must also be noted that a private law entity was constituted according to article 2 para. 1 of Law 2598/1998, in the form of a public limited company [societe anonyme], under the title "Athens 2004" with the purpose to "exercise all powers and authorities provided in the Olympic Chart and in the agreement signed on the 5th of September 1997 in Lausanne ...", and that the supervision of this public limited company was generally assigned under paragraph 10 of the same article to an Inter-Ministerial Committee, constituted upon the decision of the Prime Minister. This Committee (re)constituted upon decision Y10/2001 of the Prime Minister, with the same Prime Minister as Chairman and 12 Ministers as members (etc.), amongst which the Minister of National Defence. Under article 1 para. 2 of Law 2833/2000, this Committee was named: (Inter-Ministerial) Committee for the Coordination of the Preparations for the Olympic Games (DESOP). The document dated 25/6/2002, which is cited by the Respondent, addressed to the Deputy Minister of National Defence L. Lotidis, notes that this Committee, in its 37th meeting of 12/6/2002 "decided that the Ministry of National Defence should launch a call for tender for the Olympic Security Operational Centres". Furthermore, this Deputy Minister was requested to cooperate with the Olympic Committee "Athens 2004" and the Ministry of Public Order. Under this decision (which is not submitted to this tribunal, and therefore it cannot confirm which Ministers participated in the composition of the Committee), assuming it is lawful, the Ministry of National Defence appears to be empowered to carry out the procedure for the selection of the supplier for the C4I security system. If this power, according to the subject-matter of the supply, belonged to the Ministry of National Defence, then the aforesaid decision of the DESOP would be meaningless.

3.7. It can be deduced from the above that in this case, there is no evidence based on which the contested agreement could be characterised as administrative. On the contrary, it is apparent that this is a private law agreement, into which the State entered,

not by exercising public power (*jure imperii*) but *jure gestionis*, according to the freedom of contracts provided in article 361 of the Civil Code (CC) and under a regime of equality. In addition, article 18 para. 4 of the contested agreement includes limitation clauses in some cases for the supplier's liability, only for intent [*dolus*] and gross negligence (a clause permitted by article 332 CC and which is in favour of the supplier). Therefore, since the contested agreement is of a private law nature, there was no legal impediment to submit any disputes arising therefrom to arbitration, and furthermore without observing the formalities of article 39 of the Introductory Law to the Civil Procedure Code, since the contested agreement was concluded with a foreign company (article 8 of Law 736/1970, Areios Pagos in Plenary 8/1996). Consequently, the arbitration clause is valid and therefore the Arbitral Tribunal has jurisdiction to determine this case.

4. In any case, if it is considered that the contested agreement is governed by the provisions of presidential decree 284/1989, then similarly, according to the opinion of this Arbitrator, the arbitration clause would valid.

4.1. Firstly, it must be noted that the opinion in favour of the submission of the contested agreement to the provisions of presidential decree 284/1989, even though (as referred to above) it is not in agreement with the provisions of article 1 of this decree and of article 5 para. 1(a) of Law 2833/2000, as well as with the other provisions and evidence referred to previously, it is supported by the fact that the provisions of this presidential decree 284/1989, which are referred to in all cited relevant administrative act, were applied to the procedure both for the conclusion of the Agreement and for its ratification. It is, however, certain that it is a matter of interpretation of this law whether a contract falls within its scope. If the parties express their intent for a law to apply to their contract and refer to it, even in the case where this law does not apply to their contract, then the provisions of this law shall have contractual validity and shall apply in a supplementary manner, provided that they do not contradict the explicit terms of the contract. Under this concept, given that in this case the parties expressly agreed upon the resolution of their disputes by arbitration, the provisions of presidential decree 284/1989 are irrelevant to the issue in question.

4.2. Furthermore, and even if it is accepted that presidential decree 284/1989 applies immediately and directly to the contested agreement, the arbitration clause is again valid under article 69, para. 7 of this decree, which stipulates that: "...for supplies of major importance, the procedure for the dispute resolution is defined in the relevant agreement. In this case, an equivalent provision shall be stated in the specific terms of the call of the corresponding tender". Under this provision, based on both its grammatical wording and its purpose, the parties may define, in the specific terms of the tender, and consequently in the agreement, the arbitration as a procedure for the resolution of disputes (see also Fortsakis, Arbitration and Administrative Disputes, pages 167 and 181). In this case, from the cited documents it is not apparent whether a call for tender was launched before the conclusion of the contested agreement and if a tender with general and specific terms was published. From the cited decision of KYSEA no. 1/23-1-2003, it can be deduced that the procedure for the supply of the C4I system was declared unsuccessfully completed. However, the document of the Ministry

of National Defence dated 6/9/2002 under the title "Supply of C4I Olympic Security Systems", bearing the form of a call for tender, is submitted, which states that: "The Service is interested in the supply of C4I Olympic Security Systems to cover the 2004 Olympic Games". Article 16 of this document refers to arbitration as one method for the resolution of any disputes. Therefore, the contested arbitration clause was lawfully agreed in any case, based on article 69 para. 7 of presidential decree 284/1989.

4.3. In addition, the contested arbitration clause was also lawfully agreed based on the provisions of Law 2735/1999 for International Commercial Arbitration, since this arbitration is international and commercial, while on the other hand there is no law providing that any disputes arising from contracts and submitted to the provisions of presidential decree 284/1989 are excluded from arbitration. Consequently, the provisions of this law (2735/1999) constitute an independent legal basis for the validity of the arbitration clause. More specifically, regarding whether this arbitration is international and commercial, this Arbitration refers to all that was accepted by the Arbitral Tribunal in its Decision dated 18/11/2009. There is no new evidence or arguments which may lead to a different opinion as to the character of this arbitration. Furthermore, presidential decree 284/1989 does not include any provision excluding any disputes arising from agreements governed by this decree to be submitted to arbitration (so that paragraph 4 of article 1 of Law 2735/1999 may apply). Article 14, para. 2 of the general terms, which have been published along with this decree, stipulates that: "Any dispute regarding the interpretation and implementation of an agreement or order for supplies to the Special Forces may be resolved, if such recourse is provided by the current laws, by the court within the jurisdiction of which the tender is conducted, applying the Greek Law". However, these general terms do not have legislative (regulatory) validity. They constitute a sample of terms which must be included in the tender in order to obtain contractual validity, in cases where the supplier declares that it accepts them, and thus constituting a contractual element (article 27, para. 4 and 30, para. 1(a) of presidential decree 284/1989). It must also be noted that the constitutional basis for the arbitration in our national law is article 8 of the Constitution[7], which stipulates that no person shall be deprived of the judge assigned to him or her by law **against his or her will**. The provisions of para. 1 and 2 of article 94 of the Constitution govern the jurisdiction of the **state courts** against the administrative and private disputes respectively. They neither permit nor forbid the resolution of such disputes by arbitration[8], which in general is deemed to be a jurisdictional procedure equal to state jurisdiction. The arbitration award clearly cannot annul an administrative act (Hellenic Council of State 752/2008, 889/1994 etc.). It can, however, declare legal consequences binding the administrative bodies, and order rights which may be alienated (such as the right to a monetary obligation), provided that the arbitration, to which the disputes are submitted, is regulated by law and there is also a relevant agreement referring the dispute to arbitration proceedings (article 8, para. 1 of

---

[7] In German law, the legal basis of the arbitration is article 2, para. 1 of the Constitution which provides for the free development of the personality (BGH 144.146).

[8] This is also accepted for the provision of article 92 of the German Constitution which regulates the jurisdiction of the state courts (see jarass/Pietoth, Grundgezetz fur die Bundesrepublik Deutschland, Kommentar, issue. 7th, p. 1036 no. 6).

Constitution). Both conditions are met in this case, since the contested disputes fall within the provisions of article 1 of Law 2735/1999 and there is a relevant agreement assigning these disputes to arbitration. Therefore, even under the assumption that presidential decree 284/1989 applies in this case, the arbitration clause is also valid and therefore the Arbitral Tribunal is competent to determine this case.

5. Pursuant to article 281 of the Greek Civil Code, the exercise of a right is abusive and is prohibited if it manifestly exceeds the limits imposed by good faith or public morals or the social or economic purpose of the right. Furthermore, article 25 par. 3 of the Constitution stipulates that: "The abusive exercise of rights is not permitted". As consistently accepted, the plea of abusive exercise can also be raised against rights arising from the public order (Areios Pagos 952/2010, Areios Pagos 1429/2005), as well as against public rights, such as, for example, the right of enforcement (Areios Pagos in Plenary 12/2009, Areios Pagos 385/2010). It may also be raised against the plea for invalidity of specific clause of an agreement as well as for invalidity of the entire agreement (Areios Pagos 960/2010). According to the interpretation of this article (281 CC), the exercise of a right is abusive only if the obvious excess of the limits imposed by good faith, etc. is proven from the behaviour of the beneficiary before the exercise of the right or from the real situation which has been created, or from the circumstances which have arisen or from other facts which, without preventing the creation or causing the termination of the right, render its exercise intolerable according to the understanding of the average social person regarding the law and morals (Areios Pagos in Plenary 17/1995). Furthermore, the legal basis of the exercised right is unimportant. The plea of the abusive exercise is also raised against rights which are based, directly or indirectly, on the Constitution (see for example Areios Pagos 952/2010, which refers to an abusive exercise of right arising from the provision of article 22, para. 1(b) of the Constitution regarding equal treatment of employees). Therefore, the right to dispute the arbitration clause as invalid may also be exercised in an abusive manner (Areios Pagos 301/1992. See Areios Pagos in Plenary 25/1990). It must also be noted that the invalidity of the arbitration agreement (referring either to an arbitration agreement in a private law contract or to an arbitration agreement in an administrative contract) results in the establishment of the jurisdiction of the state courts, based on article 94 of the Constitution. That is, the plea for the invalidity of the arbitration clause is always founded, even indirectly, in the Constitution. It can thus be construed that the clause is invalid, and therefore the state courts have jurisdiction based on article 94 of the Constitution. However, this does not mean that it cannot be rebutted by a plea of abusive exercise.

5.1. In this case, even if it was accepted that the arbitration clause in the contested agreement is invalid, in my opinion, the Respondent relies on this invalidity in an abusive manner, as the Claimant argues in a well-founded manner (see its pleadings dated 15/10/2010, page 79 and its pleadings dated 21/1/2011, page 21), for the following reasons which are founded in the evidence of the case file: a) The arbitration clause was chosen by the State. It was included as a term (article 16) in the invitation dated 6/9/2002, calling for expression of interest regarding the conclusion of the contested agreement, which was sent to the Claimant, b) the arbitration clause was included in the Decision dated 13/5/2003 of the then Minister of National Defence

regarding the award of the contract. This decision was issued before the signing of the contested agreement, and its article 24 states that the agreement to be drafted shall include the arbitration clause, which is indeed included in the contested agreement, c) In the single para. 2(b) of the inter-ministerial decision of the Ministers of National Defence and Public Order it is stated that all powers regarding the C4I Systems are transferred to the latter Minister "including the arbitration proceedings, as can be deduced from the main agreement", d) the Claimant argues that before the 5th amendment of the Agreement, it had brought a request to arbitration, based on the disputed clause, and that the Respondent answered and had appointed an arbitrator without raising any objection regarding the invalidity of the arbitration clause. This argument, indirectly but clearly, has also been admitted by the Respondent in its pleadings dated 21/1/2011, where it notes (page 21) that: "... the previous request for arbitration by the claimant never reached the stage of drafting terms of reference, since the claimant, following the 5th amendment of the agreement, resigned from this request", e) With the 5th amendment (based on which the contested agreement was modified to a large extent), the arbitration clause of article 28 of the contested agreement was not removed and a new clause was also added for specific issues with a supplementary paragraph under number 8, in article 8 of the contested agreement, f) A letter sent by the Respondent to the Court of the ICC **following the initiation of this arbitration proceedings**, stated as follows (in free translation from English): "... *we have the honour to inform you, with reference to your letter dated 6 August 2009, that we do not intend to raise any objections regarding the existence, the validity or the scope of application of the arbitration clause*", g) On 25/9/2009, the Respondent submitted its original answer to the request (application) to the Court. In its introduction, not only did it not dispute the validity of the arbitration clause, but on the contrary it stated that: "... The abovementioned request is authorised by article 28, paragraph 3 of this Agreement, which stipulates the following arbitration clause". It then set out the text of the arbitration clause.

5.2. Given the above, it is apparent that the Respondent was the party which suggested that the arbitration clause be included in the contested agreement, and in addition it included this clause as a term in the invitation for the expression of interest to the Claimant, that the Respondent was also the party which awarded the supply contract to the Claimant and imposed as a term in the awarding decision that the arbitration clause should be included in the contested agreement, as it was indeed included, that since then it supported this clause, and furthermore that it replied to the Court of the ICC, following the initiation of the arbitration proceedings, clarifying that it did not intend to raise any objections regarding the validity of the clause, that indeed with its original answer to the request it did not dispute the validity of the clause and that it raised for the first time the objection regarding the invalidity with its supplementary answer submitted over 6 months after its original answer. This behaviour of the Respondent is according to the opinion of this Arbitrator clearly contradictory, infringes on the doctrine of *non venire contra factum proprium* and contradicts the understanding of the average social person regarding law and morals, thus manifestly exceeding the limits imposed in the exercise of a right by the rules of good faith and public morals. Therefore, even if the clause was deemed invalid, the Respondent exercises its relevant right in an abusive manner, as the Claimant argues in a well-founded manner. For these

reasons, the objection by the Respondent regarding the invalidity of the arbitration clause and the lack of jurisdiction of the Arbitral Tribunal must therefore be rejected.

**(2) <u>Dissenting opinion and different or supplementary reasoning by arbitrator Styliani Charitaki</u>**

The arbitrator Mrs Styliani Charitaki expressed the following dissenting opinion regarding the jurisdiction of the Arbitral Tribunal and the following different or supplementary reasoning:

1. The contested agreement No. $020^{A}$/03, dated 19/05/2003, as stated in its introduction, was concluded between on the one hand the Hellenic Republic (Ministry of National Defence), pursuant to decision Φ.600/AP.9092/Σ.16/13 May 2003/YPETHA/GGOSAE/GDAE/DIKE and on the other hand S.A.I.C.

2. The abovementioned decision dated 13/05/2003 of the Directorate of Capital Equipment, which belongs to the General Secretariat for Financial Planning and Defence Investments (GGOSAE) of the Ministry of National Defence, is marked as "confidential" and "urgent" and refers to the: "Awarding of Supply of C4I Olympic Security Systems" and is signed by the Minister of National Defence.

3. This decision refers to a number of relevant documents concerning the progress of the procedure of the related supply to that day (exhibits a-z).

4. Point 1 of the aforesaid awarding decision refers to a number of legislative texts (a-j), as well as a number of decisions, acts, reports, etc of the Administrative bodies (k-v), which were taken into account and constituted a legal basis for the decision on the one hand for the approval of the Minutes of the negotiation of the relevant committee and on the other hand for awarding the supply contract of the C4I Olympic Security Systems to the Claimant, amounting to 254,999 million Euros, under the terms defined in the abovementioned minutes dated 2/5/2003 (exhibit: y). Amongst the cited provisions are also the provisions of presidential decree 721/70 (Regarding the Financial Care and Accounting of the Armed Forces) (note 1 a), as well as of presidential decree 284/89 (On Supplies, Contracts and Work Implementation of the Armed Forces) (point 1.h). Express reference to presidential decree 284/89 is also made at point 32, case b of the awarding decision. Similarly, reference is made in the minutes of the negotiation dated 2/5/2003, which were approved by the abovementioned awarding decision, to a rejection of a request due to its contradiction to presidential decree 284/89, (point 7) and also to approvals which are required for variations in the context of presidential decree 284/89 (points 19, 20).

5. From the above and the remaining documents submitted to the Arbitral Tribunal, which expressly, extensively and repeatedly refer to the provisions of presidential decree 284/89, it certainly appears that, according to the

opinion of this Arbitrator, the contested agreement was concluded pursuant to the provisions of presidential decree 284/89, the parties were fully aware thereof and with no hesitation in regard to the legality of the application of the regulatory framework which governs the agreement. Indicatively, the following documents are referred to: a) the written invitation dated 06/09/2002 of the General Secretary of the General Secretariat for Financial Planning and Defence Investments (GGOS & AE) / General Director of the General Directorate of Defence Equipment (GDAE) of the Ministry of National Defence (YPETHA), addressed to the claimant and two more companies for the submission of financial – technical tender for this supply, including as annexes the programme specific terms, a guide for answers and requirements of the project specifications, b) decision by the Governmental Committee for National Defence (KYSEA) dated 23/01/2003 (declaring the unsuccessful closure of the supply procedure), c) the relevant decision Φ.600/9024/Σ.3, dated 29/01/2003 by the Minister of National Defence which declares closed the preceding procedure, approves the implementation of the supply, in exception from the ordinary procedures of presidential decree 284/89, determines the terms of its implementation and characterises the relevant specific armament programme as "confidential" and "urgent", d) the invitations of the same date and content Φ.600/550. 654 and Φ.600/550. 655 of the General Secretary of GGOS & AE/General Director of GDAE, addressed to the two companies which participated in the previous and closed procedure, i.e. the first to the Claimant and the second to the other company, e) decision of KYSEA, dated 27/02/2003 (selection of Claimant as preferable for the continuation of negotiations), f) decision of KYSEA, dated 13/03/2003 (awarding of the implementation of the supply to the Claimant).

6.  The claimant disputes the application of presidential decree 284/89, as the lawful regulatory and contractual framework that governs this agreement, for the first time at this stage of the arbitration proceedings, while the provisions of this decree also constitute the grounds of the lawful awarding of the relevant supply. The related argument challenges incidentally and inadmissibly the validity of the awarding decision, even though the latter is assumed to be legal and despite a) the unreserved participation of the Claimant to the procedure prior to the awarding of the supply, b) the signature, on its behalf, of the contested agreement and its amendments in execution to the relevant awarding decision, and c) its general participation in the various subsequent stages of the progress of the agreement (NOMOS, Hellenic Council of State in Plenary 1415/2000).

7.  From the general provisions of Law 2362/95 (Public Accounting) regarding the conclusion of agreements on behalf of the State (articles 79-85), it can be deduced that the freedom of the State is limited and that the administrative bodies do not have unlimited discretion as to the selection of the procedure for the conclusion of the agreements. These general provisions provide, *inter alia*, that: a) the agreements, which generate obligations against the State, cannot be concluded unless they are provided by general or specific

provisions or unless they contribute to the fulfilment of its purposes (article 79), b) each agreement of the State is concluded by the State's legal representative and upon the observation of a written formality (articles 80, 81), c) they follow specific proceedings, mainly through tenders (articles 82, 83), d) there are restrictions regarding the payment of advances (article 84), and e) the infringement of the specific provisions results in the absolute invalidity of the agreement.

8. The supplies which concern armament programmes executed by the Ministry of National Defence are conducted pursuant to the provisions of a) law 721/1970 (Financial Care and Accounting of Armed Forces) and b) presidential decree 284/1989 (Supplies, Works, etc. of Armed Forces), which amended, supplemented and rephrased the provisions of presidential decree 285/78. The relevant provisions continue to apply, at the material time, in exception from the provisions which as a rule apply for government supplies (article 113 of Law 2362/95 on state accounting, article 1, para. 5 II and 5, para. 1 of Law 2286/195 on the provisions of the Public State, article 2, para. 10 and article 3, para. 3 of presidential decree 370/95 on the alignment of the Greek laws to the community direction 93/36/EE- NOMOS, ES 57/2007/Act of IV Department with references to the case law).

9. If the opinion of the Claimant, regarding the non application in this case of the provisions of the regulatory framework which concerns the supplies of the Armed Forces, was to be accepted then that would also imply the acceptance that the relevant agreement was concluded against the law and thus its absolute invalidity.

10. Regardless, the contested agreement was lawfully concluded according to the provisions of presidential decree 721/70 (which in any case provides in general for cooperation between co-competent ministries) and presidential decree 284/89, since the relevant supply was made upon the care of the Ministry of National Defence (article 1 of presidential decree 284/89) and was serving, *inter alia*, material and specific needs of the Armed Forces (see relevant document of the National Defence General Staff (GEETHA) Φ.231/56/400061/Σ.10/18/02/2003, and Φ.231/55/400042/Σ.6/04/02/2003, inter-ministerial decisions regarding the duties of the personnel of the Armed Forces (486/B/2004) under the cooperation of the Armed Forces (960/B/2004) with references, *inter alia*, to the operational centre of the Armed Forces, the Hellenic Air Force, the Hellenic Navy, etc including details as to their general and specific mission), which Forces on the one hand were the co-competent body for the security of the Olympic Games (article 5 of Law 2833/2000) and on the other hand were the competent main body by law for safeguarding the national defence, but also the public order and security in case of urgency (Law 2292/95, specifically article 1, para. 1, 4 / National Defence – article 3, para. 1, case e-l / KYSEA – no. 5 / Ministry of National Defence, article 11 / Head of GEETHA with powers, depending on each case, for the coordination, direction and supervision of the security

bodies in conjunction with the provisions of Law 2800/2000 regarding the restructuring of the Ministry of Public Order aiming to the participation of the latter in safeguarding the national defence in cooperation with the armed forces – article 1, case e)

11. It must be noted that, as upheld by case law (Council of State in Plenary 1681/2005 with full references to the legal framework), the Inter-Ministerial Committee for the Coordination of the Preparations for the Olympic Games (DESOP) had a supporting role in relation to the Prime Minister's duties, and its decisions taken in the exercise of its works do not constitute enforceable administrative acts. Given the above, it is undoubtedly apparent that the powers of the Minister of National Defence for the execution of this supply are provided by the relevant specific provisions for the armed forces and the national defence, while the Claimant unfoundedly relies on the relevant decision of DESOP and argues, in an attempt to attribute a regulatory character to this decision of DESOP, that this decision established the competency of the Minister of National Defence to conduct this supply in its absolute and unlimited discretion.

12. According to the consistent case law of the courts, the agreements concluded according to the provisions of presidential decree 284/89 are characterised as administrative agreements (indicatively, NOMOS, Council of State 2497, 1921, 1855, 1674/2008,ΕΣ/Act IV Division 57/2007, E. Spiliotopoulos, Administration Law, 2005, para. 190, footnote 11) and any disputes arising from their implementation are administrative disputes, while the Administrative Courts of Appeals are the competent courts to resolve such disputes, pursuant to the provisions of Law 1406/83 (indicatively NOMOS, Special Supreme Court 19/2009, Council of State 1348/2010, Areios Pagos 1612, 1780/2009).

13. According to the theory and the case law, in order to characterise an agreement as administrative the following requirements must be met: a) the Public State or a public entity must be one of the contracting parties, b) this agreement aims to satisfy a purpose of public interest, and c) the State or the public entity, in order to satisfy the abovementioned purpose is in a dominant position over the counter-party, either based on the regulatory regime which governs the agreement, or based on clauses provided by regulations and included in the agreement, but in exception from the common law, i.e. in a position which is incompatible with the contractual bond created pursuant to private law (indicatively Spiliotopoulos, Administrative Law, para. 186, 187, Special Supreme Court 19/2009 with references to consistent case law). It is noted that the recent decisions of 2009 of the Special Supreme Court do not differ from the relevant previous consistent case law, and they do not introduce new criteria for the characterisation of an agreement as administrative.

14. This agreement is undoubtedly an administrative agreement, since the State is the one contracting party, the agreement serves a clear public purpose (special armament programme for the supply of infrastructure systems in the context of the security during and even after the end of the 2004 Olympic Games), and is governed by not only the exceptional regulatory framework of presidential decree 284/89 (indicatively, NOMOS, ES 80/2007 – act VI division, Council of State 288/2010, 1921/2008, 2497/2008, 2498/2008, but also provisions regarding the exclusive regulation of methods and procedures for supplies of Special Forces / article 1, compulsory standard terms / art. 27, guarantee/ art. 29, tenders and offsetting benefits/ art. 30, objections/ art. 34, signature of agreement and deposit of letter of good performance, and also of compulsory default and imposition of penalties/ art. 36, penalty clauses/ 42, declaration in default, which is compulsory after the period of 6 months – invalidity and non-enforceability of subsequent decisions issued in favour of the supplier – cumulative or disjunctive imposition of penalties/ art. 43, prohibition of assignments/ art. 45, payment of advance and interest-bearing return/ art. 46, compulsory payment of duties in favour of the public state/ art. 47, amendment of agreement terms/ art. 66, resolution of disputes/ art.69).

15. Article 94 para. 1 of the Constitution provides that the hearing of administrative disputes belongs to the existing ordinary administrative courts. In decision 24/1993 the Special Supreme Court upheld that the aforesaid constitutional provision, according to its literal interpretation, does not prohibit the common legislator from allowing the Administrative bodies and the tax payers to submit to arbitration, upon their agreement, specific tax dispute or tax disputes arising from specific lawful relationships. Following the rendering of this relevant decision, it is consistently accepted, both from the theory and the case law, that the submission of an administrative dispute to arbitration is permitted, provided that there is a relevant enabling provision and, based on this provision, a relevant administrative agreement including an arbitration clause is concluded, or in the case of an absence of such relevant legislative authorisation, provided that the relevant administrative agreement including an arbitration clause is subsequently ratified by law (indicatively, E. Spiliotopoulos, Administrative Law, 2005, para. 198, 492, case d, 612, Th. Fortsakis, Arbitration and Administrative Disputes 1998, specifically para. 196, Council of State 752/2008, 3300/2002, 3105/2000, 889/1994 with further analysis regarding not only the power of administrative courts, the content and the binding force of their decisions, but also the obligation of the administrative courts, when hearing administrative disputes, to investigate, in case of submission of an arbitration decision, whether the Arbitration Court had indeed jurisdiction to resolve the subject-matter which was submitted to arbitration).

16. Whereas provisions of the Civil Procedure Code and its Introductory Law permit the State to conclude arbitration clauses regarding the agreements of private law, there is no relevant equivalent legislative provision for the State

to submit administrative disputes to arbitration. Law 2735/1999 regarding the international commercial arbitration does not constitute the proper legal basis for the conclusion of an arbitration clause on behalf of the State regarding disputes arising from an administrative agreement, due to the fact that the commercial dispute, and thus a dispute of private law, is semantically incompatible with the administrative dispute, and thus a dispute of public law. If the legislator intended to also permit the submission to international commercial arbitration of administrative disputes arising from administrative agreements, then it should have included an explicit and specific relevant provision in the aforesaid law. Lack of such a provision regarding the arbitration for the administrative disputes in general, both in the Code of Administrative Procedure and in Law 1735/1999 constitutes a conscious choice of the regulatory legislator, who, in any case, either regulates the relevant issue for a specific category of administrative agreements (e.g. Law 1418/1984 on the public works, art. 14 regarding arbitration clause following a specific decision of the competent ministers in each case), or for a specific agreement, applying the procedure of its regulatory ratification.

17. Given the above and due to the lack of a legislative ratification of the contested agreement, the *ex officio* examination by the Arbitral Tribunal of its own jurisdiction (NOMOS, decision 1/2004 of the Arbitral Tribunal of Veroia, St. Kousoulis, Arbitration Law, 2006, p. 53-55, para. 60-63), must be extended to the interpretation of the provisions of the regulatory framework of the agreement, in order to decide whether the latter constitutes a lawful basis for the conclusion of the arbitration clause included in the agreement.

*18.* According to the claimant, in any case, article 69 para. 7 of presidential decree 284/89 permits the conclusion of an arbitration clause regarding supply agreements of major importance. Article 69 of the abovementioned decree, under the title "Dispute resolution", in the case of rejection of material or acceptance with reduction, regulates the submission of this matter to a Dispute Resolution Committee. Paragraph 7 stipulates as follows: "*Specifically for supplies of major importance, the procedure for the dispute resolution is defined in the relevant agreement. In this case an equivalent provision shall be mentioned in the specific terms of the call of the corresponding tender*". Article 31 of presidential decree 189/97 adds a new paragraph 8 to article 69, which is as follows: "*Any expenses for laboratory checks or other costs arising in the context of the dispute resolution proceedings are borne by the party requesting the submission of the case to the Dispute Resolution Committee.*"

*19.* Presidential decree 284/89 amended, supplemented and rephrased presidential decree 785/78, as the latter had been amended and was previously in force. As it appears from the introduction of the abovementioned presidential decrees, both decrees were issued following delegation by article 50 para. 5 of presidential decree 721/70 regarding the financial care and accounting of the armed forces. The relevant paragraph

refers to "arbitration" and cases n and v respectively provide: "*n. The method of checking and delivering, rejecting supplies, arbitration, as well as the constitution, the purpose and operation of the central or peripheral committees for the acceptance, checking and arbitration.* " *and* " *v. The remuneration paid to the military officers in general, civil officers and persons employed by other services which participate in committees for conducting tender proceedings, expert opinions, delivery acceptance procedures and arbitration proceedings.* " It is noted that, at the time of the issuance of presidential decree 721/70, and regarding the supplies of the military service, Law 654/37 was in force, article 16 of which (Rejection of Supplies – Arbitration) provides for an arbitration committee with advisory powers deciding upon the suitability of the rejected material and any reduction on its acceptance price. Article 69 of presidential decree 785/78, which was issued subsequently and upon delegation by para. 5 of art. 50 of presidential decree 721/70, under the title "Arbitration", provides for an arbitration committee and recourse to "Arbitration", in case of rejection of material or its acceptance upon reduction. Paragraph 6 of the same article provides details regarding the composition of the Arbitration Committee and, in particular, its last sentence stipulates that: "*More specifically, in case of supplies of major importance from abroad, the abovementioned Committee shall be constituted as provided by the relevant* agreement, *which may also examine any dispute regarding the interpretation and implementation of the agreement*".

*20.* From the independent and combined examination of the aforesaid provision, according to their correct interpretation, the following assumptions can be deduced:

a. At the time of the enactment of the enabling provision of para. 5 of article 50 of presidential decree 721/70 (251/A/23.11.70), its legislator refers to "arbitration" and to "arbitration committees" according to the meaning of the corresponding terms of article 16 of law 654/37, which was in force at that time, i.e. the administrative resolution of disputes by a technical collective body, deciding upon specific technical and real issues in regard to the acceptance of the materials under supply, and not according to the meaning, which was also known to the legislator, of the arbitration as a final resolution of any dispute arising from the execution of the supply agreement, upon a decision by the arbitral tribunal with a binding effect, thus excluding the jurisdiction of state courts (Law 633/70- 173/A/21.08.70- regarding the arbitration clause and composition of an arbitral Tribunal with reference to the arbitration rules of the International Chamber of Commerce).

b. Under the aforesaid interpretation and in the same spirit, the legislator of presidential decree 785/78 provided for the arbitration proceedings and the relevant arbitration committee of article 69. Irrespective of whether the relevant provision for the supplies of major importance may be in breach of the relevant legislative delegation, as long as it permits the arbitration committee to also examine every dispute regarding the interpretation and implementation of the

agreement, this provision refers to an administrative resolution of disputes by a collective body, and not to an arbitration resolution of disputes by an arbitral tribunal, deciding finally and irrevocably, thus excluding the jurisdiction of the subject-matter state courts.

c. Under article 69 of presidential decree 284/89, the legislator, in compliance with the relevant enabling provision of law 721/70, replaces the terms "arbitration" and "arbitration committee" with the terms "dispute resolution" and "dispute resolution committee" and regulates the relevant administrative procedure in order, following a decision (protocol) of the corresponding collective technical body, to resolve the existing disputes – arising either between the State and the supplier, or between the members of the administrative collective body responsible for checking and acceptance– regarding real and technical matters arising from the acceptance of the deliverables and the reduction of their price. The provision of paragraph 7, regarding the case of supplies of major importance, – in contrast to the relevant provision of presidential decree 785/78 – no longer refers to the examination of disputes regarding the interpretation and execution of the agreement, and furthermore it provides as a requirement for the contractual determination of the method of dispute resolution the existence of a corresponding provision in the specific terms of the regulatory act of the call of the relevant tender, while it does not extend the dispute resolution to other categories i.e. to other issues beyond the technical matters referred to in the previous paragraphs of the same article, and it does not authorise the administrative bodies to conclude an arbitration clause. The provision of para. 7, contrary to the previous paragraphs of article 69, is limited to procedural issues which – due to the particularities of cutting edge technologies which usually refer to supplies of major importance – require a different approach in order to reach correct technical conclusions (e.g. more than one month time limit for the issuance of the relevant protocol, different constitution and composition of the technical body, such as the participation of more members and/or foreigners, specially qualified technical advisors, determination of specific technical procedure for re-checking). This opinion is reinforced by the fact that the subsequent addition of para. 8 in article 69 provides that the financial expenses of the procedure shall be paid by the contracting party which requests the submission of the case to the Dispute Resolution Committee. If para. 7 contained a provision regarding the conclusion of the arbitration clause, then – following a logical and systemic sequence – the provision regarding the payment of the expenses should be inserted between paragraphs 6 and 7 of article 69. It is also noted that the circular instructions of YETHA, of the year 1992, regarding the implementation of the provisions of presidential decree 284/89 and specifically of article 69, are limited to indicating the need of the participation in the dispute resolution committees of a representative of the commercial and industrial sector without making any reference to the conclusion of any arbitration clauses.

d. Consequently, the arbitration clause of article 28.3 included in the agreement, which does not refer to a procedure for the resolution of technical disputes but provides in general and vaguely that: "*All claims or disputes arising out of or in connection with the present AGREEMENT or its interpretation shall be finally*

*settled by arbitration...",* and which was concluded despite the absence of relevant provision permitting its conclusion, is unlawful and invalid, and for this reason the Arbitral Tribunal lacks jurisdiction for the resolution of this dispute and thus this request for arbitration must be dismissed.

## G. THE MAJORITY OPINION

**(1)** Given the above, the decision of the Arbitral Tribunal regarding its jurisdiction and the objection of the Respondent regarding the lack of the Arbitral Tribunal's jurisdiction (Operative part, paragraphs 1 and 8) was made by majority according to Article 25(1) of the ICC Rules of Arbitration and article 29 of Law 2735/1999, while the dominant reasoning is set out in Chapter D of the award.

**(2)** In regard to the remaining preliminary issues (paragraphs 2-7 of the Operative part), the decision of the Arbitral Tribunal was made unanimously.

**(3)** This Award does not rule upon costs, since the Award is not final.

## FOR THESE REASONS

**1.** The Arbitral Tribunal accepts that it has jurisdiction to decide upon disputes arising between the parties in Agreement No. 02OA/03 regarding the Supply of the C41 System for Olympic Security and the Related Products and Services, dated 19 May 2003, according to the arbitration agreement (clause) in article 28.3, which is valid pursuant to Law 2735/1999 and articles 69 para.7, 71 para.1 and 73 para.1 of presidential decree 284/1989.

**2.** The Claimant's plea regarding the inadmissibility and belated supplementary answers of the Respondent and its claims contained therein is rejected.

**3.** The Claimant's counter-plea regarding the inadmissibility of the plea for set-off submitted by the Respondent is rejected regarding its legal basis that this pleas hides a belated counter-claim, and regarding its legal basis that the relevant Arbitration costs have not yet been paid. The Respondent's set-off objection is held admissible. The decision on the merits is reserved for a future Award.

**4.** The Claimant's request for separation of the merits of the case in two stages, the first of which will determine whether the acceptance of the C4I System by the Respondent shall be upheld or rejected, is rejected.

**5.** The Respondent's request for the suspension of the proceedings due to criminal charges is rejected.

**6.** The Respondent's objections regarding the lack of legal representation, the lack of standing to bring the request, or in the alternative, the lack of legal interest on behalf of the Claimant, are rejected.

**7.** The Respondent's objection regarding the inadmissibility of the contested request for arbitration and the related lack of jurisdiction of the Arbitral Tribunal due to lack of written preliminary steps of article 28, paragraph 2 of the contested agreement, is rejected.

**8.** The Respondent's objection regarding the invalidity of the arbitration clause of article 28.3 of the contested agreement, and thus the lack of jurisdiction of the Arbitral Tribunal, is rejected.

9. All other claims, including those relating to costs arising from the present Award, are reserved for one or more future awards.

Upheld and decided in Athens (Greece) on 14th of July 2011.

Athens, (Greece)

14 / July / 2011

**THE ARBITRAL TRIBUNAL**

(signature)

**Dionysios Kondylis**
Arbitrator

(signature)

**Styliani Charitaki**
Arbitrator

(signature)

**Grigorios I. Timagenis**
Chairman of the Arbitral Tribunal

Appendix A

List of Abbreviations

# INTERNATIONAL CHAMBER OF COMMERCE

# INTERNATIONAL COURT OF ARBITRATION

**Case 16394/GZ**

Between:

The company **SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**, as legally represented and with registered office in the United States of America (1710 SAIC DRIVE, McLean, VA, 22102)

**CLAIMANT**

- and -

The **GREEK STATE**, seated in Athens
as legally represented
by the Minister of Finance and the
Minister of Civil Protection
(68, Akadimias Str., 106 78 Athens, Greece)

**RESPONDENT**

---

## AWARD REGARDING THE PRELIMINARY ISSUES

(referred to in paragraph 14 of the Terms of Reference dated 21 July 2010)
**(INTERIM AWARD)**

---

**TABLE OF CONTENTS**

The present translation is the Arbitral Tribunal's unofficial translation used in its correspondence with the ICC that it provided to the parties on July 21, 2011. I, Prokopios Dimitriadis, have reviewed and determined is a true and accurate translation from the original Greek. The Tribunal's translation did not include paragraph B.8, the table of contents or appendix so a true and accurate translation of paragraph B.8 has been added and placeholders were added for the table of contents and appendix.

I further certify that I am competent in both Greek and English and I am entitled to render and certify such translation in accordance with art. 36 par. 2.c. of the Lawyers' Code.

Athens, 8th of September 2014

PROKOPIOS G. DIMITRIADIS
ATTORNEY AT LAW (Reg. No. 26051)
LAMBADARIOS LAW FIRM
3, STADIOU STREET - ATHENS 105 62
TEL.: 0030 210 3221135 - 0030 210 3224419
FAX: 0030 210 3226368
VAT.: 070678280

LAMBADARIOS LAW FIRM
3, STADIOU STR.-ATHENS 105 62 GREECE
TEL. +30 210 3224047, +30 210 3224517
e-mail: info@lambalaw.gr
website: www.lambadarioslaw.gr

# EXHIBIT A
# GREEK VERSION

ICC
International Chamber of Commerce
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

19 July 2011/alu

**16394/GZ**

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION ("SAIC") (U.S.A.) **vs/** THE GREEK STATE, AS LEGALLY REPRESENTED BY THE MINISTER OF FINANCE AND THE MINISTER OF CIVIL PROTECTION (Greece)

---

**Counsel: Ms Galina Zukova** (Tel: + 33 1 49 53 30 90)
**Deputy Counsel: Ms Alina Leoveanu** (Tel: + 33 1 49 53 30 91)
(Fax: + 33 1 49 53 57 99)
(Email: ica7@iccwbo.org)

Mr William T. O'Brien
Mr Allen B. Green
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N. W.
Washington D.C., 20006-1108
U.S.A.

*By FedEx*

Mr Gregory Pelecanos.
BALLAS PELECANOS & ASSOCIATES
10 Solonos str.
Kolonaki
10673 Athens
Greece

*By FedEx*

Mr Epameinondas Lambadarios
LAMPADARIOS AND ASSOCIATES
3 Stadiou str.
10562 Athens
Greece

*By FedEx*

Mr Demetrios Chanis, Legal Counsel of the State
Mr Dimitrios Katopodis, Associate Judge of the Legal Council of the State
Mrs Georgia Papadaki, Associate Judge of the Legal Council of the State
THE GREEK STATE, AS LEGALLY REPRESENTED BY THE MINISTER OF FINANCE AND THE MINISTER OF CIVIL PROTECTION
3, Akadimias street
106 78 Athens
Greece

*By FedEx*

.../...

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28 Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org Website www.iccarbitration.org

Mr Stathis Potamitis Esq.
Mr Xenophon Paparrigopoulos
Ms Vicky Psaltis
POTAMITIS VEKRIS BERSIS PAPADIAMANTIS PAPARRIGOPOULOS IOANNOU LAW PARTNERSHIP
9, Neofytou Vamva Street
10674 Athens
Greece

*By FedEx*

Dear Mesdames and Sirs,

Pursuant to Article 28 of the ICC Rules of Arbitration, the Secretariat of the ICC International Court of Arbitration notifies you the Interim Award (containing the "*Different and Supplementary Reasoning*" of Mr Kondylis and the Dissenting Opinion of Ms Charitaki) dated 14 July 2011 and rendered by the Arbitral Tribunal, which was approved by the Court at its session of 30 June 2011.

We draw your attention to Article 28(6) of the Rules which states:

*"Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made."*

Yours faithfully,

Alina Leoveanu
Deputy Counsel
Secretariat of the ICC International Court of Arbitration

Encl: - Original of the Interim Award dated 14 July 2011

cc: - Mr Grigorios J. Timagenis — *By email: gjt@timagenislaw.com*
- Mr Dionysios G. Kondylis — *By email: d-kondil@otenet.gr*
- Ms Styliani Charitaki — *By email: ns.symv3@yo.syzefxis.gov.gr*



ICC
International Chamber of Commerce
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

AWARD

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28 Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org Website www.iccarbitration.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 16394/GZ**

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION ("SAIC")

(U.S.A.)

**vs/**

THE GREEK STATE, AS LEGALLY REPRESENTED BY THE MINISTER OF FINANCE

AND THE MINISTER OF CIVIL PROTECTION

(Greece)

This document is an original of the Interim Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

# ΔΙΕΘΝΕΣ ΕΜΠΟΡΙΚΟ ΕΠΙΜΕΛΗΤΗΡΙΟ

# ΔΙΕΘΝΕΣ ΔΙΚΑΣΤΗΡΙΟ ΔΙΑΙΤΗΣΙΑΣ

**Υπόθεση 16394/GZ**

Μεταξύ:

Της εταιρίας **SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**, όπως νόμιμα εκπροσωπείται και έχει την έδρα της στις Ηνωμένες Πολιτείες Αμερικής (1710 SAIC DRIVE, McLean, VA, 22102)

**ΑΙΤΟΥΣΑ**

- και -

Του **ΕΛΛΗΝΙΚΟΥ ΔΗΜΟΣΙΟΥ**, που εδρεύει στην Αθήνα
όπως νόμιμα εκπροσωπείται
από τον Υπουργό Οικονομικών και τον
Υπουργό Προστασίας του Πολίτη
(Ακαδημίας 68, 106 78 Αθήνα, Ελλάς)

**ΚΑΘΟΥ**

---

## ΑΠΟΦΑΣΗ ΕΠΙ ΤΩΝ ΠΡΟΔΙΚΑΣΤΙΚΩΝ ΖΗΤΗΜΑΤΩΝ

(που αναφέρονται στην παράγραφο 14 της από 21 Ιουλίου 2010 Πράξης Πλαισίου)
**(INTERIM AWARD)**

---

### Α. <u>ΕΙΣΑΓΩΓΙΚΑ ΚΑΙ ΑΝΤΙΚΕΙΜΕΝΟ ΤΗΣ ΑΠΟΦΑΣΗΣ</u>

Το Διαιτητικό Δικαστήριο συγκροτούμενο από τους Διαιτητές: Γρηγόριο Τιμαγένη, Πρόεδρο του Διαιτητικού Δικαστηρίου, Διονύσιο Κονδύλη, Διαιτητή και Στυλιανή Χαριτάκη, Διαιτητή:

**1.** Συνεδρίασε σε ακροαματική διαδικασία με την παρουσία των πληρεξουσίων των διαδίκων στις 17 Δεκεμβρίου 2010 σε ειδική αίθουσα στο Ξενοδοχείο Athenaeum Intercontinental στην Αθήνα και στη συνέχεια συνήλθε σε διάσκεψη στην Αθήνα στις 11 Φεβρουαρίου 2011 και 6 Απριλίου 2011, για να αποφασίσει επί των προδικαστικών ζητημάτων που αναφέρονται στην παράγραφο 14 της από 21 Ιουλίου 2010 Πράξης

Πλαισίου, τα οποία είναι σχετικά με την διαφορά που προέκυψε μεταξύ των μερών από την από 19 Μαΐου 2003 υπ' αριθ. 020Α/03 Σύμβαση μεταξύ των διαδίκων στην παρούσα διαιτησία για την προμήθεια Συστήματος Ολυμπιακής Ασφαλείας C4I και σχετικών Προϊόντων και Υπηρεσιών και για τα οποία τα μέρη συμφώνησαν να γίνει ξεχωριστή συζήτηση και να εκδοθεί ξεχωριστή απόφαση.

**2.** (α) Το αντικείμενο της Σύμβασης για το Σύστημα C4I περιγράφεται συνοπτικά στην παράγραφο 7(β) της Πράξης Πλαισίου ως εξής:

« Η διαφορά που καλείται να επιλύσει το Διαιτητικό Δικαστήριο προκύπτει από την Σύμβαση 020Α/03 που συνήφθη μεταξύ των διαδίκων την 19 Μαΐου 2003, αντικείμενο της οποίας ήταν σύμφωνα με το άρθρο 3.1 αυτής, η μελέτη, σχεδίαση, κατασκευή, εγκατάσταση, έλεγχος, πιστοποίηση, ολοκλήρωση, εξέλιξη, πώληση, παροχή υπηρεσιών, κατά περίπτωση και παράδοση με το «*κλειδί στο χέρι*» των συστημάτων C4I Ολυμπιακής Ασφαλείας, συμβατών και διαλειτουργικών μεταξύ τους, όπως προσδιορίζονται στο Παράρτημα Α της ανωτέρω σύμβασης ως ενιαίο σύνολο, τα οποία αποτελούν ένα πληροφοριακό σύστημα ασφαλείας και υποστήριξης διεξαγωγής επιχειρήσεων με την ονομασία «Διοίκηση Έλεγχος Επικοινωνίες Συντονισμός & Εναρμόνιση (Command Control Communications Coordination & Integration – C4I)» σχετικά με την ασφάλεια των Ολυμπιακών Αγώνων 2004 αρχικά και στη συνέχεια για μόνιμη χρήση (εφεξής **"Σύστημα C4I"**). Με βάση τη Σύμβαση, το Σύστημα C4I αποτελείται από τρία συστήματα: (α) το σύστημα Υποστήριξης Διοίκησης και Λήψης Αποφάσεων – CDSS αποτελούμενο από συνολικά από 7 υποσυστήματα, (β) το σύστημα Επικοινωνιών και Πληροφορικής – CIS αποτελούμενο από 13 υποσυστήματα και (γ) το σύστημα Κέντρων Διοίκησης – CSS αποτελούμενο από 10 υποσυστήματα.

Η αρχική σύμβαση τροποποιήθηκε στη συνέχεια με τις ακόλουθες τροποποιητικές συμβάσεις:

- (i) την από 23 Δεκεμβρίου 2003 1η Τροποποίηση
- (ii) την από 7 Απριλίου 2004 2η Τροποποίηση
- (iii) την από 25 Ιουνίου 2004 3η Τροποποίηση
- (iv) την από 05 Αυγούστου 2004 4η Τροποποίηση
- (v) την από 29 Μαρτίου 2007 5η Τροποποίηση
- (vi) την από 11 Σεπτεμβρίου 2007 6η Τροποποίηση
- (vii) την από 27 Οκτωβρίου 2008 7η Τροποποίηση

Η αρχική σύμβαση και οι τροποποιήσεις θα αναφέρονται εφ' εξής για τους σκοπούς της παρούσης διαιτησίας ως **η Σύμβαση** ».

(β) Οι ισχυρισμοί της Αιτούσας συνοψίζονται στην παράγραφο 7(γ) της Πράξης Πλαισίου ως εξής:

« Με βάση την από 16 Ιουνίου 2009 αίτηση προσφυγής σε διαιτησίας της Αιτούσας (εφεξής **"Αίτηση Διαιτησίας"**), η Αιτούσα ισχυρίζεται ότι το Καθού έχει ενεργήσει αντισυμβατικά και κακόπιστα και έχει διαπράξει πολυάριθμες

παραβάσεις της Σύμβασης. Ειδικότερα, η Αιτούσα θεωρεί ότι, ενώ το Σύστημα C4I έχει ολοκληρωθεί και παραληφθεί από το Καθού και ήδη χρησιμοποιείται καθημερινά και έχει καταστεί μόνιμο τμήμα της υποδομής δημόσιας ασφάλειας του ελληνικού κράτους, το Καθού αρνείται να αποπληρώσει την Αιτούσα και να επιστρέψει τις εγγυητικές επιστολές που είχε δώσει η Αιτούσα. Η Αιτούσα ισχυρίζεται ότι το Καθού δεν έχει εκπληρώσει τις υποχρεώσεις του, χωρίς οποιαδήποτε αιτιολόγηση και ιδίως παρέβη την υποχρέωση καλόπιστης συμπεριφοράς και τήρησης των συμβατικών υποχρεώσεών του. »

(γ) Τα αιτήματα της Αιτούσας συνοψίζονται στην παράγραφο 7(δ) της Πράξης Πλαισίου.

(δ) Οι ισχυρισμοί του Καθού συνοψίζονται στην παράγραφο 7(ε) της Πράξης Πλαισίου ως εξής:

« Με βάση την από 25 Σεπτεμβρίου 2009 απάντηση του Καθού (εφεξής **"Απάντηση"**) στην Αίτηση Διαιτησίας, το Καθού ισχυρίζεται ότι η Αιτούσα αδυνατούσε να προμηθεύσει στο Καθού ένα πολυσύνθετο και διαλειτουργικό σύστημα ασφαλείας των Ολυμπιακών Αγώνων της Αθήνας 2004 με το κλειδί στο χέρι, όπως απαιτούσαν οι περιστάσεις και οι προδιαγραφές που έθετε το Καθού. Το Καθού ισχυρίζεται ότι η Αιτούσα δεν εξεπλήρωσε τις υποχρεώσεις της και ιδίως δεν κατόρθωσε να προμηθεύσει, εκτός των άλλων συστημάτων και υποσυστημάτων, το Σύστημα CDSS. Το αποτέλεσμα ήταν να εκτεθεί η χώρα σε κίνδυνο διεθνούς διασυρμού λόγω της διαφαινόμενης μεταφοράς των Αγώνων σε άλλο κράτος. Ενόψει των Ολυμπιακών Αγώνων κατέστη αναγκαία η προσωρινή κατά χρήση και μη συμβατική παραλαβή ορισμένων Συστημάτων και Υποσυστημάτων του C4I, χωρίς τις συμφωνημένες δοκιμές, με την επιφύλαξη διενέργειας όλων των συμβατικών διαδικασιών αποδοχής παραλαβής του Συστήματος.

Το Καθού ισχυρίζεται ότι η Αιτούσα ενήργησε κακόπιστα, καταχρηστικά και η Αίτηση Διαιτησίας ασκείται πρόωρα. Η Αιτούσα έπρεπε να είχε παραδώσει το Σύστημα C4I ως ενιαίο σύστημα «με το κλειδί στο χέρι» και έτοιμο για επιχειρησιακή χρήση. Βασικός όρος της Σύμβασης ήταν η ακριβόχρονη εκτέλεσή της. Η Αιτούσα καθυστερούσε και αδυνατούσε να ανταπεξέλθει σε ουσιώδεις απαιτήσεις της Σύμβασης, με προεξάρχουσα την διαλειτουργικότητα του συστήματος και την ανάπτυξη του συστήματος CDSS.

Μετά δε την 5η τροποποίηση της Σύμβασης, ενώ το Καθού τήρησε τις υποχρεώσεις του, η Αιτούσα δεν τήρησε τις δικές της και καθυστέρησε στην παράδοση ορισμένων από τα υπόλοιπα υποσυστήματα, όπως του υποσυστήματος 16 AVL, ενώ στο υποσύστημα 17 δεν ανέπτυξε ευρυζωνικό δίκτυο που η ίδια υποσχέθηκε. Πλέον δε τούτων, η αιτούσα δεν κατέβαλε τη διαφορά των τηλεπικοινωνιακών τελών, που προέκυψαν λόγω αλλαγής της αρχιτεκτονικής του δικτύου στο υποσύστημα 17, όπως είχε υποχρέωση από τη σύμβαση. Ακόμη, δεν εκπλήρωσε τη συμβατική της υποχρέωση κατασκευής, μέχρι την ολοκλήρωση της γενικής δοκιμής του συστήματος C4I (Οκτώβριος

2008), δεύτερου κέντρου μεταγωγής του υποσυστήματος 20 TETRA στη ΓΑΔΑ. Επίσης, η Αιτούσα καθυστέρησε την εκπλήρωση συμβατικής της (5ης τροποποίησης) υποχρέωσης παράδοσης του συνολικού σχεδιασμού υλοποίησης των υποσυστημάτων 1-7. Επιπλέον το Καθού υποστηρίζει ότι η SIEMENS ΕΛΛΑΣ Α.Ε., υπεκατεστάθη στη θέση της Αιτούσας, μετά την 5η τροποποίηση της σύμβασης. »

(ε) Τα αιτήματα του Καθού συνοψίζονται στην παράγραφο 7(στ) της Πράξης Πλαισίου.

**3.** Η Παράγραφος 14 της Πράξης Πλαισίου σχετικά με τα Προδικαστικά Ζητήματα έχει κατά λέξη ως εξής:

« **14. <u>Προδικαστικά Ζητήματα</u>**

Θα διεξαχθεί ξεχωριστή συζήτηση και θα εκδοθεί ξεχωριστή απόφαση για τα προδικαστικά ζητήματα. Για τους σκοπούς της παρούσης παραγράφου 14 (δηλαδή για την ξεχωριστή συζήτηση και απόφαση) ως προδικαστικά ζητήματα ορίζονται αυτά που συνδέονται με:

α) τα ακόλουθα αιτήματα της Αιτούσης:

(1) Απαράδεκτο Συμπληρωματικών Απαντήσεων Καθού
(2) Απαράδεκτο Ένστασης συμψηφισμού τόσο ως υποκρύπτουσας εκπρόθεσμη ανταγωγή όσο και λόγω μη καταβολής των εξόδων της Διαιτησίας του ICC
(3) Χωρισμός της εξέτασης της ουσίας της υπόθεσης σε δύο (2) στάδια, στο πρώτο εκ των οποίων θα κριθεί η αποδοχή ή μη του Συστήματος C4I από το Καθού

β) τα ακόλουθα αιτήματα του Καθού:

(1) Αίτημα Αναστολής της διαδικασίας λόγω άσκησης ποινικών διώξεων.
(2) Αμφισβήτηση ενεργητικής νομιμοποίησης.
(3) Απαράδεκτο Αίτησης Διαιτησίας λόγω έλλειψης γραπτής προδικασίας.
(4) Ακυρότητα της ρήτρας διαιτησίας και ως εκ τούτου έλλειψη δικαιοδοσίας του Διαιτητικού Δικαστηρίου.

Αυτονόητο όμως είναι ότι ο προσδιορισμός των θεμάτων αυτών και γενικότερα η παρούσα παράγραφος δεν αποτελεί ούτε μπορεί να ερμηνευθεί ως περιορισμός οποιουδήποτε διαδίκου, να προβάλλει, σύμφωνα με τους διαδικαστικούς κανόνες που διέπουν την παρούσα διαιτησία, σε οποιοδήποτε τυχόν μεταγενέστερο στάδιο, οποιουσδήποτε ισχυρισμούς ή ενστάσεις, επί της ουσίας ή της διαδικασίας, προδικαστικούς ή μη, ούτε περιορίζει ή μπορεί να ερμηνευθεί ότι περιορίζει την δυνατότητα του Διαιτητικού Δικαστηρίου σε οποιοδήποτε στάδιο της διαδικασίας να εκτιμήσει ότι υπάρχουν και άλλα προδικαστικά ζητήματα για την διαδικασία ή την ουσία ή μέρος αυτών και το αν ένα ζήτημα είναι προδικαστικό ή όχι, όπως και το αν ένα προδικαστικό ζήτημα συνδέεται τόσο στενά με την ουσία της διαφοράς ή απαιτεί διεξαγωγή τέτοιων αποδείξεων, ώστε να πρέπει να κριθεί μαζί με την ουσία της διαφοράς. »

**4.** Έλαβε υπόψη τους Κανόνες Διαιτησίας (***Κανόνες***) του Διεθνούς Δικαστηρίου Διαιτησίας του Διεθνούς Εμπορικού Επιμελητηρίου (***ICC***) πως ισχύουν από την 1η

ΣΑ στη ΓΑΔΑ.
.κής της (5[ης]
ού υλοποίησης
η SIEMENS
[η] τροποποίηση

:) της Πράξης

Ζητήματα έχει

όφαση για τα
14 (δηλαδή για
ονται αυτά που

ις εκπρόθεσμη
; του ICC
2) στάδια, στο
ος C4I από το

ιώξεων.

ικασίας.
δικαιοδοσίας

γενικότερα η
περιορισμός
; κανόνες που
τερο στάδιο,
διαδικασίας,
εριορίζει την
αδικασίας να
ικασία ή την
:ως και το αν
οάς ή απαιτεί
ιν ουσία της

Δικαστηρίου
από την 1[η]

Ιανουαρίου 1998 και συνεπώς ήταν εφαρμοστέοι και κατά τον χρόνο συνάψεως της διαιτητικής συμφωνίας και κατά τον χρόνο ενάρξεως της παρούσης διαιτησίας.

**5.** Έλαβε υπόψη, πλην των εισαγωγικών δικογράφων και τα ακόλουθα έγγραφα που υπεβλήθησαν από τους διαδίκους, ήτοι **από το Καθού** (α)το από 20/4/2010 δικόγραφο Συμπληρωματικής του Απάντησης, (β)την από 14 Μαΐου 2010 Δεύτερη Συμπληρωματική Απάντηση, (γ)τα από 28 Μαΐου 2010 σχόλια του Καθού και (δ)την από 19 Ιουλίου 2010 επιστολή του και **από την Αιτούσα** (α)την από 30 Απριλίου 2010 επιστολή της σχετικά με το απαράδεκτο της Συμπληρωματικής Απάντησης του Καθού (β)την από 14 Μαΐου 2010 απάντηση με συνημμένη την από 4 Μαΐου 2010 Εξώδικη Δήλωση-Απάντηση, (γ)την από 19 Μαΐου 2010 «Απάντηση της Αιτούσης στις Συμπληρωματικές Απαντήσεις του Καθού», (δ)την από 27 Μαΐου 2010 επιστολή της, (ε)την από 6 Ιουλίου 2010 επιστολή της και (στ)την από 20 Ιουλίου 2010 επιστολή της. Επίσης το Διαιτητικό Δικαστήριο έλαβε υπόψη του και όλα τα υπόλοιπα έγγραφα που απευθύνθηκαν από τα μέρη προς αυτό ή αντηλλάγησαν μεταξύ τους και κοινοποιήθηκαν προς αυτό και οποιουσδήποτε ισχυρισμούς περιέχονται σε αυτά.

**6.** Έλαβε υπόψη τις εκατέρωθεν προτάσεις, υπομνήματα, προσθήκες και αντικρούσεις και συμπληρωματικά υπομνήματα που υπεβλήθησαν στις 24 Σεπτεμβρίου 2010, 15 Οκτωβρίου 2010 και 21 Ιανουαρίου 2011 και τα λοιπά έγγραφα που υπεβλήθησαν μαζί με αυτές και σε οποιοδήποτε άλλο στάδιο της διαδικασίας όπως και τους ισχυρισμούς και επιχειρήματα των διαδίκων που ανεπτύχθησαν προφορικά κατά την ακροαματική διαδικασία στις 17 Δεκεμβρίου 2010.

**7.** Σκέφθηκε σύμφωνα με το νόμο, τους Κανόνες Διαιτησίας του ICC και τις συμφωνίες των μερών.

**8.** Πίνακας Βραχυγραφιών είναι συνημμένος ως Παράρτημα Α και αποτελεί αναπόσπαστο μέρος αυτής της απόφασης.

## B. ΠΡΟΔΙΚΑΣΙΑ

**1.** Η παρούσα Απόφαση εκδίδεται μεταξύ των διαδίκων που αναφέρονται στην αρχή της από το Διαιτητικό Δικαστήριο που συγκροτείται από τους διαιτητές που αναφέρονται στην παράγραφο Α της παρούσης.

**2.** Οι πλήρεις διευθύνσεις των διαιτητών και των διαδίκων, όπως και τα στοιχεία και οι διευθύνσεις των πληρεξουσίων δικηγόρων τους, τα εισαγωγικά δικόγραφα, ο τρόπος συγκρότησης του Διαιτητικού Δικαστηρίου, και σύντομο διαδικαστικό ιστορικό παρατίθεται στην Πράξη Πλαισίου που υπεγράφη από τους διαδίκους στις 21 Ιουλίου 2010 («Πράξη Πλαισίου») και ειδικότερα στις παραγράφους 1, 2, 3, 4 και 7(α). Οι παράγραφοι 1-4 έχουν ως εξής:

« **1. Το Διαιτητικό Δικαστήριο**

Το διαιτητικό δικαστήριο αποτελείται από τους:

9

(α)   **Γρηγόριο Ι. Τιμαγένη** Δικηγόρο LL.M, Ph.D.
      (Πρόεδρο του Διαιτητικού Δικαστηρίου)
      οδός Νοταρά 57, 8ος όροφος
      185 35 Πειραιάς
      Ελλάς
      Τηλ.: +30-210-4220001
      Φαξ.: +30-210-4221388
      Ηλ. ταχυδρ.: gjt@timagenislaw.com

(β)   **Διονύσιο Κονδύλη** Επίτιμο Αρεοπαγίτη
      (Συνδιαιτητή διορισμένο από την Αιτούσα)
      οδός Αμαρυλλίδος 23,
      153 41 Αγ. Παρασκευή
      Ελλάς
      Τηλ.: +30-210-6399621
      Φαξ.: +30-210-6399621
      Ηλ. ταχυδρ.: d-kondil@otenet.gr

(γ)   **Στυλιανή Χαριτάκη** Νομική Σύμβουλο του Κράτους
      (Συνδιαιτητή διορισμένη από το Καθού)
      οδός Καραγεώργη Σερβίας 10,
      101 84 Αθήνα
      Ελλάς
      Τηλ.: +30-210-3375190, 3375039 (γραμματεία 210-3375221)
      Φαξ.: +30-210-3375040
      Ηλ. ταχυδρ.: ns.symv3@yo.syzefxis.gov.gr

## 2. Τα Εισαγωγικά Δικόγραφα

Η παρούσα διαιτησία άρχισε με την από 16 Ιουνίου 2009 Αίτηση Προσφυγής στη Διαιτησία της Αιτούσης, στην οποία το Καθού απάντησε με την από 25 Σεπτεμβρίου 2009 Απάντησή του μετά από παράταση που χορηγήθηκε από τη Γραμματεία του Διεθνούς Δικαστηρίου του ICC με την από 27 Αυγούστου 2009 επιστολή προς τους διαδίκους.

## 3. Συγκρότηση του Διαιτητικού Δικαστηρίου

Το Διαιτητικό Δικαστήριο συγκροτήθηκε ως ακολούθως:

(α) Στις 3 Σεπτεμβρίου 2009 δυνάμει του Άρθρου 9(2) του Κανονισμού Διαιτησίας του ICC ο Γενικός Γραμματέας του Διεθνούς Δικαστηρίου του ICC επικύρωσε τον διορισμό του κ. Διονυσίου Κονδύλη ως συνδιαιτητή που προτάθηκε από την Αιτούσα με την από 16 Ιουνίου 2009 Αίτηση Προσφυγής στη Διαιτησία.

(β) Στις 3 Σεπτεμβρίου 2009 δυνάμει του Άρθρου 9(2) του Κανονισμού Διαιτησίας του ICC ο Γενικός Γραμματέας του Διεθνούς Δικαστηρίου του ICC επικύρωσε τον διορισμό της κας Στυλιανής Χαριτάκη ως συνδιαιτητή που προτάθηκε από το Καθού με το από 6 Αυγούστου 2009 έγγραφο (Αρ. Πρωτ. 87774/457380).

(γ) Επειδή οι δυο διαιτητές που διορίσθηκαν από τους διαδίκους δεν συμφώνησαν ως προς τον διορισμό του Προέδρου του Διαιτητικού Δικαστηρίου, στις 26 Νοεμβρίου 2009 το Διεθνές Διαιτητικό Δικαστήριο του ICC διόρισε τον κ. Γρηγόριο Ι. Τιμαγένη, Διδάκτορα Νομικής, Δικηγόρο, Πρόεδρο του Διαιτητικού Δικαστηρίου μετά από πρόταση της ελληνικής επιτροπής του ICC (Άρθρα 8(4) και 9(3) του Κανονισμού Διαιτησίας του ICC).

**4. Οι διάδικοι στην παρούσα Διαιτησία και οι πληρεξούσιοι δικηγόροι τους**

Η παρούσα διαιτησία διεξάγεται μεταξύ των ακολούθων διαδίκων:

(α) Αιτούσα
**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,**
1710 SAIC DRIVE, McLean, VA, 22102,
Ηνωμένες Πολιτείες Αμερικής

Πληρεξούσιοι δικηγόροι της είναι οι:

1. κ.κ. **Allen B. Green** και **William T. O' Brien**
McKenna Long & Aldridge LLP
1900 K Street NW
Washington, DC 20006-1108
Ηνωμένες Πολιτείες Αμερικής
Τηλ: +1 202.496.7107
Φαξ: +1 202.496.7756
Ηλ.ταχυδρ.: wobrien@mckennalong.com και agreen@mckennalong.com

2. κ. **Γρηγόριος Πελεκάνος**
Μπάλλας, Πελεκάνος & Συνεργάτες
Σόλωνος 10, Κολωνάκι
106 73 Αθήνα
Ελλάς
Τηλ: 210 3625943
Φαξ: 210 3647925
Ηλ. ταχυδρ.: gregory.pelecanos@balpel.gr

3. κ. **Επαμεινώνδας Λαμπαδάριος**
Λαμπαδάριος και Συνεργάτες
Σταδίου 3
105 62, Αθήνα
Ελλάς
Τηλ: 210 3224047
Φαξ: 210 3226368
Ηλ. ταχυδρ.: lambalaw@lambalaw.gr

και

(β) Καθού
**Ελληνικό Δημόσιο**, όπως εκπροσωπείται νόμιμα από τον Υπουργό Οικονομικών και τον Υπουργό Προστασίας του Πολίτη
Ακαδημίας 68
106 78 Αθήνα

ιοσφυγής στη
Σεπτεμβρίου
ιμματεία του
λή προς τους

ύ Διαιτησίας
ικύρωσε τον
την Αιτούσα

ύ Διαιτησίας
ικύρωσε τον
τό το Καθού

9

Ελλάς
Τηλ: 210 3804971
Φαξ: 210 3328180
Ηλ. ταχυδρ.: n.poulakos@nsk.gr

Πληρεξούσιοι δικηγόροι του είναι οι:

1. κ. **Δημήτριος Χανής** (Νομικός Σύμβουλος του Κράτους)
Παπαρρηγοπούλου 2, 105 61 Αθήνα, Ελλάς
Τηλ: +30 210 3252977 και +30 210 3368747 / Φαξ: +30210 3231964
κ. **Δημήτριος Κατωπόδης**
(Πάρεδρος του Νομικού Συμβουλίου του Κράτους)
κα **Γεωργία Παπαδάκη**
(Πάρεδρος του Νομικού Συμβουλίου του Κράτους)
Ακαδημίας 3
106 71 Αθήνα
Ελλάς
Τηλ: 210 3682541
Φαξ: 210 3682221
Ηλ. ταχυδρ.: georgiapapadaki@mfa.gr

2. Δικηγορική Εταιρεία Ποταμίτης Βεκρής Μπερσής Παπαδιαμάντης Παπαρρηγόπουλος Ιωάννου,
Υπόψη: **Στάθη Ποταμίτη, Ξενοφώντα Παπαρρηγόπουλου, Βίκυς Ψάλτη**
Νεοφύτου Βάμβα 9
106 74 Αθήνα
Ελλάς
Τηλ: 210 3380000
Φαξ: 210 3380020
Ηλ. ταχυδρ.: stathis.potamitis@potamitisvekris.com, xenophon.paparrigopoulos@potamitisvekris.com, vicky.psaltis@potamitisvekris.com

(Η Αιτούσα και το Καθού αναφέρονται εφεξής και ως οι **«διάδικοι»**). »

**3.** Για την νομιμοποίηση των πληρεξουσίων δικηγόρων τους έχουν υποβληθεί στο Διαιτητικό Δικαστήριο:

(α) Από την Αιτούσα το από 24 Μαΐου 2010 πληρεξούσιο (στην αγγλική με νόμιμη μετάφραση στην Ελληνική και Apostille ημερομηνίας 26 Μαΐου 2010) το οποίο υπέγραψε ο Lawrence E.Ruggiero, Αντιπρόεδρος και Βοηθός Γενικός Νομικός Σύμβουλος, ως νόμιμος εκπρόσωπος της Αιτούσης ενώπιον του συμβολαιογράφου της Πολιτείας Virginia των ΗΠΑ Kaye Elliot Endahl, και

(β) από το Καθού τα από 6 Αυγούστου 2009 (αρ. πρωτ. 87775/457380), 11 Δεκεμβρίου 2009 (αρ. πρωτ. 136444/457380) και 17 Ιουνίου 2010 (αρ. πρωτ. 69270/457380) έγγραφα του Προέδρου του Νομικού Συμβουλίου του Κράτους όπως και η από 14 Ιουλίου 2010 (αρ. πρωτ. 10107) απόφαση του Υπουργού Οικονομικών.

**4.** Κατά την ακροαματική διαδικασία παρέστησαν για την Αιτούσα πλην των ανωτέρω και οι Ιωάννης-Διονύσιος Φιλιώτης, Lawrence Ruggiero, Προκόπιος Δημητριάδης, Χαρίκλεια Δαούτη και Κωνσταντίνος Λαμπαδάριος, οι οποίοι ορίσθηκαν με το από 9.12.2010 ηλεκτρονικό μήνυμα (e-mail) προς τον Πρόεδρο του Διαιτητικού

Δικαστηρίου του κ. Επαμεινώνδα Λαμπαδάριου με σχετική εξουσία του από το ανωτέρω αναφερθέν πληρεξούσιο.

**5.** Τέλος, κατά την ακροαματική διαδικασιά παρέστη και ο Διοικητικός Γραμματεύς του Διαιτητικού Δικαστηρίου Ιωάννης Τιμαγένης, ο οποίος έχει διορισθεί με την από 18 Νοεμβρίου 2010 Διάταξη του Διαιτητικού Δικαστηρίου.

3231964

**6.** Κατά την ακροαματική διαδικασία τηρήθηκαν πρακτικά στενογραφημένα και μαγνητοφωνημένα.

**7.** Μετά το πέρας της ακροαματικής διαδικασίας ορίσθηκε η 21 Ιανουαρίου 2011 για την υποβολή από τους διαδίκους συμπληρωματικών υπομνημάτων και την περάτωση της διαδικασίας. Με την υποβολή των υπομνημάτων αυτών η διαδικασία για τα προδικαστικά ζητήματα περατώθηκε στις 21 Ιανουαρίου 2011 σύμφωνα με το Άρθρο 22 των Κανόνων και το Διαιτητικό Δικαστήριο προχώρησε στην εξέταση της υπόθεσης και την έκδοση απόφασης για τα προδικαστικά ζητήματα.

της

**βίκυς Ψάλτη**

**8.** Μετά την συγκρότηση του Διαιτητικού Δικαστηρίου ο φάκελος της υπόθεσης διαβιβάσθηκε στους διαιτητές από τους οποίους παρελήφθη στις 15/1/2010. Παράλληλα, το Διεθνές Δικαστήριο Διαιτησίας του ICC με απόφαση του στην συνεδρία της 7/1/2010 (που γνωστοποιήθηκε στο Διαιτητικό Δικαστήριο στις 8/1/2010), όρισε ως προθεσμία για την σύνταξη της Πράξης Πλαισίου την 31/3/2010. Στη συνέχεια η προθεσμία αυτή παρατάθηκε διαδοχικά μέχρι 30 Απριλίου 2010, 31 Μαΐου 2010, 30 Ιουνίου 2010 και 31 Ιουλίου 2010, με αποφάσεις του Διεθνούς Δικαστηρίου Διαιτησίας του ICC, στις συνεδρίες του στις 4/3/2010, 1/4/2010, 6/5/2010 και 3/6/2010 αντίστοιχα (που γνωστοποιήθηκαν στο Διαιτητικό Δικαστήριο στις 22/3/2010, 21/4/2010, 28/5/2010 και 24/6/2010 αντίστοιχα).
Η Πράξη Πλαισίου υπεγράφη στις 21 Ιουλίου 2010 και η προθεσμία που προβλέπεται από τους Κανόνες για την έκδοση απόφασης παρετάθη διαδοχικά μέχρι τις 30 Απριλίου 2011 και 31 Ιουλίου 2011 με αποφάσεις του Διεθνούς Δικαστηρίου Διαιτησίας του ICC στις συνεδρίες της 13/1/2011 και 7/4/2011 αντίστοιχα (που γνωστοποιήθηκαν στο Διαιτητικό Δικαστήριο και τους διαδίκους με ηλεκτρονικό ταχυδρομείο στις 13/1/2011 και με επιστολές στις 28/1/2011 και 19 Απριλίου 2011 αντίστοιχα).

ιβληθεί στο

αγγλική με
Ιαΐου 2010)
θός Γενικός
νώπιον του
ahl, και
-57380), 11
(αρ. πρωτ.
ου Κράτους
Υπουργού

## Γ. <u>ΔΙΚΑΙΟΔΟΣΙΑ</u>

### 1. Σύνοψη

(α) Κατά την διάσκεψη το Διαιτητικό Δικαστήριο αποφάσισε κατά πλειοψηφία ότι έχει δικαιοδοσία να κρίνει τις διαφορές που προκύπτουν από την μεταξύ των διαδίκων επίδικη σύμβαση, με βάση τη συμφωνία (ρήτρα) διαιτησίας που περιέχεται στο άρθρο 28.3, η οποία είναι έγκυρη και απέρριψε την περί του αντιθέτου ένσταση του Καθού κατά τα ειδικώτερα διαλαμβανόμενα στις επόμενες παραγράφους του παρόντος Κεφαλαίου Δ και στο διατακτικό.

ιν ανωτέρω
μητριάδης.
με το από
Διαιτητικού



(β) Η κρατήσασα άποψη ως προς την αιτιολογία παρατίθεται στις επόμενες παραγράφους, ενώ η μειοψηφούσα γνώμη και αποκλίνουσες ή συμπληρωματικές αιτιολογίες παρατίθενται στο Κεφάλαιο ΣΤ κατωτέρω.

**2. <u>Η ρήτρα δικαιοδοσίας (και εφαρμοστέου δικαίου)</u>**

Η δικαιοδοσία του Διαιτητικού Δικαστηρίου θεμελιούται εκ πρώτης όψεως στην συμφωνία διαιτησίας («Ρήτρα Διαιτησίας») που ευρίσκεται στο άρθρο 28 παρ.3 της μεταξύ των διαδίκων Συμβάσεως Νο. 020Α/03 για την Προμήθεια του Συστήματος Ολυμπιακής Ασφάλειας C4I και Σχετικών Προϊόντων και Υπηρεσιών με ημερομηνία 19 Μαΐου 2003 και ορίζει ότι:

> *«Κάθε αξίωση ή διένεξη που προκύπτει από ή σχετίζεται με την παρούσα ΣΥΜΒΑΣΗ ή την ερμηνεία της θα επιλύεται οριστικά από διαιτησία, σύμφωνα με τους Κανόνες Διαιτησίας του Διεθνούς Εμπορικού Επιμελητηρίου (International Chamber of Commerce – ICC) και θα δικάζεται με το Ελληνικό Δίκαιο. Η διαιτησία θα διεξάγεται στην Αθήνα, Ελλάδα, από τρεις Έλληνες Διαιτητές που ορίζονται με τους Κανόνες του Διεθνούς Εμπορικού Επιμελητηρίου (ICC), όπου ένας Διαιτητής ορίζεται από τον ΑΓΟΡΑΣΤΗ, ένας Διαιτητής ορίζεται από τον ΠΡΟΜΗΘΕΥΤΗ και ο τρίτος Διαιτητής, που θα ενεργεί ως Πρόεδρος, θα διορίζεται από τους δύο διορισμένους Διαιτητές ή, σε περίπτωση διαφωνίας, σύμφωνα με τους προαναφερθέντες κανόνες.»*

**3. <u>Η αμφισβήτηση της δικαιοδοσίας / Η εξουσία του Διαιτητικού Δικαστηρίου να κρίνει τη δικαιοδοσία του</u>**

(α) Το Καθού με την από 20 Απριλίου 2010 Συμπληρωματική του Απάντηση και για τους λόγους που αναφέρονται εκεί, ζήτησε να αναγνωρισθεί η ακυρότητα της ρήτρας διαιτησίας και ως εκ τούτου έλλειψη δικαιοδοσίας του Διαιτητικού Δικαστηρίου, ενώ εξ άλλου με την παράγραφο 14 της από 21 Ιουλίου 2010 Πράξης Πλαισίου συμφωνήθηκε για ορισμένα Προδικαστικά Ζητήματα, μεταξύ των οποίων και η ακυρότητα της ρήτρας διαιτησίας, να διεξαχθεί ξεχωριστή συζήτηση και να εκδοθεί ξεχωριστή απόφαση. Η Αιτούσα ζήτησε την απόρριψη του αιτήματος αυτού με τα έγγραφα και τις προτάσεις της που αναφέρονται ανωτέρω υπό Α4 και 5.

(β) Το Διαιτητικό Δικαστήριο έχει δικαιοδοσία να κρίνει το ζήτημα της δικαιοδοσίας του σύμφωνα με το άρθρο 6 παράγραφος 2 των Κανόνων Διαιτησίας του Διεθνούς Δικαστηρίου Διαιτησίας του Διεθνούς Εμπορικού Επιμελητηρίου (ICC). Ανεξάρτητα όμως από το σχετικό αίτημα του Καθού το Διαιτητικό Δικαστήριο οφείλει και αυτεπάγγελτα να ελέγξει και αποφανθεί για την δικαιοδοσία του, πριν να εξετάσει οποιοδήποτε άλλο ζήτημα προδικαστικό ή της ουσίας της διαφοράς.

**4. <u>Εφαρμοστέο δίκαιο</u>**

Δεδομένου ότι τόσο με την ρήτρα διαιτησίας όσο και με βάση την Πράξη Πλαισίου (παράγραφος 10) τόπος διαιτησίας είναι η Αθήνα, εφαρμοστέο επί της διαιτησίας, περιλαμβανομένου του κύρους της διαιτητικής συμφωνίας και της δικαιοδοσίας του Διαιτητικού Δικαστηρίου, είναι το Ελληνικό δίκαιο.

## 5. <u>Το Σύνταγμα της Ελλάδος</u>

Σύμφωνα με τις παραγράφους 1 και 2 του άρθρου 94 του Συντάγματος της Ελλάδος (εφ' εξής το «Σύνταγμα») :

> « *1. Στο Συμβούλιο της Επικρατείας και τα τακτικά διοικητικά δικαστήρια υπάγονται οι διοικητικές διαφορές, όπως νόμος ορίζει, με την επιφύλαξη των αρμοδιοτήτων του Ελεγκτικού Συνεδρίου.*
>
> *2. Στα πολιτικά δικαστήρια υπάγονται οι ιδιωτικές διαφορές, καθώς και υποθέσεις εκούσιας δικαιοδοσίας, όπως νόμος ορίζει.* »

## 6. <u>Το νομοθετικό έρεισμα για την υπαγωγή ιδιωτικών διαφορών σε διαιτησία του ΚΠολΔ</u>

Με βάση τις διατάξεις αυτές είναι σαφές ότι για να αφαιρεθεί μια διαφορά είτε διοικητική είτε ιδιωτική από την δικαιοδοσία των δικαστηρίων που ορίζει το Σύνταγμα και για να είναι έγκυρη μια συμφωνία των μερών περί αυτού (διαιτητική συμφωνία) απαιτείται αυτό να ορίζεται από νόμο («*όπως νόμος ορίζει*»). Για τις ιδιωτικές διαφορές που υπάγονται σε διαιτησία του Κώδικα Πολιτικής Δικονομίας (ΚΠολΔ) γίνεται πάγια (και χωρίς αντίθετη άποψη) δεκτό ότι επιτρέπεται η υπαγωγή τους σε διαιτησία με συμφωνία των μερών με βάση το άρθρο 867 ΚΠολΔ και με τις προϋποθέσεις του. Ειδικότερα, όταν ένας από τους συμβαλλόμενους είναι το Ελληνικό Δημόσιο, η υπαγωγή σε διαιτησία του ΚΠολΔ γίνεται με βάση και το άρθρο 49 ΕισΝΚΠολΔ και με τις προϋποθέσεις του.

## 7. <u>Απόφαση ΑΕΔ 24/1993 για την υπαγωγή σε διαιτησία των διοικητικών διαφορών</u>

(α) Για τις διοικητικές διαφορές όμως είχε αμφισβητηθεί αν μπορούν να υπαχθούν σε διαιτησία (και συνεπώς αν είναι έγκυρη η σχετική διαιτητική συμφωνία) ακόμη και αν αυτό προβλέπεται ή επιτρέπεται από νόμο και ειδικότερα γεννήθηκε το ζήτημα αν ένας τέτοιος νόμος είναι αντισυνταγματικός.

(β) Το ζήτημα αυτό λύθηκε με την απόφαση 24/1993 του Ανωτάτου Ειδικού Δικαστηρίου υπέρ της απόψεως ότι κατά την αληθή έννοια του άρθρου 94 παρ.1 του Συντάγματος, δεν απαγορεύεται στον νομοθέτη να επιτρέψει την υπαγωγή με συμφωνία των μερών σε διαιτησία διοικητικών διαφορών και ο σχετικός νόμος δεν είναι αντισυνταγματικός.

(γ) Με βάση τα ανωτέρω γίνεται ήδη δεκτό ότι μπορούν να υπαχθούν σε διαιτησία και διοικητικές διαφορές εφόσον νόμος το επιτρέπει. Όμως για τις διοικητικές διαφορές δεν υπάρχει γενική διάταξη που να επιτρέπει την υπαγωγή σε διαιτησία αντίστοιχη προς τα άρθρα 867 ΚΠολΔ και 49 ΕισΝΚΠολΔ και γι' αυτό κάθε φορά ερευνάται αν υπάρχει νόμος, ο οποίος να επιτρέπει την υπαγωγή στην διαιτησία της συγκεκριμένης κατηγορίας διοικητικών διαφορών διότι, αν δεν υπάρχει νομοθετικό έρεισμα, η συμφωνία διαιτησίας είναι άκυρη ως αντικείμενη ευθέως στην ανωτέρω διάταξη του Συντάγματος.

**8. Οι ισχυρισμοί των διαδίκων**

Ήδη το Καθού έθεσε το θέμα της ακυρότητος της ρήτρας διαιτησίας με την από 20.4.2010 Συμπληρωματική Απάντησή του και το ανέπτυξε ειδικώτερα με τις προτάσεις και τα υπομνήματά του που αναφέρονται ανωτέρω (υπό Α5) αλλά και προφορικά κατά την ακροαματική διαδικασία της 17 Δεκεμβρίου 2010, η δε Αιτούσα προέβαλε αντιρρήσεις τόσο ως προς το εμπρόθεσμο και παραδεκτό όσο και ως προς την ουσία του σχετικού ισχυρισμού τόσο με την από 30.4.2010 επιστολή της όσο και με τις λοιπές επιστολές της, προτάσεις και υπομνήματα που αναφέρονται ανωτέρω (υπό Α4 και 5 αντίστοιχα) και προφορικά κατά την ακροαματική διαδικασία της 17 Δεκεμβρίου 2010 και υποστήριξε το κύρος της διαιτητικής συμφωνίας.

Εις το παρόν μέρος γίνεται αναφορά ιδίως στην αυτεπάγγελτη έρευνα του Διαιτητικού Δικαστηρίου για την δικαιοδοσία του, ενώ στα πλαίσια αυτής της αυτεπάγγελτης έρευνας απαντώνται και οι συναφείς ισχυρισμοί των διαδίκων.

**9. Η αυτεπάγγελτη έρευνα του Διαιτητικού Δικαστηρίου**

Εν όψει των ανωτέρω το Διαιτητικό Δικαστήριο οφείλει να ερευνήσει αυτεπάγγελτα κατά την έρευνα της δικαιοδοσίας του, αν η διαφορά που φέρεται ενώπιόν του είναι ιδιωτική ή διοικητική διαφορά, και στην τελευταία περίπτωση αν υπάρχει νόμος που να επιτρέπει την υπαγωγή της διαφοράς σε διαιτησία ή αν υπάρχει νομοθετικό έρεισμα που επιτρέπει την υπαγωγή της διαφοράς σε διαιτησία ανεξάρτητα από το αν η διαφορά είναι ιδιωτική ή διοικητική. Ειδικά ως προς αυτό το τελευταίο ζήτημα πρέπει να ερευνηθεί αν ο ν. 2735/1999 για την διεθνή εμπορική διαιτησία αποτελεί νομοθετικό έρεισμα για την εγκυρότητα της συμφωνίας διαιτησίας που περιέχεται στην επίδικη σύμβαση, ένα θέμα το οποίο έχει θέσει ήδη και η Αιτούσα με το από 21 Ιανουαρίου 2011 Υπόμνημά της.

**10. Διάκριση της ερμηνείας του άρθρου 1 του ν. 2735/1999 και της υπαγωγής σε αυτό από την ερμηνεία και υπαγωγή σε άλλες διατάξεις**

Συναφώς, το Διαιτητικό Δικαστήριο πρέπει να αποφανθεί κατά πρώτον περί του αν συντρέχουν οι προϋποθέσεις εφαρμογής του άρθρου 1 του Ν. 2735/1999 και ειδικώτερα αν η παρούσα διαιτησία είναι διεθνής και εμπορική κατά την έννοια της διάταξης αυτής. Σημειωτέον ότι κατά την κρίση του ζητήματος αυτού δεν ασκεί επιρροή το αν η επίδικη διαφορά των διαδίκων είναι διοικητική διαφορά ή όχι και τούτο διότι ο χαρακτηρισμός μιας διαφοράς ως διοικητικής ή μη ή ο χαρακτηρισμός της ως διεθνούς ή εμπορικής ή μη, γίνεται πάντοτε στα πλαίσια (ερμηνείας) συγκεκριμένων διατάξεων για να διαπιστωθεί αν πληρούται το πραγματικό τους ώστε να επέλθουν οι αντίστοιχες έννομες συνέπειες. Έτσι το τι είναι διοικητική διαφορά κρίνεται κατά κανόνα στα πλαίσια της ερμηνείας του άρθρου 1 ν. 1406/1983 ή του άρθρου 94 παράγραφος 1 του Συντάγματος ή ενδεχομένως και άλλων διατάξεων που περιέχουν τον όρο διοικητική διαφορά. Στην συγκεκριμένη όμως περίπτωση αντικείμενο ερμηνείας είναι το άρθρο 1 του Ν. 2735/1999 το οποίο στο πραγματικό του δεν περιέχει τέτοιο όρο (δηλαδή «διοικητική διαφορά»), αλλά τους όρους «διεθνής»

και «εμπορική». Συνεπώς μια διαφορά η οποία σύμφωνα με άλλες διατάξεις είναι διοικητική, στα πλαίσια της ερμηνείας του άρθρου 1 του Ν. 2735/1999 δεν αποκλείεται να είναι «διεθνής» ή «εμπορική», χωρίς αυτό να είναι αντιφατικό προς τον διαφορετικό χαρακτηρισμό της ίδιας διαφοράς στα πλαίσια της ερμηνείας άλλων διατάξεων. Η αυτοτελής ερμηνεία του άρθρου 1 του Ν. 2735/1999 ενισχύεται και από το γεγονός ότι στην ουσία ο νόμος αυτός ενσωματώνει στην ελληνική έννομη τάξη ένα διεθνές πρότυπο και ειδικώτερα τον Πρότυπο Νόμο της UNCITRAL για την διεθνή εμπορική διαιτησία.

**11. <u>Επί του διεθνούς ή μη χαρακτήρα της διαιτησίας</u>**

**(1)** Σύμφωνα με το άρθρο 1 του Ν. 2735/1999 για την εμπορική διαιτησία «*οι διατάξεις του νόμου αυτού εφαρμόζονται ..... στην διεθνή εμπορική διαιτησία, ο τόπος της οποίας βρίσκεται στην Ελληνική επικράτεια*» (παράγραφος 1), «*Διεθνής είναι η διαιτησία όταν : α)τα μέρη έχουν, κατά την σύναψη της συμφωνίας διαιτησίας, την εγκατάστασή τους σε διαφορετικά κράτη ...*» (παράγραφος 2) και για την εφαρμογή της παραγράφου 2 «*α)αν ένα μέρος έχει περισσότερες από μια εγκαταστάσεις, θεωρείται ως εγκατάστασή του εκείνη που έχει τη στενότερη σχέση με τη συμφωνία διαιτησίας, β)αν ένα μέρος δεν έχει εγκατάσταση, λαμβάνεται υπόψη η συνήθης διαμονή του και προκειμένου περί νομικού προσώπου ο τόπος όπου διατηρεί γραφείο*» (παράγραφος 3).

**(2)** Παρά την διατύπωση του νόμου (χρήση οριστικού άρθρου «την εγκατάστασή τους» στο άρθρο 1 παράγραφος 2α) η οποία παραπέμπει στην πραγματική έδρα μιας εταιρείας, όπου ασκείται η διοίκησή της, όπως προκύπτει από την παράγραφο 3α του άρθρου 1, ο νόμος προβλέπει την δυνατότητα μια επιχείρηση να έχει περισσότερες εγκαταστάσεις, κάτι που παραπέμπει σε υποκαταστήματα (ειδικές εμπορικές κατοικίες) και όχι στον τόπο της κεντρικής διοίκησης όπου λαμβάνονται οι σημαντικές αποφάσεις για την επιχείρηση (έδρας) που δεν μπορεί να είναι περισσότεροι από ένα.

**(3)** Το αυτό προκύπτει και από το αγγλικό πρωτότυπο κείμενο όπου ο όρος που χρησιμοποιείται είναι «τόπος επιχειρήσεων» ("place of business"). Το αυτό προκύπτει και από τις προπαρασκευαστικές εργασίες της UNCITRAL για τον Πρότυπο Νόμο περί Διεθνούς Εμπορικής Διαιτησίας (βλ. Αναλυτικό Σχολιασμό του σχεδίου του Προτύπου Νόμου για την Διεθνή Εμπορική Διαιτησία στην Αναφορά του Γενικού Γραμματέα στην 18η Σύνοδο της UNCITRAL στη Βιέννη, 3-21 Ιουνίου 1985 UN doc A/CN.9/264/25 March 1985, εφ' εξής Model Law Commentary) όπου αναφέρεται ότι ο Πρότυπος Νόμος δεν αποβλέπει στον <u>κύριο</u> τόπο των επιχειρήσεων (principal place of business) ή στην έδρα της διοίκησης (head office), αλλά στο υποκατάστημα με το οποίο καταρτίστηκε μια συγκεκριμένη σύμβαση (βλ. Model Law Commentary, υπό άρθρο 1 παρ.26 και 27). Το αυτό προκύπτει και από την Σύμβαση των Ηνωμένων Εθνών για τις διεθνείς πωλήσεις κινητών πραγμάτων (Βιέννη 1980, ν. 2532/1997 άρθρα 1 και 10) την διατύπωση της οποίας στο σημείο αυτό ακολούθησε και ο Πρότυπος Νόμος για την Διεθνή Εμπορική Διαιτησία (βλ. Model Law Commentary, υπό άρθρο 1 παρ. 24) και συνεπώς και η Σύμβαση για τις διεθνείς πωλήσεις μπορεί να χρησιμοποιείται ως ερμηνευτικό βοήθημα, όπως και ο αντίστοιχος σχολιασμός της από την Γραμματεία των Ηνωμένων Εθνών (βλ. UN document A/CONF.97/5 εφ' εξής

International Sales Commentary υπό άρθρα 1 και 9 του Σχεδίου ήδη άρθρα 1 και 10 της Συμβάσεως).

**(4)** Παράλληλα όμως ορίζεται στον νόμο ότι λαμβάνεται υπόψη η εγκατάσταση κατά τον χρόνο της συνάψεως της συμφωνίας διαιτησίας (άρθρο 1 παρ.2α, ν. 2735/1999) και αν μια επιχείρηση έχει περισσότερες από μια εγκαταστάσεις, τότε λαμβάνεται υπόψη εκείνη που έχει στενότερη σχέση με την συμφωνία διαιτησίας (άρθρο 1 παρ.3α ν. 2735/1999) και τέτοια περίπτωση στενότερης σχέσης υπάρχει όταν η διαπραγμάτευση της σύμβασης έγινε πλήρως με μια συγκεκριμένη εγκατάσταση χωρίς να παίζει ρόλο ο τόπος που τελικώς υπεγράφη η σύμβαση (Model Law Commentary, υπό άρθρο 1 παρ. 32, πρβλ. και άρθρο 1 παρ.2 της Σύμβασης για τις διεθνείς πωλήσεις όπου αναφέρεται ότι αν η εγκατάσταση σε μια χώρα δεν προκύπτει από την σύμβαση ή από προηγούμενες συναλλαγές των μερών ή προηγούμενες πληροφορίες, η εγκατάσταση αυτή δεν λαμβάνεται υπόψη (βλ. και άρθρο 10 της Συμβάσεως για τις διεθνείς πωλήσεις και International Sales Commentary, υπό άρθρο 9 του σχεδίου παρ.7 όπου αναφέρεται ότι εκπλήρωση της συμβάσεως μεταγενέστερα από άλλη εγκατάσταση δεν έχει ως συνέπεια την μεταβολή της εγκατάστασης που έχει στενότερη σχέση με την συμφωνία). Τέλος ο νόμος (άρθρο 1 παρ. 3β ν. 2735/1999) κάνει αναφορά και σε τόπο όπου ένα νομικό πρόσωπο διατηρεί γραφείο, το οποίο δεν θεωρεί ως εγκατάσταση. Σημειωτέον δε ότι αντίστοιχη ρύθμιση δεν περιέχει ο Πρότυπος Νόμος της UNCITRAL, ο οποίος αναφέρεται μόνο σε συνήθη διαμονή.

**(5)** Στην υπό κρίση υπόθεση η επίδικη από 19 Μαΐου 2003 σύμβαση υπ' αριθ. 020Α/03, όπως προκύπτει από το κείμενό της, συνήφθη μεταξύ αφ' ενός μεν της Ελληνικής Δημοκρατίας και αφ' ετέρου της εταιρείας SAIC, η οποία όπως αναφέρεται στη σύμβαση, έχει τα κεντρικά της γραφεία στην πόλη McLean της Πολιτείας Virginia των ΗΠΑ. Υπεγράφη δε η σύμβαση αυτή εκ μέρους της SAIC από τον Ανώτερο Αντιπρόεδρο (Senior Vice President) Steven H.Weiss (με βάση πληρεξούσιο) για τον οποίο δεν προκύπτει να έχει οποιαδήποτε εγκατάσταση στην Ελλάδα. Παράλληλα δεν γίνεται καμία αναφορά σε εγκατάσταση της SAIC στην Ελλάδα, η οποία να ανεμείχθη καθ' οιονδήποτε τρόπο στην διαπραγμάτευση και σύναψη της σύμβασης. Η διεύθυνση Λ.Κηφισίας 90, Αμαρούσιο, Αττικής, που αναφέρεται στο άρθρο 30 της σύμβασης για την αλληλογραφία, ακόμη και αν είναι διεύθυνση εγκατάστασης της Αιτούσης στην Ελλάδα κατά τον χρόνο εκείνο, αναφέρεται για αλληλογραφία που θα ανταλλάσσεται <u>μετά</u> την σύναψη της Σύμβασης (ήτοι για την ερμηνεία της Σύμβασης παρ. 30.2.1, για την υλοποίηση της Σύμβασης παρ. 30.2.2 και για οικονομικά θέματα της Σύμβασης παρ. 30.2.2) και δεν προκύπτει ότι οποιαδήποτε εγκατάσταση της Αιτούσης στην Ελλάδα ανεμείχθη στην διαπραγμάτευση και σύναψη της Σύμβασης, ενώ η εγκατάσταση που λαμβάνεται υπόψη είναι εκείνη του χρόνου της σύναψης της συμφωνίας και στενότερα συνδεόμενη με την συμφωνία είναι αυτή που διεπραγματεύθη και συνήψε την συμφωνία διαιτησίας.

**(6)** Συνεπώς η εγκατάσταση της Αιτούσης που από την Σύμβαση προκύπτει ότι διεπραγματεύθη και συνήψε την Σύμβαση, κάτι που δεν ανατρέπεται από άλλα στοιχεία, είναι εκείνη στις ΗΠΑ η οποία ευρίσκεται σε άλλο κράτος από το κράτος εγκατάστασης του Καθού και συνεπώς η διαιτησία είναι διεθνής κατά την έννοια του άρθρου 1 του ν. 2735/1999.

## 12. Επί του εμπορικού ή μη χαρακτήρα της διαιτησίας

**(1)** Το άρθρο 1 παρ.1 του ν. 2735/1999 ρητά ορίζει ότι οι διατάξεις του νόμου αυτού εφαρμόζονται στη διεθνή εμπορική διαιτησία.

**(2)** Ο νόμος δεν περιέχει ορισμό του όρου «εμπορική». Όμως, στην Εισηγητική Έκθεση του νόμου αναφέρονται μεταξύ άλλων ότι :

> *« Το ίδιο το κείμενο του προτύπου νόμου, όπως συντάχθηκε από την UNCITRAL έχει σε σχέση με τον όρο «εμπορική» την ακόλουθη υποσημείωση που διευρύνει τα εννοιολογικά όριά του, ώστε να λαμβάνεται υπόψη ως «οικονομική»:*
>
> *«Στον όρο «εμπορική» δίδεται ευρεία ερμηνεία, ώστε να καλύπτει ζητήματα που προκύπτουν από κάθε σχέση εμπορικής φύσης, συμβατική ή όχι. Οι σχέσεις εμπορικής φύσης περιλαμβάνουν –χωρίς να περιορίζονται σε αυτές– τις ακόλουθες συναλλαγές:*
>
> *Κάθε εμπορική συναλλαγή για την παροχή ή ανταλλαγή εμπορευμάτων ή υπηρεσιών, συμφωνία διανομής, εμπορική αντιπροσωπεία ή πρακτορεία, πρακτορεία επιχειρηματικών απαιτήσεων (factoring), χρηματοδοτική μίσθωση (leasing), κατασκευή έργων, παροχή άδειας εκμετάλλευσης, επένδυση, χρηματοδότηση, τραπεζικές εργασίες, ασφαλίσεις, σύμβαση εκμετάλλευσης ή παραχώρησης, κοινοπραξία και άλλες μορφές βιομηχανικής ή επιχειρηματικής συνεργασίας, αεροπορική, θαλάσσια, σιδηροδρομική ή οδική μεταφορά αγαθών και επιβατών».*
>
> *Για νομοτεχνικούς λόγους αυτή η υποσημείωση δεν έχει περιληφθεί στο κείμενο του προτεινόμενου νομοθετήματος, όπως προκρίθηκε σε διάφορες χώρες κατά υιοθέτηση του προτύπου νόμου ως εσωτερικού δικαίου. Όμως δεν παύει εξ αυτού να αποτελεί ερμηνευτικό βοήθημα για την έκταση του όρου «εμπορική».*

**(3)** Εξ άλλου το Model Law Commentary σχολιάζοντας το άρθρο 1, αναφέρει σχετικά και ότι η υποσημείωση στον όρο «commercial» προσετέθη ως ερμηνευτικό βοήθημα για τον όρο αυτό (παράγραφος 16) και εκφράζει την νομοθετική βούληση να ερμηνεύεται ο όρος «εμπορική» με ευρύ τρόπο (παράγραφος 18). Επίσης επισημαίνεται ότι η υποσημείωση αυτή καθοδηγεί στην αυτόνομη ερμηνεία του όρου «εμπορική», ότι ο Πρότυπος Νόμος δεν παραπέμπει για τον χαρακτηρισμό μιας σχέσεως ως εμπορικής στην εθνική νομοθεσία των κρατών, όπως κάνει η Σύμβαση της Νέας Υόρκης του 1958 «για την αναγνώριση και εκτέλεση αλλοδαπών διαιτητικών αποφάσεων» (ν. 4220/1961) στο άρθρο 1 παράγραφος 3 και ότι θα ήταν σφάλμα να εφαρμόζει κανείς εθνικές αντιλήψεις για τον χαρακτηρισμό μιας σχέσης ως εμπορικής (παράγραφος 19). Τέλος, διευκρινίζεται ότι παρόλον ότι ο Πρότυπος Νόμος δεν αναφέρεται στο ζήτημα της κρατικής ασυλίας, ο Πρότυπος Νόμος καλύπτει και σχέσεις στις οποίες ένα κρατικό όργανο ή μια κρατική οντότητα είναι συμβαλλόμενα, υπό τον όρο φυσικά ότι η σχέση είναι εμπορικής φύσεως (παράγραφος 21).

**(4)** Εξ άλλου έχει επισημανθεί ότι ιστορικά ο όρος «διεθνής διαιτησία» χωρίς άλλο προσδιορισμό, παραπέμπει σε διαιτησίες του (δημοσίου) διεθνούς δικαίου ιδίως μεταξύ κρατών και συνεπώς η προσθήκη του όρου «εμπορική» διακρίνει αυτή την διαιτησία

από την διαιτησία διεθνούς δικαίου μεταξύ κρατών[1] και παρόλον ότι η ανάμειξη εμπόρων είναι ένα ενδεικτικό στοιχείο, αυτό δεν είναι πρωταρχικό διότι κράτη επίσης μπορούν να μετέχουν σε εμπορική διαιτησία στα πλαίσια μιας εμπορικής δραστηριότητας[2].

**(5)** Επίσης έχει επισημανθεί ότι η έννοια της εμπορικότητας είναι τόσο ευρεία που καταλαμβάνει στην ουσία οποιαδήποτε οικονομική διαφορά[3] και με αυτή την έννοια της εμπορικότητας διαφορές στις οποίες μετέχουν δημόσιες οντότητες και προέρχονται από διεθνείς εμπορικές συναλλαγές τους, πρέπει να περιλαμβάνονται στην έννοια της διεθνούς εμπορικής διαιτησίας, αφού συχνά ο δημόσιος χαρακτήρας των οντοτήτων αυτών δεν επηρεάζει τους κανόνες που διέπουν μια σύμβαση ή μια διεθνή διαιτησία στην οποία μετέχουν[4].

**(6)** Στην συγκεκριμένη περίπτωση η επίδικη σύμβαση είναι μια σύμβαση πώλησης αγαθών και παροχής υπηρεσιών και η διαιτησία για τις διαφορές από αυτήν σαφώς εμπίπτει στην έννοια της εμπορικής διαιτησίας, όπως νοείται στο άρθρο 1 του ν. 2735/1999 για την διεθνή εμπορική διαιτησία, όπως η έννοια αυτή διευκρινίζεται από την εισηγητική έκθεση του νόμου, από την αντίστοιχη υποσημείωση στον Πρότυπο Νόμο της UNCITRAL και στο Model Law Commentary κατά τα ανωτέρω. Αυτή δε η αυτόνομη ερμηνεία του όρου «διεθνής εμπορική διαιτησία» στον ν. 2735/1999 δεν επηρεάζεται από, ούτε επηρεάζει, οποιαδήποτε ερμηνεία ή χαρακτηρισμό της σχέσης αυτής στα πλαίσια ερμηνείας οποιουδήποτε άλλου νόμου.

**(7)** Εξ άλλου και ανεξάρτητα από τον χαρακτηρισμό και την υπαγωγή της παρούσης διαιτησίας στο άρθρο 1 του Ν. 2735/1999, κατά την σύναψη της διαιτητικής συμφωνίας (και ανεξάρτητα από το επιτρεπτό αυτής ή την εγκυρότητά της) αλλά και κατά την διαδικασία διαπραγμάτευσης και σύναψης της επίδικης σύμβασης προμήθειας και το Καθού αντιλαμβανόταν τις διαφορές που θα προέκυπταν από αυτήν ως διεθνείς εμπορικές και γι' αυτό συμφώνησε διαιτησία του Διεθνούς Εμπορικού Επιμελητηρίου (ICC) σε σχέση με την οποία το άρθρο 1 παράγραφος 1 των Κανόνων Διαιτησίας ορίζει ότι η λειτουργία (function) του Διεθνούς Δικαστηρίου Διαιτησίας του ICC είναι η «επίλυση με διαιτησία <u>εμπορικών</u> διαφορών διεθνούς χαρακτήρα» ("the settlement by arbitration of <u>business</u> disputes of an international character").

**(8)** Σημειωτέον ότι η παραπομπή των διαφορών σε διαιτησία σύμφωνα με τους Κανόνες Διαιτησίας του ICC περιλαμβάνεται όχι μόνο στην ίδια την επίδικη σύμβαση προμήθειας των συστημάτων C4I αλλά και στην απόφαση του Υπουργείου Εθνικής

[1] J.M. Lew, L.A. Mistelis, S.M. Kröll, Essential Characteristics of International Commercial Arbitration, Chapter 4 in J.M. Lew, L.A. Mistelis et al, Comparative International Commercial Arbitration (Kluwer Law International 2003) σελ. 49-69, paras 4-3, σε σελ. 49.

[2] Αυτόθι παρ. 4-5 σελ. 50.

[3] E.Gaillrd, J.Savage, Definition of International Commercial Arbitration, in Emmanuel Gaillard and John Savage (eds), Fouchard Gaillard Golman on International Commercial Arbitration, (Kluwer Law International 1999) σελ. 9-62 σε παρ. 59 σελ. 34, βλ. Και Εισηγητική Έκθεση του Ν. 2735/1999.

[4] Αυτόθι παρ. 70-71 σελ. 40.

Άμυνας που κατακύρωσε την προμήθεια των Συστημάτων C4I Ολυμπιακής Ασφάλειας (Φ600/ΑΠ 9092 Σ.16 13 Μαΐου 2003, παράγραφος 24). Είναι δε βέβαιο ότι ο όρος αυτός απετέλεσε και αντικείμενο διαπραγμάτευσης αφού στην πρόσκληση ενδιαφέροντος για την προμήθεια των Συστημάτων C4I Ολυμπιακής Ασφάλειας (Αποφ. ΥΠΕΘΑ Φ600/44139 Σ.23 6 Σεπτεμβρίου 2002) ενώ προβλέπεται η επίλυση διαφορών με διαιτησία (παράγραφος 16) δεν γίνεται αναφορά σε διαιτησία του ICC κάτι που περιελήφθη τελικά στην απόφαση κατακύρωσης. Συνεπώς πρέπει να ληφθούν υπόψη και αυτά τα στοιχεία κατά την αναζήτηση της αληθινής βούλησης των μερών τόσο υποκειμενικά (ΑΚ 173) όσο και αντικειμενικά (ΑΚ 200), κάτι που οδηγεί στο συμπέρασμα ότι (και ανεξάρτητα από την ευθεία εφαρμογή του άρθρου 1 του ν.2735/1999) και κατά την αντίληψη και τη βούληση των μερών οι διαφορές που τυχόν θα προέκυπταν από την επίδικη σύμβαση ήταν εμπορικές υπαγόμενες στην παρούσα διαιτησία.

**13. <u>Ο ν. 2735/1999 ως νομοθετικό έρεισμα για την έγκυρη σύναψη συμφωνιών διαιτησίας</u>**

**(1)** Εν όψει των ανωτέρω (υπό Γ11 και Γ12) η παρούσα διαιτησία αποτελεί διεθνή εμπορική διαιτησία κατά την έννοια του άρθρου 1 του ν. 2735/1999 και διέπεται από τις διατάξεις του νόμου αυτού.

**(2)** Γεννάται όμως το ερώτημα αν ο ν. 2735/1999 αποτελεί νομοθετικό έρεισμα για την σύναψη εγκύρων συμφωνιών διαιτησίας, δηλαδή αν εμπίπτει στην έννοια του «νόμου» όπως ο όρος αυτός χρησιμοποιείται στις παραγράφους 1 και 2 του άρθρου 94 του Συντάγματος («*όπως νόμος ορίζει*»).

**(3)** Συναφώς, πρέπει να επισημανθεί ότι για τις ιδιωτικές διαφορές δεν έχει γεννηθεί κανένα ζήτημα ούτε φαίνεται να έχει εκφρασθεί οποιαδήποτε διαφορετική άποψη ή αμφιβολία είτε στη θεωρία είτε στη νομολογία περί του ότι ο ν. 2735/1999 αποτελεί το νομοθετικό έρεισμα το οποίο απαιτεί το Σύνταγμα (άρθρο 94 παρ.2) για την αφαίρεση ιδιωτικών διαφορών από την δικαιοδοσία των πολιτικών δικαστηρίων και για την υπαγωγή τους με συμφωνία στη διαιτησία. Σημειωτέον ότι επίσης γίνεται γενικώς δεκτό χωρίς να υπάρχει αντίλογος ή αμφιβολία περί του αντιθέτου ότι οι διεθνείς εμπορικές διαφορές που σύμφωνα με άλλες διατάξεις (του εσωτερικού δικαίου) χαρακτηρίζονται ως ιδιωτικές, μετά την θέση σε ισχύ του ν. 2735/1999 (ο οποίος είναι και νεώτερος από τον ΚΠολΔ και ειδικώτερος αφού αναφέρεται μόνο σε ορισμένες ιδιωτικές διαφορές, δηλαδή τις διεθνείς εμπορικές, ενώ το άρθρο 867 ΚΠολΔ αναφέρεται σε όλες τις ιδιωτικές διαφορές) υπάγονται πλέον στον ν. 2735/1999 και όχι στον ΚΠολΔ. Συνεπώς το νομοθετικό έρεισμα για το κύρος των σχετικών συμφωνιών διαιτησίας βρίσκεται στον νόμο αυτό.

**(4)** Εξ άλλου δεν φαίνεται να έχει αντιμετωπισθεί μέχρι σήμερα ούτε στη νομολογία ούτε στη θεωρία το ζήτημα αν ο ν. 2735/1999 αποτελεί έρεισμα για την υπαγωγή σε διαιτησία με συμφωνία διαφορών οι οποίες με άλλες διατάξεις (όπως το άρθρο 94 παράγραφος 1 του Συντάγματος ή το άρθρο 1 του ν. 1406/1983) χαρακτηρίζονται ως διοικητικές διαφορές αλλά παράλληλα και ανεξάρτητα από αυτό εμπίπτουν κατά τα ανωτέρω (υπό Γ 10-12) ως διεθνείς εμπορικές στο άρθρο 1, και εντεύθεν στο πεδίο

εφαρμογής του ν. 2735/1999. Όμως, για ταυτότητα λόγου πρέπει να δοθεί και στο ζήτημα αυτό η ίδια λύση που ανεφέρθη ανωτέρω για τις ιδιωτικές διαφορές. Πράγματι, η διατύπωση της πρώτης παραγράφου του άρθρου 94 του Συντάγματος που αφορά τις διοικητικές διαφορές (*«όπως νόμος ορίζει»*) είναι πανομοιότυπη προς την διατύπωση της δεύτερης παραγράφου που αφορά τις ιδιωτικές διαφορές (*«όπως νόμος ορίζει»*) και για τις ιδιωτικές διαφορές ο ν. 2735/1999 θεωρείται χωρίς αμφιβολίες και χωρίς αντίθετες απόψεις ότι αποτελεί το κατ' άρθρο 94 παρ.2 του Συντάγματος νομοθετικό έρεισμα για έγκυρες συμφωνίες διαιτησίας. Συνεπώς, εξ ίσου χωρίς αμφιβολία πρέπει να γίνει δεκτό ότι ο ίδιος νόμος αποτελεί το νομοθετικό έρεισμα που απαιτεί και το πανομοιότυπο άρθρο 94 παρ.1 του Συντάγματος για την σύναψη εγκύρου διαιτητικής συμφωνίας γι' αυτή την κατηγορία των διοικητικών διαφορών, δηλαδή γι' αυτές που παράλληλα εμπίπτουν και στην έννοια των διεθνών εμπορικών διαφορών κατ' άρθρο 1 του ν. 2735/1999 (εκτός από εκείνες για τις οποίες -όπως προβλέπεται από το άρθρο 1 παράγραφος 4 του ν.2735/1999- υφίστανται διατάξεις νόμων που ειδικά τις εξαίρουν από την διαιτησία, κάτι το οποίο δεν φαίνεται να συντρέχει για την επίδικη διαφορά ούτε κάποιος από τους διαδίκους έχει επικαλεσθεί κάτι σχετικό).

**(5)** Η αναγνώριση από το ν. 2735/1999 της συμφωνίας διαιτησίας ως λόγου για την αφαίρεση από τα κρατικά δικαστήρια και την υπαγωγή σε διαιτησία των διαφορών που εμπίπτουν στο άρθρο 1 του νόμου αυτού προκύπτει από το σύνολο των διατάξεών του, προϋπόθεση για τις οποίες αποτελεί η υπαγωγή μιας διαφοράς σε διαιτησία με βάση τη συμφωνία που προβλέπεται από το άρθρο 7 του νόμου αλλά και ρητά προβλέπεται στο άρθρο 8 του νόμου αυτού (το «αρνητικό» αποτέλεσμα της συμφωνίας διαιτησίας, βλ. και Model Law Commentary, υπό άρθρο 8, παρ.1), το οποίο ορίζει ότι όταν υπάρχει συμφωνία διαιτησίας το δικαστήριο ενώπιον του οποίου ασκείται αγωγή παραπέμπει την υπόθεση στη διαιτησία (εφόσον υποβληθεί εμπρόθεσμα σχετικό αίτημα) ενώ το άρθρο 9 ορίζει ότι η συμφωνία διαιτησίας δεν εμποδίζει το δικαστήριο να διατάξει ασφαλιστικά μέτρα, και συνεπώς εξ αντιδιαστολής συνάγεται και από αυτή τη διάταξη ότι εμποδίζει την εκδίκαση της ουσίας της διαφοράς από τα δικαστήρια. Τέλος, το ίδιο το άρθρο 7 του ν.2735/1999 δεν περιγράφει απλά τον ορισμό της συμφωνίας διαιτησίας αλλά περιέχει και αναγνώρισή της ως *«του σημαντικού νομικού εγγράφου το οποίο αποτελεί την βάση και τον δικαιολογητικό λόγο μιας διαιτησίας»* (βλ. και Model Law Commentary, υπό άρθρο 7, παρ.1 και 2-4).

**(6)** Όμως η υπαγωγή κατ' άρθρο 1 ν.2735/1999 σε διαιτησία των διεθνών εμπορικών συναλλαγών (δηλαδή των διεθνών προμηθειών) και του Ελληνικού Δημοσίου, εξυπηρετεί και τα συμφέροντα του ίδιου του Ελληνικού Δημοσίου αφού αν δεν υπήρχε η δυνατότης υπαγωγής σε διαιτησία και μάλιστα διεθνώς αποδεκτή πολλοί προμηθευτές ή πάροχοι υπηρεσιών από το εξωτερικό, θα δίσταζαν να μετάσχουν σε διαγωνισμούς ή διαπραγματεύσεις για συμβάσεις με το Ελληνικό Δημόσιο κάτι που θα στερούσε το ίδιο το Ελληνικό Δημόσιο από τη δυνατότητα να διαπραγματευθεί με περισσότερους υποψήφιους και αφενός μεν να έχει περισσότερες επιλογές καλλίτερων προϊόντων αφ' ετέρου δε να επιτύχει και καλλίτερους όρους στις συμφωνίες του.

**(7)** Για το λόγο αυτό πολλές διατάξεις της ελληνικής νομοθεσίας καθιστούν ευχερέστερη την σύναψη συμφωνίας διαιτησίας (αλλά και άλλους όρους συμφωνιών κατ' απόκλιση περιορισμών που ισχύουν για συναλλαγές αμιγώς εσωτερικού

χαρακτήρα) στις διεθνείς συναλλαγές του Ελληνικού Δημοσίου. Ενδεικτικά αναφέρεται η εξαίρεση από τους περιορισμούς του άρθρου 49 Εισ.Ν. ΚΠολΔ (δηλαδή ύπαρξη γνωμοδότησης ολομέλειας Νομικού Συμβουλίου του Κράτους) προκειμένου περί διεθνών συναλλαγών (βλ. άρθρο 8 παρ.1 του νδ 736/1970 και ΑΠ (Ολομ.) 8/1996 ΕλλΔνη 1996 σελ. 1052, ΕΕΝ 1996 σελ.32, ΕΝΔ 1996 σελ. 448, βλ. και άλλες τέτοιες διατάξεις κατωτέρω υπό Γ14(13) (ε) και Γ14(14)(ε)).

**(8)** Το γεγονός ότι ο ν. 2735/1999 δεν κάνει ρητή αναφορά στις διοικητικές διαφορές δεν μπορεί να στηρίξει την ερμηνεία ότι ο νόμος αυτός δεν καταλαμβάνει και αυτές τις διαφορές (με το επιχείρημα ότι αν ήθελε να τις καταλάβει θα περιείχε σχετική πρόβλεψη), διότι ο ν. 2735/1999 ενσωματώνει στην ελληνική νομοθεσία τον Πρότυπο Νόμο της UNCITRAL δηλαδή ένα διεθνές κείμενο το οποίο δεν μπορούσε να αναφέρεται σε διακρίσεις της εσωτερικής ελληνικής νομοθεσίας και το οποίο μάλιστα συνειδητά ήθελε να αποσυνδέσει τον χαρακτηρισμό των διεθνών εμπορικών διαφορών από οποιονδήποτε χαρακτηρισμό τους με βάση την εσωτερική νομοθεσία οποιουδήποτε κράτους (βλ. και Model Law Commentary, υπό άρθρο 1, παρ.19). Όμως ήθελε να περιλάβει και διαφορές με κρατικές οντότητες (βλ. και Model Law Commentary, υπό άρθρο 1, παρ.21). Εξ άλλου ο ν. 2735/1999 δεν κάνει αναφορά ούτε σε ιδιωτικές διαφορές αλλά εξ αυτού δεν αμφισβητείται ότι υπάγονται σε αυτόν οι ιδιωτικές διαφορές. Τέλος, ο ν. 2735/1999 –και η δι' αυτού ενσωμάτωση στην ελληνική νομοθεσία του Προτύπου Νόμου της UNCITRAL– δεν μπορεί να ερμηνεύεται (δηλαδή να αναζητείται η βούληση του νομοθέτου) με επιχειρήματα που αντλούνται από άλλους νόμους όπως ο ν. 2717/1999 (Κώδικας Διοικητικής Δικονομίας), ο οποίος δεν περιέχει διάταξη για την δυνατότητα υπαγωγής των διοικητικών διαφορών σε διαιτησία όπως ο ΚΠολΔ) σε σχέση με τον οποίο ο ν. 2735/1999 είναι επιπλέον και νεώτερος και ειδικώτερος, αφού κατά την ανωτέρω ανάλυση αφορά μια μόνο κατηγορία διοικητικών διαφορών, ήτοι αυτές που παράλληλα αποτελούν διεθνείς εμπορικές διαφορές σύμφωνα με το άρθρο 1 του νόμου αυτού.

**(9)** Εν όψει των ανωτέρω δεδομένου ότι η παρούσα διαιτησία (ανεξάρτητα από τον χαρακτηρισμό της επίδικης διαφοράς σύμφωνα με άλλες διατάξεις) αποτελεί διεθνή εμπορική διαιτησία και η διαφορά που φέρεται ενώπιον της διεθνή εμπορική διαφορά, σύμφωνα με το άρθρο 1 του ν. 2735/1999, δεν είναι απαραίτητο να κριθεί αν η διαφορά η οποία φέρεται ενώπιον της αποτελεί ιδιωτική ή διοικητική διαφορά σύμφωνα με τις παραγράφους 1 και 2 του άρθρου 94 του Συντάγματος, αφού υπό οιανδήποτε εκδοχή νομίμως μπορεί να υπαχθεί σε διαιτησία με συμφωνία, η δε σχετική συμφωνία περί διαιτησίας είναι έγκυρη και νομοθετικό έρεισμα αυτής αποτελεί ο ν. 2735/1999.

### 14. <u>Το κύρος της συμφωνίας διαιτησίας σύμφωνα και με το ΠΔ 284/1989</u>

**(1)** Επάλληλα η συμφωνία (ρήτρα) διαιτησίας που περιέχεται στο άρθρο 28 της επίδικης σύμβασης είναι έγκυρη σύμφωνα και με το άρθρο 69 παράγραφος 7 του πδ 284/1989[5] για τις προμήθειες των Ενόπλων Δυνάμεων, το οποίο ίσχυε κατά τον χρόνο

[5] Το πδ 284/1989 εκδόθηκε κατά νομοθετική εξουσιοδότηση από το άρθρο 50 παρ.5 του ΝΔ 721/1970 "*Περί Οικονομικής Μερίμνης και Λογιστικού των Ενόπλων Δυνάμεων*» που επαναφέρθηκε σε ισχύ με το ν. 370/1976 «*περί καταργήσεως του εδαφίου 2 της περιπτώσεως α' του άρθρου 1 του ΠΔ 142/1974*»).



συνάψεως της επίδικης σύμβασης (το πδ 284/1989 καταργήθηκε με το άρθρο 71 του ν. 3433/2006) και σύμφωνα με τις διατάξεις του οποίου νόμιμα συνήφθη η επίδικη σύμβαση.

**(2)** Ειδικώτερα με το άρθρο 1 του πδ 284/1989 ορίζεται ότι: «*Με το παρόν Προεδρικό Διάταγμα ρυθμίζονται αποκλειστικώς οι διαδικασίες προμηθειών, εργολαβιών, εργασιών και παροχής υπηρεσιών, που πραγματοποιούνται στο εσωτερικό και στο εξωτερικό της χώρας με τη φροντίδα του Υπουργείου Εθνικής Άμυνας για την ικανοποίηση των κάθε φύσεως αναγκών του*».

**(3)** Εξ άλλου με το άρθρο 1 παρ.1 του ν. 2292/1995 για την οργάνωση και λειτουργία του Υπουργείου Εθνικής Άμυνας ορίζεται ότι: «*Η Εθνική Άμυνα περιλαμβάνει το σύνολο των λειτουργιών και δραστηριοτήτων, που αναπτύσσονται από το Κράτος, με σκοπό την προστασία της εδαφικής ακεραιότητας, της εθνικής ανεξαρτησίας και κυριαρχίας και της ασφάλειας των πολιτών εναντίον οποιασδήποτε εξωτερικής επίθεσης ή απειλής, καθώς και την υποστήριξη των εθνικών συμφερόντων*», ενώ με την παράγραφο 3 του ιδίου άρθρου ορίζεται ότι «*κύριο όργανο για την λήψη αποφάσεων που αφορούν την άσκηση της αμυντικής πολιτικής είναι το Κυβερνητικό Συμβούλιο Εξωτερικών και Άμυνας (ΚΥΣΕΑ)*» και με το άρθρο 3 του ιδίου νόμου (αρμοδιότητες του ΚΥΣΕΑ) ορίζεται ότι το ΚΥΣΕΑ έχει αρμοδιότητα να εγκρίνει «*τα μείζονα προγράμματα προμηθείας και παραγωγής αμυντικών μέσων και υλικού*» (στοιχ. γ') και να αποφασίζει «*σχετικά με ζητήματα για τη ρύθμιση των οποίων απαιτείται η συνεργασία περισσοτέρων του ενός υπουργείων*» (στοιχ. ιη').

**(4)** Παράλληλα με το άρθρο 5 παρ.1 του ν. 2833/2000 ορίζεται ότι: «*1. Η ασφάλεια των Ολυμπιακών Αγώνων ανήκει στην Ελληνική Αστυνομία, στο Αρχηγείο της οποίας συνιστάται ειδική υπηρεσία με τον τίτλο «Διεύθυνση Ασφάλειας Ολυμπιακών Αγώνων» για τον επιτελικό σχεδιασμό και το συντονισμό των εμπλεκομένων για την προετοιμασία και τη διεξαγωγή των Ολυμπιακών Αγώνων 2004 φορέων επί θεμάτων τάξης και ασφάλειας*», ενώ με την παράγραφο 2 του ιδίου άρθρου ορίζεται ότι: «*2. Για την εκτέλεση της αποστολής της η ανωτέρω Υπηρεσία συνεργάζεται με όλους τους εμπλεκόμενους για την προετοιμασία και τη διεξαγωγή των Ολυμπιακών Αγώνων 2004 φορείς. Το αντικείμενο και ο τρόπος της συνεργασίας και κάθε συναφές με αυτή θέμα ρυθμίζονται με κοινές αποφάσεις του Υπουργού Δημόσιας Τάξης και του Υπουργού Πολιτισμού και των κατά περίπτωση αρμόδιων Υπουργών*».

**(5)** Τέλος με το άρθρο 1 του ν. 2800/2000 που αφορά το Υπουργείο Δημόσιας Τάξης (ήδη Υπουργείο Προστασίας του Πολίτη), ορίζεται ότι: «*Το Υπουργείο Δημόσιας Τάξης, μέσα στα πλαίσια του Συντάγματος και των νόμων, έχει ως αποστολή: α) Την κατοχύρωση και διατήρηση της δημόσιας τάξης. β) Την προστασία της δημόσιας και κρατικής ασφάλειας*».

**(6)** Από τις πιο πάνω διατάξεις προκύπτει ότι η ασφάλεια των Ολυμπιακών Αγώνων ανετέθη με το άρθρο 5 του ν. 2833/2000 στην Ελληνική Αστυνομία και συνεπώς ενέπιπτε κατά κύριο λόγο στην αρμοδιότητα του Υπουργείου Δημόσιας Τάξης σύμφωνα και με τον οργανωτικό του νόμο. Όμως η ανάθεση αυτή δεν ήταν αποκλειστική αφού από το άρθρο 5 του ν. 2833/2000 (παράγραφοι 1 και 2) προκύπτει

ότι η σι
τον συν
(παρ.1)
όλους τ
και το
των πο
2292/19
στην α
Ολυμπι

(7) Συν
ζητημάτ
η συνερ
2292/19
εξουσιο
συμμετέ
του προ
εφαρμογ
ρητά μν
και 1ε,
εκτέλεσ
Εθνικής
το πρόγ
υπ' αρι
ανάδοχο
1/13.3.2
κοινοπρ

(8) Αρμ
τους αν
Ασφάλει
Αιτούσα
οποίας α
διαδικασ
διατάξεα
και εκτέ
721/197
α').

(9) Εν ό
σύμβαση
διατάξεις
σύμφωνο

(10) Εξ
του 1-6,
σχέση μ

ότι η συνιστώμενη Διεύθυνση Ασφαλείας Ολυμπιακών Αγώνων έχει αρμοδιότητα «*και τον συντονισμό των εμπλεκομένων ……… φορέων επί θεμάτων τάξης και ασφαλείας*» (παρ.1) και «*Για την εκτέλεση της αποστολής της η ανωτέρω Υπηρεσία συνεργάζεται με όλους τους εμπλεκόμενους …… φορείς*» (παρ.2) μεταξύ των οποίων αναμφίβολα ήταν και το ΥΠΕΘΑ, αφού στις αρμοδιότητές του εμπίπτει και η προστασία «*της ασφάλειας των πολιτών εναντίον οποιασδήποτε εξωτερικής επίθεσης ή απειλής*» (άρθρο 1 παρ.1 ν. 2292/1995) τα δε μέτρα Ασφάλειας των Ολυμπιακών Αγώνων αναμφίβολα απέβλεπαν στην ασφάλεια των πολιτών και από εξωτερική απειλή κατά τη διάρκεια των Ολυμπιακών Αγώνων.

**(7)** Συνεπώς το ΚΥΣΕΑ ως το αρμόδιο κυβερνητικό όργανο για την ρύθμιση ζητημάτων που εμπίπτουν στις αρμοδιότητες του ΥΠΕΘΑ και για τα οποία απαιτείται η συνεργασία περισσότερων του ενός υπουργείων (άρθρο 3 παρ.3 στοιχ. ιη' του ν. 2292/1995) νόμιμα κατ' αρμοδιότητα (α)με την απόφαση του 1/23.1.2003 εξουσιοδότησε το ΥΠΕΘΑ να προχωρήσει σε απευθείας διαπραγματεύσεις με καθένα συμμετέχοντα σε προηγηθείσα άκαρπη διαδικασία για την ανάθεση της υλοποίησης του προγράμματος C4I Ολυμπιακής Ασφάλειας σύμφωνα με το πδ 284/1989 κατ' εφαρμογή των άρθρων 6 παρ.2θ, 71 παρ. 1β και 73 παρ. 1β, 13 και 1ζ αυτού, τις οποίες ρητά μνημονεύει η απόφαση αλλά και σύμφωνα με τις διατάξεις των άρθρων 71 παρ.1α και 1ε, 73 παρ.1η και 76 παρ. 1 και 3, οι οποίες δεν μνημονεύονται στην απόφαση, σε εκτέλεση της οποίας εκδόθηκε η απόφαση Φ.600/9024/Σ3 της 29.1.2003 του Υπουργού Εθνικής Άμυνας με την οποία εγκρίνεται η υλοποίηση του προγράμματος (παρ. 1β) και το πρόγραμμα χαρακτηρίζεται «απόρρητο» και «κατεπείγον», (β)με την απόφαση του υπ' αριθ. 2 της 27.2.2003 επέλεξε την κοινοπραξία SAIC Team, ως προτιμητέα ανάδοχο για την συνέχιση των διαπραγματεύσεων και (γ)με την απόφαση του υπ' αριθ. 1/13.3.2003 αποφάσισε την ανάθεση της υλοποίησης του προγράμματος C4I στην κοινοπραξία SAIC Team, αντί του ποσού των Ευρώ 254.999.000.

**(8)** Αρμοδίως δε και ο Υπουργός Εθνικής Άμυνας (με βάση τις ανωτέρω αποφάσεις και τους ανωτέρω νόμους) κατακύρωσε την προμήθεια Συστημάτων C4I Ολυμπιακής Ασφάλειας στην εταιρεία Science Applications International Corporation (δηλαδή την Αιτούσα) με την απόφασή του Φ.600/ΑΠ.9092/Σ.16 της 13 Μαΐου 2003 ως Σχετικά της οποίας απαριθμούνται 26 έγγραφα (α' – κστ') τα οποία αναφέρονται στην προηγηθείσα διαδικασία, στην δε παράγραφο 1 της απόφασης απαριθμούνται σειρά εφαρμοστέων διατάξεων (α-ι) μεταξύ των οποίων και το πδ 284/1989 «περί προμηθειών, εργολαβιών και εκτέλεσης εργασιών των ΕΔ» (υπό η) και ο εξουσιοδοτικός του νόμος ήτοι το ν.δ. 721/1970 «*περί Οικονομικής Μερίμνης και Λογιστικού των Ενόπλων Δυνάμεων*» (υπό α').

**(9)** Εν όψει όλων των ανωτέρω δεν καταλείπεται αμφιβολία περί του ότι η επίδικη σύμβαση απετέλεσε αντικείμενο διαπραγμάτευσης και συνήφθη σύμφωνα με τις διατάξεις του πδ 284/1989 και ότι αυτό έγινε νόμιμα και με τις νόμιμες διαδικασίες σύμφωνα με τα ανωτέρω εκτεθέντα.

**(10)** Εξ άλλου το άρθρο 69 (επίλυση διαφορών) του πδ 284/1989 στις παραγράφους του 1-6, ορίζει μια διοικητική διαδικασία επίλυσης ορισμένων διαφορών ιδίως σε σχέση με την παραλαβή προμηθειών. Δεδομένου ότι η παράγραφος 7 ορίζει ότι:

*«Ειδικότερα για προμήθειες μείζονος σημασίας, ο τρόπος επίλυσης των διαφορών καθορίζεται* ***από τη σχετική σύμβαση****. Στην περίπτωση αυτή θα υπάρχει ανάλογη πρόβλεψη στους ειδικούς όρους της διακήρυξης του αντίστοιχου διαγωνισμού»*, γεννάται το ερώτημα αν αυτή η διάταξη αποτελεί νομοθετικό έρεισμα για την εγκυρότητα της συμφωνίας (ρήτρας) διαιτησίας που περιέχεται στο άρθρο 28 της επίδικης σύμβασης.

**(11)** Σχετικά με το ζήτημα αυτό κατά πρώτον πρέπει να επισημανθεί ότι το γράμμα της διάταξης της παραγράφου 7 του άρθρου 69 πδ 284/1989 είναι σαφές (*«για προμήθειες μείζονος σημασίας,* ***ο τρόπος επίλυσης των διαφορών καθορίζεται από τη σχετική σύμβαση****»*) και δεν αμφισβητείται ότι η προμήθεια Συστήματος Ολυμπιακής Ασφάλειας C4I αποτελεί *«προμήθεια μείζονος σημασίας»*, ενώ η επίλυση των διαφορών με διαιτησία προβλέπεται τόσο στο άρθρο 16 της από 6 Σεπτεμβρίου 2002 πρόσκλησης εκδήλωσης ενδιαφέροντος (αποφ. ΥΠΕΘΑ Φ.600/44139/Σ.23 της 6 Σεπτ. 2002, η οποία εκδόθηκε σε εκτέλεση της από 12.6.2002 απόφασης της Διυπουργικής Επιτροπής Συντονισμού Ολυμπιακής Προετοιμασίας –ΔΕΣΟΠ, αλλά ευρίσκει και νομοθετικό έρεισμα στις ανωτέρω αναφερθείσες διατάξεις για την έστω και μερική αρμοδιότητα του ΥΠΕΘΑ) όσο και στο άρθρο 24 της κατακυρωτικής απόφασης της Προμηθείας (απόφ. ΥΠΕΘΑ Φ.600/ΑΠ 9092/Σ.16 της 13 Μαΐου 2003).

**(12)** Το Καθού όμως ισχυρίζεται ότι η παράγραφος 7 του άρθρου 69 του πδ 284/1989 δεν αποτελεί νομοθετικό έρεισμα για την έγκυρη σύναψη συμφωνίας διαιτησίας (και συνεπώς η ρήτρα διαιτησίας που περιέχεται στο άρθρο 28 της επίδικης σύμβασης είναι άκυρη) και τούτο διότι η παράγραφος αυτή πρέπει να ερμηνευθεί συσταλτικά λόγω της θέσεώς της στο άρθρο 69 το οποίο (στο σύνολό του) αφορά μόνο την διοικητική επίλυση ορισμένων μόνο διαφορών (ιδίως σε σχέση με την παραλαβή προμηθειών) και συνεπώς ναι μεν για προμήθειες μείζονος σημασίας μπορεί να προβλέπεται διαφορετικός τρόπος επίλυσης των διαφορών, πάντοτε όμως διαφορών ομοίων με τις διαφορές που αναφέρονται στις προηγούμενες παραγράφους και αφορούν την παραλαβή προμηθειών και πάντοτε με μια διοικητική διαδικασία παρεμφερή με αυτήν που προβλέπουν οι προηγούμενες παράγραφοι του ιδίου άρθρου 69.

**(13)** **(α)** Η συστηματική όμως ερμηνεία, δηλαδή η ερμηνεία με βάση την θέση μιας διάταξης, την οποία επιχειρεί το Καθού παρόλον ότι σε ορισμένες περιπτώσεις αποτελεί ερμηνευτικό βοήθημα στην αναζήτηση του νοήματος μιας διάταξης, δεν αρκεί για να δικαιολογήσει συσταλτική ερμηνεία (ιδίως μιας διάταξης που είναι τόσο σαφής) αν δεν συνδυασθεί και με άλλες ερμηνευτικές προσεγγίσεις και ιδίως την τελολογική.

**(β)** Εξ άλλου ακόμη και από συστηματικής πλευράς δεν πρέπει να αγνοήσει κανείς ότι η παράγραφος 7 (σε ένα άρθρο με τίτλο «επίλυση διαφορών») βρισκόταν στο τέλος του άρθρου και προφανώς ήθελε να διακρίνει (και να υποβάλει σε διαφορετική νομική μεταχείριση, δηλαδή σε διαφορετικό τρόπο επίλυσης των διαφορών) τις προμήθειες μείζονος σημασίας, και συνεπώς η *a contrario* ερμηνεία της παραγράφου 7 σε σχέση με τις προηγούμενες, είναι αυτό που θέλησε ο νομοθέτης. Για το αν αυτός ο διαφορετικός τρόπος επίλυσης των διαφορών(τον οποίο είναι βέβαιον ότι θέλησε η παράγραφος 7) και ο οποίος θα συμφωνείται στη σύμβαση πρέπει να υπόκειται σε κάποιους περιορισμούς (ως προς το είδος των διαφορών, ήτοι για την παραλαβή και ως προς το είδος της επίλυσης ήτοι διοικητική) με βάση τις προηγούμενες παραγράφους δεν φαίνεται να υπάρχουν πειστικά επιχειρήματα.

**(γ)** Το γεγονός ότι μεταγενέστερα (με το άρθρο 31 του πδ 189/1997) προστέθηκε μια όγδοη παράγραφος που αφορά και πάλι τις Επιτροπές Επίλυσης Διαφορών (δαπάνες) δεν μπορεί να πείσει ότι και η παράγραφος 7 αφορά παρεμφερή διαδικασία επίλυσης διαφορών διότι αφενός μεν δεν μεταβάλλει το γεγονός ότι η παράγραφος 7 πολύ συνειδητά θέλει να καθιερώσει ένα διαφορετικό τρόπο επίλυσης των διαφορών για τις προμήθειες μείζονος σημασίας και μάλιστα τρόπο που να συμφωνείται στη σύμβαση και αφετέρου η συστηματική ερμηνεία έχει κάποια βαρύτητα σε νομοθετήματα με δογματική ενότητα ενώ η προσθήκη μιας παραγράφου με μεταγενέστερο νόμο μετά την παράγραφο 7 ενώ ενδεχομένως έπρεπε να ενταχθεί πριν, μπορεί κάλλιστα να αποτελεί νομοτεχνική αστοχία.

**(δ)** Εξ άλλου η ιστορική ερμηνεία (δηλαδή το τι προέβλεπε το προγενέστερο πδ 785/1978) μπορεί να βοηθήσει ερμηνευτικά λαμβάνοντας υπόψη ότι το πδ 284/1989 ήθελε ακριβώς να τροποποιήσει και συμπληρώσει (και μεταγλωττίσει) το πδ 785/1978. Πράγματι, το πδ 785/78 στο άρθρο 69 παράγραφος 6 (στο τελευταίο εδάφιό της που ήταν αντίστοιχο προς την παράγραφο 7 του άρθρου 69 πδ 284/1989) προέβλεπε ότι : *«Ειδικώτερον δια προμηθείας εξ οίκων εξωτερικού μείζονος σημασίας η ως είρηται Επιτροπή συγκροτείται ως προβλέπεται υπό της οικείας συμβάσεως, δυναμένης να εξετάση και πάσαν διαφοράν περί την ερμηνείαν και την εκτέλεσιν της συμβάσεως».*

**(ε)** Από τη διάταξη αυτή (η οποία είναι άλλο ένα δείγμα διατάξεως με το οποίο ο νομοθέτης ευνοεί την διαιτησία του Δημοσίου σε διεθνείς διαφορές) προκύπτει και ο σκοπός της (τελολογική ερμηνεία) και ο σκοπός της τροποποιημένης διατάξεως (δηλαδή της παραγράφου 7 του άρθρου 69 του πδ 284/1989) και ο σκοπός των τροποποιήσεων. Πράγματι είναι προφανές ότι το τελευταίο εδάφιο της παραγράφου 6 του πδ 785/78 είχε σκοπό σε προμήθειες «*μείζονος σημασίας*» «*εξ οίκων εξωτερικού*» η επιτροπή επίλυσης των διαφορών να συγκροτείται όχι όπως προέβλεπε το πδ για τις άλλες προμήθειες αλλά «*όπως προβλέπεται υπό της οικείας συμβάσεως*» (συνεπώς σύμφωνα με την σύμβαση θα μπορούσε να συγκροτείται πχ. και όπως προβλέπουν οι Κανόνες Διαιτησίας του ICC) και να μπορεί «*να εξετάζει και πάσαν διαφοράν περί την ερμηνείαν και την εκτέλεσιν της συμβάσεως*» (δηλαδή να έχει το εύρος μιας πλήρους διαιτησίας σαν αυτή που προβλέπεται στο άρθρο 28 της επίδικης σύμβασης).

**(στ)** Ο λόγος δε για μια τέτοια ρύθμιση είναι προφανής και είναι αυτός που αναφέρεται στις παραγράφους Γ13(6) και (7) ανωτέρω, ήτοι για μείζονος σημασίας προμήθειες πολλοί οίκοι του εξωτερικού δεν ήταν διατεθειμένοι να δεχθούν επίλυση των διαφορών από τις επιτροπές του πδ ή και τα δικαστήρια (κάτι που σε τελευταία ανάλυση λειτουργούσε εις βάρος του Ελληνικού Δημοσίου αφού περιόριζε τους υποψήφιους προμηθευτάς του και έτσι και την δυνατότητά του να επιτύχει καλές προμήθειες και με καλούς όρους) και γι' αυτό το πδ 785/78 επέτρεπε την συγκρότηση των επιτροπών με τρόπο που θα συνεφωνείτο και αντικείμενο της επίλυσης να είναι όλες οι διαφορές από την σύμβαση. Το γεγονός ότι η ανωτέρω ρύθμιση του πδ 785/1978 (δηλαδή διαιτησία με συμφωνημένη σύνθεση επιτροπών και με αντικείμενο την επίλυση όλων των διαφορών από την ερμηνεία και την εκτέλεση της σύμβασης) περιέχεται στο τελευταίο εδάφιο της παραγράφου 6 του άρθρου 69 (το οποίο κατά τα λοιπά αφορά την διοικητική επίλυση διαφορών περί την παραλαβή) δείχνει ότι η θέση μιας διάταξης (συστηματική ερμηνεία) έχει πολύ μικρότερη σημασία από το γράμμα της (γραμματική ερμηνεία) σε συνδυασμό με τον σκοπό της (τελολογική ερμηνεία).

**(ζ)** Με την τροποποίηση του πδ 284/1989, η παράγραφος 7 του άρθρου 69 στην πραγματικότητα διηύρυνε (σαφώς προς το συμφέρον του Ελληνικού Δημοσίου) την

προηγούμενη ρύθμιση ώστε πρώτον να εφαρμόζεται σε όλες τις προμήθειες μείζονος σημασίας (δηλαδή ακόμη και αν είναι από οίκους του εσωτερικού) και δεύτερον από την συμφωνία να ρυθμίζεται όχι μόνο η συγκρότηση των επιτροπών αλλά γενικότερα ο τρόπος επίλυσης των διαφορών (δηλαδή είτε από τα τακτικά δικαστήρια είτε από διαιτησία) και στην περίπτωση διαιτησίας η μορφή του διαιτητικού δικαστηρίου και η όλη διαδικασία χωρίς να τίθεται από την (νέα) παράγραφο 7 κάποιος περιορισμός ως προς το αντικείμενο της διαιτησίας.

**(η)** Εν όψει των ανωτέρω, το να ερμηνευθεί το πδ 284/1989 (άρθρο 69 παρ.7) *a contrario* προς το πδ 785/1978 (άρθρο 69 παρ.6) και να συναχθεί το συμπέρασμα ότι με την τροποποίηση του πδ 284/1989 ο νομοθέτης, παρά το σαφές γράμμα της διατάξεως, δεν θέλησε να διευρύνει την προηγούμενη ρύθμιση αλλά να την περιορίσει έτσι ώστε οι μείζονος σημασίας προμήθειες να μην μπορούν να υπαχθούν σε διαιτησία ως προς κάθε διαφορά και με συμφωνημένα όργανα επίλυσης των διαφορών δεν εξυπηρετεί κανένα σκοπό και μια τέτοια ερμηνεία *a contrario* χωρίς συνδυασμό με τελολογική ερμηνεία δεν πρέπει να γίνεται δεκτή διότι οδηγεί σε εσφαλμένα συμπεράσματα.

**(θ)** Εν όψει των ανωτέρω είναι φανερό ότι δεν δικαιολογείται περιορισμός του σαφούς γράμματος και πνεύματος της παραγράφου 7 του άρθρου 69 του πδ 284/1989.

**(14)** **(α)** Δεδομένου όμως ότι το πδ 284/1989 είναι προεδρικό διάταγμα ενώ για την έγκυρη σύναψη συμφωνίας διαιτησίας που μεταφέρει μια διαφορά από τα δικαστήρια σε διαιτησία, απαιτείται (σύμφωνα με το άρθρο 94 παρ.1 και 2) νόμος, αυτό που μένει να ερευνηθεί είναι η νομοθετική εξουσιοδότηση για το πδ 284/1989 και ιδίως αναφορικά με την δυνατότητα να επιτρέπει την σύναψη συμφωνίας διαιτησίας για τις διαφορές που προκύπτουν από τις συμβάσεις που συνάπτονται με τις διαδικασίες του πδ 284/1989.

**(β)** Σχετικά πρέπει να σημειωθεί ότι το πδ 284/1989 εκδόθηκε κατ' εξουσιοδότηση της παραγράφου 5 του άρθρου 50 του νδ 721/1970. Ειδικότερα η παράγραφος 5 προβλέπει μεταξύ άλλων και τα εξής:

> « *5. Διά Β.Διαταγμάτων, προτάσει των Υπουργών Εθνικής Αμύνης και Οικονομικών εκδιδομένων, καθορίζονται εκάστοτε τα κάτωθι επί προμηθειών, εργολαβιών και εργασιών, ενεργουμένων εν τω εσωτερικώ της χώρας και τω εξωτερικώ υπό των Κλάδων των Ενόπλων Δυνάμεων:* »
>
> ..................
>
> « *κ. Η διαδικασία διενεργείας των διαγωνισμών, κατακυρώσεως αυτών, υποβολής και εκδικάσεως ενστάσεων.* »
>
> ..................
>
> « *ν. Ο τρόπος ελέγχου και παραλαβής, απορρίψεως προμηθειών, διαιτησίας, ως και η σύστασις, ο σκοπός και η λειτουργία κεντρικών ή περιφερειακών επιτροπών παραλαβών, ελέγχου και διαιτησίας.* »
>
> ..................
>
> « *υ. Οι ειδικοί όροι και αι διαδικασίαι προμηθειών τινών εκ του εξωτερικού, κατά παρέκκλισιν των περί προμηθειών των Ενόπλων Δυνάμεων διατάξεων.* »
>
> ..................
>
> « *φ. Αι καταβαλλόμεναι αποζημιώσεις εις τους μετέχοντες στρατιωτικούς εν γένει, πολιτικούς υπαλλήλους και εις ξένα υπό την υπηρεσίαν πρόσωπα, εις επιτροπάς διενεργείας διαγωνισμών, πραγματογνωμοσύνης, παραλαβών και διαιτησίας.* »

..................

«*ψ. <u>Πάσα άλλη συναφής διάταξις</u> και λεπτομέρεια.* »

**(γ)** Με τις διατάξεις αυτές χορηγείται εξουσιοδότηση για τον καθορισμό με βασιλικά και ήδη προεδρικά διατάγματα του «*τρόπου .... διαιτησίας*» (στοιχείο ν) και γίνεται αναφορά σε αποζημίωση για «*ξένα προς την υπηρεσία πρόσωπα*» μετέχοντα «*εις επιτροπάς ...... διαιτησίας*» (στοιχείο φ).

**(δ)** Δεν θα μπορούσε δε να υποστηριχθεί πάλι η συσταλτική ερμηνεία του όρου "διαιτησία" με την αιτιολογία ότι ο ιστορικός και πολύ περισσότερο ο αφηρημένος νομοθέτης του νδ 721/1970 (και ειδικώτερα η εξουσιοδοτική διάταξη της παραγράφου 5 του άρθρου 50) δεν έδινε ευρύτερη εξουσιοδότηση για τον τρόπο διαιτησίας αλλά είχε υπόψη του (και περιόριζε την εξουσιοδότησή του) αποκλειστικά και μόνο στην περιορισμένη και συμβουλευτική διαιτησία του άρθρου 16 του αν 654/1937 (Α162) δηλαδή ενός κειμένου που είχε νομοθετηθεί 33 χρόνια ενωρίτερα και σε μια εποχή κατά την οποία η δεσμευτική διαιτητική συμφωνία γινόταν περιορισμένα δεκτή ακόμη και στις ιδιωτικές διαφορές, δηλαδή μόνο στις εμπορικές, (πρβλ. ΠολΔ ήτοι ν. 2/14 Απρ. 1834 άρθρα 106-110)[6] και όταν μάλιστα η ίδια εξουσιοδοτική διάταξη (ήτοι η παράγραφος 5 του άρθρου 50 του νδ 721/1970) έχει χρησιμοποιηθεί ως νομοθετικό έρεισμα για την διαιτησία του τελευταίου εδαφίου της παραγράφου 6 του άρθρου 69 του πδ 785/1978 η οποία αφορούσε τις προμήθειες από το εξωτερικό και καθιέρωνε δεσμευτική διαιτησία για όλες τις διαφορές από τη σύμβαση και με σύνθεση διαιτητικών επιτροπών με βάση την συμφωνία των μερών κάτι που κατά τα ανωτέρω διηύρυνε το πδ 284/1989.

**(ε)** Ανεξάρτητα όμως από τα ανωτέρω με το εδάφιο υ της παραγράφου 5 του άρθρου 50 του νδ 721/1970 χορηγείται εξουσιοδότηση για την ρύθμιση ειδικών όρων και διαδικασιών «*προμηθειών τινων εκ του εξωτερικού κατά παρέκκλιση των περί προμηθειών των Ενόπλων Δυνάμεων διατάξεων*» (και αυτή είναι άλλη μια διάταξη που παρέχει ευρύτερες ευχέρειες για την σύναψη διεθνών συμβάσεων, περιλαμβανομένης και διαιτησίας κατά παρέκκλιση των λοιπών διατάξεων) ενώ με το εδάφιο ψ ορίζεται ότι με τα εκδιδόμενα διατάγματα μπορεί να προβλέπεται και «*πάσα άλλη συναφής διάταξη*» περιλαμβανομένης και συμφωνίας για διαιτησία ως συναφούς διατάξεως.

**(στ)** Εν όψει των ανωτέρω η νομοθετική εξουσιοδότηση για την παράγραφο 7 του άρθρου 69 του πδ 284/1989 (αλλά και το νομοθετικό έρεισμα για ρήτρες διαιτησίας) βρίσκεται όχι μόνο στα εδάφια ν και φ της παραγράφου 5 του άρθρου 50 του νδ 721/1970 αλλά και στα εδάφια υ και ψ της ιδίας παραγράφου, κάτι που ενισχύεται και από το γεγονός ότι η επίδικη σύμβαση συνήφθη με βάση τις εξαιρετικές διατάξεις των άρθρων 71, 73 και 76 του πδ 284/1989 οι οποίες επιτρέπουν την «*πραγματοποίηση προμηθειών χωρίς τήρηση των κανονικών διαδικασιών*» (άρθρο 71 παρ.1) και με «*απ' ευθείας ανάθεση προμήθειας χωρίς διαγωνισμό*» (άρθρο 73 παρ.1) και χωρίς να τίθεται περιορισμός ως προς το περιεχόμενο των σχετικών συμβάσεων, επιτρεπομένης και της συμφωνίας για διαιτησία.

**(ζ)** Εν όψει των ανωτέρω η παράγραφος 7 του άρθρου 69 του πδ 284/1989 αποτελεί νομοθετικό έρεισμα για την σύναψη εγκύρου συμφωνίας για την υπαγωγή σε διαιτησία των διαφορών που προκύπτουν από συμβάσεις μείζονος σημασίας που συνήφθησαν σύμφωνα με το πδ 284/1989 και εντεύθεν και της ρήτρας διαιτησίας που

[6] Πρβλ. Εξελικτική ερμηνεία

περιέχεται στο άρθρο 28 της επίδικης σύμβασης. Επιπλέον νομοθετικό έρεισμα για το επιτρεπτό αυτής της συμφωνίας διαιτησίας αποτελούν και τα άρθρα 71 παρ.1 και 73 παρ.1 τα οποία προς το συμφέρον του Ελληνικού Δημοσίου επιτρέπουν σε ορισμένες περιπτώσεις (στις οποίες εμπίπτει και η επίδικη) την απευθείας ανάθεση προμηθείας και χωρίς την τήρηση των κανονικών διαδικασιών και χωρίς περιορισμούς ως προς το περιεχόμενο των σχετικών συμβάσεων. Κατά συνέπεια η ρήτρα διαιτησίας στο άρθρο 28 της επίδικης σύμβασης είναι έγκυρη.

**(η)** Εξ άλλου, αφού το ίδιο το Καθού περιέλαβε διαιτητική συμφωνία τόσο στην αρχική πρόσκληση ενδιαφέροντος όσο και στην απόφαση για την κατακύρωση της προμήθειας και τελικώς στην επίδικη σύμβαση, είναι προφανές ότι και το ίδιο εδέχετο ότι το άρθρο 69 παρ.7 και γενικότερα οι διατάξεις του πδ 284/1989 (σύμφωνα με το οποίο συνήφθη η σύμβαση) του επέτρεπαν την σύναψη εγκύρου συμφωνίας διαιτησίας και στα πλαίσια της χρηστής διοίκησης δεν είναι επιτρεπτό να επιχειρεί εκ των υστέρων διαφορετική ερμηνεία και να διαψεύδει τις εύλογες προσδοκίες των αντισυμβαλλομένων του οι οποίοι στηρίχθηκαν στην εγκυρότητα της ρήτρας διαιτησίας στο άρθρο 28 της επίδικης σύμβασης, η οποία κατά τα ανωτέρω απετέλεσε και αντικείμενο διαπραγμάτευσης.

**15. <u>Η απόφαση</u>**

Εν όψει όλων των ανωτέρω πρέπει να γίνει δεκτό ότι η συμφωνία διαιτησίας που περιέχεται στο άρθρο 28 της επίδικης σύμβασης είναι έγκυρη και βρίσκει νομοθετικό έρεισμα τόσο στον ν. 2735/1999 όσο και επαλλήλως και στο πδ 284/1989 άρθρο 69 παρ. 7 αλλά και τα άρθρα 71 παρ.1 και 73 παρ.1. Κατά συνέπεια, το Διαιτητικό Δικαστήριο έχει δικαιοδοσία να κρίνει τις διαφορές που προκύπτουν από την επίδικη σύμβαση απορριπτομένων των περί του αντιθέτου ισχυρισμών του Καθού. Σημειωτέον ότι με βάση την ανωτέρω ανάλυση παρέλκει τουλάχιστον προς το παρόν για την κρίση της δικαιοδοσίας του να αποφανθεί το Διαιτητικό Δικαστήριο περί του αν η επίδικη σύμβαση και οι εξ αυτής διαφορές είναι ιδιωτικές ή διοικητικές αφού υπό οιανδήποτε εκδοχή με βάση τις ανωτέρω διατάξεις του νόμου είναι επιτρεπτή η έγκυρη σύναψη συμφωνίας διαιτησίας για τις διαφορές αυτές.

**16. <u>Άλλα ζητήματα</u>**

Τέλος, δεδομένου ότι το Διαιτητικό Δικαστήριο στα πλαίσια της αυτεπάγγελτης έρευνας της δικαιοδοσίας του (πρβλ. και άρθρο 16 παρ.1 του ν. 2735/1999) έκρινε ότι έχει δικαιοδοσία, παρέλκει η εξέταση των ισχυρισμών της Αιτούσης περί εκπρόθεσμης και απαράδεκτης άλλως καταχρηστικής προβολής του ισχυρισμού του Καθού περί ακυρότητας της ρήτρας διαιτησίας.

## Δ. <u>ΠΡΟΔΙΚΑΣΤΙΚΑ ΑΙΤΗΜΑΤΑ ΠΟΥ ΥΠΟΒΛΗΘΗΚΑΝ ΑΠΌ ΤΗΝ ΑΙΤΟΥΣΑ</u>

### 1. <u>Επί του παραδεκτού ή μη των συμπληρωματικών απαντήσεων του Καθού</u>

(α) Η Αιτούσα με σειρά εγγραφών, αρχής γενομένης με την από 30 Απριλίου 2010 επιστολή της προς το Διαιτητικό Δικαστήριο, και με τις προτάσεις, υπομνήματα και προσθήκες της όπως και προφορικά κατά την ακροαματική διαδικασία της 17

Δεκεμβρίου 2010 υποστήριξε ότι οι ισχυρισμοί και τα αιτήματα του Καθού, που υπεβλήθησαν με τις συμπληρωματικές απαντήσεις του είναι απαράδεκτοι, κυρίως διότι δεν προβλέπεται τέτοια δυνατότης από τους Κανόνες Διαιτησίας του ICC. Το Καθού απήντησε ότι αυτοί οι ισχυρισμοί και τα αιτήματά του υπεβλήθησαν παραδεκτά.

(β) Σχετικά πρέπει να επισημανθεί ότι το άρθρο 5 των Κανόνων Διαιτησίας του ICC, το οποίο ορίζει ότι ο καθού η διαιτησία πρέπει να υποβάλει την Απάντησή του σε 30 ημέρες, απαιτεί ο καθού να δώσει απάντηση στα αιτήματα της Αιτήσεως (και να προβάλει τους ισχυρισμούς του σχετικά με τα πραγματικά περιστατικά), κάτι το οποίο έκανε το Καθού με την από 25 Σεπτεμβρίου 2009 απάντησή του (μετά από παράταση της προθεσμίας υποβολής που του δόθηκε από την Γραμματεία του Διεθνούς Δικαστηρίου Διαιτησίας του ICC).

(γ) Όμως το άρθρο 5 των Κανόνων ζητεί μεν απάντηση στο αίτημα (και το Καθού με την απάντησή του ζήτησε την απόρριψη) αλλά δεν απαιτεί ο καθού να προβάλει όλους τους ισχυρισμούς του, επιχειρήματα, άμυνες ή αιτήματα με την απάντηση.

(δ) Επιπλέον το άρθρο 18(1) των Κανόνων προϋποθέτει την δυνατότητα υποβολής και άλλων ισχυρισμών μέχρι τη σύνταξη της πράξης πλαισίου, αφού προβλέπει ότι η Πράξη Πλαισίου συντάσσεται λαμβάνοντας υπόψη (υπό το φως/in the light of) τους πιο πρόσφατους ισχυρισμούς των διαδίκων.

(ε) Εξ άλλου το άρθρο 19 των Κανόνων ορίζει ότι μετά την υπογραφή της Πράξης Πλαισίου κανένας διάδικος δεν μπορεί να προβάλει απαιτήσεις ή ανταπαιτήσεις (*«να υποβάλει αιτήματα ή ανταιτήματα»* κατά την Ελληνική απόδοση των Κανόνων) πέραν των ορίων της Πράξης Πλαισίου, εκτός αν επιτραπεί από το Διαιτητικό Δικαστήριο. Από την διάταξη αυτή προκύπτει ότι μέχρι την υπογραφή της Πράξης Πλαισίου μπορούν να υποβληθούν νέες απαιτήσεις ή ανταπαιτήσεις και χωρίς την άδεια του Διαιτητικού Δικαστηρίου.

(στ) Λαμβανομένων υπόψη όλων των ανωτέρω όλες οι άμυνες και τα αιτήματα του Καθού (αλλά και της Αιτούσης) που υπεβλήθησαν μέχρι την υπογραφή της Πράξεως Πλαισίου υπεβλήθησαν εμπρόθεσμα απορριπτομένων των περί του αντιθέτου ισχυρισμών της Αιτούσης.

**2. <u>Επί του απαραδέκτου της ενστάσεως συμψηφισμού που υπεβλήθη από το Καθού (α)ως υποκρύπτουσας εκπρόθεσμη ανταγωγή και (β)λόγω μη προκαταβολής των εξόδων Διαιτησίας</u>**

(α) Το Καθού με την από 20.4.2010 Συμπληρωματική Απάντησή του υπέβαλε επικουρικό αίτημα να συμψηφισθούν προς τις απαιτήσεις της Αιτούσης μέχρι του ποσού των €70.246.683,30 ανταπαιτήσεις του συνολικού ποσού €122.027.043 και άλλες ανταπαιτήσεις του που δεν προσδιορίζονταν κατά πόσο αλλά υπήρχε επιφύλαξη για τον προσδιορισμό του ποσού με τις προτάσεις [βλ. ειδικώτερα Πράξη Πλαισίου υπό 7(στ)11(3)].

(β) Η Αιτούσα προέβαλε διαδικαστική ένσταση απαραδέκτου του αιτήματος του Καθού για συμψηφισμό με την αιτιολογία τόσο ότι το σχετικό αίτημα υποκρύπτει εκπρόθεσμη ανταγωγή όσο και ότι δεν κατεβλήθησαν τα έξοδα Διαιτησίας.

(γ) Σχετικά πρέπει να επισημανθεί ότι το Καθού προβάλλοντας τις ανταπαιτήσεις του δεν ζητεί να του επιδικασθούν τα ποσά αυτών των ανταπαιτήσεων αλλά ζητεί λόγω των ανταπαιτήσεων του να απορριφθούν τα αιτήματα της Αιτούσης.

(δ) Με τέτοιο όμως αίτημα η προβολή των ανταπαιτήσεων του Καθού αποτελεί πραγματική ένσταση συμψηφισμού και οι περί του αντιθέτου ισχυρισμοί της Αιτούσης πρέπει να απορριφθούν.

(ε) Εξάλλου το Διαιτητικό Δικαστήριο δεν έχει αρμοδιότητα να προσδιορίζει το ύψος της προκαταβολής. Ειδικώτερα σύμφωνα με το άρθρο 30(2) των Κανόνων το ύψος της προκαταβολής προσδιορίζεται από το Διεθνές Δικαστήριο Διαιτησίας του ICC. Αυτός δε ο κανόνας έχει εφαρμογή και στην περίπτωση ένστασης συμψηφισμού η οποία σύμφωνα με το άρθρο 30(5) των κανόνων λαμβάνεται υπόψη για τον προσδιορισμό ή την αναπροσαρμογή της προκαταβολής από το Διεθνές Δικαστήριο Διαιτησίας του ICC σύμφωνα με το άρθρο 30(2) των Κανόνων.

(στ) Σε κάθε περίπτωση η κρίση από το Διαιτητικό Δικαστήριο για το παραδεκτό της ένστασης συμψηφισμού δεν συνδέεται με την απόφαση του Διεθνούς Δικαστηρίου Διαιτησίας του ICC για το ύψος της προκαταβολής.

(ζ) Για τους λόγους αυτούς το Διαιτητικό Δικαστήριο δέχεται ότι η σχετική ένσταση συμψηφισμού του Καθού έχει υποβληθεί παραδεκτά, και το Διαιτητικό Δικαστήριο επιφυλάσσεται να κρίνει το ουσία βάσιμο ή μη της ενστάσεως αυτής με μελλοντική απόφασή του.

**3. <u>Επί του χωρισμού της εξετάσεως της ουσίας της υπόθεσης σε δύο στάδια, στο πρώτο εκ των οποίων θα κριθεί η αποδοχή ή μη του Συστήματος C4I από το Καθού</u>**

(α) Η Αιτούσα με τα ανωτέρω αναφερθέντα έγγραφα της και κατά τη σύνταξη της Πράξης Πλαισίου και με τις ανωτέρω προτάσεις και υπομνήματα και κατά την ακροαματική διαδικασία της 17 Δεκεμβρίου 2010 υπέβαλε και υποστήριξε αίτημα η ουσία της υπόθεσης να κριθεί σε δύο (2) στάδια στο πρώτο εκ των οποίων να κριθεί η αποδοχή ή μη του Συστήματος C4I από το Καθού. Το Καθού αρνήθηκε αυτόν τον χωρισμό. Με την Πράξη Πλαισίου (παράγραφος 14) το αίτημα αυτό συμφωνήθηκε να κριθεί ως προδικαστικό ζήτημα στην ξεχωριστή συζήτηση για τα προδικαστικά ζητήματα.

(β) Εν όψει αυτού του αιτήματος πρέπει να επισημανθεί ότι για λόγους διευκολύνσεως της διαδικασίας το Διαιτητικό Δικαστήριο έχει την εξουσία να χωρίσει την εξέταση της ουσίας της υπόθεσης σε στάδια.



(γ) Όμως τα στοιχεία που υπεβλήθησαν μέχρι τώρα στο Διαιτητικό Δικαστήριο δεν είναι επαρκή ώστε το Διαιτητικό Δικαστήριο να μπορεί να κρίνει αν ο αιτούμενος χωρισμός θα διευκολύνει ή θα δυσχεράνει την έρευνα της ουσίας (όπως σημειωτέον υποστηρίζουν αντίστοιχα οι δύο πλευρές) και παρόλον ότι ανεφέρθησαν ενδεικτικά παραδείγματα από τις δύο πλευρές, αυτά δεν ήταν αρκετά ώστε να δώσουν ολοκληρωμένη εικόνα στο Διαιτητικό Δικαστήριο.

(δ) Το κύριο ζήτημα το οποίο δεν προκύπτει με σαφήνεια είναι ποιες θα είναι οι έννομες συνέπειες (και με βάση ποιες διατάξεις) της αναγνώρισης εκ μέρους του Διαιτητικού Δικαστηρίου ότι υπήρξε αποδοχή του Συστήματος C4I από το Καθού και ποιες από τις άμυνες του Καθού (π.χ. ισχυρισμοί περί ελαττωμάτων ή ελλείψεων ένσταση συμψηφισμού κλπ) θα απεκλείοντο από την τυχόν ύπαρξη αποδοχής και είναι σαφές ότι τυχόν ανάπτυξη τέτοιων ισχυρισμών εκατέρωθεν σε αυτό το στάδιο εξετάσεως των προδικαστικών ζητημάτων θα απαιτούσε εκτεταμένη ανάπτυξη ουσιαστικών ζητημάτων. Συνεπώς και εξ αυτού προκύπτει ότι το αίτημα αυτό συνδέεται τόσο στενά με την ουσία ώστε να μην μπορεί να κριθεί από το Διαιτητικό Δικαστήριο πριν να έχει ενώπιόν του όλους τους ισχυρισμούς και τα αποδεικτικά μέσα επί της ουσίας και ιδίως ως προς την επιρροή της αποδοχής του Συστήματος C4I επί των λοιπών ζητημάτων της ουσίας. Εξάλλου ο προτεινόμενος χωρισμός δεν αντιστοιχεί προς χωρισμό μεταξύ ευθύνης και ποσού (quantum) απαιτήσεως αλλά επηρεάζει και τους εκατέρωθεν ισχυρισμούς επί της ευθύνης.

(ε) Βέβαια τα ανωτέρω δεν διευκολύνουν τους διαδίκους, οι οποίοι θα είναι υποχρεωμένοι να προετοιμάσουν και υποβάλουν όλους τους ισχυρισμούς τους κυρίως και επικουρικά αλλά για την ορθή απονομή της δικαιοσύνης είναι ανάγκη το Διαιτητικό Δικαστήριο να έχει ενώπιόν του όλο το υλικό της υποθέσεως ώστε να μπορεί να αποφασίσει αν ορισμένα ζητήματα μπορούν ή εξυπηρετεί να χωριστούν και να εξετασθούν σε ξεχωριστή ακροαματική διαδικασία.

(στ) Κατόπιν των ανωτέρω το αίτημα της Αιτούσης για τον προτεινόμενο χωρισμό απορρίπτεται.

## Ε. <u>ΠΡΟΔΙΚΑΣΤΙΚΑ ΑΙΤΗΜΑΤΑ ΠΟΥ ΥΠΟΒΛΗΘΗΚΑΝ ΑΠΟ ΤΟ ΚΑΘΟΥ</u>

### 1. <u>Το Αίτημα Αναστολής της διαδικασίας λόγω άσκησης ποινικών διώξεων</u>

Το Καθού (όπως αναπτύσσεται λεπτομερώς κατωτέρω) ζητεί την αναστολή της διαιτησίας με βάση το άρθρο 250 του Κώδικα Πολιτικής Δικονομίας λόγω εκκρεμούς ποινικής διαδικασίας.

Ειδικότερα, το άρθρο 250 του Κώδικα Πολιτικής Δικονομίας έχει ως εξής:

> « *Αν είναι εκκρεμής ποινική αγωγή που επηρεάζει τη διάγνωση της διαφοράς, το δικαστήριο μπορεί, αυτεπαγγέλτως ή ύστερα από αίτηση κάποιου διαδίκου, να διατάξει την αναβολή της συζήτησης εωσότου περατωθεί αμετάκλητα η ποινική διαδικασία.* »

Σε σχέση με το αίτημα αυτό του Καθού πρέπει να επισημανθεί ότι το Διαιτητικό Δικαστήριο, κατά τα κατωτέρω ειδικότερα εκτιθέμενα, έχει την ευχέρεια (αλλά όχι την υποχρέωση) να αναστείλει την διαιτητική διαδικασία εν όψει άλλης εκκρεμούς δικαστικής διαδικασίας, τα αποτελέσματα της οποίας έχουν επιρροή στα ζητήματα που κρίνονται από την διαιτησία. Αυτή η ευχέρεια όμως πρέπει να ασκείται με φειδώ ώστε να μην οδηγεί την διαιτητική διαδικασία σε υπέρμετρες καθυστερήσεις που από τη φύση τους είναι αντίθετες στην διαιτητική διαδικασία και πολύ περισσότερο μάλιστα αφού το Διαιτητικό Δικαστήριο έχει την εξουσία να κρίνει παρεμπιπτόντως οποιαδήποτε ζητήματα, τα οποία αποτελούν προϋποθέσεις για την αποδοχή ή την απόρριψη αιτημάτων ή ισχυρισμών που έχουν τεθεί ενώπιόν του και στη συγκεκριμένη περίπτωση παρόλον ότι έχουν περάσει 2 ½ χρόνια από την άσκηση της δίωξης, ούτε η ανάκριση έχει προσωποποιήσει την κατηγορία κατά συγκεκριμένων δημοσίων λειτουργών ούτε το Καθού.
Ως προς δε τυχόν επιρροή (και με ποίες έννομες συνέπειες) διαφθοράς (στην σύναψη της σύμβασης ή στην παραλαβή ή μη του έργου) τα στοιχεία που μέχρι στιγμής έχουν προσκομισθεί δεν είναι επαρκή ώστε να δικαιολογήσουν αναστολή της διαιτησίας μέχρι πέρατος κάποιας ποινικής διαδικασίας. Για το λόγο αυτό το αίτημα αναστολής δεν μπορεί να γίνει δεκτό σε αυτό το στάδιο αλλά μπορεί να επανεξετασθεί μαζί με την ουσία εφόσον προταθεί εκ νέου και προσδιορισθεί ειδικώτερα ποια διαφθορά υπήρξε και τι επηρέασε (την σύναψη της σύμβασης ή την παραλαβή) και με ποιο τρόπο.
Η άσκηση ποινικών διώξεων και μόνο in rem και μάλιστα –παρά την πάροδο μακρού χρόνου– χωρίς να προσωποποιηθούν κατά προσώπων που χειρίσθηκαν το θέμα εκ μέρους του Καθού δεν δικαιολογεί την αναστολή.

Ειδικώτερα:

(α) Το αίτημα για αναστολή της διαιτητικής διαδικασίας λόγω ασκήσεως ποινικών διώξεων υποβλήθηκε από το Καθού με την αρχική απάντησή του στην προσφυγή (σελ.9-10), αναπτύσσεται δε λεπτομερώς με τις Προτάσεις της 24.9.2010 που υπέβαλε τόσο πριν από τη συζήτηση της 17-12-2009 (ιδίως σελ. 1-38), όσο και με το από 21.1.2011 Συμπληρωματικό Υπόμνημα προσθήκης-αντίκρουσης που υπέβαλε μετά (ιδίως σελ. 23-40). Αναπτύχθηκε επίσης και προφορικώς κατά τη συζήτηση από τους πληρεξουσίους του Καθού.

Σύμφωνα με τους ισχυρισμούς του Καθού, νομική βάση του αιτήματος αποτελεί το άρθρο 250 ΚΠολΔ, πραγματική δε το γεγονός ότι έχει ασκηθεί ποινική δίωξη και διεξάγεται ανάκριση τακτική για την υπόθεση της Σήμενς, «πτυχή της οποίας αποτελεί και η σύναψη και εκτέλεση της σύμβασης προμήθειας των συστημάτων C4I Ολυμπιακής Ασφάλειας». Η ποινική δίωξη έχει ασκηθεί για τα εξής εγκλήματα, στρεφόμενα κατά του Δημοσίου: Παθητική και ενεργητική δωροδοκία, νομιμοποίηση εσόδων από εγκληματική δραστηριότητα, απάτη, συγκρότηση εγκληματικής οργάνωσης για τη διάπραξη των εγκλημάτων αυτών σε βαθμό κακουργήματος (βλ. σελ. 12-13 του από 24/9/2009 υπομνήματος). Αναφέρει επίσης το Καθού ότι η επίμαχη σύμβαση αποτελεί το αντικείμενο έρευνας και από Εξεταστική Επιτροπή της Βουλής.

Για να θεμελιώσει τη σύνδεση της εταιρείας Σήμενς με την Αιτούσα το Καθού αναφέρει ότι η πρώτη έχει αναλάβει ως υπεργολάβος το μεγαλύτερο τμήμα (σε ποσοστό πάνω από 80%) της επίδικης σύμβασης προμήθειας του συστήματος C4I, ότι μετά την 5η τροποποίηση της σύμβασης έχει αναλάβει την εκτέλεση του συνόλου

σχεδόν του έργου και ότι ανέλαβε μάλιστα, σε αντικατάσταση της Αιτούσης, τον κρίσιμο τομέα της διαλειτουργικότητας του συστήματος.

(β) Η Αιτούσα υποστηρίζει ότι το άρθρο 250 ΚΠοινΔ δεν εφαρμόζεται στην παρούσα διαιτητική διαδικασία, η οποία πρέπει να διεξαχθεί με βάση τους κανόνες διαιτησίας του ICC, του ν.2735/1999 και επικουρικώς των άρθρων 682-703 ΚΠολΔ, όπως ορίστηκε με την παρ. 11 της Πράξης Πλαισίου. Στους κανόνες αυτούς δεν περιέχεται -υποστηρίζει- διάταξη αντίστοιχη προς το άρθρο 250 ΚΠολΔ. Άρα, κατά την Αιτούσα, το αίτημα είναι μη νόμιμο. Υποστηρίζει ακόμη η Αιτούσα, προδήλως επικουρικά, ότι σε κάθε περίπτωση δεν συντρέχουν οι προϋποθέσεις εφαρμογής του άρθρου 250 ΚΠολΔ, καθώς και ότι «η απόφαση για την αναστολή ανήκει πλέον στη διακριτική ευχέρεια του Διαιτητικού Δικαστηρίου». Επικαλούμενη δε το άρθρο 24 παρ. 1 των Κανόνων Διαιτησίας του ICC, καθώς και την βραδύτητα των ποινικών διαδικασιών στην Ελλάδα, προβάλλει τον ισχυρισμό, ότι τυχόν αποδοχή του αιτήματος αναστολής «θα είχε ως αποτέλεσμα να καταργηθεί τελικά η διαιτητική διαδικασία» και θα παραβιαζόταν έτσι η αρχή της δίκαιης δίκης.

(γ) Το άρθρο 15 παρ. 1 των Κανόνων Διαιτησίας του ICC ορίζει τα εξής (κατά ελεύθερη μετάφραση από τα αγγλικά): «Η διαδικασία ενώπιον του Διαιτητικού Δικαστηρίου θα ρυθμίζεται από τους παρόντες Κανόνες και όπου οι Κανόνες αυτοί σιωπούν, από οποιουσδήποτε κανόνες ήθελαν θέσει τα μέρη ή, ελλείψει συμφωνίας των μερών, το Διαιτητικό Δικαστήριο, άσχετα από το εάν με αυτόν τον τρόπο γίνεται ή όχι παραπομπή σε διαδικαστικούς κανόνες κάποιου εθνικού δικαίου για την εφαρμογή τους στη διαιτησία».
Με βάση τη διάταξη αυτή στην παρ. 11 της Πράξης Πλαισίου ορίστηκε ότι το Διαιτητικό Δικαστήριο θα εφαρμόσει τους Κανόνες Διαιτησίας του ICC, και ότι «*κατά τα λοιπά, ως προς τη διαδικασία, αν αυτή δεν ρυθμίζεται από άλλους κανόνες, θα εφαρμόζονται επικουρικά οι διατάξεις των άρθρων 683-703 ΚΠολΔ, με τις αποκλίσεις που αναφέρονται κατωτέρω στην παράγραφο 13*». Με δεδομένο ότι η παρούσα διαιτησία (κατά τα ανωτέρω κριθέντα) είναι διεθνής εμπορική και εμπίπτει στον ν. 2735/1999 εφαρμογή έχει και το άρθρο 19 του νόμου αυτού (και μάλιστα κατά προτεραιότητα έναντι των διατάξεων περί ασφαλιστικών μέτρων του ΚΠολΔ που είναι η τελευταία επικουρική ρύθμιση) το οποίο ορίζει ότι μη υπαρχούσης συμφωνίας των μερών για κάποια θέματα της διαδικασίας, το Διαιτητικό Δικαστήριο καθορίζει την προσφορότερη κατά την κρίση του διαδικασία. Τέλος, στον αριθμό 9 της παραγράφου 13 της Πράξης Πλαισίου αναφέρεται, πλην άλλων, ότι το Διαιτητικό Δικαστήριο θα μπορεί να θεσπίσει και άλλες ρυθμίσεις ή αποκλίσεις για όλα τα διαδικαστικά ζητήματα και ότι περί αυτού θα ενημερώνει εγκαίρως τους διαδίκους.

(δ) Οι αναφερόμενες στον προηγούμενο αριθμό διατάξεις, που διέπουν τη διαδικασία της παρούσας διαιτησίας, δεν παραπέμπουν ρητά στο άρθρο 250 ΚΠολΔ, ούτε περιέχουν αντίστοιχη προς το άρθρο αυτό διάταξη ούτε το άρθρο 250 ΚΠολΔ εφαρμόζεται στην διαδικασία των ασφαλιστικών μέτρων ούτε είναι συμβατό με τον επείγοντα χαρακτήρα τους. Όταν όμως η διαδικασία αυτή έχει συμφωνηθεί σε διαιτησία για την εκδίκαση κύριας υπόθεσης όπως εν προκειμένω, το άρθρο 250 ΚΠολΔ δεν είναι μη συμβατό και με βάση το άρθρο 19 του ν.2735/1999 το Διαιτητικό Δικαστήριο μπορεί κατά την κρίση του να το εφαρμόσει άμεσα ή αναλογικά.

Περαιτέρω το Καθού υπέβαλε το αίτημά του για αναβολή της διαιτητικής διαδικασίας, βάσει του άρθρου 250 ΚΠολΔ, ήδη με την αρχική απάντησή του στην Αίτηση Προσφυγής, δηλαδή πριν προσδιορισθούν οι πιο πάνω κανόνες, το επανέφερε κατά τη συζήτηση προς κατάρτιση της Πράξεως Πλαισίου και διατυπώθηκε σ' αυτήν ως «πρώτο προδικαστικό» αίτημά του. Η Πράξη Πλαισίου καταρτίστηκε με ομοφωνία των διαδίκων και του Διαιτητικού Δικαστηρίου και προβλέπει ξεχωριστή συζήτηση και απόφαση για τα προδικαστικά ζητήματα. Συνεπώς, θα ήταν αντιφατικό να δεχθεί κανείς ότι οι προβλεπόμενοι με την Πράξη Πλαισίου διαδικαστικοί κανόνες αποκλείουν *a priori* να κριθεί ως νόμω βάσιμο το παραπάνω αίτημα και συγχρόνως ότι επιβάλλουν την εξέτασή του κατά προτεραιότητα. Κατά την ορθή λοιπόν ερμηνευτική προσέγγιση των προαναφερθέντων ορισμών της Πράξης Πλαισίου μεταξύ των «ρυθμίσεων και αποκλίσεων» που μπορεί να θεσπίζονται από το Διαιτητικό Δικαστήριο κατά τη διάρκεια της διαιτησίας περιλαμβάνεται και η εφαρμογή του άρθρου 250 ΚΠολΔ και η κατ' ουσίαν έρευνα, βάσει του άρθρου αυτού του σχετικού αιτήματος του Καθού, καθώς η σχετική απόκλιση προϋποτίθεται από την ίδια την Πράξη Πλαισίου, η οποία ήταν γνωστή στους διαδίκους και ομόφωνα αποδεκτή από αυτούς. Εν όψει αυτών το Διαιτητικό Δικαστήριο κρίνει ότι δεν πρέπει να αποκλεισθεί στην παρούσα διαδικασία η εφαρμογή του άρθου 250 ΚΠολΔ, αλλά αντιθέτως να επιτρέπεται, με την βασική προϋπόθεση ότι συντρέχουν οι προϋποθέσεις του, ότι η αναβολή ή μη εναπόκειται στη διακριτική ευχέρεια του Διαιτητικού Δικαστηρίου και η αναβολή δεν οδηγεί σε de facto ματαίωση ή υπερβολική καθυστέρηση της διαδικασίας της διαιτησίας. Συνεπώς το αίτημα του Καθού είναι παραδεκτό και κατ' αρχήν (υπό την έννοια ύπαρξης θεμελιωτικής διάταξης) νόμω βάσιμο και πρέπει να κριθεί κατά τα λοιπά το νόμω (δηλαδή το αν υπάρχει επίκληση πραγματικών γεγονότων που να πληρούν τα υπόλοιπα στοιχεία του πραγματικού του άρθρου 250 ΚΠολΔ) και ουσία (δηλαδή αν τα επικαλούμενα στοιχεία είναι αληθή) βάσιμο αυτού.

(ε) Για την νομική και κατ' ουσίαν θεμελίωση του παραπάνω αιτήματος το Καθού επικαλείται και προσκομίζει κυρίως τα ακόλουθα στοιχεία, το ουσιώδες περιεχόμενο των οποίων έχει εν συντομία ως εξής: α) Τις ω-05, ω-7/50 και ω/2008/47 παραγγελίες του εισαγγελέα Πρωτοδικών Αθηνών προς διενέργεια κύριας ανάκρισης. Με αυτές ασκήθηκε ποινική δίωξη για τα αδικήματα που αναφέρονται πιο πάνω (στον αρ.1) σχετικά με την εταιρεία Σήμενς. Την 26/6/2009 εκδόθηκε ένταλμα σύλληψης κατά του Μιχ. Χριστοφοράκου, υπαλλήλου και διευθύνοντος συμβούλου της Σήμενς στην Ελλάδα, για απάτη σε βάρος του Δημοσίου, ποσού μεγαλύτερου των 150.000 ευρώ, σχετικώς με την προμήθεια από το Δημόσιο του συστήματος ασφάλειας των Ολυμπιακών Αγώνων C4I. Σύμφωνα με το ένταλμα, οι στοιχειοθετούσες την απάτη ψευδείς παραστάσεις συνίσταντο βασικώς στο ότι η Αιτούσα και η υποκατασκευάστρια Σήμενς είχαν τη δυνατότητα, από πλευράς τεχνικής υποδομής, τεχνογνωσίας κ.λπ., να εκτελέσουν και παραδώσουν το έργο εντός της συμβατικής προθεσμίας, ενώ τέτοια δυνατότητα δεν είχαν. Ως χρόνος τελέσεως της απάτης φέρεται το χρονικό διάσημα από του έτους 2002 έως και την 19-5-2003. β) Την 14-9-2009 εκδόθηκε και νέο ένταλμα συλλήψεως του Χριστοφοράκου για απάτη κατ' εξακολούθηση σε βάρος του Δημοσίου. Αφορά το χρονικό διάσημα 23-8-2004 έως 5-12-2007, αναφέρει τις ίδιες ψευδείς παραστάσεις και το συνολικό ύψος της ζημίας προσδιορίζεται στο ποσό των ευρώ 79.279.261,35, όσο το εκταμιευθέν τίμημα της προμήθειας κατά το διάστημα αυτό. γ) Διαταγή επιβολής ποινής, ενός έτους συνολικά, στο Μ.Χριστοφοράκο από το

Ειρηνοδικείο του Μονάχου, διότι ως διευθυντής της Σήμενς στην Ελλάδα προέβαινε σε δωρεές στα δύο μεγαλύτερα κόμματα και δη προς τους τότε ταμίες των κομμάτων αυτών. Συγκεκριμένα καταδικάστηκε, διότι κατέβαλε προς τους πιο πάνω ταμίες των δύο κομμάτων διψήφιο ποσό εκατομμυρίων ευρώ για να επιταχυνθεί η παραλαβή των επί μέρους έργων της προμήθειας C4I και να επηρεάσουν τους αρμόδιους υπαλλήλους, ώστε να αποφασίσουν, ενδεχομένως και κατά παράβαση των καθηκόντων τους, υπέρ της εταιρείας Σήμενς. δ) Την απόφαση του Πρωτοδικείου του Μονάχου της 28-7-2008, με την οποία καταδικάστηκε σε ποινή φυλακίσεως 2 ετών το στέλεχος της Σήμενς Rheinhard Siekaczec για δωροδοκίες σε διάφορες χώρες, περιλαμβανομένης και της Ελλάδας, σχετικά με την προμήθεια C4I. Στην απόφαση αναφέρεται ότι για τις δωροδοκίες αυτές επιβλήθηκε στη Σήμενς (στη Γερμανία) πρόστιμο ποσού 201.000.000 ευρώ). ε)Το από 6-6-2008 υπόμνημα της αμερικανικής δικηγορικής εταιρείας Debevoise and Plimpton LLP προς τον Εισαγγελέα Πρωτοδικών Αθηνών. Αναφέρεται σ' αυτό, ότι ο Μ. Χριστοφοράκος είπε στον Siekaczek, «αφού η παράδοση του έργου είχε δρομολογηθεί για τα καλά» (Siekaczec δηλαδή του έργου C4I), ότι θα χρειαζόταν 10-15 εκατομμύρια ευρώ «προκειμένου να καταβληθούν προμήθειες σε τέσσερα υπουργεία -Εσωτερικών, Άμυνας, Πολιτισμού, Επικοινωνιών- βάσει υποσχέσεων που είχε δώσει κατά το χρόνο ανάληψης της σύμβασης». Αναφέρεται επίσης στο έγγραφο ότι: «Ο Siekaczec πρόσθεσε, ότι δεν είχε συζητήσει ποτέ σχετικά με τις καταβολές προμηθειών με οποιονδήποτε στη SAIC και ότι δεν είχε ποτέ την εντύπωση ότι η SAIC είχε κάποια ανάμιξη στις καταβολές αυτές» (σελ. 24 στιχ. 3-6). Το έγγραφο αυτό αναφέρει ακόμη και για προσπάθειες που έκανε ο Μ. Χριστοφοράκος να λάβει χρήματα για δωροδοκίες σχετικά με το έργο C4I μέσω των υπαλλήλων της Σήμενς Kutschenreuther και Meyer. στ)Την από 17-11-2006 κατάθεση του Siekaczec στο Ειρηνοδικείο Μονάχου, στην οποία αναφέρει ότι ο Χριστοφοράκος του είπε ότι παραλήπτες των χρημάτων, που διακινούνταν από την εταιρεία Placid Blue Corporation, μέσω λογαριασμού της ABN AmroBank Μονάχου (το ποσό των οποίων υπολογίζει σε 1 έως 4 εκατομμύρια ευρώ ετησίως), «ήταν τα πολιτικά κόμματα στην Ελλάδα». Στην ίδια κατάθεση αναφέρει ο Siekaczek ότι ο Μ. Χριστοφοράκος του είπε ότι για να ανατεθεί το πρόγραμμα C4I στη Σήμενς και στη κοινοπραξία έπρεπε να πληρώσει (ο Χριστοφοράκος) «το Υπουργείο Αμύνης, το Υπουργείο Εσωτερικών, το Υπουργείο Αθλητισμού και ένα ακόμη Υπουργείο», καθώς και ότι το ποσό που έπρεπε να πληρωθεί ανερχόταν σε 10 εκατομμύρια ευρώ περίπου. ζ) Την από 6-2-2007 απολογία του Siekaczek στην Υπηρεσία Δίωξης Εγκλήματος της Βαυαρίας, στην οποία αναφέρει για χρήματα που δόθηκαν για δωροδοκίες σε διάφορες χώρες, μεταξύ των οποίων και 10 εκατομμύρια ευρώ στην Ελλάδα. η) Την από 8-10-2008 έκθεση εξέτασης ως μάρτυρα του Siekaczek στον 4° ειδικό ανακριτή, που έγινε στο Μόναχο. Τα πλέον κρίσιμα περιστατικά που καταθέτει ο μάρτυρας (και που δεν διαφοροποιούνται από τα προηγούμενα) είναι ότι στέλνονταν χρήματα μέσω Μονάχου «για την καλλιέργεια σχέσεων με τα πολιτικά κόμματα, δηλαδή το ΠΑΣΟΚ και την Νέα Δημοκρατία», και ότι αυτός διέθετε στους Χριστοφοράκο και Μαυρίδη περίπου 10-15 εκατομμύρια ευρώ ετησίως. Προσθέτει ακόμη ότι δεν γνωρίζει αν έλληνες υπάλληλοι ή υπουργοί ή πολιτικοί δωροδοκήθηκαν από τη Σήμενς ή τη SAIC, καθώς και ότι: «Απ' όσο γνωρίζω η SAIC δεν εμπλέκεται σε ενδεχόμενες υποσχέσεις για καταβολή χρημάτων (δωροδοκίες)».



(στ) Όπως αναφέρει το Καθού, προκύπτει δε και από τα πιο πάνω έγγραφα, που επικαλείται και προσκομίζει, ποινική δίωξη ασκήθηκε για πρώτη φορά για τα πιο πάνω εγκλήματα τον Ιούλιο 2008 (την 2-7-2008). Η δίωξη ασκήθηκε in rem, η δε σχετική κατηγορία δεν είχε μέχρι την ακροαματική διαδικασία της 17.12.2010 και μέχρι το κλείσιμο της διαδικασίας (21.1.2011) προσωποποιηθεί με απαγγελία κατηγορίας κατά συγκεκριμένων δημοσίων λειτουργών ή υπαλλήλων του ελληνικού κράτους. Μόνο υπάλληλοι της Σήμενς έχουν κατηγορηθεί. Αλλά η δωροδοκία προϋποθέτει δωρολήπτη δημόσιο υπάλληλο ή λειτουργό. Τέτοιο συγκεκριμένο πρόσωπο ούτε αναφέρεται από το Καθού, ούτε από τα στοιχεία που προσκομίζονται προκύπτει. Τέτοια όμως πρόσωπα και ο τρόπος με τον οποίο επηρεάσθηκε η επίδικη σύμβαση ή επηρεάζονται οι απαιτήσεις της Αιτούσης, δεν έχουν προσδιορισθεί ούτε από το Καθού ούτε από την διενεργούμενη ανάκριση παρόλον ότι έχει παρέλθει σημαντικός χρόνος από την άσκηση διώξεως.

(ζ) Εν όψει των προεκτεθέντων αποδοχή από το Διαιτητικό Δικαστήριο του αιτήματος αναστολής της διαιτησίας μέχρις ότου περατωθεί η ποινική δίκη (που όπως προκύπτει βρίσκεται στα αρχικά της στάδια) δεν δικαιολογείται ιδίως στα πλαίσια της διαιτησίας που απαιτεί ταχύτητα, αφού μάλιστα κανένα στοιχείο δεν υπάρχει ότι στις τυχόν πράξεις δωροδοκίας εκ μέρους της Σήμενς είχε οποιαδήποτε συμμετοχή ή, έστω, γνώση η διάδικος στην παρούσα διαιτησία SAIC. Συνεπώς, το σχετικό αίτημα του Καθού πρέπει να απορριφθεί. Αν όμως κατά την εξέλιξη της υπόθεσης προκύψουν νέα στοιχεία που δικαιολογούν αναβολή για συγκεκριμένο εύλογο χρονικό διάστημα μπορεί να υποβληθεί εκ νέου σχετικό αίτημα.

**2. <u>Αμφισβήτηση της νόμιμης εκπροσώπησης και ενεργητικής νομιμοποίησης άλλως του εννόμου συμφέροντος της Αιτούσης</u>**

(α) Ήδη με την αρχική του απάντηση το Καθού (σελ. 10-11) αμφισβήτησε την εξουσία της νόμιμης εκπροσώπησης της Αιτούσης για την άσκηση της ένδικης αίτησης επ' ονόματί της και την ενεργητική της νομιμοποίηση με την αιτιολογία ότι με την 5η Τροποποίηση της επίδικης σύμβασης η εταιρεία «SIEMENS ΕΛΛΑΣ ΑΕ», ανέλαβε να εκτελέσει τόσο μεγάλο μέρος του έργου ώστε εν τοις πράγμασι υποκαταστάθηκε πλήρως στη θέση της SAIC (Αιτούσης) δηλαδή υπεισήλθε σε όλα τα δικαιώματα και τις υποχρεώσεις της επίδικης σύμβασης και συνεπώς δεν νομιμοποιείται ενεργητικά άλλως (σύμφωνα με τις από 24.9.2010 Προτάσεις του Καθού) δεν έχει έννομο συμφέρον στην παρούσα διαιτησία η Αιτούσα αλλά η εταιρεία «SIEMENS ΕΛΛΑΣ ΑΕ». Η Αιτούσα αρνήθηκε αυτούς τους ισχυρισμούς του Καθού.

(β) Και ως προς μεν την νόμιμη εκπροσώπηση της Αιτούσης στην παρούσα διαιτησία, προσκομίσθηκε το πληρεξούσιο που αναφέρεται ανωτέρω υπό **Β 3(α)** το οποίο, το Διαιτητικό Δικαστήριο, τουλάχιστον προς το παρόν και εφόσον δεν αμφισβητηθεί περαιτέρω με συγκεκριμένους και πειστικούς λόγους, το θεωρεί επαρκές για την νομιμοποίηση της παραστάσεως της Αιτούσης στην παρούσα διαιτησία ως προς δε την ενεργητική νομιμοποίηση της Αιτούσης πρέπει να επισημανθεί ότι όπως προκύπτει από την από 29.3.2007 5η τροποποίηση της επιδίκου συμβάσεως, και η τροποποίηση αυτή (όπως και η αρχική σύμβαση και οι προηγούμενες τροποποιήσεις) συνήφθη και υπεγράφη μεταξύ αφενός της Ελληνικής Δημοκρατίας (Καθού) και της

Science Applications International Corporation – SAIC (Αιτούσης) και ανεξάρτητα από το μέγεθος του έργου το οποίο ανέλαβε να εκτελέσει η εταιρεία «SIEMENS ΕΛΛΑΣ ΑΕ», η εταιρεία αυτή ενεργούσε και συνέχισε να ενεργεί ως υπεργολάβος της Αιτούσης ενώ συμβαλλόμενοι στην επίδικη σύμβαση παρέμειναν το Καθού και η Αιτούσα, η οποία κατά συνέπεια και νομιμοποιείται ενεργητικά στην παρούσα διαιτησία και έννομο συμφέρον έχει να προβάλλει τις αξιώσεις τις οποίες προβάλλει, απορριπτομένων των περί του αντιθέτου ισχυρισμών του Καθού.

### 3. <u>Απαράδεκτο της Αίτησης Διαιτησίας λόγω έλλειψης γραπτής προδικασίας</u>

(α) Το Καθού ήδη με την αρχική από 25 Σεπτεμβρίου 2009 Απάντησή του (σελ. 11-12) έθεσε θέμα απαραδέκτου της αίτησης διαιτησίας της Αιτούσης λόγω μη τήρησης της προδικασίας που προβλέπεται στο άρθρο 28 παράγραφος 2 της επίδικης σύμβασης, αίτημα το οποίο επανέφερε με τις από 24 Σεπτεμβρίου 2010 προτάσεις του (σελ. 40-42) προσθέτοντας επιπλέον ότι η παράλειψη τηρήσεως της διαδικασίας του άρθρου 28 παράγραφος 1 «*εγείρει θέμα δικαιοδοσίας του διαιτητικού δικαστηρίου ή, εν πάση περιπτώσει, απαραδέκτου της κρινόμενης αιτήσεως*» (σελ. 42 των προτάσεων *in finem*).

(β) Το άρθρο 28 παράγραφος 2 της επίδικης σύμβασης προβλέπει ότι:
« ***28.2.*** *Τα Μέρη αναλαμβάνουν να ενεργούν με καλή πίστη και μέσω διαπραγματεύσεων για την επίλυση σε σύντομο χρόνο κάθε διαφοράς, διένεξης ή αξίωσης που προκύπτει από τη ΣΥΜΒΑΣΗ, ή έχει σχέση με αυτή ή οποιονδήποτε από τους όρους της. Αν τα Μέρη δεν καταφέρουν να επιλύσουν τη διαφορά με τα περιγραφόμενα ανωτέρω μέσα, μετά από λήψη έγγραφης ειδοποίησης του ενός Μέρους από το άλλο, που να επιβεβαιώνει τη διένεξη, τότε οποιοδήποτε από τα Μέρη μπορεί να παραπέμψει τη διένεξη σε διαιτησία όπως περιγράφεται παρακάτω. Σε συνέχεια των παραπάνω, κάθε Μέρος θα παρέχει στον άλλο γραπτή αναφορά των θέσεών του σχετικά με το θέμα που δεν επιλύθηκε ως ανωτέρω.*»

(γ) Η Αιτούσα (ιδίως με το από 15 Οκτωβρίου 2010 Υπόμνημα της σελ. 42 επ.) επικαλείται το άρθρο 8 της επίδικης σύμβασης, όπως τροποποιήθηκε με την 5η Τροποποίηση της επίδικης σύμβασης, και ιδίως την παράγραφο 8 αυτού και υποστηρίζει ότι με βάση αυτή την τροποποίηση (που σημειωτέον είναι και μεταγενέστερη του άρθρου 28.2) προβλέπεται ειδική διαδικασία για την παραλαβή του συστήματος και την προσφυγή στην διαιτησία, η δε Αιτούσα κατά τους ισχυρισμούς της με όλη την αλληλογραφία της με το Καθού αφ' ενός μεν τήρησε την διαδικασία του άρθρου 8.8 αφ' ετέρου δε και συγχρόνως τήρησε και την διαδικασία του άρθρου 28.2. Ειδικότερα, το άρθρο 8.8 της επίδικης σύμβασης όπως τροποποιήθηκε με την 5η Τροποποίηση της επίδικης σύμβασης, έχει κατά λέξη ως εξής:
« ***8.8.*** *Όταν ολοκληρωθούν όλες οι διαδικασίες ελέγχου του ΣΥΣΤΗΜΑΤΟΣ C4I, επιτυχώς ή με ελλείψεις/ αποκλίσεις που δεν το καθιστούν ακατάλληλο για τη χρήση που προορίζεται, ο ΑΓΟΡΑΣΤΗΣ θα εκδώσει και θα υπογράψει Πρωτόκολλο Ποιοτικής και Ποσοτικής Παραλαβής εντός 15 ημερών από την ολοκλήρωση, οπότε τη συγκεκριμένη ημερομηνία υπογραφής του ανωτέρω Πρωτοκόλλου θεωρείται ότι το ΣΥΣΤΗΜΑ C4I, έχει ΟΡΙΣΤΙΚΩΣ ΠΑΡΑΛΗΦΘΕΙ από τον ΑΓΟΡΑΣΤΗ. Σε περίπτωση που σύμφωνα με την*

*αιτιολογημένη κρίση του ΑΓΟΡΑΣΤΗ υφίστανται ελλείψεις/ αποκλίσεις κατά τα ανωτέρω, θα τις καταγράφει στο Πρωτόκολλο Ποιοτικής και Ποσοτικής Παραλαβής. Τα μέρη υποχρεούνται, όπως εντός 50 ημερών από την ημερομηνία έκδοσης του Πρωτοκόλλου Ποιοτικής και Ποσοτικής Παραλαβής, να προβούν στην επίλυση κάθε διαφοράς τους επί της αξίας των ελλείψεων/ αποκλίσεων του ΣΥΣΤΗΜΑΤΟΣ C4I και των ΥΠΟΣΥΣΤΗΜΑΤΩΝ του. Εάν η συμφωνία αυτή δεν καταστεί δυνατόν να επιτευχθεί εντός της παραπάνω προθεσμίας, οιοδήποτε των Μερών θα δικαιούται να προσφύγει στην προβλεπόμενη στο άρθρο 28 διαιτησία για την οριστική επίλυση της Διαφοράς.»*

(δ) Σχετικά πρέπει να σημειωθεί ότι η τήρηση ή μη της διαδικασίας που προβλέπεται στο άρθρο 28.2 της Σύμβασης δεν επηρεάζει καθ' οιονδήποτε τρόπο το κύρος της ρήτρας διαιτησίας (που περιέχεται στο άρθρο 28 παρ.3 της επίδικης σύμβασης) και συνεπώς δεν τίθεται θέμα δικαιοδοσίας του Διαιτητικού Δικαστηρίου. Αντίθετα μάλιστα, το Διαιτητικό Δικαστήριο έχει την αρμοδιότητα να κρίνει αν τηρήθηκε η διαδικασία αυτή ή όχι, αφού και η αμφισβήτηση του ζητήματος αυτού είναι μια διένεξη που προκύπτει από την επίδικη σύμβαση ή την ερμηνεία της και εμπίπτει στην συμφωνία διαιτησίας που περιέχεται στον όρο 28.3 της επίδικης σύμβασης. Η μη τήρηση της διαδικασίας του άρθρου 28.2 θα μπορούσε να λειτουργήσει απλώς ως αναβλητική ένσταση για την πρόοδο της διαιτητικής διαδικασίας.

(ε) Προπάντων όμως σκοπός της διαδικασίας του άρθρου 28.2 είναι να δώσει στα μέρη την δυνατότητα συμβιβαστικής επίλυσης της μεταξύ τους διαφοράς με διαπραγματεύσεις. Η δε έγγραφη ειδοποίηση του ενός προς τον άλλο που προβλέπεται στον όρο αυτό σκοπό έχει να καταστήσει γνωστό στο άλλο μέρος ότι το μέρος που στέλνει την ειδοποίηση θεωρεί ότι εξαντλήθηκαν τα περιθώρια διαπραγματεύσεων και έτσι το άλλο μέρος, αν θέλει, να ξεκινήσει την διαδικασία διαιτησίας (χωρίς να περιμένει τυχόν απάντηση από το μέρος που στέλνει την ειδοποίηση ή να ελπίζει ακόμη σε διαπραγματεύσεις).

(στ) Όταν όμως ένα μέρος ξεκινά διαιτησία τότε στην ουσία ενσωματούται στο έγγραφο ενάρξεως της διαιτησίας και η πιστοποίηση περί διένεξης και η ειδοποίηση ότι δεν έχουν νόημα περαιτέρω διαπραγματεύσεις και η αναφορά των θέσεων του ενώ οι θέσεις του άλλου μέρους εκτίθενται στην απάντησή του.

(ζ) Σημειωτέον ότι η σχετική έγγραφη ειδοποίηση του όρου 28.2 δεν εξυπηρετεί κανένα άλλο σκοπό πλην του αναφερομένου στην παρ. (ε) ανωτέρω και συνεπώς δεν μπορεί να ερμηνευθεί ότι εμποδίζει την έναρξη διαιτησίας.

(η) Εξ άλλου, αντίθετα με τους ισχυρισμούς του Καθού η πρόβλεψη στο άρθρο 28.2 της επίδικης σύμβασης για επίλυση κάθε διαφοράς μέσω διαπραγματεύσεων σε σύντομο χρόνο και έγγραφη ειδοποίηση και γραπτή αναφορά των θέσεων των μερών δεν εξυπηρετεί ούτε έχει νόημα να εξυπηρετεί τον λεπτομερή προσδιορισμό των αντικειμένων της διαφοράς πριν από την έναρξη της διαιτησίας. Αυτή η άποψη ενισχύεται πολύ περισσότερο μάλιστα αφού κατά τα ανωτέρω κριθέντα και σύμφωνα με τους Κανόνες Διαιτησίας του ICC και κατ' αποδοχή ισχυρισμών του Καθού, πρόσθετα αιτήματα και πολύ περισσότερο άμυνες και ισχυρισμοί (από τα οποία

προσδιορίζεται το αντικείμενο της διαιτησίας) μπορούν να υποβάλλονται και μετά τις αρχικές αιτήσεις και απαντήσεις, κάτι το οποίο και το Καθού υποστήριξε σθεναρά σε σχέση με τις συμπληρωματικές απαντήσεις του. Ούτε όμως τα «στενά» χρονικά όρια που προβλέπουν οι Κανόνες Διαιτησίας του ICC για την απάντηση και τις λοιπές διαδικασίες αποβλέπει να αντιμετωπίσει η διαδικασία του άρθρου 28.2 αφού αυτά τα όρια των Κανόνων Διαιτησίας του ICC αντιμετωπίζονται σε πολύπλοκες υποθέσεις με χορήγηση παρατάσεων (όπως έχει συμβεί και στην επίδικη περίπτωση πρώτον για την υποβολή της απάντησης του Καθού όσο και για μεταγενέστερα στάδια της διαδικασίας) και με την δυνατότητα υποβολής συμπληρωματικών αιτημάτων (όπως έγινε επίσης δεκτό στην επίδικη υπόθεση κατά τα ανωτέρω).

(θ) Σε κάθε περίπτωση τόσο από τις επικοινωνίες των μερών πριν από την έναρξη της διαιτησίας (οι οποίες περιγράφονται λεπτομερώς στο από 15 Οκτωβρίου 2010 Υπόμνημα της Αιτούσης, σελ. 44-49 και αποδεικνύονται από τα προσαγόμενα έγγραφα) όσο και από τις εκατέρωθεν θέσεις όπως διατυπώνονται στην Πράξη Πλαισίου και στις εκατέρωθεν προτάσεις επιβεβαιούται πλήρως η ύπαρξη διένεξης και οι θέσεις των διαδίκων μερών και συνεπώς δεν θα είχε κανένα νόημα η αναστολή της διαιτητικής διαδικασίας για να δοθεί η έγγραφη ειδοποίηση που να επιβεβαιώνει τη διένεξη.

(ι) Εν όψει των ανωτέρω πρέπει να γίνει δεκτό ότι η επίδικη από 16 Ιουνίου 2009 Αίτηση Προσφυγής στην Διαιτησία της Αιτούσης δεν είναι απαράδεκτη λόγω μη τήρησης της γραπτής προδικασίας κατ' άρθρο 28.2 της επίδικης σύμβασης και οι αντίθετοι ισχυρισμοί του Καθού πρέπει να απορριφθούν.

**4. <u>Ακυρότητα της ρήτρας διαιτησίας και ως εκ τούτου έλλειψη δικαιοδοσίας του διαιτητικού δικαστηρίου</u>**

Το Καθού με την από 20 Απριλίου 2010 Συμπληρωματική Απάντηση και με τις μεταγενέστερες προτάσεις και προσθήκη του και για τους λόγους που αναφέρονται εκεί, προέβαλε ένσταση ελλείψεως δικαιοδοσίας του Διαιτητικού Δικαστηρίου λόγω ακυρότητος της διαιτητικής ρήτρας που περιέχεται στο άρθρο 28.3 της επίδικης σύμβασης. Το σχετικό αίτημα του Καθού εξετάσθηκε ανωτέρω υπό Γ παράλληλα με την αυτεπάγγελτη έρευνα από το Διαιτητικό Δικαστήριο της δικαιοδοσίας του, την οποία κατά τα εκεί ειδικώτερα εκτιθέμενα εδέχθη, απορριπτομένης της περί του αντιθέτου ενστάσεως του Καθού.

## ΣΤ. <u>ΜΕΙΟΨΗΦΟΥΣΑ ΓΝΩΜΗ ΚΑΙ ΑΠΟΚΛΙΝΟΥΣΕΣ Ή ΣΥΜΠΛΗΡΩΜΑΤΙΚΕΣ ΑΙΤΙΟΛΟΓΙΕΣ</u>

### (1) <u>Αποκλίνουσες και συμπληρωματικές αιτιολογίες του διαιτητού κ. Διονυσίου Κονδύλη</u>

Ο εκ των διαιτητών κ. Διονύσιος Κονδύλης διετύπωσε και τις ακόλουθες αποκλίνουσες και συμπληρωματικές αιτιολογίες ιδίως σε σχέση με την δικαιοδοσία του Διαιτητικού Δικαστηρίου και το κύρος της διαιτητικής συμφωνίας:

1. Η περί ακυρότητας της διαιτητικής ρήτρας και συνεπώς περί ελλείψεως δικαιοδοσίας του Διαιτητικού Δικαστηρίου ένσταση προβλήθηκε με την πρώτη από 20-4-2009 «Συμπληρωματική Απάντηση» του Καθού, αναπτύσσεται δε λεπτομερώς με τα υπομνήματα που υπέβαλε τόσο πριν από τη συζήτηση της 17-12-2009, όσο και μετά τη συζήτηση αυτή. Αναπτύχθηκε επίσης εκτενώς και προφορικά. Άλλωστε την ύπαρξη δικαιοδοσίας οφείλει να εξετάσει και αυτεπαγγέλτως το Διαιτητικό Δικαστήριο, βάσει των γενικών αρχών του δικαίου, αλλά και των ειδικών διατάξεων του άρθρου 6 παρ. 2 των Κανόνων Διαιτησίας του ICC και του άρθρου 16 παρ.1 του ν. 2735/1999.

2. Για να θεμελιώσει την ακυρότητα της διαιτητικής ρήτρας το Καθού ισχυρίζεται, ότι η επίδικη Σύμβαση είναι διοικητική, ότι διέπεται από τις διατάξεις του π.δ.284/1989 και ότι οι διατάξεις αυτές δεν επιτρέπουν την επίλυση των διαφορών με διαιτησία.
Η επί της ενστάσεως αυτής γνώμη του διαιτητού αυτού είναι η εξής:

(1) Κατά την κρατούσα στη νομολογία και στην επιστήμη άποψη, η σύμβαση είναι διοικητική, αν ένα από τα συμβαλλόμενα μέρη είναι το Δημόσιο ή ν.π.δ.δ. και με τη σύναψή της επιδιώκεται η ικανοποίηση σκοπού, τον οποίο ο νόμος έχει αναγάγει σε δημόσιο, επιπλέον δε το Δημόσιο ή το ν.π.δ.δ., είτε βάσει του κανονιστικού καθεστώτος που διέπει τη σύμβαση, είτε βάσει ρητρών που προβλέπονται κανονιστικώς και έχουν περιληφθεί στη σύμβαση, αποκλίνουν δε από το κοινό δίκαιο, βρίσκεται, προς ικανοποίηση του εν λόγω σκοπού, σε υπερέχουσα θέση έναντι του αντισυμβαλλομένου (ΑΕΔ 19, 20, 21/2009, όπου και άλλες παραπομπές στη νομολογία του ΑΕΔ, Σπηλιωτόπουλος, Εγχειρίδιο Διοικ. Δικαίου, έκδ.13η, παρ.186, 187). Η διοικητική σύμβαση εντάσσεται οργανικώς στο πεδίο του διοικητικού δικαίου, το δε στοιχείο της υπερέχουσας θέσης του Δημοσίου ή του ν.π.δ.δ., εννοιολογικό στοιχείο του δικαίου αυτού, πρέπει να προκύπτει από το κανονιστικό καθεστώς που διέπει τη σύμβαση, είτε από τους όρους της που όχι μόνο αποκλίνουν από το κοινό δίκαιο, αλλά και πρέπει να περιληφθούν κατά νόμο σ'αυτήν («.....που προβλέπονται κανονιστικώς και έχουν περιληφθεί στη σύμβαση» , κατά τη διατύπωση των παραπάνω αποφάσεων του ΑΕΔ).

(2) Το άρθρο 1 του π.δ. 284/1989, που ίσχυε κατά το χρόνο κατάρτισης της επίδικης Σύμβασης, ορίζει ότι: «Με το παρόν Προεδρικό Διάταγμα ρυθμίζονται αποκλειστικώς οι διαδικασίες προμηθειών, εργολαβιών, εργασιών και παροχής υπηρεσιών, που πραγματοποιούνται στο εσωτερικό και στο εξωτερικό της χώρας με τη φροντίδα του Υπουργείου Εθνικής Άμυνας για την ικανοποίηση των κάθε φύσεως αναγκών του». (Τα ίδια, με αναλυτικότερη όμως διατύπωση, ορίζει και το άρθρο 1 του ν.3433/2006, με το άρθρο 71 του οποίου καταργήθηκε το π.δ.284/1989). Επίσης το άρθρο 5 παρ. 1 εδ.α του ν.2833/2000 ορίζει ότι: «Η ασφάλεια των Ολυμπιακών Αγώνων ανήκει στην Ελληνική Αστυνομία, στο Αρχηγείο της οποίας συνιστάται ειδική υπηρεσία με τον τίτλο «Διεύθυνση Ασφάλειας Ολυμπιακών Αγώνων» για τον επιτελικό σχεδιασμό και το συντονισμό των εμπλεκομένων για την προετοιμασία και τη διεξαγωγή των Ολυμπιακών Αγώνων φορέων επί θεμάτων τάξης και ασφάλειας». Περαιτέρω με το άρθρο 1 παρ. 1 του ν. 2292/1995 και με το άρθρο 1 εδ.α και β του ν.2800/2000, που αφορούν το μεν πρώτο στο Υπουργείο Εθνικής Άμυνας, το δε δεύτερο στο Υπουργείο Δημόσιας Τάξης, ορίζονται τα εξής. Άρθρο 1 παρ. 1 ν.2292/1995: «Η Εθνική Άμυνα περιλαμβάνει το σύνολο των λειτουργιών και δραστηριοτήτων, που αναπτύσσονται από το Κράτος, με ~~σκοπό~~ την προστασία της

εδαφική
των πολ
υποστήρ
Υπουργε
ως αποι
προστασ

3.1. Από
Αγώνων
Τάξης, σ
αποστολ
ν.2833/2
νόμου, ό
«(
Ει
πρ
επ
στ
χώ
η
στ
Προκύπτ
που υπέβ
Ολυμπιαι
ασφάλεια
και υπηρ
υπηρεσία
αναγκών
δεν μπορ
για την ικ

3.2. Η επί
την ασφά
άλλωστε
ως αντικε
«μελετήσε
ολοκληρώ
παραδώσε
συστήματ
Ασφάλεια
ασφάλεια
Σύμβαση
Δημόσιας
απόφαση
του άρθρο
ορίζεται ό
υλοποίησ



; δικαιοδοσίας τό 20-4-2009 ιερώς με τα ιο και μετά τη ε την ύπαρξη στήριο, βάσει θρον 6 παρ. 2 )99.

χυρίζεται, ότι π.δ.284/1989 αιτησία.

ι, η σύμβαση π.δ.δ. και με ι αναγάγει σε κανονιστικού προβλέπονται κοινό δίκαιο, η έναντι του η νομολογία 86, 187). Η καίου, το δε ικό στοιχείο ου διέπει τη δίκαιο, αλλά ανονιστικώς αποφάσεων

άρτισης της ρυθμίζονται αι παροχής χώρας με τη άθε φύσεως άρθρο 1 του . Επίσης το Ολυμπιακών τάται ειδική » για τον οιμασία και ασφάλειας». α και β του νας, το δε 1 παρ. 1 ργιών και στασία της

εδαφικής ακεραιότητας, της εθνικής ανεξαρτησίας και κυριαρχίας και της ασφάλειας των πολιτών εναντίον οποιασδήποτε εξωτερικής επίθεσης ή απειλής, καθώς και την υποστήριξη των εθνικών συμφερόντων». Άρθρο 1 εδ. α και β του ν.2800/2000: «Το Υπουργείο Δημόσιας Τάξης, μέσα στα πλαίσια του Συντάγματος και των νόμων, έχει ως αποστολή: α) Την κατοχύρωση και διατήρηση της δημόσιας τάξης. β) Την προστασία της δημόσιας και κρατικής ασφάλειας».

3.1. Από τις προπαρατεθείσες διατάξεις προκύπτει ότι η ασφάλεια των Ολυμπιακών Αγώνων του 2004 αποτελούσε αντικείμενο αρμοδιότητας του Υπουργείου Δημόσιας Τάξης, στο οποίο υπάγεται η Ελληνική Αστυνομία. Αυτό προκύπτει από την κατά νόμο αποστολή του εν λόγω Υπουργείου, ορίζεται δε ρητά στο άρθρο 5 παρ.1 του ν.2833/2000, που παρατίθεται πιο πάνω, αλλά και στην εισηγητική έκθεση του εν λόγω νόμου, όπου αναγράφονται τα εξής:

> «Οι ανωτέρω απαιτήσεις σε επίπεδο ασφάλειας επιβάλλουν την οργάνωση μιας Ειδικής Υπηρεσίας στα πλαίσια της Ελληνικής Αστυνομίας, όπως άλλωστε προβλέπεται και στο φάκελο υποψηφιότητας, η οποία θα είναι αρμόδια για τον επιτελικό σχεδιασμό και το συντονισμό όλων των φορέων που εμπλέκονται στην προετοιμασία και τη διεξαγωγή των Ολυμπιακών Αγώνων του 2004 στη χώρα μας, σε θέματα τάξης και ασφάλειας. Για την εκτέλεση της αποστολής της η υπηρεσία αυτή θα συνεργάζεται με όλους τους συναρμόδιους φορείς και θα στελεχώνεται από προσωπικό που θα αποσπάται από τους φορείς αυτούς.... ».

Προκύπτει μάλιστα από την παραπάνω περικοπή ότι και στο φάκελο υποψηφιότητας, που υπέβαλε η Χώρα μας για την ανάληψη της διοργάνωσης και τη διεξαγωγή των Ολυμπιακών Αγώνων, την Αστυνομία όρισε ως αρμόδια για θέματα τάξης και ασφάλειας. Συνεπώς και οι σχετικές με την ασφάλεια των αγώνων αυτών προμήθειες και υπηρεσίες αφορούσαν ικανοποίηση αναγκών της Ελληνικής Αστυνομίας, ήτοι υπηρεσίας υπαγόμενης στο Υπουργείο Δημόσιας Τάξης, και όχι στην ικανοποίηση αναγκών του Υπουργείου Εθνικής Άμυνας. Κατ' ακολουθίαν για τις προμήθειες αυτές δεν μπορεί να τύχει εφαρμογής το π.δ. 284/1989, αφού αυτό αφορά προμήθειες κ.λπ. για την ικανοποίηση των αναγκών του τελευταίου αυτού Υπουργείου.

3.2. Η επίδικη Σύμβαση αφορά προμήθειες αγαθών και παροχή υπηρεσιών σχετικών με την ασφάλεια των Ολυμπιακών Αγώνων. Αυτό δεν αμφισβητείται, προκύπτει δε άλλωστε και από το όλο περιεχόμενό της και ιδίως από το άρθρο 3 αυτής, που ορίζει ως αντικείμενό της την υποχρέωση της Αιτούσης, όπως, έναντι χρηματικής αμοιβής, «μελετήσει, σχεδιάσει, κατασκευάσει, εγκαταστήσει., ελέγξει, πιστοποιήσει, ολοκληρώσει, εξελίξει, πωλήσει και παράσχει υπηρεσίες, κατά περίπτωση, και παραδώσει με το κλειδί στο χέρι στον αγοραστή (δηλαδή το Ελληνικό Δημόσιο) τα συστήματα C41 Ολυμπιακής Ασφάλειας... Τα ΣΥΣΤΗΜΑΤΑ C41 Ολυμπιακής Ασφάλειας αποτελούν ένα πληροφοριακό σύστημα ασφαλείας..... που αφορά την ασφάλεια των Ολυμπιακών Αγώνων 2004». Συνεπώς, λόγω του αντικειμένου της, η Σύμβαση αυτή ικανοποιεί, τουλάχιστον κατά κύριο λόγο, ανάγκες του Υπουργείου Δημόσιας Τάξης. Αυτό άλλωστε ρητά ορίζεται και στην 249101/22/8/2006 κοινή απόφαση των Υπουργών Εθνικής Άμυνας και Δημόσιας Τάξης, που εκδόθηκε βάσει του άρθρου 19 του ν.3489/2006, στην παράγραφο 1 του άρθρου μόνου της οποίας ορίζεται ότι οι εν λόγω Υπουργοί αποφασίζουν «τη μεταβίβαση για εκτέλεση και υλοποίηση των υπ' αριθ. 020Α/03 Σύμβασης Συστημάτων C41 Ολυμπιακής



Ασφαλείας, καθώς και 16/03 Σύμβασης Αντισταθμιστικών Ωφελημάτων, ως εκ της προμήθειας αυτών, από το Υπουργείο Εθνικής Άμυνας στο Υπουργείο Δημόσιας Τάξης, **στο οποίο αφορούν κυρίως οι εν λόγω προμήθειες**».

3.3. Εν όψει των προεκτεθέντων ο ισχυρισμός του Καθού, ότι η επίδικη Σύμβαση είναι διοικητική, διότι ρυθμίζεται από το π.δ.284/1989 και άρα υπόκειται σε κανονιστικό καθεστώς που διασφαλίζει υπερέχουσα θέση στο Δημόσιο, κατά τη γνώμη του Διαιτητού αυτού δεν είναι ορθός.

3.4. Υποστηρίζει περαιτέρω το Καθού, ότι: «οι ίδιες οι ρυθμίσεις της Σύμβασης αποκλίνουν του αστικού δικαίου και συνιστούν εξαιρετικό δίκαιο που προσδίδει εξουσιαστική θέση στο Δημόσιο». Αναφέρει δε ως τέτοιες ρυθμίσεις της επίδικης Σύμβασης: α) το άρθρο 23.1, που σε περίπτωση καθυστέρησης του προμηθευτή να εκπληρώσει τις υποχρεώσεις του προβλέπει την επιβολή ποινικών ρητρών, εισπραττομένων με παρακράτηση από την αμοιβή του ή με κατάπτωση εγγυήσεων κ.λπ., β) Το άρθρο 24 που προβλέπει την κήρυξη του προμηθευτή έκπτωτου, αν δεν συμμορφωθεί με τις συμβατικές του υποχρεώσεις, γ) Τις παρ. 8.1 και 8.2 του άρθρου 8. Υποστηρίζει το Καθού ότι από τις παραγράφους αυτές προκύπτει η δυνατότητα μονομερούς μείωσης του τιμήματος, σε περίπτωση που κάποιο υποσύστημα παρουσιάζει ελλείψεις ή αποκλίσεις. Πρέπει να παρατηρηθεί κατ' αρχάς ότι η αρχική σύμβαση δεν περιείχε στις παρ. 8.1 και 8.2 του άρθρου 8 διατάξεις περί μειώσεως του τιμήματος. Τα περί μειώσεως του τιμήματος προστέθηκαν στις παραγράφους αυτές κατά την 5η τροποποίηση, με την οποία αναμορφώθηκαν οι διατάξεις αυτές. Πλην και κατά την ισχύουσα διατύπωσή τους δεν προβλέπουν οι διατάξεις αυτές μονομερή μείωση του τιμήματος, αλλά μείωση «αντίστοιχη» ή «ανάλογη» προς τις ελλείψεις ή αποκλίσεις, για το ύψος της οποίας θα πρέπει να υπάρξει προφανώς συμφωνία των μερών, όπως προκύπτει και από την αντιπαραβολή τους προς την παράγραφο 8 του ίδιου άρθρου, που προστέθηκε επίσης με την 5η τροποποίηση. Πάντως το ζήτημα δεν αλλάζει και αν στις διατάξεις δοθεί η ερμηνεία που δίδει το Καθού, δ) Τις διατάξεις του άρθρου 34.1, 34.3 και 34.3.4.4, που παρέχουν το δικαίωμα στο Δημόσιο να καταγγείλει μονομερώς τη Σύμβαση και να προκαλέσει την κατάπτωση των εγγυητικών επιστολών, αν ο προμηθευτής αδυνατεί υπαιτίως να εκπληρώσει τις υποχρεώσεις του ή κηρυχθεί σε κατάσταση πτωχεύσεως κλπ.

3.5. Όλοι οι προαναφερόμενοι όροι της επίδικης σύμβασης κατά την γνώμη του Διαιτητού αυτού, δεν αποκλίνουν από το κοινό δίκαιο. Αντιθέτως μάλιστα. Η ρήτρα έκπτωσης, σε περίπτωση μη εκπλήρωσης των υποχρεώσεων του ενός των συμβαλλομένων, η παρεπόμενη συμφωνία για ποινική ρήτρα, σε περίπτωση καθυστέρησης ή πλημμελούς εκπλήρωσης της κύριας παροχής, καθώς και το δικαίωμα υπαναχώρησης του αγοραστή ή μείωσης του τιμήματος, αν το πράγμα έχει ελλείψεις ή ελαττώματα, είναι συνηθισμένοι όροι των συμβάσεων του ιδιωτικού δικαίου, δεσμευτικοί κατά το άρθρο 361 ΑΚ, προβλέπονται δε και ειδικά στα άρθρα 399, 404 και 540 ΑΚ. Αν, βέβαια, η επίδικη Σύμβαση υπέκειτο σε κανονιστικό καθεστώς, που επέβαλε τη διατύπωση των όρων αυτών στο κείμενό της, τότε θα μπορούσε ενδεχομένως να υποστηριχθεί, ότι οι εν λόγω όροι συνιστούν εκδήλωση υπερέχουσας θέσης του Καθού έναντι της Αιτούσης.



Αφού όμως, όπως αναπτύχθηκε, το π.δ. 284/1989 δεν εφαρμόζεται εν προκειμένω και δεν υπάρχει άλλος νόμος που να επιβάλλει τη θέσπιση των παραπάνω όρων στη Σύμβαση, οι όροι αυτοί είναι προϊόν της βούλησης των μερών, σύμφωνοι δε με τους κανόνες του ιδιωτικού δικαίου. Αλλά και αν αποκλίνουν από τους κανόνες του ιδιωτικού δικαίου, αυτό δεν αρκεί να χαρακτηριστεί η σύμβαση «διοικητική». Θα πρέπει επιπλέον οι όροι αυτοί, σύμφωνα με τη νομολογία του ΑΕΔ, να «**προβλέπονται κανονιστικώς**», πράγμα που δεν συμβαίνει εν προκειμένω.

3.6. Υποστηρίζει ακόμη το Καθού, ότι, αν η επίδικη σύμβαση δεν ρυθμίζεται από το π.δ.284/1989, είναι απολύτως άκυρη, βάσει των άρθρων 79 και 85 του ν.2362/1995, που απαγγέλλουν απόλυτη ακυρότητα των συμβάσεων, με τις οποίες δημιουργούνται υποχρεώσεις του Δημοσίου, αν δεν συντελούν στην εκπλήρωση των σκοπών του. Αλλά εν προκειμένω, αφού «η ασφάλεια των Ολυμπιακών Αγώνων ανήκει στην Ελληνική Αστυνομία» (άρθρο 5 παρ.1 ν.2833/2000), αποτελεί σκοπό του Δημοσίου η τήρησή της. Στην εκπλήρωση δε του σκοπού αυτού συντελεί η επίδικη σύμβαση. Πρέπει ακόμη να σημειωθεί ότι με το άρθρο 2 παρ. 1 του ν.2598/1998 συστάθηκε ν.π.ι.δ., υπό μορφή ανώνυμης εταιρείας, με το διακριτικό τίτλο «Αθήνα 2004» και με σκοπό να «ασκεί όλες τις εξουσίες και αρμοδιότητες που προβλέπονται στις διατάξεις του Ολυμπιακού Χάρτη και στη σύμβαση που υπογράφτηκε την 5η Σεπτεμβρίου 1997 στη Λοζάννη.....», καθώς και ότι με την παρ. 10 του ίδιου άρθρου ανατέθηκε γενικώς η εποπτεία της εν λόγω ανώνυμης εταιρείας σε Διυπουργική Επιτροπή, συγκροτούμενη με απόφαση του Πρωθυπουργού. Η Επιτροπή αυτή (ανα)συγκροτήθηκε με την Υ10/2001 απόφαση του Πρωθυπουργού, με Πρόεδρο τον ίδιο και μέλη 12 Υπουργούς (κλπ.), μεταξύ των οποίων και τον Υπουργό Εθνικής Άμυνας. Με το άρθρο 1 παρ.2 του ν.2833/2000 η εν λόγω Επιτροπή ονομάστηκε : (Διυπουργική) Επιτροπή Συντονισμού Ολυμπιακής Προετοιμασίας (Δ.Ε.Σ.Ο.Π.). Στο προσκομιζόμενο από το Καθού από 25-6-2002 έγγραφο προς τον τότε Υφυπουργό Εθνικής Άμυνας Λ. Λωτίδη, αναφέρεται ότι η εν λόγω Επιτροπή κατά την 37η συνεδρίασή της, της 12-6-2002 «απεφάσισε τη διενέργεια του διαγωνισμού για τα Ολυμπιακά Επιχειρησιακά Κέντρα Ασφαλείας από το Υπουργείο Εθνικής Άμυνας». Παρακαλείται δε ο εν λόγω Υφυπουργός να συνεργαστεί με την Ολυμπιακή Επιτροπή «Αθήνα 2004» και το Υπουργείο Δημόσιας Τάξης. Με την απόφαση αυτή (που δεν προσκομίζεται, ώστε να διαπιστωθεί ποιοι Υπουργοί μετείχαν στη σύνθεση της Επιτροπής), η οποία έχει υπέρ αυτής το τεκμήριο της νομιμότητας, φαίνεται ότι ιδρύεται η αρμοδιότητα του Υπουργείου Εθνικής Άμυνας να διεξαγάγει τη διαδικασία για την επιλογή του προμηθευτή του συστήματος ασφάλειας C41. Αν η αρμοδιότητα ανήκε, ως εκ του αντικειμένου της προμήθειας, στο Υπουργείο Άμυνας, η απόφαση αυτή της Δ.Ε.Σ.Ο.Π. δεν θα είχε έννοια.

3.7. Προκύπτει από τα πιο πάνω ότι δεν συντρέχουν εν προκειμένω τα στοιχεία εκείνα, που θα επέτρεπαν το χαρακτηρισμό της επίδικης σύμβασης ως διοικητικής. Αντίθετα προκύπτει ότι πρόκειται για σύμβαση του ιδιωτικού δικαίου, την οποία κατάρτισε το Δημόσιο όχι κατ' ενάσκηση δημόσιας εξουσίας (iure imperii), αλλά iure gestionis, βάσει της κατ' άρθρο 361 ΑΚ ελευθερίας των συμβάσεων, υπό καθεστώς ισότητας. Μάλιστα, στο άρθρο 18 παρ.3 και 4 της επίδικης σύμβασης περιέχονται ρήτρες περιορισμού της ευθύνης του προμηθευτή σε ορισμένες περιπτώσεις μόνο για δόλο και για βαριά αμέλεια (ρήτρα που επιτρέπει το άρθρο 332 του ΑΚ και είναι ευνοϊκή για τον προμηθευτή). Συνεπώς, αφού η επίδικη σύμβαση είναι ιδιωτικού δικαίου, δεν υπήρχε

νομικό κώλυμα υπαγωγής των εκ της συμβάσεως αυτής διαφορών σε διαιτησία, και μάλιστα χωρίς τήρηση των διατυπώσεων του άρθρου 49 ΕισΝΚΠολΔ, αφού η επίδικη σύμβαση καταρτίστηκε με αλλοδαπή εταιρεία (άρθρο 8 του ν.736/1970, ΟλΑΠ 8/1996). Άρα η ρήτρα διαιτησίας είναι έγκυρη και συνεπώς υπάρχει δικαιοδοσία του Διαιτητικού Δικαστηρίου.

4. Σε κάθε περίπτωση, αν ήθελε θεωρηθεί ότι η επίδικη σύμβαση υπάγεται στη ρύθμιση του π.δ. 284/1989, πάλι κατά τη γνώμη του Διαιτητού αυτού η ρήτρα διαιτησίας είναι έγκυρη.

4.1. Κατ' αρχάς πρέπει να παρατηρηθεί, ότι η άποψη υπέρ της υπαγωγής της επίδικης σύμβασης στη ρύθμιση του π.δ. 284/1989, παρότι (όπως εκτέθηκε) δεν συμπορεύεται με τις διατάξεις του άρθρου 1 του δ/τος αυτού και του άρθρου 5 παρ.1 εδ.α του ν.2833/2000, καθώς και με τις λοιπές διατάξεις και στοιχεία που αναφέρονται στον προηγούμενο αριθμό, έχει υπέρ αυτής το γεγονός ότι για τη διαδικασία προς κατάρτιση της Σύμβασης και για την επικύρωσή της εφαρμόστηκαν οι διατάξεις του εν λόγω π.δ., το οποίο και αναφέρεται σχεδόν σε όλες τις σχετικές διοικητικές πράξεις που προσκομίζονται. Βέβαια, το αν μία σύμβαση υπάγεται στο πεδίο εφαρμογής ενός νόμου ή όχι, είναι θέμα ερμηνείας του νόμου αυτού. Αν οι συμβαλλόμενοι, παρότι ο νόμος δεν εφαρμόζεται στη σύμβασή τους, θέλουν την εφαρμογή του και παραπέμπουν σ' αυτόν, τότε οι διατάξεις του έχουν πλέον συμβατική ισχύ και εφαρμόζονται συμπληρωματικά, κατά το μέρος που δεν αντίκεινται στους ρητούς όρους της σύμβασης. Υπό αυτήν την έννοια, αφού εν προκειμένω τα μέρη ρητά συμφώνησαν τη διαιτητική επίλυση των διαφορών τους, οι διατάξεις του π.δ. 284/1989 είναι για το ερευνόμενο ζήτημα αδιάφορες.

4.2. Πέραν όμως των προεκτεθέντων, και υπό την εκδοχή της άμεσης και απευθείας εφαρμογής του π.δ.284/1989 στην επίδικη σύμβαση, πάλι η ρήτρα διαιτησίας εγκύρως συμφωνήθηκε, με βάση τη διάταξη του άρθρου 69 παρ.7 του εν λόγω διατάγματος, που ορίζει ότι: «….. για προμήθειες μείζονος σημασίας, ο τρόπος επίλυσης των διαφορών καθορίζεται από τη σχετική σύμβαση. Στην περίπτωση αυτή θα υπάρχει ανάλογη πρόβλεψη στους ειδικούς όρους της διακήρυξης του αντίστοιχου διαγωνισμού». Η διάταξη αυτή παρέχει, τόσο κατά τη γραμματική της διατύπωση, όσο και κατά το σκοπό της, τη δυνατότητα να οριστεί με τους ειδικούς όρους της διακήρυξης και συνεπώς να περιληφθεί στη σύμβαση ως τρόπος επίλυσης των διαφορών η διαιτησία, εφόσον πρόκειται για προμήθειες μείζονος σημασίας (βλ. σχετικώς και Φορτσάκη, Διαιτησία και Διοικ. Διαφορές, σελ.167 και 181). Εν προκειμένω από τα προσκομιζόμενα έγγραφα δεν προκύπτει, αν πριν καταρτιστεί η επίδικη σύμβαση, έγινε ή όχι διαγωνισμός και αν δημοσιεύτηκε διακήρυξη με γενικούς και ειδικούς όρους. Από την προσκομιζόμενη 1/23-1-2003 απόφαση του Κ.Υ.Σ.Ε.Α. προκύπτει ότι κηρύχθηκε περατωθείσα, χωρίς αποτέλεσμα, η διαδικασία για την προμήθεια του συστήματος C41. Προσκομίζεται όμως και το από 6-9-2002 έγγραφο του Υπουργείου Εθνικής Άμυνας, με τίτλο «Προμήθεια Συστημάτων C41 Ολυμπιακής Ασφάλειας», διατυπωμένο υπό μορφή διακηρύξεως, στο οποίο αναφέρεται ότι: « Η Υπηρεσία ενδιαφέρεται για προμήθεια Συστημάτων C41 Ολυμπιακής Ασφάλειας, για κάλυψη των Ολυμπιακών Αγώνων 2004». Στο άρθρο 16 του εγγράφου αυτού προβλέπεται ως τρόπος επίλυσης των τυχόν διαφορών η διαιτησία. Συνεπώς εγκύρως συμφωνήθηκε σε



κάθε περίπτωση η επίμαχη ρήτρα διαιτησίας, βάσει του άρθρου 69 παρ. 7 του π.δ. 284/1989.

4.3. Περαιτέρω, η επίμαχη ρήτρα διαιτησίας εγκύρως συμφωνήθηκε και βάσει των διατάξεων του ν.2735/1999 για τη Διεθνή Εμπορική Διαιτησία, αφού η παρούσα διαιτησία είναι διεθνής και εμπορική, δεν υπάρχει δε νόμος πού να ορίζει ότι οι διαφορές που μπορεί να ανακύψουν από συμβάσεις, υπαγόμενες στη ρύθμιση του π.δ.284/1989, δεν υπόκεινται σε διαιτησία. Άρα οι διατάξεις του εν λόγω νόμου (2735/1999) αποτελούν αυτοτελή νομική βάση θεμελιώσεως και συνεπώς του κύρους της διαιτητικής ρήτρας. Ειδικότερα, ως προς το ζήτημα ότι η παρούσα διαιτησία είναι διεθνής και εμπορική, ο Διαιτητής αυτός αναφέρεται σε όσα έχει δεχθεί το Διαιτητικό Δικαστήριο στην από 18-11-2009 Διάταξή του. Νέα στοιχεία ή επιχειρήματα, που να οδηγούν σε διαφορετική άποψη ως προς το χαρακτήρα αυτόν της προκείμενης διαιτησίας, δεν υπάρχουν. Εξάλλου, στο κείμενο του π.δ.284/1989 δεν υπάρχει διάταξη, ορίζουσα ότι οι διαφορές, που ανακύπτουν από συμβάσεις υπαγόμενες στη ρύθμισή του, δεν μπορούν να υπαχθούν σε διαιτησία (ώστε να έχει εφαρμογή η παράγραφος 4 του άρθρου 1 του ν.2735/1999). Το άρθρο 14 παρ. 2 των γενικών όρων που έχουν δημοσιευτεί μαζί με το εν λόγω διάταγμα ορίζει, βέβαια, ότι: «Κάθε διαφορά για την ερμηνεία και την εκτέλεση σύμβασης ή παραγγελίας των προμηθειών των Ε.Δ. λύνεται, εφόσον από την κείμενη νομοθεσία προβλέπεται τέτοιου είδους προσφυγή, από το δικαστήριο της περιοχής που διεξάγεται ο διαγωνισμός με εφαρμογή του Ελληνικού Δικαίου». Αλλά οι εν λόγω γενικοί όροι δεν έχουν νομοθετική (κανονιστική) ισχύ. Αποτελούν υπόδειγμα των όρων που πρέπει να περιλαμβάνονται στη διακήρυξη, ώστε να αποκτήσουν συμβατική ισχύ, εφόσον ο προμηθευτής δηλώσει ότι τους αποδέχεται και αποτελέσουν συμβατικό στοιχείο (άρθρα 27 παρ.4 και 30 παρ. 1 εδ.α τον π.δ. 284/1989). Πρέπει επίσης να σημειωθεί, ότι συνταγματικό θεμέλιο του θεσμού της διαιτησίας στο δίκαιό μας αποτελεί το άρθρο 8 του Συντάγματος[7], που ορίζει ότι κανείς δεν στερείται **χωρίς τη θέλησή του** από το δικαστή που του ορίζει ο νόμος. Οι διατάξεις των παρ. 1 και 2 του άρθρου 94 του Συντάγματος ρυθμίζουν τη δικαιοδοσία **των πολιτειακών δικαστηρίων** επί των διοικητικών και των ιδιωτικών διαφορών, αντιστοίχως. Ούτε επιτρέπουν, ούτε απαγορεύουν την επίλυση των διαφορών αυτών με διαιτησία[8], που γενικώς θεωρείται δικαιοδοτική τάξη ισότιμη της πολιτειακής δικαιοδοσίας. Βέβαια, η διαιτητική απόφαση δεν μπορεί να ακυρώσει διοικητική πράξη (ΣτΕ 752/2008, 889/1994 κ.α.). Μπορεί όμως να αναγνωρίσει δεσμευτικώς για τη διοίκηση έννομες συνέπειες και να επιδικάσει απαλλοτριωτά δικαιώματα (όπως είναι το δικαίωμα σε χρηματική παροχή), υπό την προϋπόθεση ότι υπάρχει νομοθετική ρύθμιση της διαιτησίας, στην οποία υπάγονται οι επίδικες διαφορές, καθώς και σχετική περί υπαγωγής τους στη διαιτησία συμφωνία (άρθρο 8 παρ.1 του Συντάγματος). Αυτές δε οι προϋποθέσεις συντρέχουν εν προκειμένω, αφού και στο πραγματικό του άρθρου 1 του ν. 2735/1999 υπάγονται οι επίδικες διαφορές και συμφωνία περί υπαγωγής τους στη διαιτησία υπάρχει. Συνεπώς, και υπό την εκδοχή ότι

---

[7] Στο γερμ. δίκαιο νομική βάση της διαιτησίας θεωρείται το άρθρο 2 παρ.1 του Σ, που καθιερώνει το δικαίωμα για ελεύθερη ανάπτυξη της προσωπικότητας (BGH 144.146).

[8] Αυτό γίνεται δεκτό και για τη θεσπίζουσα τη δικαιοδοσία των πολιτειακών δικαστηρίων διάταξη του άρθρου 92 του γερμ. Συντάγματος (βλ. jarass/Pietoth, Grundgezetz fur die Bundesrepublik Deutschland, Kommentar, έκδ. 7η, σελ. 1036 αριθ. 6).

εφαρμόζεται στην επίδικη Σύμβαση το π.δ. 284/1989, πάλι η ρήτρα διαιτησίας εγκύρως συμφωνήθηκε και άρα υπάρχει δικαιοδοσία του Διαιτητικού Δικαστηρίου.

5. Σύμφωνα με το άρθρο 281 ΑΚ, είναι καταχρηστική και απαγορεύεται η άσκηση του δικαιώματος, αν υπερβαίνει προφανώς τα όρια που επιβάλλουν η καλή πίστη ή τα χρηστά ήθη ή ο κοινωνικός ή οικονομικός σκοπός του δικαιώματος. Επίσης με το άρθρο 25 παρ.3 του Συντάγματος ορίζεται ότι: «Η καταχρηστική άσκηση δικαιώματος δεν επιτρέπεται». Όπως παγίως γίνεται δεκτό, ο ισχυρισμός περί καταχρηστικής ασκήσεως προτείνεται και κατά δικαιωμάτων που πηγάζουν από τη δημόσια τάξη (ΑΠ 952/2010, ΑΠ 1429/2005), όπως επίσης και κατά δημοσίων δικαιωμάτων, όπως π.χ. κατά του δικαιώματος της αναγκαστική εκτέλεσης (ΟλΑΠ 12/2009, ΑΠ 385/2010). Προτείνεται επίσης και κατά του ισχυρισμού περί ακυρότητας ορισμένου όρου της δικαιοπραξίας, καθώς και επί ακυρότητας της δικαιοπραξίας στο σύνολό της (ΑΠ 960/2010). Κατά την έννοια του άρθρου αυτού (ΑΚ 281), για να κριθεί καταχρηστική η άσκηση του δικαιώματος θα πρέπει η προφανής υπέρβαση των ορίων της καλής πίστης κλπ. να προκύπτει από την προηγηθείσα της ασκήσεως συμπεριφορά του δικαιούχου ή από την πραγματική κατάσταση που δημιουργήθηκε ή τις περιστάσεις που μεσολάβησαν ή από άλλα περιστατικά, τα οποία, χωρίς κατά νόμο να εμποδίζουν τη γέννηση ή να επάγονται την απόσβεση του δικαιώματος, καθιστούν μη ανεκτή την άσκηση αυτού, κατά τις περί δικαίου και ηθικής αντιλήψεις του μέσου κοινωνικού ανθρώπου (ΟλΑΠ 17/1995). Εξάλλου, η νομική θεμελίωση του ασκούμενου δικαιώματος δεν ενδιαφέρει. Η ένσταση της καταχρηστικής ασκήσεως προτείνεται και κατά δικαιωμάτων, που θεμελιώνονται, αμέσως ή εμμέσως, και στο Σύνταγμα (βλ.π.χ. ΑΠ 952/2010, που αφορά καταχρηστική άσκηση δικαιώματος που πηγάζει από τη διάταξη του άρθρου 22 παρ. 1 εδ.β του Συντάγματος περί ίσης μεταχείρισης των εργαζομένων). Συνεπώς καταχρηστικώς μπορεί να ασκείται και το δικαίωμα προσβολής της διαιτητικής ρήτρας ως άκυρης (ΑΠ301/1992. Πρβλ. ΟλΑΠ 25/1990). Πρέπει δε να σημειωθεί ότι η ακυρότητα της διαιτητικής συμφωνίας (είτε πρόκειται για διαιτητική συμφωνία σε σύμβαση ιδιωτικού δικαίου είτε πρόκειται για διαιτητική συμφωνία σε σύμβαση διοικητική) επάγεται ως συνέπεια τη θεμελίωση της δικαιοδοσίας των πολιτειακών δικαστηρίων, βάσει του άρθρου 94 του Συντάγματος. Δηλαδή ο ισχυρισμός περί ακυρότητας της διαιτητικής ρήτρας έχει πάντοτε θεμελίωση, έστω και έμμεση, στο Σύνταγμα. Έχει δηλαδή την έννοια, ότι η ρήτρα είναι άκυρη και συνεπώς δικαιοδοσία έχουν τα πολιτειακά δικαστήρια, βάσει του άρθρου 94 του Συντάγματος. Αυτό όμως δεν εμποδίζει την απόκρουσή του με την ένσταση καταχρηστικής άσκησης.

5.1. Εν προκειμένω, και αν ήθελε θεωρηθεί ότι η ρήτρα διαιτησίας στην επίδικη σύμβαση είναι άκυρη, ο Διαιτητής αυτός έχει τη γνώμη ότι καταχρηστικώς επικαλείται το καθού την ακυρότητα, όπως βασίμως υποστηρίζει η Αιτούσα (βλ το από 15-10-2010 υπόμνημα της, σελ.79, και το από 21-1-2011 υπόμνημα της, σελ.21) για τους εξής λόγους, που θεμελιώνονται στα στοιχεία της δικογραφίας: α) Η περί διαιτησίας ρήτρα υπήρξε επιλογή τον Δημοσίου. Περιλήφθηκε ως όρος (άρθρο 16) στο από 6-9-2002 έγγραφο - πρόσκληση, για την εκδήλωση ενδιαφέροντος σχετικά με τη σύναψη της επίδικης σύμβασης, το οποίο στάλθηκε και στην Αιτούσα, β) Η ρήτρα διαιτησίας περιλήφθηκε στην από 13-5-2003 κατακυρωτική για την προμήθεια πράξη του τότε Υπουργού Εθνικής Άμυνας. Η πράξη αυτή εκδόθηκε πριν από την υπογραφή της

επίδικης σύμβασης, αναφέρει δε στο άρθρο 24 ότι στη σύμβαση που θα καταρτιστεί θα περιληφθεί η ρήτρα διαιτησίας που περιέχεται πράγματι στην επίδικη σύμβαση, γ) Στο άρθρο μόνο παρ.2 εδ. β της κοινής απόφασης των Υπουργών Εθνικής Άμυνας και Δημόσιας Τάξης αναφέρεται ότι μεταβιβάζεται στο δεύτερο Υπουργείο το σύνολο των αρμοδιοτήτων σχετικά με τα Συστήματα C41 «συμπεριλαμβανομένης και της διαιτητικής διαδικασίας, όπως προκύπτει από την κύρια σύμβαση», δ) Υποστηρίζει η Αιτούσα, ότι είχε και προηγουμένως ασκήσει προσφυγή στη διαιτησία, με βάση την επίμαχη ρήτρα, πριν από την 5η τροποποίηση της Σύμβασης, και ότι το Καθού είχε απαντήσει και είχε ορίσει διαιτητή, χωρίς να προτείνει ισχυρισμό περί ακυρότητας της διαιτητικής ρήτρας. Ο ισχυρισμός αυτός εμμέσως πλην σαφώς ομολογείται από το Καθού με το από 21-1-2011 υπόμνημά του, στο οποίο αναφέρει (σελ. 21) ότι: «.. ουδέποτε η προηγούμενη προσφυγή σε διαιτησία εκ μέρους της αντιδίκου έφθασε στο στάδιο της συντάξεως πράξεως πλαισίου, αλλά η αντίδικος μετά την 5η τροποποίηση της συμβάσεως παραιτήθηκε από την προσφυγή», ε) Με την 5η τροποποίηση (με την οποία αναμορφώθηκε η επίδικη σύμβαση σε μεγάλο βαθμό) όχι μόνο δεν απαλείφθηκε η ρήτρα διαιτησίας του άρθρου 28 της επίδικης σύμβασης, αλλά προστέθηκε και νέα ρήτρα για συγκεκριμένα θέματα με προσθήκη παραγράφου, υπό τον αριθμό 8, στο άρθρο 8 της επίδικης σύμβασης, στ) Σε επιστολή που απέστειλε το Καθού προς το Δικαστήριο του ICC **μετά την έναρξη της παρούσας διαιτητικής διαδικασίας** δήλωσε τα εξής (κατ' ελεύθερη μετάφραση από τα αγγλικά): «*....έχουμε την τιμή να σας πληροφορήσουμε, εν αναφορά με την επιστολή σας με ημερομηνία 6 Αυγούστου 2009, ότι δεν σκοπεύουμε να εγείρουμε αντιρρήσεις όσον αφορά την ύπαρξη, το κύρος ή το πεδίο εφαρμογής της συμφωνίας διαιτησίας*», ζ)Την 25/9/2009 το Καθού υπέβαλε προς το Δικαστήριο την αρχική απάντησή του στην προσφυγή (αίτηση). Με αυτήν όχι μόνο δεν αμφισβήτησε το κύρος της διαιτητικής ρήτρας, αλλά αντιθέτως δήλωσε στο εισαγωγικό κεφάλαιό της ότι: «*...Η ως άνω αίτηση στηρίζεται στην παρ. 3 του άρθρου 28 της εν λόγω Σύμβασης, με την οποία έχει συνομολογηθεί ρήτρα διαιτησίας η οποία έχει ως ακολούθως*». Παρέθεσε δε εν συνεχεία το κείμενο της διαιτητικής ρήτρας.

5.2. Από τα προαναφερθέντα στοιχεία προκύπτει ότι το Καθού είναι εκείνο που πρότεινε να περιληφθεί στη επίδικη σύμβαση διαιτητική ρήτρα, και μάλιστα τη διατύπωσε ως όρο στην πρόσκληση για την εκδήλωση ενδιαφέροντος προς την Αιτούσα, ότι επίσης το Καθού κατακύρωσε την προμήθεια στην Αιτούσα και έθεσε ως όρο στην πράξη κατακύρωσης τη διατύπωση στην επίδικη σύμβαση ρήτρας διαιτησίας όμοιας με αυτήν που πράγματι υπάρχει στην επίδικη σύμβαση, ότι ενέμεινε έκτοτε στην εν λόγω ρήτρα και μάλιστα ειδικά απάντησε προς το Δικαστήριο του ICC, μετά την έναρξη της διαιτητικής διαδικασίας, ότι δεν σκοπεύει να προβάλει αντιρρήσεις περί του κύρους της, ότι πράγματι με την αρχική του απάντηση στην προσφυγή δεν αμφισβήτησε το κύρος της ρήτρας, καθώς και ότι πρόβαλε για πρώτη φορά ισχυρισμό περί ακυρότητας με συμπληρωματική απάντηση, την οποία υπέβαλε μάλιστα μετά 6 και πλέον μήνες από την αρχική απάντησή του. Η συμπεριφορά αυτή του Καθού είναι κατά τη γνώμη του Διαιτητού αυτού καταδήλως αντιφατική, προσκρούει στη θεμελιώδη αρχή non venire contra factum proprium και στις περί δικαίου και ηθικής αντιλήψεις του μέσου κοινωνικού ανθρώπου, υπερβαίνει δε ως εκ τούτου προφανώς τα όρια που επιβάλλουν στην άσκηση του δικαιώματος οι κανόνες της καλής πίστεως και των χρηστών ηθών. Συνεπώς, και αν ακόμη η ρήτρα είναι άκυρη, το Καθού καταχρηστικά ασκεί το σχετικό δικαίωμά του, όπως βάσιμα υποστηρίζει η Αιτούσα.

Πρέπει, λοιπόν και γι' αυτούς τους λόγους να απορριφθεί η ένσταση του Καθού περί ακυρότητας της διαιτητικής ρήτρας και ελλείψεως δικαιοδοσίας του Διαιτητικού Δικαστηρίου.

**(2) <u>Μειοψηφούσα γνώμη και αποκλίνουσες ή συμπληρωματικές αιτιολογίες της διαιτητού Στυλιανής Χαριτάκη</u>**

Η εκ των διαιτητών κα Στυλιανή Χαριτάκη διατύπωσε την ακόλουθη μειοψηφούσα γνώμη ως προς την δικαιοδοσία του Διαιτητικού Δικαστηρίου και τις ακόλουθες αποκλίνουσες και συμπληρωματικές αιτιολογίες:

1. Η ένδικη από 19.05.2003 σύμβαση No. 020$^{A}$/03 ,όπως αναφέρεται και στο προοίμιό της, συνήφθη μεταξύ της Ελληνικής Δημοκρατίας( Υπουργείο Εθνικής Άμυνας), σύμφωνα με την απόφαση Φ.600/ΑΡ.9092/Σ.16/13 Μαΐου 2003/ΥΠΕΘΑ/ΓΓΟΣΑΕ/ΓΔΑΕ/ΔΙΚΕ, αφενός και της εταιρείας S.A.I.C. αφετέρου.

2. Η προαναφερθείσα από 13.05.2003 απόφαση της Δ/νσης Κύριου Εξοπλισμού ,που υπάγεται στη Γεν. Διεύθυνση Οικονομικού Σχεδιασμού και Αμυντικών Επενδύσεων του Υπουργείου Εθνικής Άμυνας, φέρει τους χαρακτηρισμούς «απόρρητο» και «επείγον», έχει ως θέμα: «Κατακύρωση Προμήθειας Συστημάτων C4I Ολυμπιακής Ασφάλειας» και υπογράφεται από τον Υπουργό Εθνικής Άμυνας.

3. Στη προαναφερθείσα απόφαση περιέχεται αναφορά σε σειρά σχετικών εγγράφων που αφορούν στην μέχρι τότε εξέλιξη της διαδικασίας για τη διενέργεια της σχετικής προμήθειας ( σχετ. α- κστ).

4. Στο σημείο 1 της ως άνω κατακυρωτικής απόφασης αναφέρεται σειρά νομοθετικών κειμένων (α-ι),καθώς και σειρά εν γένει αποφάσεων, πράξεων, εισηγήσεων κλπ των οργάνων της Διοίκησης (ια- κβ), τα οποία ελήφθησαν υπόψη και αποτέλεσαν το νόμιμο έρεισμα της απόφασης, αφενός έγκρισης του Πρακτικού διαπραγματεύσεων της οικείας επιτροπής και αφετέρου κατακύρωσης στην αιτούσα της προμήθειας των Συστημάτων C4I Ολυμπιακής Ασφάλειας, ύψους 254,999 εκ. ευρώ, με τους όρους που καθορίζονται στο προαναφερθέν από 2.5.2003 πρακτικό (σχετικό: κε). Μεταξύ των μνημονευομένων διατάξεων περιλαμβάνονται και οι διατάξεις του ν.δ. 721/70 (Περί Οικονομικής Μερίμνης και Λογιστικού των Ενόπλων Δυνάμεων) (σημ. 1 α),καθώς και του π.δ. 284/89( Περί Προμηθειών, Εργολαβιών και Εκτέλεσης Εργασιών των ΕΔ) (σημείο 1.η). Ρητή αναφορά στο πδ 284/89 γίνεται και στο σημείο 32 περ. β της κατακυρωτικής απόφασης. Ομοίως στο δι΄ αυτής εγκριθέν από 2.5.2003 πρακτικό διαπραγματεύσεων γίνεται αναφορά σε απόρριψη αιτήματος λόγω αντίθεσης προς το πδ 284/89 (σημείο 7), αλλά και περί

απαιτούμενων εγκρίσεων για αποκλίσεις στα πλαίσια του π.δ. 284/89 (σημεία 19,20).

5. Από τα προαναφερθέντα ,αλλά και τα λοιπά τεθέντα υπόψη του Διαιτητικού Δικαστηρίου στοιχεία στα οποία γίνεται ρητή ,εκτενής και κατ΄ επανάληψη αναφορά στις διατάξεις του πδ 284/89 ,προκύπτει, κατά τη γνώμη της Διαιτητού αυτής, ανενδοίαστα ότι η υπό κρίση σύμβαση συνήφθη κατά τις διατάξεις του πδ 284/89,με πλήρη σχετική γνώση των μερών και χωρίς κανένα ενδοιασμό ως προς την νομιμότητα εφαρμογής του θεσμικού πλαισίου που διέπει την σύμβαση. Ενδεικτικά αναφέρονται: α)από 6.09.2002 έγγραφη πρόσκληση Γενικού Γραμματέα ΓΓΟΣ & ΑΕ /Γεν.Δ/ντή ΓΔΑΕ ΥΠΕΘΑ, απευθυνόμενη προς την αιτούσα και άλλες δύο εταιρείες, για υποβολή τεχνικοοικονομικής προσφοράς για την συγκεκριμένη προμήθεια , με συνημμένα παραρτήματα ειδικών όρων προγράμματος, οδηγού απόκρισης και απαιτήσεων προδιαγραφών έργου, β)απόφαση ΚΥΣΕΑ από 23.01.2003 (κήρυξη περαίωσης διαδικασίας προμήθειας χωρίς αποτέλεσμα), γ)Φ.600/9024/Σ.3 από 29.01.2003 σχετική απόφαση Υπουργού Εθνικής Άμυνας, με την οποία κηρύσσεται περαιωμένη η προηγηθείσα διαδικασία, εγκρίνεται η υλοποίηση της προμήθειας, κατ΄ εξαίρεση των κανονικών διαδικασιών του πδ 284/89, καθορίζονται οι όροι υλοποίησής της και χαρακτηρίζεται το σχετικό ειδικό εξοπλιστικό πρόγραμμα «απόρρητο» και «κατεπείγον», δ)οι της ίδιας ημερομηνίας και ομοίου περιεχομένου Φ.600/550. 654 και Φ. 600/550. 655 προσκλήσεις για διαπραγμάτευση του Γεν. Γραμματέα ΓΓΟΣ & ΑΕ/Γεν. Δ/ντή ΓΔΑΕ που απευθύνονται στις δύο εταιρείες που είχαν συμμετάσχει στη προηγούμενη και περαιωθείσα διαδικασία , ήτοι η πρώτη στην Αιτούσα και η δεύτερη στην άλλη εταιρεία, ε)απόφαση ΚΥΣΕΑ από 27.02.2003 (επιλογή της Αιτούσας ως προτιμητέας για συνέχιση διαπραγμάτευσης), στ)απόφαση ΚΥΣΕΑ από 13.03.2003 (ανάθεση υλοποίησης προμήθειας στην Αιτούσα).

6. Η εφαρμογή του π.δ. 284/89, ως νομίμου θεσμικού και συμβατικού πλαισίου που διέπει την υπό κρίση σύμβαση ,οι διατάξεις του οποίου αποτελούν και το έρεισμα της νόμιμης ανάθεσης της σχετικής προμήθειας ,αμφισβητείται από την Αιτούσα για πρώτη φορά στη παρούσα φάση της διαιτητικής διαδικασίας . Ο σχετικός ισχυρισμός πλήττει παρεμπιπτόντως και απαραδέκτως το κύρος της κατακυρωτικής απόφασης , καίτοι αυτή έχει το τεκμήριο νομιμότητας και παρά το γεγονός α)της ανεπιφύλακτης συμμετοχής της Αιτούσης στη προηγηθείσα της ανάθεσης της προμήθειας διαδικασία, β)της σε εκτέλεση της σχετικής κατακυρωτικής απόφασης υπογραφής, εκ μέρους της, της ένδικης σύμβασης, αλλά και τροποποιήσεών της και γ)της εν γένει σύμπραξής της στα διάφορα επόμενα στάδια εξέλιξης της σύμβασης ( ΝΟΜΟΣ ΣτΕ Ολ 1415/2000).

7. Από τις γενικές διατάξεις του ν. 2362/95( Δημόσιο Λογιστικό) για τη σύναψη συμφωνιών για λογαριασμό του Δημοσίου (αρθ. 79-85) με τις οποίες προβλέπεται, πλην άλλων, ότι : α)οι συμβάσεις ,από τις οποίες δημιουργούνται υποχρεώσεις σε βάρος του Δημοσίου, δεν δύνανται να συνομολογηθούν εάν δεν προβλέπονται από γενικές ή ειδικές διατάξεις ή δεν συντελούν στην εκπλήρωση των σκοπών του (άρθρο 79), β)ότι κάθε σύμβαση του Δημοσίου καταρτίζεται από τον νόμιμο εκπρόσωπο του Δημοσίου και με τήρηση εγγράφου τύπου (αρθ. 80,81), γ)βάσει συγκεκριμένων διαδικασιών, κατά κανόνα διαγωνιστικών (αρθ.82,83), δ)με περιορισμούς ως προς τη χορήγηση προκαταβολών (αρθ. 84) και ε)ότι η παραβίαση των σχετικών διατάξεων συνεπάγεται την απόλυτη ακυρότητα της σύμβασης, προκύπτει το περιορισμένο της συναλλακτικής ελευθερίας του Δημοσίου και η έλλειψη απεριόριστης διακριτικής ευχέρειας επιλογής διαδικασίας σύναψης συμβάσεων εκ μέρους των διοικητικών οργάνων.

8. Οι αφορώσες εξοπλιστικά προγράμματα προμήθειες που εκτελούνται από το Υπουργείο Εθνικής Άμυνας διενεργούνται σύμφωνα με τις διατάξεις α)του ν.δ. 721/1970 (Οικονομική Μέριμνα και Λογιστικό Ε.Δ.) και β)του Π.Δ. 284/1989 (Προμήθειες, Έργα κλπ ΕΔ ), που τροποποίησε, συμπλήρωσε και μεταγλώττισε τις διατάξεις του ΠΔ 785/78. Οι σχετικές διατάξεις εξακολουθούν να εφαρμόζονται, κατά τον κρίσιμο χρόνο, κατ΄ εξαίρεση των κατά κανόνα ισχυόντων για τις κρατικές προμήθειες (αρθ. 113 ν.2362/95 περί δημόσιου λογιστικού, αρθ. 1 παρ. 5 ΙΙ και 5 παρ. 1 ν. 2286/195 για τις προμήθειες του Δημόσιου Τομέα, αρθ.2παρ.10 και αρθ. 3 παρ. 3 πδ 370/95 για τη προσαρμογή της ελληνικής νομοθεσίας στη περί προμηθειών κοινοτική οδηγία 93/36/ΕΕ-ΝΟΜΟΣ ,ΕΣ 57/2007/πράξη του IV Τμήματος με αναφορές σε νομολογία).

9. Αποδοχή της υποστηριζόμενης από την Αιτούσα άποψης περί μη εφαρμογής στην υπό κρίση περίπτωση των διατάξεων του αφορώντος στις προμήθειες των Ενόπλων Δυνάμεων θεσμικού πλαισίου συνεπάγεται παραδοχή της παρά τον νόμο σύναψης της σχετικής σύμβασης και της απόλυτης ακυρότητάς της.

10. Εν πάση περιπτώσει, η υπό κρίση σύμβαση νομίμως, συνήφθη κατά τις διατάξεις του πδ 721/70 (προβλέπει ούτως ή άλλως συνεργασία εν γένει συναρμοδίων υπουργείων) και του πδ 284/89, δεδομένου ότι η σχετική προμήθεια έγινε με τη φροντίδα του Υπουργείου Εθνικής Άμυνας (άρθ. 1 πδ 284/89) και εξυπηρετούσε, πλην άλλων, και ουσιώδεις και συγκεκριμένες ανάγκες των Ενόπλων Δυνάμεων (σχετικά βλ. έγγραφο ΓΕΕΘΑ Φ.231/56/400061/Σ.10/18.02.2003, ομοίως Φ.231/55/400042/Σ.6/04.02.2003 ,κ.υ.α. σχετικές με καθήκοντα προσωπικού ΕΔ (486/Β/2004), καθώς και με συνδρομή ΕΔ (960/Β/2004) με αναφορές, πλην άλλων, στο επιχειρησιακό κέντρο ΕΔ, τη Πολεμική Αεροπορία, το Πολεμικό Ναυτικό κλπ με

λεπτομέρειες ως προς την γενική και ειδική αποστολή τους), το μεν ως συναρμόδιου φορέα στην ασφάλεια των Ολυμπιακών Αγώνων (άρθρο 5 ν. 2833/2000),το δε ως εκ του νόμου αρμόδιου κύριου φορέα για τη διασφάλιση της εθνικής άμυνας ,αλλά και της τήρησης της δημόσιας τάξης και ασφάλειας σε περίπτωση κρίσης (ν.2292/95, ιδίως αρθ.1παρ.1,4 ,/ Εθνική Αμυνα-αρθ.3 παρ.1περ. ε-ιβ/ΚΥΣΕΑ- αρθ. 5 /Υπουργός Εθν. Άμυνας, αρθ. 11/Αρχηγός ΓΕΕΘΑ με αρμοδιότητες, κατά περίπτωση, συντονισμού, κατεύθυνσης και ελέγχου σωμάτων ασφαλείας σε συνδυασμό με τις διατάξεις του ν. 2800/2000 περί αναδιάρθρωσης του Υπουργείου Δημόσιας Τάξης που προβλέπουν τη συμμετοχή του τελευταίου στην εξασφάλιση της εθνικής άμυνας σε συνεργασία με τις ένοπλες δυνάμεις-αρθ. 1 περ. ε ).

11. Επισημαίνεται ότι, όπως και νομολογιακά έχει κριθεί (ΣτΕ-Ολ 1681/2005 με πλήρη παράθεση νομικού πλαισίου), η Διϋπουργική Επιτροπή Συντονισμού Ολυμπιακής Προετοιμασίας (ΔΕΣΟΠ) είχε χαρακτήρα υποβοηθητικό στο έργο του Πρωθυπουργού και οι εκδιδόμενες κατά την ενάσκηση του έργου της αποφάσεις δεν συνιστούν εκτελεστές διοικητικές πράξεις. Εν όψει των ανωτέρω συνάγεται αναμφίβολα ότι η αρμοδιότητα του Υπουργού Εθνικής Άμυνας για τη διενέργεια της υπό κρίση προμήθειας προβλέπεται από τις σχετικές ειδικές περί ενόπλων δυνάμεων και εθνικής άμυνας διατάξεις, αβάσιμα δε η Αιτούσα επικαλείται σχετική απόφαση της ΔΕΣΟΠ και ισχυρίζεται, επιχειρώντας να προσδώσει έτσι κανονιστικό χαρακτήρα στην απόφαση της ΔΕΣΟΠ, ότι με την απόφαση αυτή καθιδρύθηκε αρμοδιότητα του Υπουργού Εθνικής Άμυνας για την, κατά απόλυτη και απεριόριστη διακριτική του ευχέρεια, διενέργεια της επίμαχης προμήθειας.

12. Κατά τη πάγια νομολογία των δικαστηρίων οι, κατά τις διατάξεις του πδ 284/89, συναπτόμενες συμβάσεις χαρακτηρίζονται ως διοικητικές συμβάσεις (ενδεικτικώς ΝΟΜΟΣ ΣτΕ 2497,1921,1855,1674/2008,ΕΣ/Πράξη IV Τμήματος 57/2007, αλλά και Ε. Σπηλιωτόπουλος, Εγχειρίδιο Διοικητικού Δικαίου, 2005, παρ.190, υποσημείωση 11) και οι διαφορές που γεννώνται από την εκτέλεσή τους είναι διοικητικές διαφορές ουσίας, αρμόδια δε για την επίλυσή τους, κατά τις διατάξεις του ν.1406/83,είναι τα Διοικητικά Εφετεία (ενδ. ΝΟΜΟΣ ΑΕΔ 19/2009,ΣτΕ 1348/2010,ΑΠ 1612,1780/2009).

13. Κατά τη θεωρία και τη νομολογία, οι προϋποθέσεις για τον χαρακτηρισμό μιας σύμβασης ως διοικητικής είναι οι ακόλουθες : α) το ένα αντισυμβαλλόμενο μέρος είναι το Δημόσιο ή ν.π.δ.δ. , β) με τη σύναψη της σύμβασης επιδιώκεται η ικανοποίηση σκοπού δημοσίου συμφέροντος και γ) το Δημόσιο ή το ν.π.δ.δ., είτε βάσει του κανονιστικού καθεστώτος που διέπει τη σύμβαση, είτε βάσει ρητρών που προβλέπονται κανονιστικώς και έχουν περιληφθεί στη σύμβαση και που αποκλίνουν από το κοινό δίκαιο, βρίσκεται, προς ικανοποίηση του σχετικού

σκοπού, σε υπερέχουσα θέση απέναντι στο αντισυμβαλλόμενο μέρος, δηλ. σε θέση μη προσιδιάζουσα στον δυνάμει του ιδιωτικού δικαίου συναπτόμενο συμβατικό δεσμό (ενδ. Επ. Σπηλιωτόπουλου, Εγχειρίδιο Διοικητικού Δικαίου, 2005, παρ. 186,187,ΑΕΔ 19/2009 με παραπομπή στη πάγια νομολογία). Επισημαίνεται ότι οι πρόσφατες αποφάσεις του ΑΕΔ έτους 2009 δεν διαφοροποιούν καθόλου τη σχετική προγενέστερη πάγια νομολογία, ούτε εισάγουν νέα κριτήρια για τον χαρακτηρισμό μιας σύμβασης ως διοικητικής .

14. Η υπό κρίση σύμβαση, είναι αναμφίβολα διοικητική, αφού το Δημόσιο είναι το ένα αντισυμβαλλόμενο μέρος, η σύμβαση εξυπηρετεί πρόδηλο δημόσιο σκοπό (ειδικό εξοπλιστικό πρόγραμμα προμήθειας συστημάτων υποδομής στα πλαίσια ασφάλειας κατά τη διάρκεια, αλλά και μετά τη λήξη, των Ολυμπιακών Αγώνων 2004), διέπεται δε από το εξαιρετικό κανονιστικό πλαίσιο του πδ 284/89 ( ενδ. ΝΟΜΟΣ,ΕΣ 80/2007- πράξη VI τμήματος, ΣτΕ 288/2010, 1921/2008, 2497/2008,2498/2008, αλλά και προβλέψεις περί αποκλειστικής ρύθμισης μεθόδων και διαδικασιών προμηθειών ΕΔ/ αρθ. 1,υποχρεωτικών πάγιων όρων/αρ.27, εγγυοδοσίας/αρ. 29,προσφορών και αντισταθμιστικών ωφελημάτων/αρ.30, ενστάσεων/αρθ. 34, υπογραφής σύμβασης και κατάθεσης εγγυητικής επιστολής καλής εκτέλεσης, αλλά και υποχρεωτικής έκπτωσης και επιβολής κυρώσεων /αρθ.36, ποινικών ρητρών/42, έκπτωσης, υποχρεωτικής μάλιστα μετά πάροδο 6μήνου- ακυρότητας και ανεκτέλεστου διοικητικών μεταγενέστερων αποφάσεων ευνοϊκών για προμηθευτή-αθροιστικής ή διαζευκτικής επιβολής κυρώσεων/ αρθ. 43,απαγόρευσης εκχωρήσεων/αρθ. 45, χορήγησης προκαταβολής και έντοκης επιστροφής/ αρθ. 46, αναγκαστικής είσπραξης δικαιωμάτων δημοσίου/ αρθ. 47,τροποποίησης όρων συμβάσεων/αρθ. 66, επίλυσης διαφορών/αρθ. 69 ).

15. Το άρθρο 94 παρ. 1 του Συντάγματος προβλέπει ότι η εκδίκαση των διοικητικών διαφορών ουσίας ανήκει στα υφιστάμενα τακτικά διοικητικά δικαστήρια. Με την απόφαση 24/1993 ΑΕΔ κρίθηκε ότι η προαναφερθείσα συνταγματική διάταξη, κατά την αληθή της έννοια, δεν απαγορεύει στον κοινό νομοθέτη να επιτρέψει στη Διοίκηση και στον φορολογούμενο να υπάγουν, με συμφωνία τους, σε διαιτησία συγκεκριμένη φορολογική διαφορά ή φορολογικές διαφορές που θα προέλθουν από ορισμένη έννομη σχέση. Μετά την έκδοση της σχετικής απόφασης γίνεται πάγια δεκτό, κατά τη θεωρία και τη νομολογία, ότι η υπαγωγή διοικητικής διαφοράς ουσίας σε διαιτησία είναι επιτρεπτή, εφόσον υφίσταται σχετική εξουσιοδοτική διάταξη και ,με βάση αυτή την διάταξη, συναφθεί σχετική διοικητική σύμβαση περιέχουσα διαιτητική ρήτρα ή, σε περίπτωση απουσίας σχετικής νομοθετικής εξουσιοδότησης, εφόσον η, περιέχουσα διαιτητική ρήτρα, σχετική διοικητική σύμβαση κυρωθεί στη συνέχεια με νόμο (ενδ. Ε. Σπηλιωτόπουλου ,Εγχειρίδιο Διοικητικού Δικαίου, 2005, παρ.198, 492 περ. δ,612, Θ. Φορτσάκης, Διαιτησία και Διοικητικές

 

Διαφορές, 1998, ιδίως παρ. 196, ΣτΕ 752/2008,3300/2002,3105/2000,889/1994 με περαιτέρω σκέψεις ως προς την εξουσία των διαιτητικών δικαστηρίων, το περιεχόμενο και τη δεσμευτικότητα των αποφάσεών τους, αλλά και την υποχρέωση των διοικητικών δικαστηρίων, όταν δικάζουν διοικητικές διαφορές να ερευνούν, σε περίπτωση προσαγωγής διαιτητικής απόφασης, αν το επιλυθέν με τη διαιτητική απόφαση ζήτημα υπαγόταν στη δικαιοδοσία του Διαιτητικού Δικαστηρίου).

16. Προκειμένου για την υπαγωγή των εν γένει διοικητικών διαφορών σε διαιτησία δεν υφίσταται σχετική νομοθετική πρόβλεψη, αντίστοιχη με τις προβλέψεις του ΚΠολΔ και του Εισαγωγικού του Νόμου , κατ΄ εφαρμογή των οποίων επιτρέπεται η εκ μέρους του Δημοσίου συνομολόγηση διαιτητικής ρήτρας, προκειμένου περί συμβάσεων ιδιωτικού δικαίου. Ο ν. 2735/1999 περί διεθνούς εμπορικής διαιτησίας, δεν αποτελεί την κατάλληλη νομική βάση για την, εκ μέρους του Δημοσίου, συνομολόγηση διαιτητικής ρήτρας προκειμένου περί διαφορών αναφυομένων από διοικητική σύμβαση, δεδομένης της αδυναμίας εννοιολογικής ταύτισης της εμπορικής και συνεπώς ιδιωτικού δικαίου διαφοράς με τη διοικητική και συνεπώς δημοσίου δικαίου διαφορά. Αν ο νομοθέτης επιθυμούσε να επιτρέψει την υπαγωγή σε διεθνή εμπορική διαιτησία και των διοικητικών διαφορών ουσίας που ανακύπτουν από τις εν γένει διοικητικές συμβάσεις, τότε ώφειλε να περιλάβει ρητή και συγκεκριμένη σχετική διάταξη στον προαναφερθέντα νόμο. Η απουσία σχετικής πρόβλεψης περί διαιτησίας για τις εν γένει διοικητικές διαφορές, τόσο στον Κώδικα Διοικητικής Δικονομίας, όσο και στον ν. 1735/1999, αποτελεί συνειδητή επιλογή του κανονιστικού νομοθέτη, ο οποίος, κατά περίπτωση, είτε ρυθμίζει το σχετικό ζήτημα για συγκεκριμένη κατηγορία διοικητικών συμβάσεων ( π.χ . ν. 1418/1984 για τα δημόσια έργα, αρθ. 14 περί διαιτητικής ρήτρας κατόπιν έκδοσης ειδικής απόφασης των ,κατά περίπτωση, συναρμοδίων υπουργών), είτε για συγκεκριμένη σύμβαση, επιλέγοντας την οδό της νομοθετικής κύρωσής της.

17. Εν όψει των προαναφερθέντων και δεδομένης της απουσίας νομοθετικής κύρωσης της ένδικης σύμβασης, ο εκ μέρους του Διαιτητικού Δικαστηρίου οφειλόμενος αυτεπάγγελτος έλεγχος για την ύπαρξη δικαιοδοσίας του (ΝΟΜΟΣ απόφαση 1/2004 Διαιτητικού Δικαστηρίου Βέροιας , Στ. Κουσούλης, Δίκαιο της Διαιτησίας,2006, σ.53-55,παρ. 60-63) πρέπει να επεκταθεί στην ερμηνεία των διατάξεων του κανονιστικού πλαισίου της( σύμβασης), προκειμένου να κριθεί αν αυτό αποτελεί νόμιμο έρεισμα συνομολόγησης της περιεχόμενης στη σύμβαση διαιτητικής ρήτρας.

18. Κατά την Αιτούσα, σε κάθε περίπτωση, το άρθρο 69 παρ. 7 του π. δ. 284/89 επιτρέπει τη συνομολόγηση ρήτρας διαιτησίας , προκειμένου περί συμβάσεων προμηθειών μείζονος σημασίας. Το άρθρο 69 του ως άνω διατάγματος ,με τίτλο

« Επίλυση διαφορών», προβλέπει ,για τη περίπτωση απόρριψης υλικού ή παραλαβής του με έκπτωση , παραπομπή του ζητήματος σε Επιτροπή Επίλυσης Διαφορών. Στη παράγραφο 7 ορίζονται τα ακόλουθα : «*Ειδικότερα για προμήθειες μείζονος σημασίας, ο τρόπος επίλυσης των διαφορών καθορίζεται από τη σχετική σύμβαση. Στην περίπτωση αυτή θα υπάρχει ανάλογη πρόβλεψη στους ειδικούς όρους της διακήρυξης του αντίστοιχου διαγωνισμού.*». Με το άρθρο 31 π.δ. 189/97 προστέθηκε στο άρθρο 69 νέα παράγραφος 8 που έχει ως εξής: «*Τυχόν έξοδα για εργαστηριακούς ελέγχους ή άλλες δαπάνες, που προκαλούνται στα πλαίσια της διαδικασίας επίλυσης διαφορών ,βαρύνουν το συμβαλλόμενο που αιτείται την παραπομπή της υπόθεσης στην Επιτροπή Επίλυσης Διαφορών.*».

*19.* Το πδ 284/89 τροποποίησε ,συμπλήρωσε και μεταγλώττισε το ,μέχρι την έκδοσή του εφαρμοζόμενο ,π.δ. 785/78,όπως αυτό τροποποιηθέν ίσχυε. Όπως προκύπτει από το προοίμιο των ως άνω π.δ/των και τα δύο εκδόθηκαν κατ΄ εξουσιοδότηση του άρθρου 50 παρ. 5 του ν.δ. 721/70 περί οικονομικής μέριμνας και λογιστικού των ενόπλων δυνάμεων. Στη σχετική παράγραφο περιέχεται αναφορά σε «διαιτησία» στις περιπτώσεις ν και φ, που προβλέπουν αντίστοιχα : « *ν. Ο τρόπος ελέγχου και παραλαβής, απορρίψεως προμηθειών, διαιτησίας, ως και η σύστασις ,ο σκοπός και η λειτουργία κεντρικών ή περιφερειακών επιτροπών παραλαβών, ελέγχου και διαιτησίας.*» και « *φ. Αι καταβαλλόμεναι αποζημιώσεις εις τους μετέχοντας στρατιωτικούς εν γένει, πολιτικούς υπαλλήλους και εις ξένα υπό την υπηρεσίαν πρόσωπα, εις επιτροπάς διενεργείας διαγωνισμών, πραγματογνωμοσύνης ,παραλαβών και διαιτησίας*». Παρατηρείται ότι, κατά τον χρόνο έκδοσης του ν.δ. 721/70, και προκειμένου περί προμηθειών της στρατιωτικής υπηρεσίας ίσχυε ο α.ν. 654/37,το άρθρο 16 του οποίου (Απόρριψη Προμηθειών-Διαιτησία )προβλέπει επιτροπή διαιτησίας, συμβουλευτικού χαρακτήρα περί καταλληλότητας απορριφθέντος υλικού και καταγνώσεως ποσοστού έκπτωσης τιμής παραλαβής. Στο άρθρο 69 του, μεταγενέστερου και κατ΄ εξουσιοδότηση της παρ. 5 αρθ. 50 ν.δ. 721/70 εκδοθέντος, π.δ. 785/78, με τον τίτλο επίσης «Διαιτησία», προβλέπεται επιτροπή διαιτησίας και παραπομπή στη «Διαιτησία» , προκειμένης απόρριψης υλικού ή παραλαβής του με έκπτωση. Στη παρ. 6 του ως άνω άρθρου που προβλέπει τα της συγκρότησης της Επιτροπής Διαιτησίας και ειδικότερα στο τελευταίο εδάφιό της προβλέπεται ότι: « *Ειδικώτερον δια προμηθείας εξ οίκων εξωτερικού μείζονος σημασίας η ως είρηται Επιτροπή συγκροτείται ως προβλέπεται υπό της οικείας συμβάσεως, δυναμένης να εξετάση και πάσαν διαφοράν περί την ερμηνείαν και την εκτέλεσιν της συμβάσεως.*».

*20.* Από την αυτοτελή και συνδυασμένη θεώρηση των προαναφερθεισών διατάξεων, κατά την ορθή τους ερμηνεία, προκύπτουν τα ακόλουθα :



α. Κατά τον χρόνο θέσπισης της εξουσιοδοτικής διάταξης της παρ. 5 του άρθρου 50 του ν.δ. 721/70( 251/Α/23.11.70), ο νομοθέτης του αναφέρεται στη «διαιτησία» και στις «επιτροπές διαιτησίας» κατά την έννοια των αντίστοιχων όρων του τότε ισχύοντος άρθρου 16 του α.ν. 654/37, δηλ. της διοικητικής επίλυσης διαφωνιών από τεχνικό συλλογικό όργανο, αποφαινόμενο επί συγκεκριμένων πραγματικών και τεχνικών ζητημάτων, συνδεομένων με τη παραλαβή ή όχι των υπό προμήθεια ειδών και όχι κατά την ,επίσης γνωστή στον νομοθέτη, έννοια της διαιτησίας ως τελεσίδικης επίλυσης οιασδήποτε διαφοράς που αναφύεται από την εκτέλεση σύμβασης προμήθειας με , έχουσα ισχύ δεδικασμένου, απόφαση διαιτητικού δικαστηρίου, κατ΄ αποκλεισμό των πολιτειακών δικαστηρίων (Ν.Δ. 633/70- 173/Α/21.08.70- περί ρήτρας διαιτησίας και συστάσεως διαιτητικού Δικαστηρίου με αναφορά στους κανόνες διαιτησίας του Διεθνούς Εμπορικού Επιμελητηρίου).

β. Υπό την προεκτεθείσα έννοια και με το ίδιο πνεύμα, ο νομοθέτης του π.δ. 785/78 θέσπισε τη διαδικασία διαιτησίας και της σχετικής επιτροπής διαιτησίας του άρθρου 69.Ανεξάρτητα δε από το εάν η σχετική πρόβλεψη για τις μείζονος σημασίας προμήθειες ,κατά το μέρος που επιτρέπει στην επιτροπή διαιτησίας την εξέταση και κάθε διαφοράς σχετικά με την ερμηνεία και την εκτέλεση της σύμβασης, έχει τεθεί κατά παράβαση ή όχι της σχετικής νομοθετικής εξουσιοδότησης, και πάλι η σχετική πρόβλεψη αναφέρεται σε διοικητική επίλυση διαφορών από συλλογικό όργανο και όχι σε διαιτητική επίλυση διαφορών από διαιτητικό δικαστήριο, αποφαινόμενο τελεσιδίκως και αμετακλήτως ,κατ΄ αποκλεισμό των καθ΄ύλη αρμοδίων πολιτειακών δικαστηρίων.

γ. Με το άρθρο 69 του π.δ. 284/89, ο νομοθέτης, συνεπής προς την σχετική εξουσιοδοτική διάταξη του ν.δ. 721/70, αντικαθιστά τους όρους « διαιτησία» και « επιτροπή διαιτησίας» με τους όρους « επίλυση διαφορών» και « επιτροπή επίλυσης διαφορών» και ρυθμίζει τη σχετική διοικητική διαδικασία προκειμένου, κατόπιν απόφασης (πρωτοκόλλου) του αντίστοιχου συλλογικού τεχνικού οργάνου, να αρθούν οι υφιστάμενες διαφωνίες - είτε μεταξύ Δημοσίου και προμηθευτή, είτε μεταξύ των μελών του αρμόδιου για τον έλεγχο και τη παραλαβή διοικητικού συλλογικού οργάνου - σχετικά με τα πραγματικά και τεχνικά ζητήματα που συνδέονται με τη παραλαβή και την έκπτωση τιμής των υπό παραλαβή ειδών. Η περιεχόμενη στη παράγραφο 7 ρύθμιση για τις περιπτώσεις προμηθειών μείζονος σημασίας , η οποία πλέον – σε αντίθεση με τη σχετική πρόβλεψη του π.δ. 785/78 - δεν αναφέρεται σε εξέταση διαφορών περί την ερμηνεία και την εκτέλεση της σύμβασης, προσθέτως δε θέτει ως προϋπόθεση ,για τον συμβατικό καθορισμό του τρόπου επίλυσης διαφορών , την ύπαρξη ανάλογης πρόβλεψης στους ειδικούς όρους της κανονιστικής πράξης της διακήρυξης του αντίστοιχου διαγωνισμού, ούτε επεκτείνει το αντικείμενο επίλυσης διαφορών σε άλλες κατηγορίες ζητημάτων, δηλ. πέραν των τεχνικών ζητημάτων που αναφέρονται στις προηγούμενες παραγράφους του ιδίου άρθρου, ούτε εξουσιοδοτεί τα όργανα της διοίκησης να συνομολογούν ρήτρα διαιτησίας. Η ρύθμισης της παρ. 7 έναντι των προηγουμένων παραγράφων του άρθρου 69 περιορίζεται σε διαδικαστικά ζητήματα, που - λόγω των ιδιαιτεροτήτων των τεχνολογιών αιχμής που συνήθως αφορούν οι μείζονος σημασίας προμήθειες - απαιτούν διαφορετική

εση ICC 16394/GZ

ψης υλικού ή
οπή Επίλυσης
*ιδικότερα για*
*αθορίζεται από*
*οόβλεψη στους*
ε το άρθρο 31
έχει ως εξής:
*προκαλούνται*
*βαλλόμενο που*
*ορών.».*

,μέχρι την
ίσχυε. Όπως
δόθηκαν κατ΄
οικονομικής
ή παράγραφο
προβλέπουν
*προμηθειών,*
*κεντρικών ή*
και *« φ. Αι*
*ούς εν γένει,*
*εις επιτροπάς*
*διαιτησίας».*
προκειμένου
.το άρθρο 16
ή διαιτησίας,
ς υλικού και
ρο 69 του,
ν.δ. 721/70
προβλέπεται
ς απόρριψης
άρθρου που
ικότερα στο
*ίας εξ οίκων*
*ροτείται ως*
*και πάσαν*

αφερθεισών

αντιμετώπιση για την διασφάλιση συναγωγής ορθών τεχνικών συμπερασμάτων (π.χ. περισσότερος του ενός μηνός χρόνος για την έκδοση του σχετικού πρωτοκόλλου, διαφορετική συγκρότηση και σύνθεση του τεχνικού οργάνου όπως με συμμετοχή σε αυτό περισσοτέρων μελών ή/και αλλοδαπών, ειδικά εξειδικευμένων τεχνικών εμπειρογνωμόνων, καθορισμός συγκεκριμένης τεχνικής διαδικασίας επανελέγχου).Η άποψη αυτή ενισχύεται από το γεγονός της μεταγενέστερης προσθήκης της παρ. 8 στο άρθρο 69, με την οποία προβλέπεται η ανάληψη του οικονομικού βάρους της διαδικασίας από το συμβαλλόμενο μέρος που ζητάει την παραπομπή της υπόθεσης στην Επιτροπή Επίλυσης Διαφορών. Αν η παρ. 7 περιείχε πρόβλεψη συνομολόγησης διαιτητικής ρήτρας, τότε - κατά λογική και συστηματική ακολουθία- η πρόβλεψη ανάληψης δαπάνης θα έπρεπε να παρεμβληθεί μεταξύ των παραγράφων 6 και 7 του άρθρου 69.Επισημαίνεται επίσης ότι οι εγκύκλιες οδηγίες του ΥΠΕΘΑ, έτους 1992,σχετικά με την εφαρμογή των διατάξεων του π.δ. 284/89 και ειδικότερα του άρθρου 69 περιορίζονται στην επισήμανση της ανάγκης συμμετοχής στις επιτροπές επίλυσης διαφορών του εκπροσώπου του εμποροβιομηχανικού κόσμου, χωρίς καμία αναφορά σε δυνατότητα συνομολόγησης διαιτητικών ρητρών.

δ. Κατά συνέπεια, η περιληφθείσα στη σύμβαση διαιτητική ρήτρα του άρθρου 28.3, που δεν αναφέρεται σε διαδικασία επίλυσης τεχνικών διαφορών, αλλά προβλέπει γενικά και αόριστα ότι: *« Κάθε αξίωση ή διένεξη που προκύπτει από ή σχετίζεται με την παρούσα ΣΥΜΒΑΣΗ ή την ερμηνεία της θα επιλύεται οριστικά από διαιτησία.....»*, συναφθείσα, παρά την ανυπαρξία σχετικής διάταξης που να προβλέπει τη δυνατότητα συνομολόγησής της, είναι μη νόμιμη και άκυρη ,λόγος για τον οποίο το Διαιτητικό Δικαστήριο στερείται δικαιοδοσίας για την επίλυση της ενώπιόν του αχθείσας διαφοράς και για τον οποίο η κρινόμενη αίτηση πρέπει να απορριφθεί.

## Ζ. <u>Η ΚΡΑΤΗΣΑΣΑ ΓΝΩΜΗ</u>

**(1)** Εν όψει των ανωτέρω η απόφαση του Διαιτητικού Δικαστηρίου ως προς την δικαιοδοσία του και ως προς την ένσταση του Καθού περί ελλείψεως δικαιοδοσίας του Διαιτητικού Δικαστηρίου (Διατακτικό, παράγραφοι 1 και 8) ελήφθη κατά πλειοψηφία σύμφωνα με το Άρθρο 25, παράγραφος 1 των Κανόνων Διαιτησίας του ICC και και το άρθρο 29 του ν. 2735/1999 η δε κρατήσασα αιτιολογία παρατίθεται στο Κεφάλαιο Δ της απόφασης.

**(2)** Ως προς τα λοιπά προδικαστικά ζητήματα (παράγραφοι 2-7 του Διατακτικού) η απόφαση του Διαιτητικού Δικαστηρίου ελήφθη ομόφωνα.

**(3)** Με την παρούσα Απόφαση δεν επιδικάζονται δικαστικά έξοδα επειδή η Απόφαση δεν είναι οριστική.

## ΓΙΑ ΤΟΥΣ ΛΟΓΟΥΣ ΑΥΤΟΥΣ

**1.** Το Διαιτητικό Δικαστήριο δέχεται ότι έχει δικαιοδοσία να κρίνει τις διαφορές που προκύπτουν από την μεταξύ των διαδίκων Σύμβαση No. 02ΟΑ/03 για την Προμήθεια του Συστήματος Ολυμπιακής Ασφαλείας C4I και Σχετικών Προϊόντων και Υπηρεσιών, με ημερομηνία 19 Μαΐου 2003 σύμφωνα με την συμφωνία (ρήτρα) διαιτησίας στο άρθρο 28.3, η οποία είναι έγκυρη σύμφωνα με τον ν. 2735/1999 και τα άρθρα 69 παρ.7, 71 παρ.1 και 73 παρ.1 του πδ 284/1989.

**2.** Η ένσταση της Αιτούσης για απαράδεκτο και εκπρόθεσμο των συμπληρωματικών απαντήσεων του Καθού και των ισχυρισμών του που περιέχονται σε αυτές απορρίπτεται.

**3.** Η αντένσταση της Αιτούσης για το απαράδεκτο της ένστασης συμψηφισμού που υπεβλήθη από το Καθού απορρίπτεται ως προς την βάση της περί υποκρυπτομένης ανταγωγής και ως προς την βάση μη προκαταβολής των σχετικών εξόδων Διαιτησίας. Η ένσταση συμψηφισμού κρίνεται παραδεκτή και το Διαιτητικό Δικαστήριο επιφυλάσσεται να κρίνει το ουσία βάσιμο ή μη με μελλοντική του απόφαση.

**4.** Το αίτημα της Αιτούσης για χωρισμό της ουσίας της υπόθεσης σε δύο στάδια, στο πρώτο εκ των οποίων να κριθεί η αποδοχή ή μη του Συστήματος C4I από το Καθού απορρίπτεται.

**5.** Το αίτημα του Καθού για αναστολή της διαδικασίας λόγω άσκησης ποινικών διώξεων απορρίπτεται.

**6.** Οι ενστάσεις του Καθού για έλλειψη νόμιμης εκπροσώπησης, ενεργητικής νομιμοποίησης άλλως έλλειψης εννόμου συμφέροντος της Αιτούσης απορρίπτονται.

**7.** Η ένσταση του Καθού περί απαραδέκτου της επίδικης αίτησης διαιτησίας και συναφούς έλλειψης δικαιοδοσίας του Διαιτητικού Δικαστηρίου λόγω μη τήρησης της γραπτής προδικασίας του άρθρου 28, παράγραφος 2 της επίδικης σύμβασης απορρίπτεται.

**8.** Η ένσταση του Καθού περί ακυρότητας της ρήτρας διαιτησίας στο άρθρο 28.3 της επίδικης σύμβασης και εντεύθεν έλλειψης δικαιοδοσίας του Διαιτητικού Δικαστηρίου απορρίπτεται.

9. Για όλα τα λοιπά αιτήματα περιλαμβανομένων και εκείνων που αφορούν δικαστικές δαπάνες από την παρούσα Απόφαση, το Διαιτητικό Δικαστήριο επιφυλάσσεται να εκδώσει μια ή περισσότερες αποφάσεις στο μέλλον.

Κρίθηκε και αποφασίστηκε στην Αθήνα (Ελλάς) στις 14 Ιουλίου 2011.

Αθήνα, Ελλάς
14 / Ιουλίου / 2011

**ΤΟ ΔΙΑΙΤΗΤΙΚΟ ΔΙΚΑΣΤΗΡΙΟ**

**Διονύσιος Κονδύλης**
Διαιτητής

**Στυλιανή Χαριτάκη**
Διαιτητής

**Γρηγόριος Ι. Τιμαγένης**
Πρόεδρος του Διαιτητικού Δικαστηρίου

ICC :

Internati
Commeı

Model L
Commeı

UNCITI

ΑΕΔ :

ΑΚ :

ΑΠ :

ΑΠ (Ολ

ΓΕΕΘΑ

ΔΕΣΟΠ

ΕΔ :

ΕΕΝ :

ΕισΝΚΠ

ΕλλΔνη

ΕΝΔ :

ΗΠΑ :

ΚΠολΔ :

Παράρτημα Α'

**Πίνακας Βραχυγραφιών**

| | |
|---|---|
| ICC : | Διεθνές Εμπορικό Επιμελητήριο |
| International Sales Commentary : | UN doc A/ CONF.97/5 |
| Model Law Commentary : | UN doc A/ CN.9/264/ 25 March 1995 |
| UNCITRAL : | United Nations Commission on International Trade Law |
| ΑΕΔ : | Ανώτατο Ειδικό Δικαστήριο |
| ΑΚ : | Αστικός Κώδικας |
| ΑΠ : | Άρειος Πάγος |
| ΑΠ (Ολομ.) : | Ολομέλεια Αρείου Πάγου |
| ΓΕΕΘΑ : | Γενικό Επιτελείο Εθνικής Άμυνας |
| ΔΕΣΟΠ : | Διϋπουργική Επιτροπή Συντονισμού Ολυμπιακής Προετοιμασίας |
| ΕΔ : | Ένοπλες Δυνάμεις |
| ΕΕΝ : | Εφημερίς Ελλήνων Νομικών |
| ΕισΝΚΠολΔ : | Εισαγωγικός Νόμος Κώδικα Πολιτικής Δικονομίας |
| ΕλλΔνη : | Ελληνική Δικαιοσύνη |
| ΕΝΔ : | Επιθεώρηση Ναυτιλιακού Δικαίου |
| ΗΠΑ : | Ηνωμένες Πολιτείες της Αμερικής |
| ΚΠολΔ : | Κώδικας Πολιτικής Δικονομίας |

ΚΥΣΕΑ :          Κυβερνητικό Συμβούλιο Εξωτερικών και
                 Άμυνας

Ν και ν :        Νόμος

ΝΔ ή νδ :        Νομοθετικό Διάταγμα

ν.π.δ.δ. :       Νομικό Πρόσωπο Δημοσίου Δικαίου

ΟλΑΠ :           Ολομέλεια Αρείου Πάγου

ΠΔ ή πδ :        Προεδρικό Διάταγμα

ΠολΔ :           Πολιτική Δικονομία 1834

ΣτΕ :            Συμβούλιο της Επικρατείας

Σύνταγμα :       Το Σύνταγμα της Ελλάδος

ΥΠΕΘΑ :          Υπουργείο Εθνικής Άμυνας

# ΔΙΕΘΝΕΣ ΕΜΠΟΡΙΚΟ ΕΠΙΜΕΛΗΤΗΡΙΟ

# ΔΙΕΘΝΕΣ ΔΙΚΑΣΤΗΡΙΟ ΔΙΑΙΤΗΣΙΑΣ

**Υπόθεση 16394/GZ**

Μεταξύ:

Της εταιρίας **SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**, όπως νόμιμα εκπροσωπείται και έχει την έδρα της στις Ηνωμένες Πολιτείες Αμερικής (1710 SAIC DRIVE, McLean, VA, 22102)

**ΑΙΤΟΥΣΑ**

- και -

Του **ΕΛΛΗΝΙΚΟΥ ΔΗΜΟΣΙΟΥ**, που εδρεύει στην Αθήνα όπως νόμιμα εκπροσωπείται από τον Υπουργό Οικονομικών και τον Υπουργό Προστασίας του Πολίτη (Ακαδημίας 68, 106 78 Αθήνα, Ελλάς)

**ΚΑΘΟΥ**

---

## ΑΠΟΦΑΣΗ ΕΠΙ ΤΩΝ ΠΡΟΔΙΚΑΣΤΙΚΩΝ ΖΗΤΗΜΑΤΩΝ

(που αναφέρονται στην παράγραφο 14 της από 21 Ιουλίου 2010 Πράξης Πλαισίου)

**(INTERIM AWARD)**

---

## ΠΕΡΙΕΧΟΜΕΝΑ

| | | Σελίς |
|---|---|---|
| **Α.** | **ΕΙΣΑΓΩΓΙΚΑ ΚΑΙ ΑΝΤΙΚΕΙΜΕΝΟ ΤΗΣ ΑΠΟΦΑΣΗΣ** | **1** |
| | | |
| **Β.** | **ΠΡΟΔΙΚΑΣΙΑ** | **5** |
| 1 – 2 | Στοιχεία παραγόντων διαιτησίας | **5** |
| | (1. Το Διαιτητικό Δικαστήριο) | **5** |
| | (2. Τα Εισαγωγικά Δικόγραφα) | **6** |
| | (3. Συγκρότηση του Διαιτητικού Δικαστηρίου) | **6** |
| | (4. Οι διάδικοι στην παρούσα Διαιτησία και οι πληρεξούσιοι δικηγόροι τους) | **7** |
| 3 | Πληρεξούσια / Εξουσιοδοτήσεις | **6** |
| 4 – 6 | Παραστάντες στην Ακροαματική Διαδικασία | **8-9** |
| 7 | Περάτωση διαδικασίας για τα Προδικαστικά | **9** |
| 8 | Η πιο πρόσφατη παράταση για την έκδοση απόφασης | **9** |
| | | |
| **Γ.** | **ΔΙΚΑΙΟΔΟΣΙΑ** | **9** |
| | 1. Σύνοψη | **9** |
| | 2. Η ρήτρα δικαιοδοσίας (και εφαρμοστέου δικαίου) | **10** |
| | 3. Η αμφισβήτηση της δικαιοδοσίας / Η εξουσία του Διαιτητικού Δικαστηρίου να κρίνει τη δικαιοδοσία του | **10** |

| | | Σελίς |
|---|---|---|
| | 4. Εφαρμοστέο δίκαιο | 10 |
| | 5. Το Σύνταγμα της Ελλάδος | 11 |
| | 6. Το νομοθετικό έρεισμα για την υπαγωγή ιδιωτικών διαφορών σε διαιτησία του ΚΠολΔ | 11 |
| | 7. Απόφαση ΑΕΔ 24/1993 για την υπαγωγή σε διαιτησία των διοικητικών διαφορών | 11 |
| | 8. Οι ισχυρισμοί των διαδίκων | 12 |
| | 9. Η αυτεπάγγελτη έρευνα του Διαιτητικού Δικαστηρίου | 12 |
| | 10. Διάκριση της ερμηνείας του άρθρου 1 του ν. 2735/1999 και της υπαγωγής σε αυτό από την ερμηνεία και υπαγωγή σε άλλες διατάξεις | 12 |
| | 11. Επί του διεθνούς ή μη χαρακτήρα της διαιτησίας | 13 |
| | 12. Επί του εμπορικού ή μη χαρακτήρα της διαιτησίας | 15 |
| | 13. Ο ν. 2735/1999 ως νομοθετικό έρεισμα για την έγκυρη σύναψη συμφωνιών διαιτησίας | 17 |
| | 14. Το κύρος της συμφωνίας διαιτησίας σύμφωνα και με το ΠΔ 284/1989 | 19 |
| | 15. Η απόφαση | 26 |
| | 16. Άλλα ζητήματα | 26 |
| | | |
| **Δ.** | **ΠΡΟΔΙΚΑΣΤΙΚΑ ΑΙΤΗΜΑΤΑ ΠΟΥ ΥΠΟΒΛΗΘΗΚΑΝ ΑΠΟ ΤΗΝ ΑΙΤΟΥΣΑ** | 26 |
| | 1. Επί του παραδεκτού ή μη των συμπληρωματικών απαντήσεων του Καθού | 26 |
| | 2. Επί του απαραδέκτου της ενστάσεως συμψηφισμού που υπεβλήθη από το Καθού (α)ως υποκρύπτουσας εκπρόθεσμη ανταγωγή και (β)λόγω μη προκαταβολής των εξόδων Διαιτησίας | 27 |
| | 3. Επί του χωρισμού της εξετάσεως της ουσίας της υπόθεσης σε δύο στάδια, στο πρώτο εκ των οποίων θα κριθεί η αποδοχή ή μη του Συστήματος C4I από το Καθού | 28 |
| | | |
| **Ε.** | **ΠΡΟΔΙΚΑΣΤΙΚΑ ΑΙΤΗΜΑΤΑ ΠΟΥ ΥΠΟΒΛΗΘΗΚΑΝ ΑΠΟ ΤΟ ΚΑΘΟΥ** | 29 |
| | 1. Το Αίτημα Αναστολής της διαδικασίας λόγω άσκησης ποινικών διώξεων | 29 |
| | 2. Αμφισβήτηση της νόμιμης εκπροσώπησης και ενεργητικής νομιμοποίησης άλλως του εννόμου συμφέροντος της Αιτούσης | 34 |
| | 3. Απαράδεκτο της Αίτησης Διαιτησίας λόγω έλλειψης γραπτής προδικασίας | 35 |
| | 4. Ακυρότητα της ρήτρας διαιτησίας και ως εκ τούτου έλλειψη δικαιοδοσίας του διαιτητικού δικαστηρίου | 37 |
| | | |
| **ΣΤ.** | **ΜΕΙΟΨΗΦΟΥΣΑ ΓΝΩΜΗ ΚΑΙ ΑΠΟΚΛΙΝΟΥΣΕΣ Ή ΣΥΜΠΛΗΡΩΜΑΤΙΚΕΣ ΑΙΤΙΟΛΟΓΙΕΣ** | 37 |
| | 1. Αποκλίνουσες και συμπληρωματικές αιτιολογίες του διαιτητού κ. Διονυσίου Κονδύλη | 37 |
| | 2. Μειοψηφούσα γνώμη και αποκλίνουσες ή συμπληρωματικές αιτιολογίες της διαιτητού Στυλιανής Χαριτάκη | 46 |
| | | |
| **Ζ.** | **Η ΚΡΑΤΗΣΑΣΑ ΓΝΩΜΗ** | 54 |
| | | |
| | **ΔΙΑΤΑΚΤΙΚΟ** | 55 |
| | **Παράρτημα Α** | 57 |
| | **Πίνακας Περιεχομένων** | |


